UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X

CITY OF SYRACUSE, NY, CITY OF SAN
JOSE, CA, CITY OF CHICAGO, IL, CITY OF
COLUMBIA, SC, EVERYTOWN FOR GUN
SAFETY ACTION FUND and EVERYTOWN
FOR GUN SAFETY SUPPORT FUND,

                     Plaintiffs,

                v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, REGINA
LOMBARDO, in her official capacity as Acting
Director of the Bureau of Alcohol, Tobacco,
Firearms, and Explosives, UNITED STATES
DEPARTMENT OF JUSTICE, and WILLIAM
BARR, in his official capacity as ATTORNEY
GENERAL, U.S. Department of Justice,

                   Defendants.

---------------------------------------- X

**CIVIL ACTION
DOCKET NO.:**

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## **INTRODUCTION**

1.      Today in America, anyone with a credit card and an address can go online and, without a background check, purchase a gun-building kit that can be used to create within hours a "ghost gun"—so called because the gun has no serial number and is untraceable.

2.      Such ghost guns are being used—in alarmingly rising numbers—to commit crimes and kill people in cities large and small all across the country.  As a top official of Defendant United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") acknowledged just this year, the use of ghost guns in crimes is "increasing significantly and rapidly."[1]

---

[1]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable, 60 Minutes* (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-

3.      The reason why:  Defendants ATF and United States Department of Justice ("DOJ") refuse to apply the clear terms of the Gun Control Act.  That federal law defines regulated "firearms" to include not only operable weapons but also their core building blocks—frames for pistols, and receivers for long guns—so long as those core building blocks are designed to be or may be readily converted into operable weapons.  *See* 18 U.S.C. § 921(a)(3).  Notwithstanding that statutory language, Defendants have declined to regulate unfinished ghost gun frames and receivers as "firearms," even though they are designed to be and may be readily converted into operable weapons.[2]

4.      Instead, Defendants have issued rules and letter determinations—continuing to this day—giving the green light to the unregulated sale of unfinished ghost gun frames and receivers.

5.      ATF's actions include an interpretive rule issued in 2015, embodied in ATF Ruling 2015-1[3] and related ATF statements regarding "Receiver Blanks.[4]

6.      They also include, starting in February 2015, several ATF letter determinations to Polymer80—a leading online seller of unfinished gun frames, receivers, and ghost gun kits.[5]

---

untraceable-weapons-criminal-cases-60-minutes-2020-05-10/ (quoting Thomas Chittum, ATF's assistant director of field operations).

[2]  "Unfinished" frames and receivers, as that term is used in this Complaint, are ones that are not regulated by ATF as firearms because they are solid in certain specified areas – *i.e.*, without drilling or machining in those areas—even though they are designed to be and are readily converted into operable weapons. "Unfinished" frames and receivers are colloquially referred to as "80%," meaning 80% complete—although that description is not formally recognized by the ATF and misdescribes their completeness.

[3]  ATF, Ruling 2015-1 (Jan 2, 2015), https://www.atf.gov/file/11711/download.

[4]  ATF, *Are there restrictions on who can purchase receiver blank?* [sic] (archived Sept. 5, 2015), https://web.archive.org/web/20150905203519/https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blank; ATF, *Are "80%" or "unfinished" receivers illegal?* (archived Sept. 5, 2015), https://web.archive.org/web/20150905204055/https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

[5]  Polymer80, Home (last visited Aug. 25, 2020), https://www.polymer80.com/; *see* https://www.polymer80.com/media/wysiwyg/porto/LegalDocs/P80_Product_Determination_Letters.pdf (letters).

Polymer 80's homepage prominently touts the ATF letters and 2015 rule as proof that its unfinished frames and receivers are allegedly legal.[6]  Polymer80's ghost guns are increasingly used throughout the country to commit violent crimes:  for example, of the 250 ghost guns recovered by Washington, D.C. police from 2017 through May 2020, over **80%** were manufactured by Polymer80.[7]

7.      ATF has come to this point by taking the arbitrary position, memorialized in its 2015 rule and letter determinations, that if a frame or receiver lacks drilling or machining and is "solid" in certain areas (as unfinished frames and receivers are) then it cannot be a firearm—full stop.[8]  That arbitrary position, which does not consider whether the frames and receivers are designed to be or may be readily converted into operable weapons—as unfinished frames and receivers clearly are—is contrary to the language, intent, and purpose of the Gun Control Act.  *See* 18 U.S.C. § 921(a)(3).

8.      ATF's current position also conflicts with its own past practice, as for many years ATF looked to the ease and speed with which a receiver could be turned into a functioning firearm, regardless of whether a receiver was unfinished or solid in certain areas.  ATF first reversed course without explanation in 2006 and then formalized its new, controlling reliance on specified "solidity" in 2015.

---

[6]  *Id.*

[7]  Complaint ¶ 1, *District of Columbia v. Polymer80, Inc.*, No. 2020 CA 002878 B (D.C. Super., filed June 24, 2020).

[8]   ATF, *Are "80%" or "unfinished" receivers illegal?* (last accessed Aug. 25, 2020)*,* https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (stating that receivers "in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA").

9.      Because ATF has determined that unfinished frames and receivers are not firearms subject to regulation under the Gun Control Act, gun-building kits including such frames and receivers used to create ghost guns are regularly shipped nationwide, without a background check, including to purchasers who would otherwise be prohibited from owning a firearm because of a prior felony or domestic abuse conviction, mental health history, or other disqualifying reasons.

10.     In just a few hours, and with no gun-building experience, the purchaser can turn a gun-building kit into a functioning pistol or even a semi-automatic rifle like the AR-15.  Indeed, companies like Polymer80 provide "how-to" instructions and videos showing the ease with which unfinished frames and receivers are converted into functioning weapons.[9]

11.     Such ghost guns lack serial numbers or any other identifying markings, which means they cannot be traced to their point of origin if they turn up at crime scenes.

12.     Defendants' approval of the unregulated sale of unfinished frames and receivers that can be readily converted into operable ghost guns has allowed the market for these dangerous, untraceable, and unregulated firearms to emerge and explode.

13.     Defendants also have unlawfully ignored a Petition for Rulemaking filed in December 2019 on behalf of Plaintiff Everytown for Gun Safety Action Fund ("Everytown Action Fund" and together with Everytown for Gun Safety Support Fund—"Everytown") (the "Petition," attached as Exhibit 1).  The Petition was recently joined by Plaintiff cities Syracuse, New York; San Jose, California; Chicago, Illinois; and Columbia, South Carolina (collectively "Plaintiff Cities")—all of which face immediate harm from the proliferation of ghost guns, as do cities across the United States.

---

[9] Polymer80, *How to* (last accessed Aug. 25, 2020), https://www.polymer80.com/how-to.

14.     The Petition calls on Defendants to implement the clear terms of the Gun Control Act and recognize that unfinished frames and receivers used to make ghost guns qualify as "firearms" under federal law and should be subject to the core federal regulatory requirements of having a serial number on every firearm and a background check on every commercial sale.

15.     Defendants' actions jeopardize public safety.  There is a direct causal connection between ATF's 2015 ruling and its letter determinations allowing the sale of unfinished frames and receivers (contrary to the Gun Control Act), and the harms that ghost guns are inflicting on cities, schools, and individuals across the country—including Plaintiff Cities as well as the Everytown Plaintiffs and their members and supporters.

16.     Defendants are fully aware that their position allows the sale of ghost gun frames, receivers, and kits without background checks or serial numbers, and that unregulated ghost guns are increasingly becoming the weapon of choice for violent criminals, gun traffickers, domestic abusers, dangerous extremists, and other prohibited persons.

17.     Foreseeably and predictably, the number of ghost guns showing up at crime scenes and in the hands of individuals prohibited by law from possessing firearms—including in Plaintiff cities—has jumped dramatically over the last few years.

    a.     As of 2019, as many as 30% of guns recovered by federal law enforcement agents in California were unserialized guns.[10]  California also was the site of the 2019 school shooting at Saugus High School, perpetrated by a student with a ghost gun, which left two students dead and three others shot and wounded, including Mia

---

[10]     Alain Stephens, *Ghost Guns Are Everywhere in California*, The Trace (May 17, 2019), https://www.thetrace.org/2019/05/ghost-gun-california-crime/.

Page-Tretta, a member of Plaintiff Everytown Action Fund, who was shot but survived.[11]

b.      Last year, Washington, D.C., saw a 364% increase in ghost gun recoveries, with law enforcement recovering 116 ghost guns in 2019, compared to just 25 in 2018; three of the ghost guns recovered in 2019 in Washington D.C. were involved in murders.[12]   As of the end of May 2020, Washington D.C. police had already recovered 106 ghost guns, on track to doubling the 2019 number.[13]

c.      In a recent interview with CBS's 60 Minutes, the Los Angeles County Sheriff reported that, over the last year, the number of ghost gun recoveries turning up in law enforcement investigations has increased by 50%.[14] That same 60 Minutes report found that "at least 38 states and Washington D.C. have seen criminal cases involving ghost guns."[15]

---

[11]  Dakin Andone, *The gunman in the Saugus High School shooting used a 'ghost gun,' sheriff says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html; Victoria Albert, *Santa Clarita high school shooter dies of injuries*, CBS News (Nov. 16, 2019), https://www.cbsnews.com/news/santa-clarita-shooting-nathaniel-berhow-saugus-high-school-shooter-dies-of-self-inflicted-gunshot-wound-today/.

[12]  Complaint for Violations of the Consumer Protection Procedures Act, *District of Columbia v. Polymer80, Inc.*, No. 2020 CA002878 B, at 8 (D.C. Super. Ct. June 24, 2020).

[13]  *Id.*

[14]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and are Virtually Untraceable*, 60 Minutes (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

[15]  *Id.*

d.    In Plaintiff City of Syracuse, New York, 25 ghost guns have been recovered by police in 2020 alone, a 30% increase over the prior year.[16]  In December 2019, a ghost gun was used in the shooting of a 6-year-old boy in Syracuse.[17]

e.    In Plaintiff City of San Jose, California, the police department estimates it has recovered dozens of ghost guns over the past several years.

f.    Plaintiff City of Chicago estimates that it recovered over three times as many ghost guns in 2019 as it did in 2018, and over seven times as many as it did in 2017.

g.    In May 2020, members of the far-right anti-government "boogaloo" movement used ghost guns to carry out premeditated attacks at the federal courthouse in Oakland, California and in Santa Cruz, California, murdering one Protective Security Officer and injuring another, and murdering a Santa Cruz Sheriff's Deputy.[18]  In both instances, the shooter used an untraceable privately assembled AR-15 style rifle with no manufacturer's markings.[19]

h.    In July 2020, in Snyder County, Pennsylvania, a domestic abuser murdered his former wife and a second individual using a homemade ghost gun pistol.[20]

---

[16] Ex. 4, at 1.

[17] *Id.* at 2; *see also* Douglass Dowty, *Schumer: 'Ridiculously easy' to curb Syracuse's spike in untraceable 'ghost guns' (List of crimes)*, Syracuse.com (Feb. 10, 2020), https://www.syracuse.com/crime/2020/02/schumer-ridiculously-easy-fix-to-syracuses-spike-in-untraceable-ghost-guns.html.

[18] Maura Dolan, Richard Winton, and Anita Chabria, *Suspect in killing of 2 Bay Area officers tied to right-wing 'boogaloo' group, prosecutors allege*, Los Angeles Times (June 16, 2020), https://www.latimes.com/california/story/2020-06-16/suspects-charged-killing-santa-cruz-cop-and-oakland-federal-officer.

[19] *Id.*

[20] John Beauge, *'Ghost Gun' used in shooting that killed two outside Snyder County restaurant*, Penn Live (Jul. 14, 2020), https://www.pennlive.com/crime/2020/07/ghost-gun-used-in-shooting-that-killed-two-outside-snyder-county-restaurant.html.

    i.      Earlier this month, in Massachusetts, a man with a longstanding history of violent gun use was arrested with two untraceable ghost guns in his apartment, along with 3000 rounds of ammunition, a DVD called "How to build your untraceable AR-15 at home," and a copy of Adolf Hitler's manifesto Mein Kampf.  He was not licensed to have firearms.[21]

18.    The COVID-19 pandemic has significantly exacerbated the proliferation of untraceable ghost guns produced without serial numbers or background checks.  Online sellers of gun-building kits have announced a "pandemic buying surge"[22] and "unprecedented order volume."[23]  By late March, at least 16 sellers reported shipping delays due to heavy demand[24]— and that number increased to 18 sellers reporting shipping delays as of mid-August.

19.    Applying the Gun Control Act to unfinished frames and receivers that are designed and readily converted to be operable weapons—as the statute compels—would assist ATF and other law enforcement agents (including those of Plaintiff Cities) in carrying out their mission to prevent and solve gun crimes.  Indeed, this is a change supported by ATF's own long-time former

---

[21]  Kevin Anderson and Kevin Rothstein, *AG: Winthrop man had untraceable ghost guns, ammo in apartment*, WCVB (Aug. 5, 2020), https://www.wcvb.com/article/ag-winthrop-massachusetts-man-had-untraceable-ghost-guns-ammo-in-apartment/33513995#:~:text=BOSTON%20%E2%80%94-,A%20Winthrop%20man%20had%20home%2Dbuilt%2C%20unregistered%20and%20untraceable%20%22,said%20at%20his%20arraignment%20Tuesday.

[22]  5DTactical (last accessed Aug. 25, 2020), http://web.archive.org/web/20200318191720/https://www.5dtactical.com/.

[23]  80 Percent Arms (last accessed Aug. 25, 2020), http://web.archive.org/web/20200318192729/https://www.80percentarms.com/

[24]  Tess Owen, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, Vice News (Mar. 27, 2020), https://www.vice.com/en_us/article/g5x9q3/people-are-panic-buying-untraceable-ghost-guns-online-in-the-coronavirus-pandemic.

Acting Director Thomas Brandon, who recently confirmed on national television that he thought ATF should reclassify ghost gun kits as firearms to protect public safety.[25]

20.    Defendants' failure to apply the Gun Control Act to unfinished frames and receivers, and the consequent exploding use of ghost guns, presents an immediate danger to public safety and cannot continue.  By this lawsuit, Plaintiffs seek to stop Defendants from implementing the Gun Control Act contrary to its terms.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this case arises under the Administrative Procedure Act ("APA"). This Court has remedial authority under the APA. 5 U.S.C. § 706.

22.    Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(e), because Plaintiff Everytown has its principal places of business in this District.

## PARTIES

23.    Plaintiff City of Syracuse, New York, is the fifth most populous city in the state, with over 150,000 inhabitants in the city and over 650,000 inhabitants in the greater metropolitan area.

24.    Law enforcement in the City of Syracuse has already recovered 25 ghost guns in 2020 alone.

---

[25]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and are Virtually Untraceable*, 60 Minutes (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

a.    According to crime data from the Syracuse City Police Department, there were 83 firearm murders from 2014 to 2018, approximately 17 per year.[26]  Firearms were used in 72 percent of all murders from 2014 to 2018.[27]  During the same period, there was an average of 111 shooting incidents involving injury per year.[28]

b.    From 2014 to 2018, there was an average of 92 robberies involving a firearm and 129 aggravated assaults involving a firearm per year.[29]

25.    Plaintiff City of San Jose, California is the tenth largest city in the United States with over 1,000,000 residents.

26.    The City of San Jose Police Department estimates it has recovered dozens of ghost guns over the last several years.

a.    According to the City of San Jose Police Department there were 4,561 violent crimes committed in 2019, including 34 homicides.[30]  In 2018, there were 4,444 violent crimes committed, including 28 homicides.[31]  Almost 70 percent of homicides in the state of California involve firearms.[32]

---

[26]  New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initative Crime Arrest, and Firarm Activity Report*, at p. 1901 (Jul. 1, 2020), https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf.

[27]  *Id.*

[28]  *Id.* at 1902.

[29]  *Id.* at 1901.

[30]  San Jose Police Department, *Official Crime Statistics* (updated Jul. 21, 2020), http://www.sjpd.org/crimestats/annual_crimestats.html.

[31]  *Id.*

[32]  The Crime Strategies Unit, Santa Clara County District Attorney's Office, *Crime in Santa Clara County – 2018*, at p. 6 (last accessed Aug. 25, 2020), https://www.santaclaraca.gov/home/showdocument?id=65240.

b.      According to data prepared by the Crime Strategies Unit of the Santa Clara County District Attorney's office, assaults with firearms in the city of San Jose have increased from 225 in 2006 to 507 in 2017.[33] San Jose robberies involving a firearm have increased from 240 to 403 incidents during the same time period.[34]

27.     Plaintiff City of Chicago, Illinois is the third-largest city in the United States with a population estimated to be 2,700,000 people.

a.      According to public reporting, from 2015-2019, there were an average of 2,106 people shot per year in Chicago.[35] As of August 17, 2020, there had already been 2,500 people shot in the city in 2020.[36]

b.      According to the most recent public data provided by the Chicago Police Department, there were 475 homicides in 2018, 84% of which involved guns.[37] In 2019, 441 of 495 homicides in Chicago were gun homicides.

28.     Plaintiff City of Columbia, South Carolina, located in Richland County, is the capital and second-largest city in the state, with a population of over 130,000 people.

a.      From 2014 to 2018, Richland County experienced approximately 340 firearm deaths per year, or 15.7 per 100,000 people.[38] According to Federal Bureau of Investigation Uniform Crime Reporting data, there were 16 murder and non-

---

[33] *Id.*

[34] *Id.*

[35]     Chicago    Tribune,    *Tracking    Chicago    shooting    victims*    (Aug.    17,    2020), https://www.chicagotribune.com/data/ct-shooting-victims-map-charts-htmlstory.html#rt=floating-rail.

[36] *Id.*

[37]     Chicago Police Department, *2018 Annual Report* (last accessed Aug. 25, 2020), at 56, https://home.chicagopolice.org/wp-content/uploads/2019/07/2018AnnualReport-05July19.pdf.

[38] Centers for Disease Control and Prevention. National Center for Health Statistics. Wide-ranging Online Data for Epidemiologic Research (WONDER) Underlying Cause of Death. A yearly average was developed using five years of the most recent available data: 2014 to 2018. Rates are age-adjusted.

negligent manslaughter offenses known to law enforcement in Columbia in 2018.[39]

Approximately 77% of homicides in South Carolina involve a firearm.[40]

29.     Each of the Plaintiff Cities has a strong interest in robust and proper implementation and enforcement of federal and state gun laws, including the Gun Control Act, which Defendants defy by not regulating unfinished ghost gun frames and receivers.

30.     Each of the Plaintiff Cities has a strong interest in ensuring that background checks are performed on all sales of firearms as required under federal and state law, which is interfered with and undermined by the easy availability of ghost guns, as described herein.

31.     Each of the Plaintiff Cities has a strong interest in ensuring that firearms do not end up in the hands of individuals prohibited by law from owning or possessing them, including those with felony convictions, domestic violence offenders, and others with dangerous histories; that interest is interfered with and undermined by the easy availability of ghost guns, as described herein.

32.     Each of the Plaintiff Cities has a strong interest in preventing and reducing shootings, other gun crime, and gun trafficking in its jurisdiction, which is interfered with and undermined by the easy availability of ghost guns, as described herein.

33.     Each of the Plaintiff Cities has a police force that works with Defendant ATF in joint efforts to combat and prosecute gun trafficking and gun crimes, including illegal activity involving ghost guns.

---

[39] FBI, *Offenses Known to Law Enforcement by City, 2018: South Carolina*, (last accessed Aug. 25, 2020), https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-8/table-8-state-cuts/south-carolina.xls.

[40] Centers for Disease Control and Prevention, *Fatal Injury and Violence Data*, , WISQARS Fatal Injury Reports, five-year average: 2014–2018 (last accessed Aug. 25, 2020), available at https://www.cdc.gov/injury/wisqars/fatal.html.

34.     Arrests by each of the Plaintiff Cities' police departments on firearms-related charges are at times referred to federal law enforcement for prosecution, to the extent federal law applies.

35.     Each of the Plaintiff Cities regularly recovers serialized crime guns that originated out of state, often in states with weaker gun laws, and have crossed state lines before being used in connection with criminal activity; and, on information and belief, many ghost guns that are recovered in Plaintiff cities also originate out of state.

36.     Each of the Plaintiff Cities and their police departments have a strong interest in being able to investigate and solve gun-related crimes and hold shooters accountable—an interest that is interfered with and undermined when criminals use guns that have no serial number and are untraceable.  Indeed, Defendant ATF itself explains on its website that firearms without markings or serial numbers make it difficult "to trace the firearm or determine its history, which hinders crime gun investigations and jeopardizes public safety."[41]

37.     Each of the Plaintiff Cities suffers economic injury from – and expends substantial sums of money to combat – gun crime, including gun trafficking, murders, shootings, and other firearm-related crimes.

38.     Each of the Plaintiff Cities expends substantial sums of money on emergency services associated with gun-related crime. Plaintiff Cities have suffered and will suffer economic injury, and have spent and will continue to spend significant amounts of money, because of criminal activity carried out with and connected to unregulated ghost guns, including increased law enforcement investigative and enforcement costs and emergency services costs.

---

[41]  ATF, *Can functioning firearms made from receiver blanks be traced?* (last reviewed Feb. 6, 2020), https://www.atf.gov/firearms/qa/can-functioning-firearms-made-receiver-blanks-be-traced.

39.     Defendants know or reasonably should know that by authorizing the unregulated sale of unfinished frames and receivers and enabling the massive growth of the ghost gun market—contrary to the requirements of the Gun Control Act—they have contributed to increases in the number of guns in the hands of prohibited persons and increases in gun violence and gun-related crimes, including in Plaintiff Cities.

40.     If Defendants regulated unfinished frames and receivers—as the Gun Control Act requires—the result would be to:  (a) reduce the number of firearms that end up in the hands of prohibited persons, including those who use ghost guns to commit crimes, in Plaintiff Cities; (b) reduce the ability of criminals and other prohibited persons to circumvent federal and state gun laws; (c) improve the ability of Plaintiff Cities' police departments to investigate and solve gun-related crimes; and (d) prevent and reduce future gun violence in Plaintiff Cities, including reducing the associated economic harm to and expenditures of funds of Plaintiff Cities as described above.

41.     Plaintiff Everytown Action Fund is a nonprofit membership corporation and the country's largest gun violence prevention organization.  Everytown has nearly six million supporters and more than 375,000 donors, including moms, mayors, survivors, students, and everyday Americans who are fighting for common-sense gun safety measures that can help save lives.[42]

42.     Plaintiff Everytown for Gun Safety Support Fund (the "Everytown Support Fund") is the education, research, and litigation arm of Everytown.  The Everytown Support Fund seeks to improve public understanding of the causes of gun violence and help to reduce it by conducting

---

[42] *Everytown for Gun Safety*, Home (last accessed Aug. 25, 2020), https://everytown.org/; *see also Moms Demand Action For Gun Sense in America*, Home (last accessed Aug. 25, 2020), https://momsdemandaction.org/about/.

groundbreaking original research, developing evidence-based policies, communicating this knowledge to the American public, and advancing gun safety and gun violence prevention in communities and the courts.

43. Mia Page-Tretta and her mother Tiffany Shepis-Tretta are members of Everytown Action Fund and volunteer with the Everytown Support Fund. Mia is a 15-year old student who was shot in the stomach by a ghost gun pistol during the mass shooting at Saugus High School in Santa Clarita, California, on November 14, 2019. Two of Mia's fellow students—15-year-old Gracie Anne Muelberger and 14-year-old Dominic Blackwell—were murdered in the attack. Two other students were wounded.

44. Although California law prohibited children under 21 from obtaining handguns, the Saugus shooter—who was also a student at the school—was only 16 years old. Law enforcement authorities believe he obtained the ghost gun from his father, who was legally prohibited from possessing firearms due to a prior psychiatric hold and had had his other weapons confiscated by law enforcement.[43]

45. Everytown and its members and supporters advocate for and educate about background checks on all gun sales, including by supporting and defending federal and state legislation to expand the universe of gun sales and transfers that require a background check.

46. Everytown and its members and supporters advocate for and educate about numerous policies that would keep guns out of the hands of persons with dangerous histories,

---

[43] Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable, 60 Minutes* (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/; Josh Cain, *Police continue investigating how father of California high school shooter obtained 'ghost gun'* (May 12, 2020), https://www.mercurynews.com/2020/05/12/lasd-continues-investigating-how-father-of-saugus-highs-shooter-obtained-ghost-gun/.

including by supporting and defending federal and state legislation to close various loopholes in federal and state laws (such as loopholes relating to domestic abusers).

47.    Everytown and its members and supporters advocate for and educate about "permit to purchase" laws, requiring individuals who seek to purchase a firearm to first obtain a permit from law enforcement or other government officials.

48.    Everytown and its members and supporters advocate for, educate the public about, and defend laws requiring people to turn in their firearms when they become legally prohibited from having them.

49.    All of the advocacy and education by Everytown and its members and supporters outlined herein has been and will continue to be undermined and impacted by Defendants' refusal to properly apply the Gun Control Act to unfinished frames and receivers used to make ghost guns, and the resulting ready availability of untraceable ghost guns that lack serial numbers and can be acquired without a background check.

50.    Defendants' actions have compelled Everytown to divert resources from other public advocacy, education, and litigation programs to address the violence caused by ghost guns.

51.    Defendant ATF is a component of DOJ.  ATF states that its mission is to "protect [] the public from crimes involving firearms, explosives, arson, and the diversion of alcohol and tobacco products; regulate[] lawful commerce in firearms and explosives; and provide[] worldwide support to law enforcement, public safety, and industry partners."[44]

52.    Defendant Regina Lombardo is the Acting Director of ATF.  She is sued in her official capacity.

---

[44]  ATF, *About ATF* (last accessed Aug. 25, 2020), https://www.atf.gov/about.

53.    Defendant DOJ is an executive agency within the federal government of the United States.

54.    Defendant William Barr is the Attorney General of the United States.  He is sued in his official capacity.  The Attorney General has authority under 18 U.S.C. § 926(a) to prescribe rules and regulations for carrying out the provisions of the Gun Control Act.  The Attorney General has delegated the responsibility to investigate, administer, and enforce the provisions of the Gun Control Act to ATF.  28 C.F.R. § 0.130(a)(1).

## FACTUAL ALLEGATIONS

### A.    Ghost Gun Basics

55.    Frames and receivers are the core building blocks of firearms—for pistols and semi-automatic rifles, respectively.

56.    In a pistol (such as a Glock 17), the frame provides the basic bottom outline of the gun, housing the trigger and the magazine, while providing a foundation for the slide and barrel (*i.e.*, the parts a bullet passes through when fired and from which cartridges are ejected).



57.     In a semi-automatic rifle like the AR-15, the receiver houses the trigger parts and magazine and attaches to other parts.



58.     Most ghost guns are made from "unfinished" frames and receivers—meaning frames and receivers that are "solid" and lacking in machine marking or drilling in certain specified areas (typically the fire control cavity or trigger area).  Unfinished frames and receivers are often

marketed as "80%" complete, meaning a buyer needs to do only a small percentage of the work—typically, drilling out certain parts—for the frame or receiver to be "finished" and then assembled into an operable firearm.

### B.    Statutory and Regulatory Framework

#### 1.    The Gun Control Act's Regulation of Firearms Includes Frames or Receivers Designed to or Readily Converted to Expel a Projectile

59.    In 1968, amid rising rates of violent crime and following several high-profile assassinations—including the killing of President Kennedy with a rifle ordered through the mail—Congress passed the Gun Control Act of 1968, which was landmark legislation to assert federal control over the manufacturing, distribution, purchase, and sale of firearms.

60.    One of the principal aims of the Act was to prevent individuals with felony convictions, minors, and persons with other dangerous histories to obtain mail-order firearms without any federal oversight or regulation.

61.    To achieve this aim, the Act mandated, among other things, that firearms dealers be federally licensed and that every firearm be stamped with a serial number so that law enforcement could trace the origin of the firearm if it ended up being used in a crime.

62.    To capture the full range of potentially untraceable firearms, the Act defined the term "firearm" to include not only complete, fully functional weapons, but also the weapon's core building block—the frame of a handgun, or the receiver of a long gun—so long as that building block was "designed to" or could "readily be converted" into a functional weapon.

63.    Specifically, the Act provides that:

> The term "firearm" means (A) any weapon (including a starter gun) which will or **is designed to or may readily be converted to** expel a projectile by the action of an explosive; (B) **the frame or receiver of any such weapon**; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3) (emphasis added).

64.     Because subparagraph (B) of § 921(a)(3) defines "firearm" to include the frame or receiver "of any such weapon" under subparagraph (A), a "frame or receiver" is a "firearm" under the Act if it is a component of a "weapon" that "[1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive."

65.     This is not just Plaintiffs' position, or the plain language of the statute; it is the position that Defendant DOJ has taken publicly before the federal judiciary.  In recent criminal litigation, DOJ stated that "nothing in § 921(a)(3)(B) limits receivers to only whole receivers . . . . The only limitation on the form of the receivers in subsection B is that they come from 'any such weapon' that is either designed to shoot or can readily be converted to do so.  That is, a receiver, even one in two or three pieces, that can readily be converted into a functioning gun with the addition of some other parts and [a] weld or two is a firearm."  Brief of the United States, *United States v. Wick*, No. 16-30176, 2017 WL 774210, at *29 (9th Cir. Feb. 22, 2017).

66.     Thus, individuals convicted of felonies, domestic violence offenders, minors, and other individuals with dangerous histories are prohibited from buying and possessing unfinished frames and receivers, just as they are prohibited from buying and possessing fully built firearms.[45]

67.     Anyone who manufactures or deals in frames or receivers must also be licensed by ATF.[46]

68.     A purchaser of a frame or receiver sold by a licensed dealer must undergo a background check.[47]

---

[45]  18 U.S.C. § 922(d), (g).

[46]  18 U.S.C. § 923(a).

[47]  18 U.S.C. § 922(t)(1).

69.     A frame or receiver that is not assembled into a functioning weapon when it is sold or shipped must be marked with identifying information just like a completed firearm, including a serial number.[48]

### 2. From at Least the 1980s, ATF's Statutory Interpretation Would Have Recognized Unfinished Ghost Gun Frames and Receivers as "Firearms"

70.     A longstanding federal regulation promulgated by ATF in 1968 provides the following definition of "firearm frame or receiver":

> Firearm frame or receiver.  That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.[49]

71.     The primary concern animating this definition was to clarify exactly which firearm component should be marked with the serial number and manufacturer name.  ATF has never applied this definition to delineate the scope of the unfinished frames or receivers that qualify as "firearms" under the Gun Control Act because they are designed or readily converted to be operable weapons.

72.     Dating back to at least the 1980s, sellers of firearms and firearm parts could learn whether ATF viewed particular "frames" or "receivers" as "firearms" under the Gun Control Act only by submitting a sample frame or receiver and requesting a "determination letter."

73.     ATF's early determination letters weighed the ease and speed with which a frame or receiver could be turned into a functioning firearm to determine whether the frame or receiver met the federal definition of a "firearm."  This approach was consistent with the Gun Control Act's

---

[48]  18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(2).

[49]  27 C.F.R. § 478.11.

language, which covers any frame or receiver that is "designed to" be or can "readily be converted" into a functional weapon.

74.     For example, in a 1983 determination letter, ATF determined that an AR-15 receiver sample was "identifiable as the receiver of a firearm.  It is basically complete except that the interior cavity has not been milled."[50]  The agency noted that the cavity itself was easy to mill in a relatively short amount of time:  "For test purposes, the interior of the sample was drilled out using a 5/8 inch drill and then finished with a 1/2 inch rotary file.  Approximately 75 minutes time was required to make the receiver functional."[51]  Therefore, ATF explained, "the unfinished receiver . . . is still a firearm subject to the [law]."[52]

75.     ATF repeated this analysis in a 1992 determination letter determining that an AR-15 receiver sample qualified as a firearm.[53]

76.     A decade later, in 2002, ATF again cited the time needed to finish an AR-15 lower receiver—75 minutes in that case—in determining that the receiver was a firearm.[54]

77.     In 2004, ATF similarly used the time needed to make a functioning firearm in determining whether a pistol frame constituted a firearm.  In that letter, ATF determined that a 1911-type pistol frame was a firearm even though slide rails had yet to be cut because "[a]lthough

---

[50]  Letter from Edward M. Owen, Jr., Chief, Firearms Technology Branch, ATF, to Henry A. Roehrich, SGW Incorporated (May 3, 1983).

[51]  *Id.*

[52]  *Id.*

[53]  Letter from Edward M. Owen, Jr., Chief, Firearms Technology Branch, ATF, to Robert Bower, Jr., Philadelphia Ordnance, Inc. (May 25, 1992).

[54]  Letter from Curtis H.A. Bartlett, Chief, Firearms Technology Branch, ATF, to Lane Browne, Mega Machine Shop, Incorporated (Dec. 27, 2002).

critical, this work can be completed in a minimal amount of time by a competent individual having the necessary equipment."[55]

### 3. Starting in 2006, ATF Apparently Shifted to An Unlawful Statutory Interpretation Exempting Unfinished Frames and Receivers from the Definition of "Firearm"

78.    In an April 2006 determination letter, ATF appeared to change course from its temporal approach without explanation, stating—without support from and contrary to the Gun Control Act—that it would determine whether a receiver constitutes a firearm based solely on whether the receiver is solid or contains pin holes or other machining in certain specified areas. Specifically, the letter advised that "an AR-15 type receiver which has <u>absolutely no machining performed in the area of the trigger/hammer recess</u> might not be classified as a firearm."[56]  The letter continued, "Such a receiver could have **all** other machining operations performed, including pivot pin and takedown pin hole(s) and clearance for the takedown pin lug, but must be completely solid and un-machined in the trigger/hammer recess area."[57]

79.    In other words, ATF indicated that that as long as the trigger group area of an AR-15 receiver is solid, and no holes or cavities have been drilled out, the receiver would not be considered a firearm, no matter whether it was (per the Gun Control Act) "designed to" be or "may readily be converted" into an operable weapon.

80.    In 2009, ATF letter determinations classified an AR-15-type receiver-casting as not a firearm where the fire-control cavity had not been milled and the fire-control component pivot-

---

[55]  Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF, to Robert Serva, Dan Wesson Firearms (Aug. 19, 2004).

[56]  Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF to Justin Halford (Apr. 24, 2006) (underlining in original).

[57]  *Id.* (bold in original).

pin holes had not been drilled.[58]  According to these letter determinations, a receiver was a firearm only if it "possessed either pivot pin holes or indexing marks for the firearm control components (trigger group), or, if any of the cavity for the trigger group has been milled . . . ."[59]

81.    These letters provided no justification for the apparent shift from a temporal approach to a "solidity" bright line.  Nor did they explain how the "solidity" test corresponded to the statutory definition of "firearm" in the Gun Control Act, which concerns whether a frame or receiver "is designed to or may readily be converted" into a firearm. 18 U.S.C. §921(a)(3).

### 4.    In 2015, ATF Memorialized in an Interpretive Rule Its Statutory "Solidity" Approach to Frames and Receivers

82.    In 2015, ATF memorialized into a public-facing, interpretive rule the rationale of its determination letters:  that machining (or drilling) in the trigger group distinguishes a firearm from an unregulated frame or receiver, meaning that a solid unfinished frame or receiver—even if designed to be and readily converted to a firing weapon—is not a "firearm."

83.    First, in January 2015, ATF issued Ruling 2015-1, which provided that machine shops are considered to be engaged in the business of manufacturing firearms when they sell unfinished receivers to customers and provide those customers access to equipment to finish the receivers and build a complete firearm.

84.    Ruling 2015-1 stated:  "Unlicensed individuals occasionally purchase castings or machined/molded or other manufactured bodies (sometimes referred to as 'blanks,' or '80% receivers') that have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers' under the Gun Control Act of 1968 (GCA) and implementing regulations." [60]

---

[58]  Letter from John R. Spencer, Chief, ATF, to Chris Coad, Ultra-Tech, Inc. (May 20, 2009).

[59]  Letter from John R. Spencer, Chief, Firearms Technology Branch, ATF, to Rick W. Miller, G&S Precision Machine (July 24, 2009).

[60]  ATF, Ruling 2015-1 (Jan 2, 2005), https://www.atf.gov/file/11711/download.

85.     Ruling 2015-1 then memorialized the "solidity" test, drawing a distinction between an unregulated receiver blank and a receiver classified as a firearm (and thus subject to the Gun Control Act) based on whether "minor drilling and machining activities in or on the fire control area or other critical areas" have been performed.[61]  The ruling did not seek to explain the change from ATF's prior temporal approach or reconcile the "solidity" approach with the statute it was purporting to interpret, which treats frames and receivers designed to be or readily converted into an operable weapon as firearms.

86.     Then, in or around June 2015, ATF elaborated on its interpretive rule through new statements on its website about "Receiver Blanks."[62]  With respect to "solidity," ATF provided:

> The ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm per the [Gun Control Act].[63]

87.     These two ATF actions in 2015, separately and collectively, established an interpretive rule that unfinished receivers and frames cannot be "firearms" if they are solid in certain specified areas—even if they are designed to be or are readily converted into functioning weapons.

---

[61]  ATF, Ruling 2015-1 (Jan 2, 2005), https://www.atf.gov/file/11711/download.

[62]     ATF, *Receiver Blanks* (archived Sept. 5, 2015), https://web.archive.org/web/20150905071514/https://www.atf.gov/qa-category/receiver-blanks; ATF, *Are there restrictions on who can purchase receiver blank?* [sic] (archived Sept. 5, 2015), https://web.archive.org/web/20150905203519/https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blank.

[63]     ATF, *Are "80%" or "unfinished" receivers illegal?* (archived Sept. 5, 2015), https://web.archive.org/web/20150905204055/https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal

**5.      ATF's Approach, Depicted**

88.      Under ATF's current approach, a frame or receiver exempt from federal regulation is substantially the same as a frame or receiver that is treated as a firearm and is subject to the federal firearms laws, with the only difference being whether certain holes or cavities are drilled out by the manufacturer or instead left for the purchaser to drill out with minimal effort.

89.      Stated pictorially, with respect to frames of handguns:



90.      With respect to receivers of long guns, such as AR-15s:



91.    Beginning in 2015 and continuing to today, ATF's website has included a similar graphic to illustrate the difference between an unfinished, unregulated AR-15 lower receiver and a complete, regulated AR-15 lower receiver:[64]

---

[64]    ATF, *Are "80%" or "unfinished" receivers illegal?* (last reviewed Aug. 25, 2020), https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.    (The AR-15 lower receiver houses the parts needed to fire, including the trigger cavity and magazine well, while the upper receiver attaches to the barrel. The upper receiver is not considered a firearm.).




Photos of receivers from ATF.gov.

92. Even though the receiver shown in those photos on the left has no purpose other than to be part of an operable firearm (and therefore, is "designed to" become part of a functioning weapon), and could, with minimal work, be turned into the major component of a firearm (and therefore "may readily be converted to" a fully functioning weapon), ATF's position is that the receiver is not a firearm because "the fire-control cavity area is completely solid and un-machined and [therefore] ha[s] not reached the 'stage of manufacture' which would result in the classification of a firearm to the [Gun Control Act]."[65]

### C. Defendants Have Enabled the Dramatic Expansion of the Ghost Gun Market

93. Fueled by ATF's greenlighting of unfinished ghost gun frames and receivers, there has been massive growth in recent years of the number of websites selling all the parts needed to build a firearm to anyone, anywhere, without any background check, and without any serial number.

---

[65] *Id.* (matching the "stage of manufacture" language from ATF Ruling 2015-1).

94.     A recent analysis uncovered 80 online sellers of such unfinished frames and/or receivers.[66]

95.     Through a single website, a person can purchase everything from an unfinished AR-15 lower receiver that, with minimal effort, can be finished into a lethal assault weapon; to an unfinished pistol frame that can quickly be turned into a ready-to-use handgun; to complete "kits" that include every part needed to make a functioning firearm.[67]

96.     Often these websites include or link to instructional materials and videos showing how easy it is to convert the unfinished frames and receivers into working weapons.[68] Such videos are also readily available online.

97.     Online sellers of ghost gun parts and gun-building kits often tout how easy it is to make a ghost gun. Unfinished frames and receivers are often marketed as "80%" complete, suggesting that a buyer needs to do only 20 percent of the work for the frame or receiver to be assembled into an operable firearm.[69]

98.     For example, Polymer80—a leading supplier of ghost gun frames, receivers and kits, whose name includes the "80%" concept—offers "Buy Build Shoot™ kits,"[70] as well as instructional manuals and videos for easily completing assembly.[71] A seller of an AK-47 build kit

---

[66] Everytown Research and Policy, *Untraceable: The Rising Specter of Ghost Guns* ("Ghost Gun Report") (May 14, 2020), at 12, https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 6.

[70] Polymer80, *Buy Build Shoot kits* (last accessed Aug. 25, 2020), https://www.polymer80.com/pistol-frames/buy-build-shoot-kits.

[71] Polymer80, *How To* (last accessed Aug. 25, 2020), https://www.polymer80.com/how-to.

announced that the kit was "one of the simplest processes to date."[72]  The seller helpfully provides a how-to video on the sale page demonstrating for buyers how to quickly assemble the weapon.[73]

99.     Another seller boasts that, with its AR-15 kit, "building time doesn't take too long. Within an hour or two, you should be breaking it in at the range."[74]

100.    The top five instructional videos posted on YouTube that give guidance on finishing a frame or receiver have been viewed over 3 million times.[75]

101.    Sellers not only provide all of the parts to construct a fully operational firearm, but frequently offer a jig as well.[76]  A jig is a device that fits around a frame or receiver and guides the drilling and milling necessary to finish the unfinished frame or receiver so that it is ready to be assembled into a functioning firearm.  The kits also often include the exact drill bits necessary to finish the frame or receiver.

102.    One website offering rifle- and pistol-building kits announces that its jig "makes it ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."[77]

103.    Another website states that its jig can be used to complete an unfinished receiver "in under 15 minutes with excellent results."[78]  All a buyer needs is a credit card, a file, and a drill—everything else comes pre-packaged.

---

[72]  Ghost Gun Report at 10.

[73]  *Id.*

[74]  *Id.*

[75]  *Id.*

[76]  *Id.*

[77]  *Id.* at 11.

[78]  *Id.*

104.    Below are two examples of common kits that anybody—from a felon to a high school student—can purchase on the internet.[79]





105.    Some sellers of ghost gun parts and gun-building kits expressly market their ghost guns by highlighting their value in skirting federal and state gun laws.[80]  For example:



RAW 7075 FORGING 80% AR15 LOWER RECEIVER WITH ENGRAVING

$75.00

★★★★☆2 Reviews

ENGRAVING

-- Select --

ENGRAVING POSITION

-- Select --

CERTIFIED CERAKOTE COATING (ADD 1 WEEK TO SHIP TIME)

---

[79]  *Id.* at 10, 15.

[80]  *Id.* at 13.

106.    Similarly, another seller's website boasts: "By the ATF's legal definition an 80% lower receiver is NOT a gun, as it is not a functional piece of equipment. As such it is not required to have a government registered serial number attached to it. R&B Tactical Tooling manufactures a tool kit that enables the average citizen to finish the remaining 20% of the machining process themselves. The finished product is a precision machined functional lower receiver with no serial number. *If they don't know you have it, they can't take it.*"[81]

107.    Numerous online sellers of ghost gun parts and gun-building kits trumpet ATF's rule on unfinished frames and receivers. Many of these sellers' websites include links directly to ATF's Q&As on receiver blanks. For example, 80 Percent Arms has text that explains that "an 80 percent lower receiver[] [is] viewed by the ATF as an unregulated hunk of metal" and links to ATF's Q&A page entitled "Are '80%' or 'unfinished' receivers legal?"[82] Another online seller, Modulus Arms, links to ATF Ruling 2015-1.[83]

**D.    Approved by ATF, Polymer80 is a Leading Online Seller Of Ghost Gun Frames, Receivers, and Kits**

108.    Polymer80 is one of the largest sellers of ghost gun parts and kits.

109.    According to a public filing made on June 24, 2020, Polymer80 claims to have annual sales of over $12 million.

110.    Consistent with its 2015 interpretive rule, starting in February 2015, ATF began issuing a series of letter determinations to Polymer80, stating its view that Polymer80's unfinished

---

[81]  R&B Tactical Tooling, *About* (last accessed Aug. 25, 2020), https://www.rbtacticaltooling.com/about/ (emphasis added).

[82]  80 Percent Arms, *80 Lower Jigs* (last accessed Aug. 25, 2020), https://www.80percentarms.com/80-jigs/.

[83]  Andy, Modulus Arms, *ATF Clarifies Previous Ruling Regarding 80% Lower Receiver Manufacturing Processes* (Jan 26, 2015), https://www.modulusarms.com/news/atf-clarifies-previous-ruling-regarding-80-lower-receiver-manufacturing-processes-/.

frames and receivers are not firearms because they are solid and not drilled out or milled in certain specified areas.

111.    Polymer80 prominently features the February 2015 ATF determination letter on its website homepage, offering it as the answer to the question: "Is it legal?"[84]  Polymer80 further states:  "The Polymer80 G150™, RL556v3™ and PF-Series™ 80% Frames are well within the defined parameters of a 'receiver blank' defined by the ATF and therefore has not yet reached a stage of manufacture that meets the definition of firearm frame or receiver found in the Gun Control Act of 1968 (GCA)."[85]

112.    The February 2015 ATF determination letter linked to on Polymer80's homepage addressed an AR-15 receiver, which ATF erroneously determined was "NOT a firearm receiver, or a firearm"[86]—even though it was designed to be, and is readily converted into, an operable weapon and thus satisfies the statutory definition of a "firearm" in the Gun Control Act.

113.    Polymer80 received similar ATF determination letters from the Firearms Technology Industry Services Branch in November 2015 and January 2017, also available on Polymer80's website,[87] which again concluded—arbitrarily and contrary to statute—that an AR-10-type receiver blank and certain Glock-type blanks were not "sufficiently complete" to be

---

[84]    Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, INC. (Feb. 2015), https://www.polymer80.com/documents/AR15%20P80%20Determination%20Letter.pdf.

[85]    Polymer80, Home (last visited Aug. 25, 2020), https://www.polymer80.com/.

[86]    Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, INC. (Feb. 2015), https://www.polymer80.com/documents/AR15%20P80%20Determination%20Letter.pdf. (emphasis in original).

[87]    Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, INC. (Nov. 2, 2015), https://www.polymer80.com/media/wysiwyg/porto/LegalDocs/P80_Product_Determination_Letters.pdf; Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, Inc. (Jan. 18, 2017), https://www.polymer80.com/media/wysiwyg/porto/LegalDocs/2017-01_PF940C_ATF_Determination_Letter_Approval.pdf.

considered firearms under the Gun Control Act.  ATF reached this determination even though Polymer80's products clearly were designed to be, and were readily converted into, operable weapons.

114.    The November 2015 letter concluded that the submitted Glock 17-style frame was not a firearm because four machining operations or design features were "not yet present or completed" and included the below photographic depiction of ATF's conclusion that the white weapon in the photo was *not* a firearm:[88]



115.    The November 2015 ATF letter also included the below photo of an AR-10 "WARRHOGG" receiver that ATF determined was *not* a firearm because five specific machining operations or design features were "not yet present or completed":[89]

---

[88]    Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, INC. (Nov. 2, 2015), https://www.polymer80.com/media/wysiwyg/porto/LegalDocs/P80_Product_Determination_Letters.pdf (emphasis in original).

[89]    *Id.* (emphasis in original).



116.    The January 2017 ATF letter determined that a Glock-type frame identified as a "PF940C Blank" was "not sufficiently complete to be classified as the frame or receiver of a firearm" because six specified machining operations or design features were "not yet present or completed."[90]  The letter included the below picture illustrating ATF's conclusion that the weapon presented in this picture was *not* a firearm:



---

[90]    Letter from Michael R. Curtis, Chief, to Jason Davis, POLYMER80, Inc. (Jan. 18, 2017), https://www.polymer80.com/media/wysiwyg/porto/LegalDocs/2017-01_PF940C_ATF_Determination_Letter_Approval.pdf (emphasis in original).

117.    Based on these ATF determination letters, Polymer80 has for years represented to its customers that purchasing its unfinished frames and receivers and complete kits is legal, notwithstanding that (a) they are designed to be and can readily be converted to be operable firearms, yet (b) they are not stamped with serial numbers, and (c) no background checks are performed on the purchasers.

118.    To this day, Polymer80 continues to sell the same or substantially similar frames and receivers as referenced in the above-described ATF determination letters.

119.    In addition to Polymer80, sellers of ghost gun parts and gun-building kits that feature ATF letters on their websites as purported confirmation of legality include:  1911 Builders; Tactical Machining, LLC; Tennessee Arms Company, LLC; Glock Store; AR-15 Lowers; and Broken Armory.  Several sellers link to copies of the ATF letters sent to Polymer80, including: 5D Tactical, LLC; Arm or Ally; Ceratac; Hooper Gun Works; and MDX Arms.

**E.      ATF's Greenlighting of Ghost Guns, Including Those Offered By Polymer80, Has Created an Urgent and Growing Public Safety Emergency**

**1.      Ghost Gun Recovery From Crime Scenes Is Skyrocketing**

120.    The number of ghost gun recoveries at crime scenes has exploded nationwide in recent years.  For example, in California, ATF has stated that unserialized weapons now constitute as much as 30% of all crime guns recovered by federal agents in the state.

121.    Plaintiff Cities Syracuse, Chicago, and San Jose have also seen dramatic increases in the numbers of recoveries of ghost guns in recent years, as set forth in paragraphs 17(a), (c)-(f).

122.    Washington D.C. has seen a similar surge, as detailed above in paragraph 17(b).

123. Earlier this year, James VanVliet, the Acting Assistant Special Agent in Charge of ATF's office covering Virginia, Washington, D.C., and seven counties in West Virginia, stated that "we are seeing more privately made firearms recovered at crimes in the last 2 to 3 years."[91]

124. The Public Information Officer for ATF's Kansas City Field Division stated this summer that at least 50 ghost guns had been recovered in the Midwest, adding that "I'm certain that we'll see more recovered here."[92]

125. Public reports from the first months of 2020 show this trend continuing.

126. In January 2020, white supremacists planning anti-government actions in Virginia made their own fully automatic assault rifle.[93]

127. In February 2020, a felon and member of the white nationalist group Patriot Front in Texas pleaded guilty to possession of three homemade assault rifles and one homemade pistol.[94]

128. Also in March 2020, a former Temple University football player was shot and killed in Philadelphia, Pennsylvania, after a late night fistfight by an antagonist wielding a ghost gun Glock-style handgun.[95]

---

[91] Andy Fox, *Demand increasing for ghost guns, ATF says*, Wavy.com (Jul. 2, 2020), https://www.wavy.com/news/national/demand-increasing-for-ghost-guns-atf-says/.

[92] Sarah Fili, *Untraceable 'ghost gun' trend growing nationwide, showing up in Omaha*, KETV.com (Jul. 1, 2020), https://www.ketv.com/article/untraceable-ghost-guns-trend-growing-nationwide-showing-up-in-omaha/33037078.

[93] Alain Stephens, *They Planned to Start a Race War. DIY Gun Kits Allowed them to Build an Arsenal*, The Trace (Jan. 23, 2020), https://www.thetrace.org/2020/01/white-supremacists-the-base-fbi-virginia-diy-ghost-gun/; *see United States v. Lemley*, 20-MJ-00192 (D. Md. Jan. 15, 2020).

[94] Plea Agreement, *United States. v. Cross*, 20-CR-00055 (S.D. Tex. Feb. 6, 2020).

[95] Joe Brandt, *Ex-Temple player from South Jersey was killed with unlicensed 'ghost gun,' cops say*, NJ.com (Mar. 14, 2020), https://www.nj.com/camden/2020/03/ex-temple-player-from-south-jersey-was-killed-with-unlicensed-ghost-gun-cops-say.html .

129.    In May 2020, a Tonawanda, New York, man used a homemade pistol in a drive-by shooting of a victim, then opened fire with a homemade AR-15 on police officers investigating the shooting, injuring one officer.[96]

130.    Also in May 2020, a convicted felon posted a photo of his homemade AR-15 on Instagram with hashtags that included "#watchoutwalmartimcoming," "#elpasostrong," and "#droplikeflys," clearly alluding to the August 3, 2020, mass shooting at an El Paso Walmart, for which the perpetrator has been charged with hate crimes by the federal government.[97]   The convicted felon was charged with possession of a semi-automatic AR-15-style rifle without a serial number, several semi-automatic AR-15-style pistols without serial numbers, and a fully automatic AR-15-style pistol without a serial number.

131.    In August 2020, in connection with a felony domestic violence arrest involving a gun violence restraining order (GVRO), San Jose police recovered a Polymer80 Glock 26 handgun that was used to violently threaten a woman; when the suspect was told that a GVRO would prevent him from getting his firearm back, he replied:  "Then I'll just build another one."

132.    On August 18, 2020, state and federal law enforcement in Hopewell, New York, arrested a man for criminal possession of a weapon, after finding in his vehicle a 9 mm semi-automatic pistol described as a ghost gun; the investigators and agents also seized from the man's home six assault rifles, two of which were untraceable ghost guns, two additional untraceable semi-automatic 9 mm ghost gun pistols; four rifles; three shot guns; numerous frames, receivers,

---

[96] Maki Becker, *DA: Suspect in police shooting accused of using 'homemade' guns in attacks*, The Buffalo News (May 27, 2020), https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html.

[97] Criminal Complaint, *United States v. Barron*, No. 20-CR-01506 (W.D. Tex. May 11, 2020); Indictment, *United States v. Barron*, No. 20-CR-01506 (W.D. Tex. July 8, 2020).

barrels, uppers and lowers in various states of assembly, along with tools and jigs used to complete firearms; multiple firearms silencers; and thousands of rounds of ammunition.[98]

133.    Not only are ghost guns increasingly being used in connection with crimes, but—predictably and unsurprisingly—they are too often the firearm of choice by those who are otherwise prohibited by law from obtaining or possessing a firearm.

134.    A review of over 100 federal prosecutions from 2010 to April 2020 involving ghost guns, representing over 2,500 ghost guns connected to criminal activity, shows that, in nearly half of the prosecutions reviewed, the defendants were prohibited from possessing any firearm and would not have passed a background check if one were required. [99]

135.    More than 1,300 ghost guns connected to criminal activity in these over 100 prosecutions were possessed, made, or sold by people prohibited from purchasing or possessing firearms, including felons, sex offenders, and domestic abusers.[100]

136.    These federal cases also show that ghost guns are frequently used by criminal organizations and drug traffickers to facilitate their crimes; over 1,300 ghost guns from these prosecutions were used or sold by criminal enterprises to facilitate crimes including gun trafficking, terrorism, and murder.[101]

---

[98]  Staff Report, *NYSP, Homeland Security find ghost guns in Ontario County; Hopwell man arrested on felony charges*, FingerLakes1 (Aug. 21, 2020), https://fingerlakes1.com/2020/08/21/nysp-homeland-security-find-ghost-guns-in-ontario-county-hopewell-man-arrested-on-felony-charges/.

[99]  Ghost Gun Report at 17.

[100]  *Id.*

[101]  *Id.*

**2.    Ghost Guns Made From Polymer80 Components Are Showing Up Increasingly At Crime Scenes Nationwide, Including In Plaintiff Cities**

137.    Predictably and foreseeably, with ATF's stamp of approval in hand, Polymer80 has become a leading online seller of ghost gun parts and gun-building kits that are showing up at crime scenes in significant numbers in cities across the country, including in the Plaintiff Cities.

138.    For example, of the estimated 48 ghost guns recovered by Syracuse since 2018, the Syracuse Police Department estimated that 45—or over 90%—were sold by Polymer80.  This includes a loaded Polymer80 ghost gun that Syracuse police recovered in July 2020 from an individual in possession of 12 grams of crack cocaine who was wanted for his role in two shooting incidents.

139.    In addition, as disclosed in a June 24, 2020 lawsuit against Polymer80 brought by the District of Columbia, over 200 of the ghost guns recovered in Washington, D.C. from 2017 through the end of May 2020 were sold by Polymer80—representing over 80% of the ghost guns recovered by the District of Columbia during that period.[102]

140.    In 2018 and early 2019, ATF undercover officers purchased at least three Polymer80 pistols (along with several unserialized AR-15s and a number of other firearms) from a Sacramento gun trafficker.[103]

141.    In September 2019, a man was shot and killed with a Polymer80 pistol in Honolulu, Hawaii, by an individual who did not have a permit to carry a gun and did not have the pistol registered as required by Hawaii law.[104]

---

[102]    Complaint for Violations of the Consumer Protection Procedures Act, *District of Columbia v. Polymer80, Inc.*, No. 2020 CA002878 B, at 8 (D.C. Super. Ct. June 24, 2020).

[103]    Criminal Complaint, *United States v. Savangsy*, No. 19-CR-00041, ¶¶ 52, 54  (E.D. Cal. Jan. 24, 2019).

[104]    Complaint, *State of Hawaii v. Miranda*, No. 1CPC-19-0001327 (Haw. Dist. Ct. Sept. 9, 2019).

142.    In March 2020, a known gang member with felony convictions for attempted armed robbery and intentionally discharging a firearm to cause great bodily injury was arrested in Oakland, California, with a Polymer80 ghost gun concealed under his waistband.[105]

143.    In June 2020, in Chicago, a Polymer80 pistol was seized by ATF for forfeiture.

144.    In July 2020, in Chicago, a felon suspected of gun trafficking was arrested by federal agents and found in possession of a Polymer80 pistol.[106]

145.    In July 2020, a Ventura County man with a felony conviction had a Polymer80 pistol seized during a probation search.[107]

146.    As noted above, in July 2020, in Snyder County, Pennsylvania, a domestic abuser murdered his former wife and a second individual using a homemade ghost gun pistol—a Polymer80.[108]

147.    In August 2020, a man was charged in Massachusetts after crossing states lines from Connecticut to deliver two ghost guns to undercover officers.  A search of his residence uncovered two additional completed Polymer80 Glock-type firearms, large capacity magazines, ammunition, and seven Polymer80 boxes.[109]

---

[105]  Criminal Complaint, *United States v. Moore*, No. 20-CR-00187, ¶ 11 (N.D. Cal. Apr. 21, 2020).

[106]  Criminal Complaint, *United States  v. Danuk*, No. 20-CR-00432, ¶ 8 (N.D. Ill. July 30, 2020); ATF, Official Notification Posted on August 25, 2020, https://web.archive.org/web/20200825210648/https://www.forfeiture.gov/pdf/ATF/OfficialNotification.pdf.

[107]  Staff Reports, *Loaded gun at felon's home spurs arrest, Oxnard cops say*, VC Star (Jul. 17, 2020), https://www.vcstar.com/story/news/local/communities/oxnard/2020/07/17/loaded-gun-felons-home-nets-arrest-oxnard-cops-say/5458597002/.

[108]  John Beauge, *'Ghost Gun' used in shooting that killed two outside Snyder County restaurant*, Penn Live (Jul. 14, 2020), https://www.pennlive.com/crime/2020/07/ghost-gun-used-in-shooting-that-killed-two-outside-snyder-county-restaurant.html.

[109]  Criminal Complaint, *United States v. McCarthy*, No. 20-CR-05126 (D. Mass. Aug. 5, 2020).

**F.      The Petition for Rulemaking**

148.    On December 11, 2019, in response to the urgent public safety crisis of the rapid proliferation of unregulated ghost guns being used in shootings and other crimes, Plaintiff Everytown submitted a Petition for Rulemaking to Defendants ATF and DOJ.

149.    The Petition urged these agencies to promptly engage in rulemaking to regulate unfinished frames and receivers and thereby prevent the continued spread of unserialized, untraceable firearms being sold in massive numbers without background checks.

150.    As explained above in paragraphs 70-71, the longstanding federal regulation promulgated by ATF defining "firearm frame or receiver"[110] is obsolete and not meaningfully applied by ATF to determine the applicability of the Gun Control Act in its determination letters or existing interpretive rule.

151.    ATF's existing regulatory definition has no utility for making determinations about whether a frame or receiver is a firearm or not.  For example, under the existing regulatory definition, as a federal court has found, even a finished AR-15 lower receiver cannot be deemed a "firearm" because an AR-15 lower receiver does not contain the bolt or breechlock of an AR-15 rifle.[111]

152.    The Petition proposed language amending this outdated and ineffectual definition of "firearm frame or receiver" in 27 C.F.R. § 478.11 to read as follows:

> Firearm frame or receiver.  That part of a firearm which provides housing for the trigger group, including any such part (1) that is designed, intended, or marketed to be used in an assembled, operable firearm, or (2) that, without the expenditure of substantial time and effort, can be converted for use in an assembled, operable firearm.

---

[110]  27 C.F.R. § 478.11.

[111]  Order, *United State  v. Rowold*, No. 18-CR-00387, at 10 (N.D. Ohio Dec. 18, 2019).

153.    This proposed definition, akin to ATF's temporal approach abrogated by its 2015 interpretive rule, reflects the statutory language of the Gun Control Act and appropriately applies to any unfinished frame or receiver that is designed and sold to be a functioning weapon, or that can be turned into a functioning weapon by a non-expert with widely available tools and without expending substantial time and effort.

154.    The proposed definition is also sufficiently precise to guide ATF in drawing a distinction between a frame or receiver that qualifies as a firearm and a firearm frame or receiver that is not designed to be part of a functioning firearm.

155.    Moreover, the proposed definition addresses the outdated focus on particular design features that do not apply to certain types of weapons.  Under the proposed definition, AR-15 lower receivers—and the lower receiver of other two-part receiver systems—would be covered because the definition does not limit receivers to those that provide housing for the (1) hammer, (2) bolt or breechblock, and (3) firing mechanism.

156.    Under the proposed rule, any person who wishes to buy a lower receiver or a complete build-your-own handgun kit would simply need to take the same basic steps to make a purchase that they would need to take to buy a complete firearm, including visiting a local gun dealer to undergo an instant background check.

157.    This procedure represents a very insignificant burden to hobbyists who enjoy building their own firearms, as 99 percent of Americans live within 10 miles of a gun dealer.[112]

158.    Federally licensed dealers already sell serialized lower receivers for those who wish to build their own firearms, and background checks are already conducted on these sales.

---

[112]    Everytown, *99% of Americans Live Within 10 Miles of a Gun Dealer* (Feb. 25, 2019), https://everytownresearch.org/99-americans-live-within-10-miles-gun-dealer/.

159.     This distribution method also ensures that every frame or receiver destined for conversion into an operable firearm will have a serial number, allowing for tracing and investigation if the weapon ends up being used in illegal trafficking or other criminal activity.

160.     One copy of the Petition was sent to Defendant DOJ and another to Defendant ATF.

161.     DOJ confirmed receipt of the copies of the petition in letters dated December 13, 2019[113] and December 17, 2019.[114]  Both letters (attached as Exhibit 2) stated that the petition would be reviewed and that "if a response or update is necessary it will be sent to you within 60 business days."

162.     On April 30, 2020, Everytown sent a follow-up letter urging ATF to respond to the Petition.

163.     Plaintiff City of Syracuse joined the Petition in its own letter/petition to Defendants ATF and DOJ dated July 29, 2020 (attached as Exhibit 3).

164.     Plaintiff City of Columbia, South Carolina joined the Petition in its own letter/petition to Defendants ATF and DOJ dated August 4, 2020 (attached as Exhibit 4).

165.     Plaintiff City of San Jose joined the Petition in its own letter/petition to Defendants ATF and DOJ dated August 11, 2020 (attached as Exhibit 5).

166.     Plaintiff City of Chicago joined the Petition in its own letter/petition to Defendants ATF and DOJ dated August 24, 2020 (attached as Exhibit 6).

167.     As of the date of this filing, no further response from Defendants to the Petition has been received by any of the Plaintiffs.

---

[113]  Correspondence ID No. 4366110.

[114]  Correspondence ID No. 4366915.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Arbitrary,
Capricious and Contrary to Law Agency Action – 2015 Interpretive Rule)

168.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

169.    In 2015, ATF issued an interpretive rule through Ruling 2015-1 and related statements on its website concerning "Receiver Blanks," whereby it set forth a binding interpretation of the statutory definition of "firearm" in the Gun Control Act.

170.    The 2015 rule was a final agency action.

171.    Pursuant to ATF's 2015 rule, gun frames and receivers are firearms covered by the Gun Control Act only when specified material is removed from the fire control cavity—*i.e.*, those areas are not solid in the designated ways.

172.    Under ATF's 2015 rule, unfinished or "80%" frames and receivers are never covered as "firearms" so long as they are solid—regardless whether they are designed to be and are readily converted into operative weapons.

173.    ATF's 2015 rule does not explain its deviation from ATF's prior temporal approach, which relied on the time and effort required to transform an unfinished frame or receiver into an operable weapon.

174.    Nor does ATF's 2015 rule indicate how it relates to or is consistent with the controlling definition of firearm in the Gun Control Act, under which unfinished frames and receivers are "firearms" if they are designed to be or readily can be converted to a working weapon.

175.    ATF's 2015 rule is arbitrary, capricious, and contrary to law.

176.    ATF's 2015 rule prevents ATF officials responsible for overseeing the licensing of firearms manufacturers and dealers from enforcing the provisions of the Gun Control Act against manufacturers and sellers of unfinished frames and receivers.

177.    ATF's 2015 rule also binds investigators by foreclosing the criminal investigation of individuals who unlawfully possess, receive, transport, sell, transfer, deal in, or manufacture unfinished frames and receivers.

178.    ATF's 2015 rule, and/or the language and reasoning therein, are regularly cited by ATF's letter determinations greenlighting ghost gun frames and receivers.

179.    Plaintiffs have been and will continue to be impacted and injured by ATF's 2015 rule.  Firearms assembled from unfinished receivers and frames are being purchased from websites that link to and rely on the ATF website pronouncements. After they are completed, these firearms have been used and/or foreseeably will be used in the future in connection with criminal activity, including in Plaintiff Cities in substantial and increasing numbers.

180.    ATF's 2015 rule should be vacated and declared unlawful, and Defendants should be enjoined from applying a definition of "firearm" that is contrary to the Gun Control Act, including any definition that permits unfinished frames and receivers from being treated as firearms if they are designed to be or readily can be converted to operable weapons.

### SECOND CLAIM FOR RELIEF
(Violation of the Administrative Procedure Act, 5 U.S.C.§ 706(2) Arbitrary, Capricious and Contrary to Law Agency Action – February 2015 Determination Letter to Polymer80)

181.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

182.    The determination letter issued to Polymer80 in or about February 2015 concerning an AR-15 receiver represents final agency action.  5 U.S.C. § 704.

-46-

183.    The determination in the February 2015 letter—that the referenced AR-15 receiver is not a "firearm" under federal law—was arbitrary, capricious and not in accordance with law, 5 U.S.C. § 706(2), including because it contravenes and fails to apply the Gun Control Act's definition of "firearm," which includes frames and receivers that are designed to be or readily can be converted to operable weapons.

184.    Polymer80 has used the February 2015 letter to sell AR-15 receivers and other unfinished frames and receivers since the time it was issued, including by featuring the letter prominently on its website.

185.    Plaintiffs have been and will continue to be impacted and injured by the February 2015 letter, as described above, including because firearms assembled from Polymer80 receivers and frames have been used and/or will in the future foreseeably be used in connection with criminal activity, including in Plaintiff cities in substantial and increasing numbers.

186.    The February 2015 determination letter should be declared unlawful and set aside, and Defendants should be enjoined from applying a definition of "firearm" to Polymer80 products that is contrary to that required by the Gun Control Act, including any definition that permits unfinished frames and receivers from being treated as firearms if they are designed to be or readily can be converted to operable weapons.

### THIRD CLAIM FOR RELIEF
(Violation of the Administrative Procedure Act, 5 U.S.C.§ 706(2) Arbitrary, Capricious and Contrary to Law Agency Action – November 2015 Determination Letter to Polymer80)

187.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

188.    The determination letter issued to Polymer80 in or about November 2015 concerning an AR-10 receiver and Glock-style frame represents final agency action.  5 U.S.C. § 704.

189.    The determination in the November 2015 letter—that the referenced AR-10 receiver and Glock-style frame are not "firearms" under federal law—was arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2), including because it contravenes and fails to apply the Gun Control Act's definition of "firearm," which includes frames and receivers that are designed to be or readily can be converted to operable weapons.

190.    Polymer80 has used the November 2015 letter to sell AR-10 receivers, Glock-style frames, and other unfinished frames and receivers since the time it was issued, including by featuring the letter prominently on its website.

191.    Plaintiffs have been and will continue to be impacted and injured by the November 2015 letter, as described above, including because firearms assembled from Polymer80 receivers and frames have been used and/or will in the future foreseeably be used in connection with criminal activity, including in Plaintiff Cities in substantial and increasing numbers.

192.    The November 2015 determination letter should be declared unlawful and set aside, and Defendants should be enjoined from applying a definition of "firearm" to Polymer80 products that is contrary to that required by the Gun Control Act, including any definition that permits unfinished frames and receivers from being treated as firearms if they are designed to be or readily can be converted to operable weapons.

## FOURTH CLAIM FOR RELIEF
(Violation of the Administrative Procedure Act, 5 U.S.C.§ 706 Arbitrary, Capricious and Contrary to Law Agency Action – January 2017 Determination Letter to Polymer80)

193.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.    The determination letter issued to Polymer80 in or about January 2017 concerning Glock-type frames represents final agency action.  5 U.S.C. § 704.

195.    The determination in the January 2017 letter—that the referenced Glock-type frames are not a "firearm" under federal law—was arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2), including because it contravenes and fails to apply the Gun Control Act's definition of "firearm," which includes frames and receivers that are designed to be or readily can be converted to operable weapons.

196.    Polymer80 and other online sellers of Polymer80 pistol frame gun-building kits have used the January 2017 letter to sell Glock-type frames and other unfinished frames and receivers since the time it was issued.  Polymer80 hosts the January 2017 letter on its site, to which four online sellers—Arm or Ally, Ceratac, MDX Arms, and Hooper Gun Works—link on their sale pages.

197.    Plaintiffs have been and will continue to be impacted and injured by the January 2017 letter, as described above, including because firearms assembled from Polymer80 receivers and frames have been used and/or will in the future foreseeably be used in connection with criminal activity, including in Plaintiff Cities in substantial and increasing numbers.

198.    The January 2017 determination letter should be declared unlawful and set aside, and Defendants should be enjoined from applying a definition of "firearm" to Polymer80 products that is contrary to that required by the Gun Control Act, including any definition that permits unfinished frames and receivers from being treated as firearms if they are designed to be or readily can be converted to operable weapons.

**FIFTH CLAIM FOR RELIEF**
(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1)
Unreasonable Delay – December 2019 Petition)

199.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

200.    The APA provides a right to petition for rulemaking.  5 U.S.C. § 553(e).

201.   At a minimum, the right to petition for rulemaking entitles a party to a reasoned response on the merits of the petition.  5 U.S.C. § 555(e).

202.   Such a response must occur "within a reasonable time."  5 U.S.C. § 555(b).

203.   The APA also authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

204.   Defendant Lombardo's ongoing failure to respond to Plaintiff Everytown's Petition filed in December 2019 constitutes unlawful withholding and/or unreasonable delay within the meaning of 5 U.S.C. § 706(1).

205.   Plaintiffs have been and will continue to be impacted and injured by the defendants' failure to act on the Petition, as described above, including because firearms assembled from unfinished receivers and frames are being purchased from websites that link to and rely on the ATF determination letters and website pronouncements and, after they are completed, these firearms have been used and/or will in the future foreseeably be used in connection with criminal activity, including in Plaintiff Cities in substantial and increasing numbers.

206.   Plaintiffs therefore seek an order directing Defendants to respond on the merits to the Petition no later than 30 days from the Order of this Court.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs request that this Court:

a)     Declare unlawful and set aside the 2015 rule;

b)     Declare unlawful and set aside the letter determinations to Polymer80 dated February 2015, November 2015, and January 2017;

c)     Enjoin Defendants from applying a definition of "firearm" that is contrary to the Gun Control Act, including any definition that permits unfinished frames and receivers from being treated as firearms if they are designed to be or readily can be converted to operable weapons;

d)      Declare that Defendants are in violation of the APA for failing to reasonably promptly respond to the Plaintiffs' Petition;

e)      Order the Defendants to respond to the Petition no later than 30 days from the Order of this Court;

IN ADDITION, Plaintiffs request that this Court:

a)      Award Plaintiffs their costs and attorneys' fees incurred in bringing this action; and

b)      Grant such other relief as this Court deems just and proper.

Dated: New York, New York          Respectfully Submitted,
       August 26, 2020

EVERYTOWN LAW

*/s/ Len Kamdang*
Eric Tirschwell
Len Kamdang
Aaron Esty*
Krystan Hitchcock*
450 Lexington Avenue, P.O. #4184
New York, New York 10024
Telephone:  (646) 324-8222

Daniel Grooms**
Elizabeth B. Prelogar**
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 776-2042

Kathleen Hartnett**
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:  (415) 693-2000

*Attorneys For Plaintiffs*

\*   *S.D.N.Y. admission application forthcoming*
\*\* *Pro Hac Vice application forthcoming*

-51-