From: (949) 310-0817  Origin ID: WDBA
Earl Griffith
BATFE: Firearms Technology Branch
244 NEEDY RD

MARTINSBURG, WV 25405



J141014020703262E

SHIP TO: (949) 310-0817      BILL SENDER
**Jason Davis**
**Davis & Associates**
**41593 Winchester Rd. Suite 200**
**Suite 300**
**Temecula, CA 92691**

Ship Date: 04JUN14
ActWgt: 1.5 LB
CAD: 104951464/INET3490

Delivery Address Bar Code

Ref #      Polymer 80

RMA #
Return Reason:

**RETURNS MON-FRI**
** 2DAY **

TRK#  **7900 0924 8244**
0221

**92691**
CA-US

522G3/A26D/F220



RETURN
SHIPPING
LABEL

recipient with information on the returns process, will be printed with the label(s).
the displayed buttons.

pel button under each label image above.

e conditions in the current FedEx Service Guide, available on fedex.com.FedEx will
kage, whether the result of loss, damage, delay, non-delivery,misdelivery,or
additional charge, document your actual loss and file a timely claim.Limitations
t to recover from FedEx for any loss, including intrinsic value of the package, loss of
er forms of damage whether direct, incidental,consequential, or special is limited to
overy cannot exceed actual documented loss.Maximum for items of extraordinary
struments and other items listed in our ServiceGuide. Written claims must be filed
within strict time limits, see current FedEx Service Guide.

EVAL. 302-384-46



*The Law Offices of*
# DAVIS & ASSOCIATES

41593 Winchester Rd. Suite 200, Temecula, CA 92591
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

RECEIVED
JUN 0 6 2014
F.T.B.
BY: .....................

June 4, 2014

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re:     **In re: POLYMER 80, INC.**

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture receiver
blanks. Specifically, we are asking for clarification as to whether the AR-type lower receiver
blank that my client intends to manufacture is a "firearm" as defined in 18 U.S.C. §921(a)(3) or a
merely a casting.

We have enclosed an exemplar P80 AR-15 type casting for your review and examination. The
following features are included on the AR-15 lower receiver blank:

- Magazine well;
- Magazine catch;
- Receiver extension/buffer tube;
- Pistol-grip area;
- Pistol-grip screw hole;
- Pistol-grip upper receiver tension hole;
- Pistol-grip tension screw hole;
- Bolt catch;
- Front pivot-pin takedown hole;
- Rear-pivot pin takedown hole.

Moreover, the submitted receiver blank is void of any indicators that designate or provide
guidance in the completion of the firearm. And, the sample is completely solid and un-machined
in the fire-control recess area and, accordingly, is not a "firearm" as defined in the GCA. But, in
an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco,
Firearms, and Explosives – Firearms Technology Branch.

ATF0202

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:  **In re: POLYMER 80, INC.**
June 4, 2014
Page 2

## DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq*., primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*., stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

> (B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).) Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver. A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver*. That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel. (The same definition appears in 27 C.F.R. §479.11.) "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

Assuming that a lower receiver is deemed a "frame or receiver" for licensing purposes, the statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver. Referring to ATF's definition in §478.11, an unfinished piece of metal is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components. The definition does not include raw materials that "would provide housing" for such components ". . . if further machined." Nor may it be said that such piece of metal "is . . . threaded at its forward portion" so that a barrel may be installed.

ATF0203

Re:     **In re: POLYMER 80, INC.**
June 4, 2014
Page 3

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.) Raw material requires further fabrication. The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).) The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).) The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).) Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation.*" (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.) The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a receiver in terms of whether it was "capable of accepting all parts" necessary for firing. Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b). The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).) The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled. He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire. Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540. Similar opinions were rendered by the Chief, ATF Firearms Technology

ATF0204

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:   **In re: POLYMER 80, INC.**
June 4, 2014
Page 4

Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF has taken differing opinions as to what extent raw material must be machined in order to be deemed a firearm.

In a 2002 determination, ATF stated the following about an unfinished lower receiver for an AR 15 that "by performing minor work with hand tools, this receiver can be assembled into a complete rifle." (Curtis H.A. Bartlett, Chief, Firearms Technology Branch, Oct. 22, 2002, 903050:RV.) The letter continues:

> The minor work includes:
> 1.  Drilling the holes for the takedown/assembly pins;
> 2.  Drilling the holes for the trigger and hammer pins;
> 3.  Drilling the holes for the magazine catch; and
> 4.  Drill and tap the holes for the pistol grip screw.
>     Our evaluation reveals that the submitted receiver can be readily converted to expel a projectile by the action of an explosive," and is, therefore, a firearm . . . .

The above assumes that the "can be readily converted" clause refers to a frame or receiver, when actually that clause refers to a *weapon* that can be so converted. A frame or receiver cannot, by itself, be converted to a weapon that expels a projectile. That would require the presence of all the other firearm parts, and even then the above machine work would be required, together with assembly.

By contrast, and more recently, ATF determined the following "unfinished AR15 lower" not to be sufficiently machined to constitute a frame or receiver:

> The FTB examination of your submission confirmed that machining operations have been performed for the following:
>
> • Magazine well;
> • Magazine catch;
> • Receiver extension / buffer tube;
> • Pistol grip;
> • Bolt catch;
> • Trigger guard;
> • Pivot pin and take down holes (drilled).

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:      **In re: POLYMER 80, INC.**
June 4, 2014
Page 5



The FTB examination found that this item, in its current condition, has not reached a
point in manufacturing to be classified as a "firearm" per the GCA definition, Section
921(a)(3).

(John R. Spencer, Chief, Firearms Technology Branch, November 19, 2012, 903050:MRC
3311/2012-1034.) (See also: 903050:MCP 3311/302035 (opining that a nearly identical polymer
receiver blank is not a firearm regulated by the GCA); 903050:AG 3311/2011-703; 903050:KB
3311/300863; 903050:KB3311/300862)

It is clear that the P80 casting does not provide housing for the "hammer, bolt or breechblock,
and firing mechanism." In this regard, the operations performed on the exemplar casting are
more akin to the later examination than the former. As such, it is our belief that the exemplar
casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification
on this point.

Thank you for taking the time to address this issue. We look forward to hearing from you.
Please let us know if you have any further questions or concerns. **When complete, please
return the submitted parts via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s/ *Jason Davis*

JASON DAVIS

From: (949) 310-0817
Earl Griffith
BATFE: Firearms Technology Branch
244 NEEDY RD

MARTINSBURG, WV 25405

Origin ID: WDBA



Ship Date: 04JUN14
ActWgt: 1.5 LB
CAD: 104951464/INET3490

J141014O2070326

SHIP TO: (949) 310-0817    **BILL SENDER**

**Jason Davis**
**Davis & Associates**
**41593 Winchester Rd. Suite 200**
**Suite 300**
**Temecula, CA 92691**

Delivery Address Bar Code

Ref #    Polymer 80

RMA #:
Return Reason:

**RETURNS MON-FRI**
** 2DAY **

TRK#   **7900 0924 8277**
0221

**92691**
CA-US

RETURN
LABEL



522G3/A26D/F220

1
2
3

recipient with information on the returns process, will be printed with the label(s).
the displayed buttons.

el button under each label image above.

U
n
m
fo
s
th
v

conditions in the current FedEx Service Guide, available on fedex.com.FedEx will
age, whether the result of loss, damage, delay, non-delivery,misdelivery,or
additional charge, document your actual loss and file a timely claim.Limitations
to recover from FedEx for any loss, including intrinsic value of the package, loss of
er forms of damage whether direct, incidental,consequential, or special is limited to
very cannot exceed actual documented loss.Maximum for items of extraordinary
truments and other items listed in our ServiceGuide. Written claims must be filed

within strict time limits, see current FedEx Service Guide.

ATF0207

4/6



*The Law Offices of*
# DAVIS & ASSOCIATES

41593 Winchester Rd. Suite 200, Temecula, CA 92591
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

EVAL.

302-663

RECEIVED

SEP 0 8 2014

F.T.B.

September 4, 2014

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Related to:
EVAL. 302-384 AG
302-385- AG

Re:     **In re: POLYMER 80, INC.**

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture receiver blanks. Specifically, we are asking for clarification as to whether the AR-type lower receiver blank named the G-150 that my client intends to manufacture is a "firearm" as defined in 18 U.S.C. §921(a)(3) or a merely a casting.

We have enclosed an exemplar P80 G-150 AR-15 type casting for your review and examination. The following features are included on the AR-15 lower receiver blank:

- Magazine well;
- Magazine catch;
- Receiver extension/buffer tube;
- Pistol-grip area;
- Pistol-grip screw hole;
- Pistol-grip upper receiver tension hole;
- Pistol-grip tension screw hole;
- Bolt catch;
- Front pivot-pin takedown hole;
- Rear-pivot pin takedown hole.

**The submitted G-150 receiver blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.** Finally, the sample is completely un-machined in the fire-control recess area and, accordingly, is not a "firearm" as

ATF0208

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: POLYMER 80, INC.**
September 4, 2014
Page 2

defined in the GCA. Nevertheless, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

## DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq*., primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*., stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

(B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).) Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver. A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver*. That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel. (The same definition appears in 27 C.F.R. §479.11.) "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

Assuming that a lower receiver is deemed a "frame or receiver" for licensing purposes, the statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver. Referring to ATF's definition in §478.11, an unfinished piece of metal is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components. The definition does not include raw materials that "would provide housing" for such components ". . . if further machined." Nor may it be said that such piece of metal "is . . . threaded at its forward portion" so that a barrel may be installed.

ATF0209

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: POLYMER 80, INC.**
September 4, 2014
Page 3

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.) Raw material requires further fabrication. The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).) The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition*. HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).) The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition*. HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).) Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation*." (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.) The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

### ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a receiver in terms of whether it was "capable of accepting all parts" necessary for firing. Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b). The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).) The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled. He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire. Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540. Similar opinions were rendered by the Chief, ATF Firearms Technology

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:   **In re: POLYMER 80, INC.**
September 4, 2014
Page 4

Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF has taken differing opinions as to what extent raw material must be machined in order to be deemed a firearm.

In a 2002 determination, ATF stated the following about an unfinished lower receiver for an AR 15 that "by performing minor work with hand tools, this receiver can be assembled into a complete rifle." (Curtis H.A. Bartlett, Chief, Firearms Technology Branch, Oct. 22, 2002, 903050:RV.) The letter continues:

> The minor work includes:
> 1. Drilling the holes for the takedown/assembly pins;
> 2. Drilling the holes for the trigger and hammer pins;
> 3. Drilling the holes for the magazine catch; and
> 4. Drill and tap the holes for the pistol grip screw.
>    Our evaluation reveals that the submitted receiver can be readily converted to expel a projectile by the action of an explosive," and is, therefore, a firearm . . . .

The above assumes that the "can be readily converted" clause refers to a frame or receiver, when actually that clause refers to a *weapon* that can be so converted. A frame or receiver cannot, by itself, be converted to a weapon that expels a projectile. That would require the presence of all the other firearm parts, and even then the above machine work would be required, together with assembly.

By contrast, and more recently, ATF determined the following "unfinished AR15 lower" not to be sufficiently machined to constitute a frame or receiver:

> The FTB examination of your submission confirmed that machining operations have been performed for the following:
>
> - Magazine well;
> - Magazine catch;
> - Receiver extension / buffer tube;
> - Pistol grip;
> - Bolt catch;
> - Trigger guard;
> - Pivot pin and take down holes (drilled).

ATF0211

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:  **In re: POLYMER 80, INC.**
September 4, 2014
Page 5

> The FTB examination found that this item, in its current condition, has not reached a
> point in manufacturing to be classified as a "firearm" per the GCA definition, Section
> 921(a)(3).

(John R. Spencer, Chief, Firearms Technology Branch, November 19, 2012, 903050:MRC
3311/2012-1034.) (See also: 903050:MCP 3311/302035 (opining that a nearly identical polymer
receiver blank is not a firearm regulated by the GCA); 903050:AG 3311/2011-703; 903050:KB
3311/300863; 903050:KB3311/300862)

It is clear that the P80 casting does not provide housing for the "hammer, bolt or breechblock,
and firing mechanism." In this regard, the operations performed on the exemplar casting are
more akin to the later examination than the former. As such, it is our belief that the exemplar
casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification
on this point.

Thank you for taking the time to address this issue. We look forward to hearing from you.
Please let us know if you have any further questions or concerns. **When complete, please
return the submitted parts via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s/ *Jason Davis*

JASON DAVIS

ATF0212



From: (949) 310-0817    Origin ID: WDBA
Earl Griffith
BATFE: Firearms Technology Branch
244 NEEDY RD

MARTINSBURG, WV 25405

**FedEx** Express

**BILL SENDER**

Ship Date: 04SEP14
ActWgt: 1.0 LB
CAD: 104951464/INET3550

EVAC.
302-663

Delivery Address Bar Code

SHIP TO: (949) 310-8817
**Jason Davis**
**Davis & Associates**
**41593 Winchester Rd.,**
**Suite 200**
**Temecula, CA 92591**

Ref #        Polymer 80 - G-150

RMA #:
Return Reason:

**RETURNS MON-FRI**
** 2DAY **

TRK#        7900 4794 5083
9221

92591
CA-US

522G1/CD84/8AC9

After printing this label
CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH
1  Fold the printed page along the horizontal line
2  Place label in shipping pouch and affix it to your shipment

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ATF0213



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV_
_25405_
www.atf.gov

903050:AG
3311/302384a

JAN 1 6 2015

Jason Davis, Esq.
The Law Offices of Davis & Associates
41593 Winchester Rd, Suite 200
Temecula, California  92591

Dear Mr. Davis,

This is in reference to two submitted items, AR-15 pattern receiver castings, along with
supporting correspondence recently received by the Firearms Technology Industry
Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).
You have submitted these items on behalf of your client, POLYMER 80, INC. (P80) for
classification under the Gun Control Act of 1968 (GCA).

In order to provide the most accurate classification of these items, we are requesting
additional information.  Please provide a comprehensive description of the manufacturing
process used to produce these items.

We thank you for your inquiry and look forward to our receipt of the requested
information.

Sincerely yours,

Michael R. Curtis
Acting Chief, Firearms Technology Industry Services Branch

ATF0214



*The Law Offices of*
# DAVIS & ASSOCIATES

41593 Winchester Rd. Suite 200, Temecula, CA 92591
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

February 3, 2015

Michael R. Curtis, Acting Chief
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re:     **In re: POLYMER 80, INC.**

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture receiver blanks.  Specifically, we write in reference to your letter dated January 16, 2015, requesting additional information.  In your letter you request "a comprehensive description of the manufacturing process used to produce these items."  Below is a description of the manufacturing process for the two submissions.

**Submission 1 (Two Stage Production):**

The initial submission from June 2014 was produced using a two process methodology and produced a blank with no indicators. This two stage process was designed to ensure the structural integrity of the final product.   Specifically, this was an essential process designed to eliminate the possibility of warping, malformation, dimension variation and prevent diminished product integrity caused during the curing process.  At the time of submission, without a final stabilization core, the overall dimensions, quality, and integrity of the final product would vary due to the thickness of the final blank and the inability of the center of the blanks to properly cure.  The development of a core permitted the manufacturer to ensure the products' integrity through the proper staged curing of the inner and outer portion of the blank via the following process.

The first stage consisted of manufacturing an inner core.  The core consists of features designed to ensure structural integrity of the product, including round features on the top and bottom of the core, which are present to hold the core in place in the injection mold during the second stage molding process.  Once produced in a mold, the core is allowed to cure prior to proceeding to the second stage, ensuring that the final product consistently maintains the proper dimensions and shape.  A depiction of the inner core is below:

ATF0215

Re:   **In re: POLYMER 80, INC.**
February 3, 2015
Page 2



The second stage of Submission 1 consists of manufacturing a casing around the core to produce a unibody blank. Specifically, the core was inserted into the injection mold machine and over-molded, flooding the interior of the part to create a solid blank unit. Because the inner core is made out of the same material as the outer casing it becomes bonded with the casing due to the heat of the exterior molten material. The final product functions as one piece with a greater structural integrity than other methods available at the time of submission.

The final product resulted in a blank with no indicators present as a result, the round features not being on the edge of the fire control pocket, and no indicators on the top to even indicate that a core is utilized.

**Submission 2 (One Stage Production):**

Re:     **In re: POLYMER 80, INC.**
February 3, 2015
Page 3

The second submission is produced in one single stage.  Specifically, the injection mold is a single shot, NO-CORE production method. There's never a core or "biscuit" used in the production of Submission 2.  At the moment the injection mold is closed, a single shot of molten material instantly fills the entire mold under pressure, which gives the unit its strength and retained shape.  The material utilized is a proprietary blend to achieve the unusual thickness of this unit without the need for inserts.

The final product results in a blank with no indicators.

Thank you for taking the time to address this issue.  We look forward to hearing from you. Please let us know if you have any further questions or concerns.  **When complete, please return the submitted parts via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s / *Jason Davis*

JASON DAVIS

From: (949) 310-0817　　　Origin ID: HMTA　
Jason Davis
Davis & Associates
41593 Winchester Rd.,
Suite 200
Temecula, CA 92591

J151015011403uv

SHIP TO: (949) 310-0817　　　**BILL SENDER**
**Michael Curtis**
**BATFE: Firearms Technology Branch**
**244 NEEDY RD**

**MARTINSBURG, WV 25405**

Ship Date: 03FEB15
ActWgt: 0.3 LB
CAD: 104951464/INET3610

Delivery Address Bar Code



Ref # Polymer 80 - G-150
Invoice #
PO #　　　RECEIVED
Dept #
FEB 0 5 2015
F.T.B.
BY: .................... THU - 05 FEB AA

** 2DAY **

TRK# 7728 0985 7671
0201

25405
WV-US

**SC WDBA**　　IAD



537J1/A1B3/EE48

### After printing this label:

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV
25405*
www.atf.gov

FEB 1 8 2015

907010:AG
3311/302385

Jason Davis, Esq.
The Law Offices of Davis & Associates
41593 Winchester Rd, Suite 200
Temecula, California 92591

Dear Mr. Davis,

This is in reference to your submitted item, an AR-15 pattern receiver casting kit, along
with supporting correspondence recently received by the Firearms Technology Industry
Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).
You have submitted this item (see photo, last page) on behalf of your client, POLYMER
80, INC. (P80) for classification under the Gun Control Act of 1968 (GCA).

As you are aware, FTISB has previously determined that an AR-15 type receiver casting
which is completely solid in the area of the trigger/hammer (fire-control) recess might not
be classified as a firearm. Such a receiver casting could incorporate all other features of a
functional firearm receiver, including pivot-pin and takedown-pin hole(s) and clearance
for the takedown-pin lug, but must be completely solid in the fire-control recess area.
We have determined that in order to be considered "completely solid in the fire-control
recess area," the takedown-pin lug clearance area must be no longer than .800 inch,
measured from immediately forward of the front of the buffer-retainer hole. In addition,
ATF has held that "indexing" of the fire-control area, to include molding a polymer
receiver in stages instead of as a single (homogenous) piece, is sufficient to require
classification as a firearm receiver.

Our examination of the submitted item confirmed that the receiver casting has been cast
from black polymer, and includes several features of a complete AR-15 type receiver,
including a takedown pin hole and clearance for the takedown-pin lug. Our examination
confirmed that the takedown-pin lug clearance area is less than .800 inch, measured from
immediately forward of the front of the buffer-retainer hole. The sample has been cast
entirely from a single type of polymer, to include the fire control recess area.

ATF0219

Jason Davis, Esq.                                                                          Page 2

An identical item you submitted for our evaluation (less machining fixture and drill bits/end mills, etc.) was cut in half in order to observe the internal configuration (See FTISB # 302384). This operation revealed that the submitted item incorporates a partially formed fire control cavity and was cast in a non-homogenous manner, with lines and voids being visible in the fire control area after the receiver blank was cut in half.

Supplemental information you provided in a letter dated February 3, 2015 confirmed that the submitted item was cast using a two stage production process, wherein a core was molded and subsequently overmolded to form the final product.

Based on our examination of the submitted item and your description of the manufacturing process used to produce it, we are classifying it as a firearm receiver, and therefore as a firearm.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Michael R. Curtis
Acting Chief, Firearms Technology Industry Services Branch

Attachment

Jason Davis, Esq.                                                                 Page 3

Submitted item:





**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV
25405*
www.atf.gov

907010:AG
3311/302384

FEB 1 8 2015

Jason Davis, Esq.
The Law Offices of Davis & Associates
41593 Winchester Rd, Suite 200
Temecula, California  92591

Dear Mr. Davis,

This is in reference to your submitted item, an AR-15 pattern receiver casting, along with supporting correspondence recently received by the Firearms Technology Industry Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). You have submitted this item (see photo, last page) on behalf of your client, POLYMER 80, INC. (P80) for classification under the Gun Control Act of 1968 (GCA).

As you are aware, FTISB has previously determined that an AR-15 type receiver casting which is completely solid in the area of the trigger/hammer (fire-control) recess might not be classified as a firearm.  Such a receiver casting could incorporate all other features of a functional firearm receiver, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid in the fire-control recess area. We have determined that in order to be considered "completely solid in the fire-control recess area," the takedown-pin lug clearance area must be no longer than .800 inch, measured from immediately forward of the front of the buffer-retainer hole.  In addition, ATF has held that "indexing" of the fire-control area, to include molding a polymer receiver in stages instead of as a single (homogenous) piece, is sufficient to require classification as a firearm receiver.

Our examination of the submitted item confirmed that the receiver casting has been cast from black polymer, and includes several features of a complete AR-15 type receiver, including a takedown pin hole and clearance for the takedown-pin lug.  Our examination confirmed that the takedown-pin lug clearance area is less than .800 inch, measured from immediately forward of the front of the buffer-retainer hole.  The sample has been cast entirely from a single type of polymer, to include the fire control recess area.

ATF0222

Jason Davis, Esq.                                                                Page 2

The submitted item was cut in half in order to observe the internal configuration. This operation revealed that the submitted item incorporates a partially formed fire control cavity and was cast in a non-homogenous manner, with lines and voids being visible in the fire control area after the receiver blank was cut in half.

Supplemental information you provided in a letter dated February 3, 2015 confirmed that the submitted item was cast using a two stage production process, wherein a core was molded and subsequently overmolded to form the final product.

Based on our examination of the submitted item and your description of the manufacturing process used to produce it, we are classifying it as a firearm receiver, and therefore as a firearm.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Michael R. Curtis
Acting Chief, Firearms Technology Industry Services Branch

Attachment

Jason Davis, Esq.                                                                                 Page 3

Submitted item:



Submitted item after cutting:





**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV
25405_
www.atf.gov

FEB 1 8 2015

907010:AG
3311/302663

Jason Davis, Esq.
The Law Offices of Davis & Associates
41593 Winchester Rd, Suite 200
Temecula, California 92591

Dear Mr. Davis,

This is in reference to your submitted item, an AR-15 pattern receiver casting, along with
supporting correspondence recently received by the Firearms Technology Industry
Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).
You have submitted this item (see photo, last page) on behalf of your client, POLYMER
80, INC. (P80) for classification under the Gun Control Act of 1968 (GCA).

As you are aware, FTISB has previously determined that an AR-15 type receiver casting
which is completely solid in the area of the trigger/hammer (fire-control) recess might not
be classified as a firearm. Such a receiver casting could incorporate all other features of a
functional firearm receiver, including pivot-pin and takedown-pin hole(s) and clearance
for the takedown-pin lug, but must be completely solid in the fire-control recess area.
We have determined that in order to be considered "completely solid in the fire-control
recess area," the takedown-pin lug clearance area must be no longer than .800 inch,
measured from immediately forward of the front of the buffer-retainer hole. In addition,
ATF has held that "indexing" of the fire-control area, to include molding a polymer
receiver in stages instead of as a single (homogenous) piece, is sufficient to require
classification as a firearm receiver.

Our examination of the submitted item confirmed that the receiver casting has been cast
from black polymer, and includes several features of a complete AR-15 type receiver,
including a takedown pin hole and clearance for the takedown-pin lug. Our examination
confirmed that the takedown-pin lug clearance area is less than .800 inch, measured from
immediately forward of the front of the buffer-retainer hole. The sample has been cast
entirely from a single type of polymer, to include the fire control recess area.

Jason Davis, Esq.                                                                        Page 2

The submitted item was cut into several pieces in order to observe the internal configuration.  This operation revealed that the submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner.

Your current correspondence, as well as supplemental information you provided in a letter dated February 3, 2015, confirmed that the submitted item was cast using "a single shot of molten material."

Based on our examination of the submitted item and your description of the manufacturing process used to produce it, we have determined that this item is NOT a firearm receiver, or a firearm.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Michael R. Curtis
Acting Chief, Firearms Technology Industry Services Branch

Attachment

Jason Davis, Esq.                                                         Page 3

Submitted item:



Jason Davis, Esq.                                                                 Page 4

Submitted item after cutting:







**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

907010:WJS
3311/303738

**NOV 0 2 2015**

Mr. Jason Davis
The Law Offices of Davis & Associates
41593 Winchester Road, Suite 200
Temecula, California 92590

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB). In your letter, you asked for a classification of an AR10-type item identified by you as a "WARRHOGG BLANK" as well as a Glock-type "GC9 Blank" on behalf of your client, Polymer 80, Incorporated (see enclosed photos). Specifically, you wish to know if these items would be classified as a "firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **WARRHOGG BLANK** incorporates the following design features:

- *Magazine well.*
- *Magazine catch.*
- *Receiver extension/buffer tube.*
- *Pistol grip area.*
- *Pistol-grip screw hole.*
- *Pistol grip upper receiver tension hole.*
- *Pistol grip tension screw hole.*
- *Bolt catch.*
- *Front pivot-pin takedown hole.*
- *Rear pivot-pin takedown hole.*

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "WARRHOGG Blank" to include the following statements:

- 2 -

Mr. Jason Davis

- *The submitted WarrHogg .308 blank lower receiver blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm. This submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner using a "single shot of molten material."*

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and]…**the frame or receiver of any such weapon**…*

Also, 27 CFR § 478.11 defines **"firearm frame or receiver."** *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR § 447.11, defines **"defense articles"** as—

*…Any item designated in § 447.21 or § 447.22. This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL § 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample, FTISB personnel found that the following machining operations or design features present or completed:

1. Front and rear pivot/take down pin holes.
2. Front and rear pivot/ take down detent retainer holes.
3. Front and rear pivot/take down lug clearance areas.
4. Selector-retainer hole.
5. Magazine-release and catch slots.
6. Trigger-guard formed.
7. Rear of receiver present and threaded to accept buffer tube.
8. Buffer-retainer hole.
9. Pistol-grip mounting area faced off and drilled, but not threaded.
10. Magazine well.
11. Receiver end-plate recess.

- 3 -

Mr. Jason Davis

Machining operations or design features not yet present or completed:

1. Complete removal of material from the fire-control cavity area.
2. Machining or indexing of selector-lever hole.
3. Machining or indexing of trigger slot.
4. Machining or indexing of trigger-pin hole.
5. Machining or indexing of hammer-pin hole.

As a part of this evaluation, FTISB personnel noted the following markings:

Left Side

- **308**
- **POLYMER80**

FTISB has determined that an AR-10 type receiver blank could have all other machining operations performed, including front receiver pivot-pin and rear take down pin hole and clearance for the front receiver lug and rear take down pin lug clearance area (not to exceed 1.60 inches), but must be completely solid and un-machined in the fire-control recess area. The rear take down pin lug clearance area must be no longer than 1.60 inches, measured from immediately forward of the front of the buffer-retainer hole.

The FTISB examination of your submitted item, found that the most forward portion of the rear take down pin lug clearance area measures approximately 1.32 inches in length, less the maximum allowable 1.60 inch threshold. As a result, the submitted item is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated AR10-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive; and thus, it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "**CG** or **CG9**" to include the following statement:

- *The submitted GC9 blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.*

- 4 -

Mr. Jason Davis

Please note, while not indicated in the accompanying correspondence, the submitted CG or CG9 appears to have been made utilizing additive manufacturing or 3-D printing technology and not "made out of a single casting."

During the examination of your sample **"CG or CG9,"** FTISB personnel found that the following machining operations or design features present or completed:

1. Slide lock lever location indexed.
2. Upper portion of slide lock spring recess.
3. Trigger slot.
4. Capable of accepting Glock 17 trigger mechanism housing.
5. Capable of accepting Glock 17 trigger bar.
6. Capable of accepting Glock 17 locking block.
7. Magazine well.
8. Magazine catch.
9. Accessory rail.
10. Slide-stop lever recess.
11. Magazine catch spring recess.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Locking block-pin hole machined or indexed.
3. Devoid of front or rear frame rails.
4. Barrel seat machined or formed.

As a result, the submitted "CG or CG9" is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blank incorporating the aforementioned design features is <u>not</u> classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus it is <u>not</u> a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR § 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

In conclusion, correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular

- 5 -

Mr. Jason Davis

issue or item.  We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Also, this determination is relevant to the items as submitted.  If the design, dimensions, configuration, method of operation, or utilized materials or processes such as changing from additive manufacturing to injection molding, this classification would be subject to review and require a submission to FTISB of an exemplar utilizing the new manufacturing process.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.  Please do not hesitate to contact us if additional information is needed.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosures

ATF0233

# Polymer 80, Inc. WARRHOGG Receiver Blank



ATF0234







ATF0237



ATF0238

# Polymer 80, Inc; GC or CG9 Receiver Blank



ATF0239



ATF0240



ATF0241



ATF0242

# Capable of Accepting Glock 17 Trigger Mechanism and Trigger Bar Assemblies



ATF0243

# Capable of Accepting Glock 17 Locking Block, Trigger Assembly and Slide Stop Lever



ATF0244

# Internal Frame Comparison to NFC Glock 17



ATF0245

# Frame Comparison to NFC Glock 17



ATF0246

# Frame Comparison to NFC Glock 17



ATF0247





*The Law Offices of*
# DAVIS & ASSOCIATES

Temecula Office: ~~41593 Winchester Rd. Suite 200, Temecula, CA 92590~~
Orange County Office: 27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (866) 545-GUNS/Fax (888) 624-GUNS Jason@CalGunLawyers.com
www.CalGunLawyers.com

October 3, 2016

EVAL.
305—402

RECEIVED
OCT 0 6 2016
FATD
BY............

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

ONE
PISTOL
ReceiveR

Re:  **IN RE: POLYMER 80, INC. PF940C BLANK**

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture pistol frame blanks. Specifically, we are asking for clarification as to whether the enclosed PF940C polymer 9mm ("PF940C") blank is a "firearm," "firearm frame," or "firearm receiver" as defined in 18 U.S.C. §921(a)(3) or a merely a casting.

We have enclosed an exemplar PF940C for your review and examination. **The submitted PF940C blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.**

We believe that the enclosed item is not a firearm or a firearm receiver. Nevertheless, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

## DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq*., primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*., stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

(B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

ATF0248

Re:   **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 2

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).)  Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver.  A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver.* That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel. (The same definition appears in 27 C.F.R. §479.11.)  "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

The statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver.  Referring to ATF's definition in §478.11, an unfinished piece is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components.  The definition does not include raw materials that "would provide housing" for such components ". . . if further machined."

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled.  *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.)  Raw material requires further fabrication.  The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).)  The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).)  The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).)  Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

ATF0249

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:    **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 3

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation*." (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.)  The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a frame or receiver in terms of whether it was "capable of accepting all parts" necessary for firing.  Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b).  The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).)  The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled.  He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire. Therefore, such a receiver is not a machinegun. . . .  As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540. Similar opinions were rendered by the Chief, ATF Firearms Technology Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF expressed its opinions as to what extent raw material must be machined in order to be deemed a firearm.  Specifically, in your letter dated June 12, 2014 (90350:WJS 331/302036) you stated as following in response to a submission from Tactical Machining, LLC:

> In general, to be classified as firearms, pistol forgings or castings must incorporate the following critical features:
>
> Slide rails or similar slide-assembly attachment features.
> Hammer pin hole.
> Sear pin hole.

That letter was responding to two submissions (Sample A and Sample B).  Those samples were described as having the following completed:

1. Plunger-tube holes have been drilled.
2. Slide-stop pin hole drilled.
3. Slide-stop engagement area machined.
4. Ejector pin hole drilled.
5. Safety-lock hole drilled.

ATF0250

Re:    **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 4


6.  Magazine-catch area machined.
7.  Grip-screw bushing holes drilled.
8.  Trigger slot machined.
9.  Magazine well machined.
10. Main spring housing area machined.
11. Main spring pin hole machined.
12. Sear-spring slot machined.

The critical machining operations not yet implemented in SAMPLE A and B were as follows:

1.  Slide rails cut.
2.  Sear pin hole drilled.
3.  Hammer pin hole drilled.
4.  Barrel seat machined.

The FTB determined that neither Sample A nor B meet the definition of "firearm" presented in GCA, 18 U.S.C. Section 921(a)(3).)

Similarly, the critical machining operations not yet implanted in the PF940C are as follows:

1.  Drill the locking left block pin hole.
2.  Drill the locking right block pin hole.
3.  Drill the left trigger pin hole.
4.  Drill the right trigger pin hole.
5.  Drill the trigger left housing pin hole.
6.  Drill the right trigger housing pin hole.
7.  Cut the left rail slots in the rear to allow slide installation.
8.  Cut the right rail slots in the rear to allow slide installation.
9.  Machine the side walls that block slide installation.
10. Machine the cross wall that blocks barrel and recoil spring installation.

Thus, it is clear that the PF940C blank lower does not provide housing for the "hammer, bolt or breechblock, and firing mechanism" as required by law. Moreover, like the 1911 submission that was deemed not a "firearm" by the FTB, the PF940C is missing critical operations necessary to complete the product. In this regard, the operations performed on the exemplar casting are akin to the 1911 submission deemed not a "firearm" by the FTB. As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm."   But, again, we request your clarification on this point: 1) Is it the opinion of the Bureau of Alcohol, Tobacco, Firearms, and Explosives that the enclosed PF940C blank is a firearm or firearm frame or receiver.

Thank you for taking the time to address this issue.  We look forward to hearing from you.  Please let us know if you have any further questions or concerns.  **When complete, please return the**

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:    **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 5


**submitted parts to 42690 Rio Nedo, Suite F, Temecula, CA 92590 via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s / *Jason Davis*

JASON DAVIS.

ATF0252



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

JAN 1 8 2017

907010:WJS
3311/305402

Mr. Jason Davis
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Temecula, California 92691

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry
Services Branch (FTISB). In your letter, you asked for a classification of two Glock-type
"PF940C Blank" on behalf of your client, Polymer 80 Incorporated (see enclosed
photos). Specifically, you wish to know if each of these items would be classified as a
"firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **PF940C** has critical machining operations <u>not</u> yet "implanted" as
follows:

- *Drilling of the locking left and right block pin holes.*
- *Drilling of the left and right trigger pin holes.*
- *Drilling of the left and right trigger housing pin holes.*
- *Cutting of the left and right rail slots to allow for slide installation.*
- *Machining of the side walls that block slide installation.*
- *Machining of the cross walls that block barrel and recoil spring installation.*

As a part of your correspondence, you describe design features and the manufacturing
process of the submitted "**PF940C**" to include the following statement:

• *The submitted PF940C blank is a solid core unibody design made out of a single
casting without any core strengthening inserts. Moreover, it is void of any indicators that
designate or provide guidance in the completion of the firearm.*

ATF0253

Mr. Jason Davis                                                                        Page 2

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and] ...the frame or receiver of any such weapon...*

Also, 27 CFR Section 478.11 defines **"firearm frame or receiver"**. *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR Section 447.11, defines "**defense articles**" as—

*...Any item designated in § 447.21 or § 447.22. This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL, Section 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample **"PF940C"**, FTISB personnel found that the following machining operations or design features present or completed:

1. Trigger slot.
2. Capable of accepting Glock 17 trigger mechanism housing.
3. Capable of accepting Glock 17 trigger bar.
4. Magazine well.
5. Magazine catch.
6. Accessory rail.
7. Slide-stop lever recess.
8. Magazine catch spring recess.

Machining operations or design features not yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Trigger mechanism housing pin machined or indexed.
3. Locking block-pin hole machined or indexed.
4. Devoid of front or rear frame rails.
5. Barrel seat machined or formed.
6. Incapable of accepting Glock locking-block.

Mr. Jason Davis                                                                     Page 3

**Note:** *The dust cover, top of the barrel seat area and locking-block recess area became damaged during this evaluation.*

As a result of this FTISB evaluation, the submitted **"PF940C"** is not sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a "firearm" as defined in the GCA. Consequently, the aforementioned items are therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blanks incorporating the aforementioned design features are not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus each of these items are not a "firearm" as defined in GCA, 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR Section 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

Correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular issue or item. We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Please be aware, this determination is relevant to the item as submitted. If the design, dimensions, configuration, method of operation, processes or utilized materials, this classification would be subject to review and would require a submission to FTISB of a complete functioning exemplar.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

                                        Sincerely yours,

                                        *[signature]*

                                        Michael R. Curtis
                        Chief, Firearms Technology Industry Services Branch

Enclosure

# PF940C Blank, Submitted 10/6/16



ATF0256

# PF940C Blank, Dust Cover Area Damaged



# PF940C Blank, With Trigger Mechanism Housing and Slide Stop Lever



Damage to Locking Block Recess Area

# PF940C Blank, Incapable of Accepting Glock Locking Block



ATF0259

**Calendar No. 1835**

| | | |
|---|---|---|
| 89TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1866 |

## FEDERAL FIREARMS AMENDMENTS OF 1966

OCTOBER 19, 1966.—Ordered to be printed

Mr. HRUSKA, from the Committee on the Judiciary, submitted
the following

# REPORT

together with

## INDIVIDUAL VIEWS

[To accompany S. 3767]

The Committee on the Judiciary, to which was referred the bill
(S. 3767) to amend the Federal Firearms Act, having considered the
same, reports favorably thereon, without amendment, and recommends
that the bill do pass.

### PURPOSE

The purpose of the proposed legislation is to amend existing Fed-
eral firearms control law to—

(1) regulate more effectively interstate commerce in firearms
so as to reduce the likelihood that they fall into the hands of the
lawless or those who might misuse them;

(2) assist the States and their political subdivisions to enforce
their firearms control laws and ordinances;

(3) help combat the skyrocketing increase in the incidence of
serious crime in the United States.

It is not the purpose of this bill to interfere with the legitimate
uses of firearms by the millions of law-abiding citizens who acquire,
transport and possess them for hunting and other recreational pur-
suits, self-protection, and other lawful purposes.

### MAJOR PROVISIONS OF S. 3767

1. No carrier in interstate or foreign commerce may deliver any
handgun to any person under 21 years of age.

2. No manufacturer or dealer may ship any handgun in interstate
or foreign commerce to any person, except a licensed manufacturer
or dealer, unless that person submits to the shipper a sworn statement
that he

69-593 O—66——1

ATF0260

### B. FEDERAL FIREARMS ACT OF 1938, AS AMENDED

(a) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(b) Provides certain restrictions on the movement of firearms and ammunition in interstate or foreign commerce;

(c) Prohibits convicted felons, persons under indictment, and fugitives from justice from shipping, transporting, or receiving firearms or ammunition in interstate or foreign commerce;

(d) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated or altered.

### C. MAILING OF CONCEALABLE FIREARMS (18 U.S.C. 1715)

(a) Prohibits the mailing of concealable firearms (i.e., handguns) except to officers of the Active or Reserve Forces; to law-enforcement officers whose duty is to serve warrants of arrest or commitment, to employees of the postal service; and to watchmen engaged in guarding any Government property;

(b) Permits the mailing of concealable firearms to or between firearms manufacturers and dealers.

### D. WEAPONS ABOARD AIRCRAFT (49 U.S.C. 1472(1))

(a) Prohibits the carrying on or about the person while aboard an aircraft engaged in air transportation of a concealed deadly or dangerous weapon;

(b) Permits the carrying of such weapon aboard such aircraft by any law-enforcement officer authorized to carry arms, or by any person authorized by regulations issued by the Administrator of the Federal Aviation Agency.

### E. MUTUAL SECURITY ACT OF 1954 (22 U.S.C. 1934)

(a) Gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto.

(b) Requires all persons engaging in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTIONAL ANALYSIS OF THE PROVISIONS OF S. 3767

#### SECTION 1

Section 1 of S. 3767 amends section 1 of the Federal Firearms Act (52 Stat. 1250) by restating and clarifying existing definitions contained in the act and adding several new definitions.

The definition of "person" is unchanged. The terms "interstate or foreign commerce," "firearm," "manufacturer," "dealer," and "fugitive from justice," have been restated and clarified. The term "ammunition" has been deleted. The terms "State," "pawnbroker," "Secretary," "crime of violence," and "indictment" are new.

ATF0261

**14**     FEDERAL FIREARMS AMENDMENTS OF 1966

*Paragraph (1)*

The definition of the term "person" in paragraph (1) of the bill is unchanged from the existing law (15 U.S.C. 901(1)).

*Paragraph (2)*

Paragraph (2) of section 1 of the bill adds a new definition "State" to simplify and clarify later provisions of the bill and the existing law. The Canal Zone is included in the definition. Previously it was excluded. Also included are the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa, the principal Commonwealth and possessions of the United States.

*Paragraph (3)*

Paragraph (3) restates the existing definition of "interstate or foreign commerce" (15 U.S.C. 901(2)). However, language has been removed that has been defined in paragraph (2) above.

*Paragraph (4)*

Paragraph (4) restates the definition of "firearm" and revises it to exclude from the act antique firearms made in 1898 or earlier. Also mufflers and silencers for firearms are removed from the definition.

The year 1898 was selected as the "cutoff" date on the basis of testimony presented to Congress by several gun collectors organizations and to be consistent with the regulations on importation of firearms issued by the Department of State pursuant to section 414 of the Mutual Security Act of 1954.

Mufflers and silencers for firearms are excluded from coverage since these items are included presently in the National Firearms Act (Ch. 53 of the Internal Revenue Code of 1954). This act provides for heavy transfer taxes and registration of all such items.

Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

Added to the term "firearm" are weapons which "may be readily converted to" a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive. Such so-called starter pistols have been found to be a matter of serious concern to law enforcement officers.

*Paragraph (5)*

The definition of the term "handgun" in paragraph (5) is a new provision. This definition is necessary because of later provisions of the bill which have application solely to these firearms. There is no intention that handguns be exempted from any of the other provision of the bill since a handgun is a firearm within the meaning of paragraph (4) above.

The term includes "pistols," "revolvers" and "any other weapons originally designed to be fired by the use of a single hand" which are made to be fired by the use of a single hand and which are designed to fire or are capable of firing fixed cartridge ammunition.

SRR
Technical & Scientific
Services.

FIREARMS:
"Identification Requirements"

Re: Identification requirements under Title I of the Gun Control Act.

The regulations found in 27 CFR 178.92 state in pertinent part: "Each licensed manufacturer ... of any firearm manufactured ... shall legibly identify each such firearm by ... *** That the Director may authorize other means of identification of the licensed manufacturer ... if such other identification is reasonable and will not hinder the effective administration of this part. ... .

The classification of unfinished frames manufactured by either the die casting or investment casting method. The issue is whether these castings "may readily be converted to expel a projectile by the action of an explosive". If the castings may be "readily converted" it is our view that they are firearms, and the manufacturers of these firearms must comply with the licensing, identification, and recordkeeping requirements of the Act.

Court cases and Chief Counsel's opinions cited.

See: 27 CFR 178.92: "Identification of Firearms"

ATF0263[(2)]

```
Subject:  0000179
 Ruling:  22284.0
   Date:  19761004
   Auth:  SRR
```

**KeyWords:**
Identification Requirements

**Law-Regs:**
Firearms: General

**Related Opinions:**
27 CFR 178.92

**Summary:**
RE:  Identification requirements under Title I of the Gun Control Act.                         The regulations found 27 CFR 178.92 state in pertinent part:  "Each licensed manufacturer ... of an firearm manufacturer ... shall legibly identify each such firearm by *** That the Director may authorize other means of idnetification of the licensed manufacturer ... if such other identification is reasonalbe and will not hinder the effective administration of this part.  ...  .                         The classification of unfinished frames manufactured by either the die casting or investment casting method.  The issue is whether these castings "may readily be converted to expel a projectile by theaction of an explosive." If the casting the casting may be "readily converted" it is our view that they are firearms, and the manufacturers of these firearms must comply with the licensing, identification, and recordkeeping requirements of the Act.                         Court cases and Chief Counsel's opinions cited.

jlw

ATF0264

OCT 4 1976

CC-22,329   T:SRR

MEMORANDUM TO:   Acting Assistant Director
(Technical and Scientific Services)

FROM:   Assistant Chief Counsel (Technical)

SUBJECT:   Identification Requirements Under
Title I of the Gun Control Act

Reference is made to our recent discussions wherein
you requested information regarding the identification
requirements of the Federal firearms laws.  Specifically,
the following questions were raised:

1.   Are unfinished die cast frames or
investment cast frames firearms as
that term is defined in the Gun
Control Act?

2.   What identification requirements
are imposed upon the "manufacturers"
of these items and their subsequent
processors?

Under Title I of the Gun Control Act of 1968 (18 U.S.C.,
Chapter 44), it is unlawful for any person except a
licensed manufacturer to engage in the business of
manufacturing firearms, or in the course of such busi-
ness to ship, transport, or receive any firearm in
interstate or foreign commerce.  Section 921(a)(3)
defines the term firearm to mean "(A) any weapon
(including a starter gun) which will or is designed
to, or may readily be converted to expel a projectile
by the action of an explosive; (B) the frame or
receiver of any such weapon ...."  Section 923(i)
provides that licensed manufacturers shall identify,
by means of a serial number engraved or cast on the
frame or receiver of the weapon, in such manner as
the Secretary shall by regulations prescribe, each
firearm manufactured by such manufacturer.

- 2 -

Acting Assistant Director
(Technical and Scientific Services)

The regulations found in 27 C.F.R. § 178.92 state
in pertinent part:

> "Each licensed manufacturer ... of any
> firearm manufactured ... shall legibly
> identify each such firearm by engraving,
> casting, stamping (impressing), or other-
> wise conspicuously placing or causing to
> be engraved, cast, stamped (impressed)
> or placed on the frame or receiver
> thereof in a manner not susceptible of
> being readily obliterated, altered, or
> removed, an individual serial number
> not duplicating any serial number placed
> by the manufacturer ... on any other
> firearm, and by engraving, casting,
> stamping (impressing) or otherwise
> conspicuously placing or causing to be
> engraved, cast, stamped (impressed) or
> placed on the frame, receiver, or barrel
> thereof in a manner not susceptible of
> being readily obliterated, altered or
> removed, the model, if such designation
> has been made; the caliber or gauge; the
> name ... of the manufacturer and also
> ... in the case of a domestically made
> firearm, the city and State ... wherein
> the licensed manufacturer maintains his
> place of business; ... Provided, That
> the Director may authorize other means of
> identification of the licensed manufacturer
> ... [if] such other identification is
> reasonable and will not hinder the effective
> administration of this part ...."

The first question raised involves the classification
of unfinished frames manufactured by either the die
casting or investment casting method. The issue is
whether these castings "may readily be converted to
expel a projectile by the action of an explosive."

If the castings may be "readily converted" it is our
view that they are firearms, and the manufacturers
of these firearms must comply with the licensing,
identification, and recordkeeping requirements of the
Act.

ATF0266

22284

-3-

Acting Assistant Director
(Technical and Scientific Services)

In United States v. 16,179 Moslo Italian, .22 Caliber
Windee Derringer Convertible Starter Guns, 443 F.2d 463
(2nd Cir. 1971), the court was asked to determine
whether the phrase "may readily be converted" was
constitutional.  The lower court had found that the
guns in question could be rendered usable for live
ammunition in less than fifteen minutes.  314 F. Supp. 179
(E.D. N.Y. 1970).  The appellate court, in upholding the
constitutionality of the phrase "readily convertible,"
held that the test to be applied to the phrase was
whether the language in the statute conveyed "suffi-
ciently definite warning as to the proscribed conduct
when measured by common understanding and practices."
See United States v. Petrillo, 332 U.S. 1 (1947).

A similar statutory provision was upheld in United States
v. Catanzaro, 368 F. Supp. 450 (D. Conn. 1973).  The
issue in that case revolved around the words "readily
restorable to fire," in 26 U.S.C. §§ 5845(d) and (e).
The court held that the plain words of the statute
indicated that the operative phrase referred to weapons
which with "relative ease" could be made capable of
firing.  In that case, the process took approximately
one hour.  Furthermore, in United States v. Smith,
477 F.2d 399 (8th Cir. 1973) (per curiam), the court
held that a submachinegun on which the barrel was
welded closed at the breech and was also welded to
the receiver on the outside under the handguard was
"readily restorable to shoot" within the terms of
26 U.S.C. § 5845(b) despite the fact that the process
of restoration would require eight hours work in a
properly equipped machine shop.

In light of these judicial determinations we view the
current Bureau procedure in classifying "firearms" on
a case-by-case basis as consistent with the letter
and spirit of the Gun Control Act.  It is obvious that
what constitutes "readily convertible" depends upon
the nature of each "firearm."  That there may be cases
where it is difficult to determine the side on which
a particular "firearm" falls is not a sufficient reason
to establish a rigid criterion for the phrase "readily
convertible."

ATF0267

-4-

Acting Assistant Director
(Technical and Scientific Services)

We turn now to the question of the identification of these castings by the manufacturers. The term manufacture is defined in both the statute and the regulations under Chapter 44 to mean any person engaged in the manufacture of firearms for purposes of sale or distribution. The term manufacturing has been defined as the production, whether by hand or machinery, of a new and different article or product from raw or prepared materials. It is not necessary that such materials be made by the producer of the new article.

This office has previously held that if a process for making shoulder stocks includes either an alteration of the firearm to which they are to be attached or the actual attachment of the stocks to the firearms, or both, such activity would constitute manufacturing under the National Firearms Act (26 U.S.C. Chapter 53). (Chief Counsel's Opinion No. 16,630, dated August 8, 1958.)

We have also held that a company which is engaged in the business of manufacturing barrels and fitting them to frames or receivers acquired from independent sources to be a manufacturer under Chapter 44. (Chief Counsel's Opinion No. 21,142-1, dated January 11, 1971; see also Chief Counsel's Opinion No. 21,177, dated February 11, 1971.) In Opinion No. 21,177, it was held that the delivery of machinegun frames and/or silencers by the Military Armament Corporation to Dixie Industrial Finishes in Atlanta and Statle Corporation in Sidney, Ohio, for purposes of phosphatizing and black anodizing would require both firms to obtain a manufacturer's license under Chapter 44 and to register and pay the special occupational taxes under Chapter 53. Both firms were regarded as performing one of the procedures in the manufacturing process.

ATF0268

22284

-5-

Acting Assistant Director.
(Technical and Scientific Services)

Additionally, in 55 C.J.S. Manufacturers, p. 685,
the following is stated:

> "Manufacture has been held to describe
> the process of assembling articles which,
> while complete and finished, have no
> independent utility, but are designed to
> be used in combination as parts of some
> other article, such as a typewriter, an
> automobile, or the like, but when so
> used, the process of assembling usually,
> if not always, involves the exercise of
> manual or mechanical skill and labor
> and the more or less extensive use of
> auxilliary machinery. However, the
> assembling of parts which have previ-
> ously been manufactured or partially
> manufactured is not a manufacturer of
> component parts, but it may be regarded
> as a manufacture of the completed
> article, although it has been held that
> the assembling process will not be
> regarded as the manufacture of the
> article if it involves only an infini-
> tesimal amount of work compared with the
> work of producing the component parts."

In the case of Magnesium Casting Co. v. United States,
323 F.2d 952 (1st Cir. 1963), where the court, faced
with the issue as to whether the appellant taxpayer
owed manufacturer's excise taxes imposed by sections 3408(a)
and 4201 of the 1939 and 1954 Internal Revenue Codes,
stated that a taxpayer would be considered a manu-
facturer within the excise tax statute where he purchased
lighter mechanisms and manufactured the lighter base to
receive the mechanism and then sold the mechanism and
base together as a table lighter. The court also
indicated that an article is being "manufactured"
through all of its stages, and this does not cease to
be so simply because at an earlier stage it had
already achieved described status. See also, Select
Imports, Inc. v. Campbell, Jr., 196 F. Supp. 181

22284

-6-

Acting Assistant Director
(Technical and Scientific Services)

(N.D. Tex. 1961), where it was held that a manufacturer
within the manufacturer's excise tax statute may be
one who assembles articles or fabrics that someone
else has made.  Here the taxpayer purchased and
imported lighter bases, selling components as assem-
bled.  The court held that he was a manufacturer
liable for the manufacturer's excise tax.  While these
decisions are under the manufacturer's excise tax
statute, we feel that their rationale must be consid-
ered applicable to the present situation.

In view of the above we feel that each person engaged
in performing one of the procedures in the manufacturing
process, for example, a manufacturer of frames and
receivers, and those who assemble a firearm from
parts, are manufacturers within Chapter 44  (and within
Chapter 53 in the case of NFA weapons)  and must comply
with the pertinent identification requirements, e.g.,
a serial number must be placed on each such firearm
manufactured.

The additional identification requirements enumerated
in section 178.92 may be varied if the Director finds
that the alternate identification is reasonable and
will not hinder the effective administration of the
Act.

We recognize that the identification requirements
mandated by a strict interpretation of Chapter 44
could lead to multiple serial numbers on a firearm.
Section 923(i) states that a serial number shall be
engraved on the receiver or frame of the weapon
(emphasis added).  A liberal interpretation of this
language could excuse all of the manufacturers, except
the final assembler of the weapon, from placing a
serial number on the firearm.  We note, however, that
this could impede the Bureau in its law enforcement
activities, e.g., the tracing of stolen frames or
receivers prior to their use in the final assembly
of an operable firearm.  In order to effect this

ATF0270

- 7 -

·Acting Assistant Director
(Technical and Scientific Services)

construction, a regulation would be required.   Until
such time that this regulation is promulgated, the
existing identification requirements should be
continued.

/s/ Jack B. Patterson

Jack B. Patterson

SRRubenstein:de   10/1/76

ATF0271



# ATF Firearms Technology Branch

# Technical Bulletin 14-01

## UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

**October 28, 2013**

# Unfinished "80%" AR-15 Type Receivers

There are many unfinished AR-15 type receivers being marketed as so-called "80%" receivers. It is important to note that Federal firearms statutes and supplemental regulations do not employ the terms "80%," "80% finished," or "80% complete."

These terms are industry vernacular and are neither recognized nor defined in Federal firearms statutes and regulations. These marketing terms are used by the industry to indicate that, in their opinion, an unfinished receiver has not yet reached a point in the manufacturing process where it should be classified as a "firearm" as defined in the amended Gun Control Act of 1968 (GCA).

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …*<u>*the frame or receiver of any such weapon*</u>*….*

Unfinished AR-15 type receivers that do not meet the definition of a "firearm" are not subject to regulation under GCA provisions; however, they are still considered defense articles per the U.S. Munitions Import List and, therefore, require an ATF Form 6 for importation into the U.S.

The ATF Firearms Technology Branch (FTB) has previously determined that an AR-15 type receiver which has <u>no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)</u> might not be classified as a firearm. Such a receiver could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess/cavity area. We have determined that in order to be considered "completely solid and un-machined in the fire-control recess/cavity area," the takedown-pin lug clearance area must be no longer than .800 inch, measured from immediately forward of the front of the buffer-retainer hole. (see photo below)

# ATF Firearms Technology Branch Technical Bulletin 14-01



In order to preclude classification as a "firearm", this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector.

However, FTB has examined many "80%" AR-15 type receivers and has found that, in some cases, items being marketed as "80%" actually meet the definition of a "firearm" as defined.

The following photos depict the most commonly encountered variations of unfinished "80%" AR-15 type firearm receivers and are provided to assist you in determining their classification status.



**Example 1**



**Example 2**



**Fire control cavity partially machined**

**Takedown-pin lug area may be machined**

**Firearm**

**Example 3**



**Solid**

**No holes or dimples for the selector, trigger, or hammer pins**

**Not a firearm**

2013  10

**Example 4**



UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



**Example 5**



**Example 6**



**Example 7**



**Example 8**

This general guidance is provided to assist ATF Special Agents and Industry Operations Investigators, but is not meant to be used in lieu of a formal determination.  FTB cannot render a formal determination without physically examining a submitted sample.

If you encounter any variations not depicted or described in this bulletin, or, if you have any additional questions, please contact FTB.



# ATF Firearms Technology Branch
# Technical Bulletin 14-01
### UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

**November 1, 2013**

# <u>Unfinished "80%" AR-15 Type Receivers</u>

There are many unfinished AR-15 type receivers being marketed as so-called "80%" receivers. It is important to note that Federal firearms statutes and supplemental regulations do not employ the terms "80%," "80% finished," or "80% complete."

These terms are industry vernacular and are neither recognized nor defined in Federal firearms statutes and regulations. These marketing terms are used by the industry to indicate that, in their opinion, an unfinished receiver has not yet reached a point in the manufacturing process where it should be classified as a "firearm" as defined in the amended Gun Control Act of 1968 (GCA).

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …<u>the frame or receiver of any such weapon</u>…*.

Unfinished AR-15 type receivers that do not meet the definition of a "firearm" are not subject to regulation under GCA provisions; however, they are still considered defense articles per the U.S. Munitions Import List and, therefore, require an ATF Form 6 for importation into the U.S.

The ATF Firearms Technology Branch (FTB) has previously determined that an AR-15 type receiver which has <u>no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)</u> might not be classified as a firearm. Such an unfinished receiver could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess/cavity area. We have determined that in order to be considered "completely solid and un-machined in the fire-control recess/cavity area," the takedown-pin lug clearance area must be no longer than .800 inch, measured from immediately forward of the front of the buffer-retainer hole. (See following photo.)



In order to preclude classification as a "firearm", this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector.

However, FTB has examined many unfinished "80%" AR-15 type receivers and has found that, in some cases, items being marketed as "80%" actually meet the definition of a "firearm" as defined.

The following photos depict the most commonly encountered variations of unfinished "80%" AR-15 type firearm receivers and are provided to assist you in determining their classification status.



**Example 1**



**Example 2**



**Example 3**



**Example 4**





**Example 5**



**Example 6**



**Example 7**



**Example 8**

This general guidance is provided to assist ATF Special Agents and Industry Operations Investigators and our Federal, State and local law enforcement partners, but is not meant to be used in lieu of a formal determination. FTB cannot render a formal determination without physically examining a submitted sample.

If you encounter any variations not depicted or described in this bulletin, or, if you have any additional questions, please contact FTB at (304) 616-4300 or email LowerReceiver@atf.gov.  This inbox also serves to collect information related to unfinished AR type receivers and firearms completed with unmarked AR type receivers that are recovered or encountered by ATF field personnel and our law enforcement partners.



000323

# AR TYPE FIREARM VISUAL REFERENCE GUIDE



## UPPER RECEIVERS: NOT FIREARMS



## CASTINGS/FORGINGS: NOT FIREARMS
## DEFENSE ARTICLES FOR PURPOSES OF IMPORTATION



## RECEIVERS: FIREARMS
## ALL MARKINGS REQUIRED

000324

# AR TYPE FIREARM VISUAL REFERENCE GUIDE

## MACHINES and EQUIPMENT



**FINISHING FIXTURE (JIG)**

**DRILL PRESS**

**COMMON HAND TOOLS**

**MILLING MACHINE**

**CNC MACHINE**

000325

# AR TYPE FIREARM VISUAL REFERENCE GUIDE

## PARTS





Trigger Guard

Takedown Detent Spring
Pivot Detent Spring

Takedown Pin Detent
Pivot Pin Detent

Selector Spring

Selector Detent

Bolt Catch Spring

Bolt Catch Buffer

Disconnector

Buffer Retainer Spring

Buffer Retainer

Trigger

Disconnector Spring

Trigger Guard
Roll Pin

Hammer

Magazine Catch Spring

Bolt Catch
Roll Pin

Bolt Catch

Selector

Trigger Spring

Hammer Spring

Pistol Grip Lock Washer

Pistol Grip Screw

Magazine
Catch Button

Magazine Catch

Trigger Pin
Hammer Pin

Takedown Pin

Pivot Pin

# AK TYPE FIREARM VISUAL REFERENCE GUIDE



**FLAT/CHANNEL: NOT FIREARMS**
**DEFENSE ARTICLES FOR PURPOSES OF IMPORTATION**

**RECEIVER: FIREARM**
**ALL MARKINGS REQUIRED**

000327

# AK TYPE FIREARM VISUAL REFERENCE GUIDE

## MACHINES and EQUIPMENT



**FLAT BENDING DIE SET**

**HYDRAULIC PRESS**

**COMMON HAND TOOLS**

**AK TEMPLATE**

000328

# AK TYPE FIREARM VISUAL REFERENCE GUIDE

## PARTS



ATF0289



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

*Washington, DC  20226*

January 2, 2015

**18 U.S.C. 921(a)(3)(A) and (B):  DEFINITIONS (FIREARM)**
**18 U.S.C. 921(a)(10):  DEFINITIONS (MANUFACTURER)**
**18 U.S.C. 921(a)(11)(B):  DEFINITIONS (DEALER)**
**18 U.S.C. 921(a)(21)(A):  DEFINITIONS (ENGAGED IN THE BUSINESS)**
**18 U.S.C. 922(a)(1)(A):  LICENSE REQUIRED**
**18 U.S.C. 923(i):  IDENTIFICATION OF FIREARMS**
**27 CFR 478.92(a):  IDENTIFICATION OF FIREARMS**

*Any person (including any corporation or other legal entity) engaged in the business of performing machining, molding, casting, forging, printing (additive manufacturing) or other manufacturing process to create a firearm frame or receiver, or to make a frame or receiver suitable for use as part of a "weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," i.e., a "firearm," must be licensed as a manufacturer under the Gun Control Act of 1968 (GCA); identify (mark) any such firearm; and maintain required manufacturer's records.  A business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements of the GCA by allowing persons to perform manufacturing processes on firearms (including frames or receivers) using machinery or equipment under its dominion and control where that business controls access to, and use of, such machinery or equipment.  ATF Ruling 2010-10 is hereby clarified.*

**ATF Rul. 2015-1**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has received inquiries from the public asking whether Federal Firearms Licensees (FFL), or unlicensed machine shops, may engage in the business of completing, or assisting in the completion of, the manufacture of firearm frames or receivers for unlicensed individuals without being licensed as a manufacturer of firearms.

Unlicensed individuals occasionally purchase castings or machined/molded or other manufactured bodies (sometimes referred to as "blanks," or "80% receivers") that have not yet reached a stage of manufacture in which they are classified as "firearm frames or receivers" under the Gun Control Act of 1968 (GCA) and implementing regulations.  Once purchased, these individuals may perform minor drilling and machining activities in or on the fire control area or other critical areas of the castings or machined/molded bodies sufficient to create a "firearm frame or receiver" under the law.  Although the frame or receiver may be sufficiently complete

to be classified and regulated as a "firearm," it generally requires substantial additional machining before it can accommodate fire control components such as a trigger, hammer, or sear and be used to expel projectiles.  For instance, a casting of an AR-15 type receiver can be machined using common power tools so that it reaches a stage of manufacture that it would be classified as a "firearm frame or receiver," yet incapable of being assembled into a weapon that will expel projectiles.  Unlicensed individuals propose to take either a blank, or a frame or receiver (not marked with a serial number or any other marks of identification) to a licensed dealer-gunsmith or machine shop for further machining and finishing so that it can be assembled into a complete or functional firearm as designed.  The FFLs or unlicensed machine shops would then use their own equipment, such as a Computer Numeric Controlled (CNC) machine or other means, to finish the blank or frame or receiver into one that can be used to assemble a weapon capable of firing projectiles.

The GCA, 18 U.S.C. § 921(a)(1), defines a "person" to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company."  Section 921(a)(10), defines a "manufacturer" as any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution.  As defined by section 921(a)(21)(A), the term "engaged in the business" means, as applied to a manufacturer of firearms, "a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured."  Because "manufacturing" is not defined by the GCA, courts have relied on the ordinary meaning of the word, including actions to "make a product suitable for use."  *See, e.g., Broughman v. Carver*, 624 F.3d 670, 675 (4th Cir. 2010).  Section 921(a)(11)(B) defines a "dealer," in relevant part, as any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms."  A person meeting this definition is commonly referred to as a "gunsmith."

Section 921(a)(3), defines a "firearm," in relevant part, as both a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" (921(a)(3)(A)), and the "frame or receiver of any such weapon" (921(a)(3)(B)).  Under section 923(i), licensed manufacturers must identify each firearm manufactured by a serial number in the manner prescribed by regulation.  Federal regulations at 27 CFR 478.92(a)(1) add that "a licensed manufacturer … must legibly identify each firearm manufactured … [b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing … an individual serial number" on the frame or receiver, and certain additional information - the model (if designated), caliber/gauge, manufacturer's name, and place of origin on the frame, receiver, or barrel.  Regulations further require the serial number to be at a minimum depth and print size, and the additional information to be at a minimum depth.  Additionally, the serial number must be placed in a manner not susceptible of being readily obliterated, altered, or removed, and not duplicate any serial number placed by that manufacturer on any other firearm.

In ATF Ruling 2010-10 (approved December 27, 2010), ATF advised that licensed dealer-gunsmiths (type 01) may legally perform certain firearm manufacturing activities if specified conditions were met.  Specifically, that ruling held that licensed gunsmiths could conduct such manufacturing activities if the firearms were:  (1) not owned, in whole or in part, by the dealer-gunsmith; (2) returned by the dealer-gunsmith to the importer or manufacturer upon completion of the manufacturing processes, and not sold or distributed to any person outside the

- 3 -

manufacturing process; and (3) already properly identified / marked by the importer or manufacturer in accordance with Federal law and regulations.

ATF Ruling 2010-10 is based on two distinct but related premises.  First, it recognizes that there are specific activities traditionally performed by gunsmiths, *i.e.*, repairing, modifying, embellishing, refurbishing, installing parts, or specialized finishing of functional frames or receivers.  Such activities *do not* include, and the Ruling does not directly address the machining or other manufacturing processes required for the frame or receiver to be created or any steps to make it suitable for use in assembling a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  Second, the Ruling recognizes that, by transferring the firearm *only* to another FFL involved in the manufacturing process, there is no "sale or distribution of the firearm manufactured" requiring a manufacturer's license.

**Machining or Other Manufacturing of Frames or Receivers**

Because the GCA contains distinct definitions of "firearm," one can be a manufacturer of a "frame or receiver," and also a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" that incorporates that frame or receiver.  *See Broughman*, 624 F.3d at 676 n.4 ("That Broughman manufactures 'firearms' within the meaning of one statutory definition rather than another does not render him any less a manufacturer of 'firearms' within the meaning of the Act.")  ATF Ruling 2010-10 assumes that licensed dealer-gunsmiths would perform certain activities on articles already classified as frames or receivers (*i.e.*, no machining or other processes required to allow it to be used to assemble a weapon), such as assembly and applying special coatings and treatments.  Implicit is the understanding that the manufacture of the frame or receiver was completed (for example, having an existing fire-control cavity), and it was marked by a licensed manufacturer in accordance with Federal law and regulations.

However, when a person performs machining or other manufacturing process on a blank to make a firearm "frame or receiver," or on an existing frame or receiver to make it suitable for use[1] as part of a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," that person has performed a manufacturing operation other than what is contemplated by the GCA of dealer-gunsmiths, *i.e.*, persons described by section 921(a)(11)(B) as "engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms."  In this context, "machining or other manufacturing process" includes making a frame or receiver, or taking *any* of the steps to make an existing frame or receiver functional – that is, suitable for use as part of a weapon that will expel a projectile by the action of an explosive.[2]  For example, in an AR-type weapon, "machining or other manufacturing process" would include any activity that creates a fire-control-cavity as designed.  Although such an article may be classified as a "receiver" when it is indexed, machining or other manufacturing process takes place to create a receiver when material is actually removed from the cavity so that the fire-control-components may actually be installed.

---

[1] *See Broughman* at 675 ("[T]he plain and ordinary meaning of the word 'manufacture' is 'to make into a product suitable for use.'" (quoting Merriam-Webster Online Dictionary (2010))  Consequently, the GCA required a manufacturer's license where a gunsmith assembled firearms from component parts.)

[2] For purposes of this Ruling, activities associated with tapping and mounting a scope are considered neither "machining" nor a "manufacturing process."

The activities discussed in ATF Ruling 2010-10 are not the manufacturing processes to create the firearm frame or receiver, or any of the steps that allow the frame or receiver to function when assembled into a complete weapon on behalf of non-licensed individuals.  To the contrary, those gunsmithing activities are explicitly required to be done on behalf of a licensed manufacturer or importer who are required by 27 CFR 478.92(a)(2) to mark and serialize the frame or receiver prior to shipment to the gunsmith.  As explained by the ruling, "[t]his will ensure that the frames or receivers can be traced by ATF in the event they are lost or stolen during the manufacturing process."  This distinction is also legally significant because manufacturing processes that create essential features, depending on the type of firearm, are necessary for the frame or receiver to function as part of a complete "weapon."  At this stage of production, the frame or receiver is different from one that a licensed gunsmith may receive and perform gunsmithing services because these manufacturing processes make the frame or receiver suitable for use in assembling a "weapon" under the GCA.

**Distribution of Firearms Manufactured**

Once the manufacturing processes have occurred and a frame or receiver has been made, however, to require licensing as a manufacturer, a person must still be engaged in the business through the "sale or distribution" of the firearms manufactured.  ATF Ruling 2010-10 interpreted this phrase to exclude the transfer of firearms between Federal firearms licensees *who are involved in the manufacturing process*.  The Ruling held, in part, that because the firearms manufactured were not "sold or distributed," the contracted gunsmiths did not satisfy this statutory requirement for licensing as manufacturers.  Rather, that Ruling expressly prohibits licensed gunsmiths from distributing firearms outside the manufacturing process and requires them to be returned to the licensed manufacturer that initially produced and marked the frame or receiver.  Underlying this analysis is the fact that the GCA provides special privileges to FFLs involved in firearms transactions with other FFLs.  These include the authority to transfer firearms interstate, and to transfer firearms without a background check or completion of ATF Forms 4473 (Firearms Transaction Records).  In light of this, no "distribution" occurs when a licensed manufacturer sends firearms to another FFL who performs contracted manufacturing activities and returns them.

ATF Ruling 2010-10 does recognize that gunsmiths may improve firearms by participating in the manufacturing process.  However, none of the enumerated processes (*i.e.*, repairing, modifying, embellishing, refurbishing, installing parts, or specialized finishing) actually create a frame or receiver, or make an existing frame or receiver suitable for use in assembling a "weapon" capable of expelling a projectile.  This is consistent with the traditional services that gunsmiths offer.  Generally, licensed gunsmiths perform actions in repairing or improving firearms that are already complete weapons, or capable of being assembled as such.  Gunsmiths do not perform the machining or other manufacturing processes to create frames or receivers, or make them suitable for use in assembling a weapon that can expel a projectile.

Although licensed gunsmiths return firearms to their customers after performing the contracted work, the GCA does not consider this to be a sale or distribution of the firearms manufactured.  This is because the returned firearm has only been repaired or temporarily received for custom work – it has not been machined in a manner or otherwise created or made suitable for use as part of a weapon.  However, when a licensed gunsmith takes in a frame or receiver to perform

machining or other manufacturing process, that gunsmith "distributes" a firearm to the customer upon return because that manufacturing activity results in the making of a different "frame or receiver" and also a "weapon … which will or is designed to or may readily be converted to expel a projectile" – both defined separately as a "firearm" under the GCA.

Further, permitting a licensed gunsmith to perform manufacturing processes on a frame or receiver on behalf of an unlicensed person would lead to an absurd result.  If the above mentioned activities were permitted, firearms could be legally manufactured without any markings or serialization by dealer-gunsmiths who could avoid licensing as a manufacturer simply because his/her customer is unlicensed.  For example, instead of purchasing marked and serialized receivers or complete weapons from licensed dealers, individuals might purchase unregulated castings or machined/molded bodies from a supplier, perform a minor machining or other operation sufficient to create a "firearm frame or receiver," contract with a gunsmith to perform necessary and substantial machining operations, and then assemble a complete weapon without marks of identification or records of production.  Such activity runs contrary to a major purpose of the GCA in that it eliminates the ability of law enforcement to trace firearms used in crime, or stolen or lost firearms.

**Use of Manufacturing Machines, Tools, or Equipment**

An FFL or unlicensed machine shop may also desire to make available its machinery (*e.g.*, a computer numeric control or "CNC" machine), tools, or equipment to individuals who bring in raw materials, blanks, unfinished frames or receivers and/or other firearm parts for the purpose of creating operable firearms.  Under the instruction or supervision of the FFL or unlicensed machine shop, the customers would initiate and/or manipulate the machinery, tools, or equipment to complete the frame or receiver, or entire weapon.  The FFL or unlicensed machine shop would typically charge a fee for such activity, or receive some other form of compensation or benefit.  This activity may occur either at a fixed premises, such as a machine shop, or a temporary location, such as a gun show or event.

A business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements under the GCA simply by allowing individuals to initiate or manipulate a CNC machine, or to use machinery, tools, or equipment under its dominion or control to perform manufacturing processes on blanks, unfinished frames or receivers, or incomplete weapons.  In these cases, the business controls access to, and use of, its machinery, tools, and equipment.  Following manufacture, the business "distributes" a firearm when it returns or otherwise disposes a finished frame or receiver, or complete weapon to its customer.  Such individuals or entities are, therefore, "engaged in the business" of manufacturing firearms even though unlicensed individuals may have assisted them in the manufacturing process.

*Held,* any person (including any corporation or other legal entity) engaged in the business of performing machining, molding, casting, forging, printing (additive manufacturing) or other manufacturing process to create a firearm frame or receiver, or to make a frame or receiver suitable for use as part of a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," *i.e.*, a "firearm," must be licensed as a manufacturer under the GCA; identify (mark) any such firearm; and maintain required manufacturer's records.

ATF0294

- 6 -

*Held further,* a business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements of the GCA by allowing persons to perform manufacturing processes on blanks or incomplete firearms (including frames or receivers) using machinery, tools, or equipment under its dominion and control where that business controls access to, and use of, such machinery, tools, or equipment.

*Held further*, this ruling is limited to an interpretation of the requirements imposed on persons under the GCA, and does not interpret the requirements of the National Firearms Act, 26 U.S.C. 5801 *et. seq.*

ATF Ruling 2010-10 is hereby clarified.

Date approved: January 2, 2015

B. Todd Jones
Director

# Prosecuting Firearms Offenses

**November
2015**
Volume 63
Number 6

United States
Department of Justice
Executive Office for
United States Attorneys
Washington, DC
20530

Monty Wilkinson
Director

Contributors' opinions and statements
should not be considered an
endorsement by EOUSA for any
policy, program, or service.

The United States Attorneys' Bulletin
is published pursuant to
28 CFR § 0.22(b).

The United States Attorneys' Bulletin
is published bimonthly by the
Executive Office for United States
Attorneys, Office of Legal Education,
1620 Pendleton Street,
Columbia, South Carolina 29201.

**Managing Editor**
Jim Donovan

**Contractor**
Becky Catoe-Aikey

**Law Clerk**
Mary C. Eldridge

**Internet Address**
www.usdoj.gov/usao/
reading_room/foiamanuals.
html

Send article submissions
to Managing Editor,
United States Attorneys' Bulletin,
National Advocacy Center,
Office of Legal Education,
1620 Pendleton Street,
Columbia, SC 29201.

## In This Issue

Post-*Heller* Second Amendment Litigation:  An Overview . . . . . . . .1
    By Daniel Reiss and Melissa A. Anderson

After *Johnson v. United States*: Consequences for the
Armed Career Criminal Act, the Sentencing Guidelines,
and 18 U.S.C. § 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    By Gretchen C. F. Shappert

Domestic Violence Related Gun Prosecutions . . . . . . . . . . . . . . . . . . 30
    By Dan Strong and J. Drew Yeates

Making Body Armor Provisions Bulletproof:  Closing
Loopholes for Dangerous Drug and Firearms Offenders . . . . . . . . 38
    By Seth Adam Meinero

Unfinished Lower Receivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    By Shawn J. Nelson

ATF Crime Gun Intelligence Centers . . . . . . . . . . . . . . . . . . . . . . . . 49
    By John F. Walsh and Luke Franey

Annie Get Your Gun . . . or Maybe Not??  Brady Background
Checks:  Saving Lives Through NICS and LIONS . . . . . . . . . . . . . 55
    By Margaret S. Groban

ATF0296

# Unfinished Lower Receivers

*Shawn J. Nelson*
*Assistant United States Attorney*
*Deputy Chief, General Crimes Section*
*Central District of California*

Wal-Mart, the nation's largest seller of firearms, may be phasing out sales of AR-15-type rifles, but there are still plenty of ways to get one. One increasingly popular way is to make your own. Just as home improvement stores and Web sites have flooded the market to help the do-it-yourself homeowner, businesses are moving to help and profit from the do-it-yourself firearms enthusiast.

The key piece that any do-it-yourself firearm maker needs is the frame or receiver of the firearm, the heart of the completed, functional firearm that contains the hammer, firing mechanism, and bolt or breechblock. In fact, the lower receiver of an AR-15-type firearm is so important that it is, by itself, defined as a firearm under the Gun Control Act. As a firearm, a fully machined AR-15-type lower receiver is subject to all Gun Control Act requirements relating to manufacture and sale. But an AR-15-type lower receiver that has no machining of any kind in the fire-control cavity, and no drilling or indexing for the trigger, hammer, or selector pin, generally is not a firearm and would not be subject to Gun Control Act requirements relating to manufacture or sale.

Which side of that line a particular lower receiver product falls on determines the manner in which it can be sold and who can sell it. Relatedly, there are important distinctions between who can take the lower receiver product across that line and how the lower receiver product crosses that line. Furthermore, not all of the self-made complete, functional firearms will be legal, not all self-makers will be able to legally possess a firearm, and not all of the processes employed to complete the lower receiver will be legal. Unravelling and addressing these legal issues will be important for federal prosecutors in the coming years. If you are faced with such a case, reach out to your local U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) field office, and particularly to your local ATF Counsel—their assistance can be invaluable.

## I. Introduction to the AR-15

The AR-15-type rifle is the most common type of self-made firearm. A true "AR-15" is made by Colt Industries and is the civilian semi-automatic version of the M-16 machine gun used by the United States military. However, dozens of companies have made variants of the AR-15 under their own product names. Thus, throughout this article, I will refer to this type of firearm as an "AR-15-type."

**Figure 1:** *The following photo is of a Bushmaster AR-15-type rifle:*



Property of
The Bureau of Alcohol, Tobacco, Firearms and Explosives

ATF0297

## II.     The legal background

The common understanding of a "firearm" is similar to its definition in Title 18—that is, "any weapon [] which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C.A. § 921(a)(3)(A) (2015). A completed, functioning firearm is depicted in the photograph above. This completed, functioning firearm is made up of many components, including the lower receiver, the upper receiver, the barrel, and the buttstock. Within these components are dozens of other, smaller parts.

The key part, or heart, of any completed, functional firearm is the frame or receiver. It is "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (2014). In fact, the Gun Control Act includes such a "frame or receiver" in the definition of a firearm. 18 U.S.C.A. § 921(a)(3)(B) (2015). Thus, the frame or receiver of a firearm is, itself, a firearm and is subject to all rules and restrictions applicable to firearms, including the requirements of having manufacturer's or importer's markings and bearing a serial number. It may not be sold without a completed ATF Form 4473 or background check.

**Figure 2:** *The following photo shows an unfinished lower receiver:*



Individuals may generally sell and purchase every other part of the completed functional firearm, as depicted in Figure 1 above, without restriction. Thus, the key piece to self-building a firearm is the lower receiver.

## III. The desire for a self-made firearm and the industry response

Some firearms enthusiasts make their own firearms as a hobby. Others make firearms because they prefer that the guns not have serial numbers and, therefore, be untraceable. For others, especially felons or other prohibited persons, the desire is much more sinister.

To buy a completed lower receiver from a Federal Firearms Licensee, a purchaser must go through the same process as they would to purchase a completed, functioning firearm. Additionally, the lower receiver must be marked and serialized. This process is typically too time-intensive for many purchasers. Alternatively, an individual could buy raw aluminum and manufacture it to function as a

ATF0298

lower receiver. The latter option, however, is nearly impossible, even for the strongest firearms enthusiast or machinist.

Many sellers have formed a compromise between the two options by selling partially machined, or "80%," lower receivers (it is important to note that "80% lower receiver" is industry jargon, and the ATF does not endorse or use the term or other similar terms). These types of firearms are "blanks" or castings of an AR-15-type lower receiver that are partially milled, as shown in the photo above.

Even though this item could never really be anything but an AR-15-type lower receiver, it is not yet a firearm because the fire-control cavity has not been machined.

**Figure 3:** *The following photo shows the difference in the fire-control cavity and other machining from left to right:*



## IV. ATF's response

Apart from the authority discussed in Section II, *supra*, there are no statutory or regulatory provisions that govern the classification of AR-15 type firearms. Instead, the ATF makes a case-by-case analysis based on a Technical Bulletin, and takes the general position that an AR-15-type blank is classified as a firearm when it has been indexed for, or machined in, the fire-control recess area.

This general approach is outlined in ATF Firearms Technology Branch Technical Bulletin 14-01, issued November 1, 2013. ATF states that "an AR-15 type receiver which has *no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)* might not be classified as a firearm." (Emphasis in original). An unfinished receiver "could have all other machining operations performed" but "must be completely solid and un-machined in the fire-control recess/cavity area."

For a determination whether a lower receiver product is, in fact, a firearm, a manufacturer submits a sample lower receiver to ATF's Firearms Technology Branch in Martinsburg, West Virginia. The Firearms Technology Branch will examine the proposed lower receiver and make a determination. Basically, any modification, or even indexing of the fire control cavity, will cause the lower receiver to be determined to be a firearm. A company with a negative determination—that is, a determination that the sample is not a firearm—may sell the lower receiver free from the requirements of the Gun Control Act.

## V. The process of finishing the lower receiver

Individuals can order partially completed AR–15 type lower receivers simply by entering the term "80% lower receiver" into a search engine and browsing among the many online firearms accessories dealers selling partially completed receivers. Once the purchaser makes sure that the dealer

ATF0299

has a negative determination letter from the ATF, for as little as $35, he or she can order and receive a partially completed AR–15 type lower receiver. With a few other tools, the purchaser can self-complete the lower receiver.

Once the purchaser receives the partially completed AR-15 type lower receiver, he or she must excavate the fire-control cavity and drill the holes for the selector pin, the trigger pin, and the hammer pin. There are various ways to do this:  at the more entry-level end of the spectrum, this can be done with a jig, a few drill bits, a couple of carbide end mills, a drill or drill press, eye protection, and cutting fluid or lubricant.

**Figure 4:** *The following photo shows an unfinished lower receiver in a jig and ready to be machined:*



Once the purchaser has the necessary tools, supplies, and lower receiver, he is ready to begin by drilling some small, shallow guide holes with a smaller drill bit, and then a series of other holes before clearing out more of the cavity with a larger drill bit. At this point, by putting drill to the fire-control cavity and altering the fire control cavity area in any way, the lower receiver is considered a "firearm," even though this receiver could not actually expel a projectile by means of an explosive if combined with an upper receiver and other parts.

After the initial drilling of the fire-control cavity, the purchaser must turn the jig and lower receiver on its side and drill the selector, hammer, and trigger pin holes. The fire-control cavity is complete once the purchaser slowly and carefully mills the cavity with end mills.

**Figure 5:** *The following photo shows a lower in that long, slow milling process:*



ATF0300