UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                      :

CITY OF SYRACUSE, NY, et al.,        :

                                       :          No. 1:20-CV-06885-GHW

          Plaintiffs,      :

                                       :          **PLAINTIFFS' MOTION FOR**

      v.                  :          **SUMMARY JUDGMENT**

                                       :

BUREAU OF ALCOHOL, TOBACCO,  :          *Oral Argument Requested*
FIREARMS AND EXPLOSIVES, et al.,  :

                                       :

          Defendants.      :

------------------------------------------------------------X

Eric Tirschwell (ET-3023)
Len Kamdang (LK-3895)
Aaron Esty (4793329)
Krystan Hitchcock (5270202)
EVERYTOWN LAW
450 Lexington Avenue, P.O.#4184
New York, New York 10024
Telephone: (646) 324-8222

Daniel Grooms
Elizabeth B. Prelogar
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 776-2042
*Attorneys For Plaintiffs*

DATED: December 9, 2020

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND AND STATEMENT OF FACTS ...................................................................... 3

    I.    The Statutory Scheme ...................................................................................... 3

    II.   ATF Initially Implements the GCA's "Readily Be Converted" Standard for Defining "Firearm." ...................................................................................................... 5

    III.  ATF Moves Away From the Statute-Based "Readily Be Converted" Approach to Assessing Unfinished Frames and Receivers. ........................................................ 8

    IV.  ATF Formalizes its Solidity/Machining Approach in a 2015 Interpretive Rule. ........ 11

    V.   ATF's Classification Letters to Polymer80. ........................................................ 12

    VI.  The Petition for Rulemaking. ........................................................................... 14

    VII.  This Lawsuit. ................................................................................................. 15

    VIII. The Administrative Record. .............................................................................. 16

STANDARD OF REVIEW ..................................................................................................... 17

ARGUMENT ........................................................................................................................ 18

    I.    This Court Has The Authority To Adjudicate Plaintiffs' Claims. .............................. 18

          A.   Plaintiffs Have Article III Standing. .......................................................... 18
          B.   The Challenged Actions Are Final Agency Action. ...................................... 23

    II.   The 2015 Interpretive Rule and the Polymer80 Letters are Contrary to Law. ............ 24

    III.  The 2015 Interpretive Rule and the Polymer80 Letters are Arbitrary and Capricious. .................................................................................................... 29

          A.   ATF Failed to Articulate a Rational Explanation for its "Solidity" Approach. ............................................................................................... 29
          B.   ATF Did Not Adequately Explain its Decision to Abandon its Previous Approach. ................................................................................................ 34

    IV.  ATF Has Unreasonably Delayed in Responding to the Petition for Rulemaking. ...... 35

CONCLUSION ..................................................................................................................... 40

APPENDIX A-F

## TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States*,
    573 U.S. 169 (2014) ................................................................................................ 32

*Barrick Goldstrike Mines, Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000) ................................................................................. 24

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................ 23

*Bonin v. Calderon*,
    77 F.3d 1155 (9th Cir. 1996) ................................................................................. 26

*Catskill Mts. Chptr. of Trout Unlimited, Inc. v. United States EPA*,
    846 F.3d 492 (2d Cir. 2017) ................................................................................... 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 17

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ................................................................................... 18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ......................................................................................... 25, 29

*City of Olmsted Falls v. FAA*,
    292 F.3d 261, 268 (D.C. Cir. 2002) ...................................................................... 19

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ............................................................................... 19

*Competitive Enter. Inst. v. FCC*,
    970 F.3d 372 (D.C. Cir. 2020) ............................................................................... 20

*Ctr. for Sci. in the Pub. Interest v. FDA.*,
    74 F. Supp. 3d 295 (D.D.C. 2014) .................................................................. 36, 37

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................................... 20

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ............................................................................... 24–25, 34

*Fams. for Freedom v. Napolitano*,
    628 F. Supp. 2d at 535 (S.D.N.Y. 2009) ....................................................... 36, 37, 39

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................ 34

*FERC v. Electric Power Supply Ass'n*,
  136 S. Ct. 760 (2016) ............................................................................................. 30

*Geneme v. Holder*,
  935 F. Supp. 2d 184 (D.D.C. 2013) ........................................................................ 39

*Humane Soc'y of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ............................................................................ 33–34

*Huntington Hosp. v. Thompson*,
  319 F.3d 74 (2d Cir. 2002) ...................................................................................... 35

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004) ................................................................................ 37

*Innovator Enters. v. Jones*,
  28 F. Supp. 3d 14 (D.D.C. 2014) ............................................................................ 24

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*,
  350 F.3d 73 (2d Cir. 2003) ...................................................................................... 25

*Make the Road N.Y. v. Pompeo*,
  No. 19-CV-11633, 2020 U.S. Dist. LEXIS 134493 (S.D.N.Y. July 29, 2020) ...................... 23

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................................................ 31

*Modern Muzzleloading, Inc. v. Magaw*,
  18 F. Supp. 2d 29 (D.D.C. 1998) ............................................................................ 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................... 29, 30, 34

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................................ 34

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) ................................................................................. 33, 35

*New York v. U.S. Dep't of Commerce*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in relevant part,* 139 S. Ct. 2551 (2019)............ 17

*New York v. U.S. Dep't of Health and Human Servs.,*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) .................................................................. 17

*Nnebe v. Daus,*
    644 F.3d 147 (2d Cir. 2011) ................................................................................. 22

*NRDC, Inc. v. DOI,*
    397 F. Supp. 3d 430 (S.D.N.Y. 2019) .................................................................. 22

*NYCLU v. N.Y. City Transit Auth.,*
    684 F.3d 286 (2d Cir. 2012) ................................................................................. 22

*Oakley v. DeVos,*
    No. 20-CV-03215, 2020 U.S. Dist. LEXIS 106092 (N.D. Cal. June 17, 2020) ..................... 24

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ............................................................................... 26

*Poling v. Farrah,*
    131 F. Supp. 2d 191 (D.D.C. 2001) .................................................................... 26

*Pub. Citizen Health Research Grp. v. Auchter,*
    702 F.2d 1150 (D.C. Cir. 1983) ........................................................................... 39

*Rodriguez v. Carson,*
    377 F. Supp. 3d 401 (S.D.N.Y. 2019) .................................................................. 25

*Sackett v. EPA,*
    566 U.S. 120 (2012) ............................................................................................ 23

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016) ......................................................................... 24, 32

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................................................ 18

*Telecommunications Research and Action Center v. FCC,*
    750 F.2d 70 (D.C. Cir.1984) ............................................................................... 36

*Tummino v. Von Eschenbach,*
    427 F. Supp. 2d 212 (E.D.N.Y. 2006) ................................................................ 17

*U.S. v. Mead Corp.,*
    533 U.S. 218 (2001) ............................................................................................ 29

*United States v. 16179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*,
    443 F.2d 463 (2d Cir. 1971) .................................................................................... 26

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ...................................................................................... 20

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
    441 F.3d 416 (6th Cir. 2006) .................................................................................. 26

*United States v. Smith*,
    477 F.2d 399 (8th Cir. 1973) .................................................................................. 26

*United States v. Wick*,
    No. 15-CR-00030, 2016 WL 10637098 (D. Mont. July 1, 2016), *aff'd on other grounds*,
    697 F. App'x 507 (9th Cir. 2017) ........................................................................ 26-27

*Walker v. Azar*,
    No. 20-CV-02834, 2020 U.S. Dist. LEXIS 148141 (E.D.N.Y. Aug. 17, 2020) .................... 21

*Yale-New Haven Hosp. v. Leavitt*,
    470 F.3d 71 (2d Cir. 2006) ...................................................................................... 32

*York v. Secretary of Treasury*,
    774 F.2d 417 (10th Cir. 1985) ................................................................................ 23


**Statutes**

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ............................... 1, 33, 40
Omnibus Crime Control and Safe Street Act of 1968, Pub. L. No. 90-351, 82 Stat. 228 ......... 3, 5
5 U.S.C.
    § 555(b) ................................................................................................................ 37
    § 704 .................................................................................................................... 23
    § 706(1) ........................................................................................................... 15, 36
    § 706(2)(A) ................................................................................................. 15, 24, 29
18 U.S.C.
    § 921(a)(3) ..................................................................................................... passim
    § 922(a) .................................................................................................................. 4
    § 922(a)(2) .............................................................................................................. 4
    § 922(b)(3) .............................................................................................................. 4
    § 922(d) .................................................................................................................. 4
    § 922(g) .................................................................................................................. 4
    § 922(k) .................................................................................................................. 4
    § 922(t) ................................................................................................................... 4
    § 923(d)–(f) ............................................................................................................ 4
    § 923(g) .................................................................................................................. 4
    § 923(i) ................................................................................................................... 4
    § 924(a) .................................................................................................................. 4

§ 926(a) ...................................................................................................... 3, 36

28 U.S.C. § 2251 (1996) ............................................................................... 26

**Rules and Regulations**

Bump-Stock-Type Devices, 83 Fed. Reg. 66514-01 (Dec. 26, 2018) ........................ 38

27 C.F.R.

   § 70.701(d)(2)(i)(A) ................................................................................ 23

   § 478.11 .................................................................................................. 4, 14

C.F.R. § 0.130(a) .......................................................................................... 3, 36

Fed. R. Civ. P. 56(a) ..................................................................................... 17

**Other Authorities**

S. Rep. No. 89-1866 (1966) ................................................................................ 5

S. Rep. No. 90-1097 (1968) ............................................................................ 5, 33

S. Rep. No. 90-1501 (1968) ............................................................................ 5, 33

*Webster's Third New International Dictionary of the English Language*

   *Unabridged* 611 (1965) ............................................................................ 26

**INTRODUCTION**

The Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213, subjects firearms to critical regulatory requirements to promote public safety:  firearms must be marked with serial numbers for identification and tracing; they can be shipped across state lines only by licensed dealers; and they can be purchased from dealers only by individuals who have passed background checks.  To avoid circumvention of these requirements, Congress defined "firearm" broadly to include not only weapons but also their core building blocks—the ***frame*** for a pistol and the ***receiver*** for a rifle—as well as weapons, frames, and receivers that are "designed to" be, or "may readily be converted" into, operable weapons. *See* 18 U.S.C. § 921(a)(3).  In other words, a frame or receiver is a firearm even if it is unfinished, *i.e.*, even if it is not yet in a completed state where it can be assembled with other parts into an operable firearm.  The rationale for Congress's standard is straightforward:  if an object is designed to be or readily convertible into a firearm, it almost certainly will become an operable firearm, and should be regulated as such.

Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the federal entity responsible for administering the GCA, has created a significant and continuing public safety threat by determining that many unfinished frames and receivers that plainly meet the statutory definition of "firearm" are not subject to regulation.  Through an Interpretive Rule issued in 2015, as well as through subsequent determination letters issued to sellers of gun building kits and unfinished frames and receivers, ATF has ignored the "designed to" be or "readily be converted" standard in the statute.  Instead, ATF has opted for a mechanistic approach detached from the statutory definition for determining whether unfinished frames and receivers are "firearms," classifying such objects based on whether they are solid in certain areas or lack certain machining.  Using this approach, ATF has exempted from regulation many unfinished frames and

receivers that require minimal machining and assembly to be converted into operable firearms—ignoring and failing to consider or assess whether such objects are "designed to" be and "may readily be converted" into such weapons, and thus satisfy the statutory definition of "firearm."

ATF's actions have caused an escalating public safety emergency. Manufacturers and sellers of unregulated gun-building kits (which include unfinished frames and receivers that ATF has determined are not "firearms") have created websites that advertise their products using ATF's flawed interpretation and determination letters, touting how quickly and easily the unfinished frames and receivers can be turned into operable weapons, and expressly courting individuals who wish to buy unregulated and untraceable firearms. Because the frames and receivers in these kits do not have serial numbers, are not tracked when shipped across state lines, and can be purchased without background checks, individuals who use the fully assembled guns to commit crimes cannot easily be traced. These weapons are thus colloquially referred to as "ghost guns."

Plaintiffs Syracuse, San José, Chicago, and Columbia ("Plaintiff Cities") are among the many jurisdictions across the country suffering the consequences of ATF's dereliction. In recent years, these and other cities have been recovering rapidly rising numbers of ghost guns, which are especially attractive to and increasingly being used by gun traffickers, persons prohibited from possessing firearms, and those committing violent crimes. In a December 2019 Petition for Rulemaking, Plaintiffs Everytown for Gun Safety Action Fund and Everytown for Gun Safety Support Fund (collectively, "Everytown") urged ATF to issue a regulation that would, consistent with the GCA, make clear that unfinished frames and receivers made and sold for the express and only purpose of allowing purchasers to quickly and easily make ghost guns are "firearms." But, despite mounting evidence that ghost guns pose an urgent threat to public health and safety, ATF has taken no action on that Petition in the full year since it was filed.

2

Plaintiffs bring this Administrative Procedure Act ("APA") action to require ATF to regulate frames and receivers in accordance with the GCA.  ATF's 2015 Interpretive Rule, as well as three determination letters issued to Polymer80, a leading internet purveyor of gun-building kits, are unlawful and must be set aside under the APA as final agency actions that are arbitrary, capricious, and contrary to law.  In addition, ATF has unreasonably delayed acting on the Petition for Rulemaking and must be ordered to take action on it.  Because the full administrative record provides no support for any of ATF's actions and failure to act, summary judgment should be entered for Plaintiffs on all claims.

## BACKGROUND AND STATEMENT OF FACTS

I.      **The Statutory Scheme**

The GCA, codified at 18 U.S.C. §§ 921–28, defines certain objects as "firearms," regulates covered firearms to protect public safety, and establishes a system for the licensing of firearms manufacturers and dealers.[1]  The Attorney General has authority to issue "rules and regulations as are necessary to carry out the provisions of [the GCA]."  18 U.S.C. § 926(a).  The Attorney General has in turn delegated to ATF the authority to "investigate, administer, and enforce" the GCA.  28 C.F.R. § 0.130(a).

Under the GCA, "firearm" means, in relevant part, "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [and] (B) *the frame or receiver of any such weapon*."  18 U.S.C. § 921(a)(3) (emphasis added).  ATF regulations treat "frames" and "receivers" as functional equivalents, defining them as the "part of a firearm which provides housing for the hammer, bolt or

---

[1] As indicated further below, the GCA added to the modern statutory structure for regulating firearms that began a few months prior in 1968 with the Omnibus Crime Control and Safe Street Act of 1968 ("1968 Crime Bill").  The definition of "firearm" is the same in both acts, and here we generally refer to the later-enacted GCA in describing the statutory authority for ease of reference.

breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11.  Typically, "frame" is used in the context of pistols, and "receiver" is used in the context of rifles. *See* Appendix A, attached hereto, for a pictorial representation (found at Complaint ¶¶56, 57 (Dkt#11)).

The GCA contains a series of interlocking requirements that carefully regulate interstate commerce in "firearms."  The GCA requires firearms manufacturers, importers, and dealers to obtain licenses, 18 U.S.C. § 922(a); establishes standards for issuing and revoking licenses, *id.* § 923(d)–(f); imposes obligations on licensees to place serial numbers on receivers and frames, *id.* § 923(i); and directs licensees keep records of the manufacture, acquisition, and disposition of each firearm, *id.* § 923(g).  The GCA restricts interstate sales of firearms by prohibiting licensees from selling handguns to out-of-state residents, *id.* § 922(b)(3), and from shipping firearms across state lines to non-licensees, *id.* § 922(a)(2).   The GCA also prohibits the acquisition and possession of firearms by certain classes of persons, including felons, fugitives, persons with domestic-violence misdemeanors, and persons subject to domestic-violence restraining orders.  *Id.* §§ 922(d), (g). Furthermore, the GCA punishes as a felony the transport, shipment, or receipt of firearm with a "removed, obliterated, or altered" serial number.  *Id.* §§ 922(k), 924(a).  An amendment to the GCA also requires that a licensee conduct a background check before completing a sale to a non-licensee.  *Id.* § 922(t).

Congress's comprehensive regulatory framework for firearms, established in 1968, was inspired by a wave of murders committed with mail-order guns, including the 1963 assassination of President John F. Kennedy.  In 1966, the Senate Judiciary Committee reported S. 3767, entitled "Federal Firearms Amendments of 1966," and stated that the Committee had "become increasingly concerned over the rise in lawlessness in violent crime . . . and the relationship between the

apparent easy availability of firearms and criminal behavior."  S. Rep. No. 89-1866, at 3 (1966).

Several Senators objected to S. 3767, however, because it did not "prohibit the mail-order sale of

handguns to individuals."  *Id.* at 34.  Most notably, Senator Hugh Scott urged a ban on "mail-order

purchases of all weapons because of their susceptibility to crimes, most horribly illustrated by the

assassination of President Kennedy."  *Id.* at 100.  The full Senate rejected S. 3767.  Thereafter,

when the Omnibus Crime Control and Safe Street Act of 1968 ("1968 Crime Bill") was introduced,

it contained a ban on interstate sales of firearms to unlicensed individuals.  Pub. L. No. 90-351,

§ 901, 82 Stat. at 228–29.  The accompanying Senate Judiciary Committee Report stated that the

"acquisition on a mail-order basis of firearms other than a rifle or shotgun by nonlicensed

individuals, from a place other than their State of residence, has materially tended to thwart the

effectiveness of State laws and regulations, and local ordinances."  S. Rep. No. 90-1097 at 20

(1968); *see also* S. Rep. No. 90-1501 at 22 (1968) (same point, with respect to GCA).  Just months

after the 1968 Crime Bill was signed into law, the GCA was enacted, further establishing the

licensing and regulatory framework for firearms.

## II.     ATF Initially Implements the GCA's "Readily Be Converted" Standard for Defining "Firearm."

ATF has primarily interpreted the statutory term "firearm" through letters issued in

response to requests for guidance from firearms manufacturers.  Within ATF, the Firearms and

Ammunition Technology Division ("FATD") "is the federal government's technical authority on

the classifications of firearms and ammunition under federal rules and regulations."  Plaintiffs'

Local Rule 56.1 Statement (hereafter "56.1 Statement") ¶5.  Within the FATD, the Firearms

Technology Industry Services Branch ("FTISB"), formerly the Firearms Technology Branch

("FTB"), "is responsible for providing firearm industry-related technical support regarding

firearms laws, regulations, and technology issues."  *Id.*  For decades, the FTISB has received

samples of frames and receivers from firearms manufacturers and issued determination letters classifying those frames and receivers.

The administrative record indicates that, beginning with a 1976 legal memorandum opinion, ATF established an approach for evaluating whether a frame or receiver is a "firearm" subject to the GCA. ATF0265–0271.[2] ATF's Assistant Chief Counsel explained in this opinion that if "unfinished frames" or "castings" "may be 'readily converted' it is our view that they are firearms, and the manufacturers of these firearms must comply with the licensing, identification, and recordkeeping requirements of the Act." ATF0266. The opinion concluded:

> [T]he current Bureau procedure in classifying "firearms" on a case-by-case basis [is] consistent with the letter and spirit of the Gun Control Act. It is obvious that what constitutes "readily convertible" depends upon the nature of each "firearm." That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for the phrase "readily convertible."

ATF0267.[3]

ATF followed the framework set out in the 1976 opinion in classification letters issued for many years thereafter, and determined whether a sample receiver or frame was a "firearm" by assessing whether it could "readily be converted" into an operable firearm. For example, in 1978, ATF found that a sample "machined frame" was a firearm because it had "reached a stage of manufacture such that it *may readily be converted* to functional condition." ATF0001–0002 at ATF0001 (emphasis added). In 1980, ATF reiterated that its inquiry concerning whether unfinished frames and receivers are "firearms" focuses on whether they "can *be readily converted*

---

[2] References to the administrative record filed by the defendants at Docket No. 60 are cited herein as "ATFXXXX."

[3] The statutory definition of "firearm" includes both "may readily be converted" and "designed to" be tests for determining whether an unfinished object is a "firearm," but ATF's initial post-GCA consideration of this issue focused on "readily convertible" as the touchstone. Although this initial approach largely captured unfinished frames and receivers that are "firearms," ATF's failure to implement the "designed to" portion of the statutory definition of "firearm" appears to trace back to the beginning of its implementation of the GCA.

to a functional condition," ATF0014–0015 at ATF0014 (emphasis added), and advised in a subsequent letter that "[c]ertainly, if an unfinished receiver could be converted to functional condition within a few hours time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm," ATF0016.

ATF often used testing to determine whether a frame or receiver could readily be converted into the main component of an operable firearm.  For example, in a 1983 letter, ATF classified an "unfinished AR-15 type receiver" as a firearm because the receiver was "basically complete except that the interior cavity ha[d] not been milled."  ATF0020.  To reach that conclusion, ATF completed a sample receiver and measured the difficulty and length of that process:

> For test purposes, the interior of the sample was drilled out using a 5/8 inch drill and then finished with a 1/2 inch rotary file. Approximately 75 minutes time was required to make the receiver functional.

*Id.*  Therefore, ATF determined, the receiver was "still a firearm subject to the provisions of the Gun Control Act of 1968."  *Id.*

Similarly, in a 1987 letter to a member of Congress, ATF explained why it classified a sample frame casting as a firearm after finding that it "could be converted to function as a firearm frame in approximately 20 minutes using only common hand tools."  ATF0023–0025 at ATF0024. The ATF Director tied the classification decision to the GCA's broader purposes:

> In recent years we have encountered numerous instances in which individuals have attempted to sell firearms in unassembled or unfinished form, thereby avoiding recordkeeping and transfer restrictions. We are extremely concerned that the availability of unfinished frames and receivers would provide an avenue whereby prohibited persons may be able to acquire mail order firearms in kit form bearing no serial number or marks of identification.

ATF0023–0024.

Into the early 2000s, ATF regularly invoked the concept that an unfinished frame or receiver could readily be converted to an operable firearm in making similar determinations.  *See,*

*e.g.*, 1992 ATF determination letter, ATF0050 (classifying an AR-15 receiver as a firearm because it was "basically complete except that the interior cavity ha[d] not been completely machined"); 1994 ATF determination letter, ATF0051–0052 at ATF0051 (classifying a receiver as a firearm because it was "basically complete," was "identifiable as the frame or receiver of an AR-15 type firearm[,] and it may readily be converted to function as the frame or receiver of a firearm," even though certain machining operations were still required to "allow installation of the trigger and hammer pivot pins"); 2002 ATF determination letter, ATF0053–0054 at ATF0054 (classifying one of several AR-15 receiver samples as a firearm based on a previous determination that a similar AR-15 receiver could be finished in 75 minutes); 2004 ATF determination letter, ATF0065–0066 at ATF0065 (determining that an unfinished pistol frame constituted a firearm even though slide rails had yet to be cut, reasoning that this work, "[a]lthough critical," could "be completed in a minimal amount of time by a competent individual having the necessary equipment").[4]

## III. ATF Moves Away From the Statute-Based "Readily Be Converted" Approach to Assessing Unfinished Frames and Receivers.

In the mid-2000s, ATF moved away from a GCA-based "readily be converted" analysis for determining whether unfinished frames and receivers are "firearms" in favor of a mechanistic rule that focused instead on the frame's or receiver's "solidity" and the extent of "machining" that had been completed.

---

[4] In a later 2004 letter, ATF reiterated the importance of measuring the length of time required to complete a firearm for determining whether a "partially completed" machinegun receiver is "at a stage where it should be classified as a firearm" under the GCA, informing the recipient that ATF would "determine if the submitted sample can be brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for, using basic tools in a reasonable amount of time." ATF0067–0068 at ATF0067.  The "basic tools in a reasonable amount of time" formulation was later quoted (without attribution) in a 2015 ATF letter, *see* ATF 0603–0607 at ATF0606, although, as explained below, by that time ATF had moved away from applying this type of test.

For example, in a 2006 classification letter, ATF determined that a "partially machined AR-15 pattern receiver" *was* a firearm since it was "nearly complete, requiring only minor modifications to allow it to function as the frame or receiver of a firearm." ATF0073–0074 at ATF0073. But the same letter also advised the requestor as to how to *avoid* such a determination going forward, explaining that "an AR-15 type receiver which has <u>absolutely no machining performed in the area of the trigger/hammer recess</u> might not be classified as a firearm." *Id.* (underlining in original). The letter further explained that, to avoid being classified as a firearm, "a receiver could have **all** other machining operations performed, including the boring of pivot pin and takedown pin hole(s) and clearance for the takedown pin lug, but must be completely solid and un-machined in the trigger/hammer recess area." *Id.* (bold in original).[5] The letter even provided a visual illustration of the trigger/hammer area that "must be solid" for the receiver not to be considered a firearm and advised that if the submitter was "interested in having such a modified item formally classified," it should "re-submit the prototype to FTB for examination." *Id. See also* ATF0075–0078; ATF0081–0082 (similar ATF determination letters in 2006 and 2009, finding the submitted receivers were firearms but including prospective advice on how to avoid such a classification).[6]

Over the next few years, ATF applied this mechanistic "solidity/machining" test for unfinished frames and receivers, largely abandoning its prior approach of assessing whether

---

[5] The pivot pin and takedown pin holes facilitate the attachment of a lower receiver to an upper receiver. The upper receiver is the component of an AR-15 rifle which attaches to the barrel and contains the bolt carrier group, which loads a cartridge and expels the casing after firing. The takedown-pin lug clearance area is an indentation in the top of the lower receiver, adjacent to the fire-control area, which provides space for the installation of a pin that allows for attaching and detaching the upper and lower receivers. *See* ATF0272–0277 at ATF0273.

[6] Two years before, in a January 2004 letter classifying two AR-15 receivers as firearms, ATF offered similar advice, stating, without reference to the statutory criteria: "a solid AR-15 type receiver casting, without having the critical internal areas machined (magazine well and central area for the fire control components) or crosspin holes drilled, would not constitute a 'firearm' as defined in the [GCA]." ATF0060–0061 at ATF0061.

objects could "readily be converted" to operable firearms by assessing the time and effort that would be required to finish the submitted frames and receivers.  In 2009, for example, ATF wrote that a receiver is a firearm if the receiver "possesse[s] either pivot pin holes or indexing marks for the fire-control components (trigger group), or, if any of the cavity for the trigger group has been milled."  ATF0085–0086 at ATF0086.  In late 2013, in internal guidance to ATF special agents and investigators, as well as "law enforcement partners," ATF advised in Technical Bulletin 14-01 that "an AR-15 type receiver which has <u>no machining of any kind performed in the area of the trigger/hammer (fire control) recess (or cavity)</u> might not be classified as a firearm" even with "**all** other machining operations performed," so long as the "takedown-pin lug clearance area" ("TPLCA") is "no longer than .800 inch."   ATF0278–0289 at ATF0278 (emphases in original).[7]

In numerous determination letters issued during this time period, most focusing on AR-15 unfinished receivers, ATF repeatedly applied this mechanistic test, explaining to manufacturers that whether receivers were "sufficiently complete" and classified as firearms would depend on little more than whether the length of the TPLCA was more or less than .800 inch.  *See, e.g.*, ATF0479–0480 (TPLCA of 1.060 inches leads to classification as a firearm); ATF0520–0522 (same result where TPLCA was .900 inch); ATF0541–0542 (same with TPLCA of .82 inch); ATF0558–0560 (same with TPLCA of .85 inch), or the existence or non-existence of a single hole, *see, e.g.,* ATF0469–0470 at ATF0470 ("[t]he drilling of the selector hole has caused the submitted sample to reach a point in machining at which it is classified as a firearm"); ATF0556–0557 (same).  In these same letters, ATF repeatedly expressed "regret" that its determinations were not

---

[7] As noted in fn.5, *supra*, the TPLCA (takedown-pin lug clearance area) is a term that ATF uses to describe a machined recess at the top of an AR-10 or AR-15 lower receiver that is located at the rear of the fire-control area, and which provides a space that facilitates attachment and detachment of the lower receiver to and from the upper receiver.  *See* Appendix B attached hereto, reproducing ATF0278–0283 at ATF0279 (visual depiction of TPLCA).

"more positive" or "more favorable," *see, e.g.,* ATF0479–0480 at 0480; ATF0556–0557 at ATF0556, and invited the manufacturers to re-submit their samples with slightly modified designs to achieve a different determination, *see, e.g.,* ATF0480 ("If your current design is modified to incorporate a takedown-pin lug clearance area of .800 inch or less in length, FTB is ready to reevaluate it . . . ."); ATF0521 (same); ATF0556 ("If your current design is modified to eliminate the partial selector hole, [ATF] is ready to reevaluate it . . . .").

## IV.    ATF Formalizes its Solidity/Machining Approach in a 2015 Interpretive Rule.

In 2015, ATF formalized its mechanistic "solidity/machining" approach in Ruling 2015-1, ATF0290–0295, as well as in "Q&As" posted on ATF's website.  ATF0363–0365.  Plaintiffs refer to these collectively as the "2015 Interpretive Rule."

In Ruling 2015-1, dated January 2, 2015, and addressing questions arising in the context of federal firearms licensees assisting unlicensed individuals in completing unfinished firearm frames and receivers, ATF explained that frames and receivers "have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers' under the [GCA]" if they lack "***minor drilling and machining activities*** in or on the fire control area or other critical areas"—*i.e.*, if they are solid in certain areas.  ATF0290 (emphasis added).  The Ruling noted these unfinished frames and receivers are sometimes referred to as "blanks," or "80% receivers," and gave the example of "an AR-15 type receiver [that] can be machined using common power tools." ATF0290–0091.  By stating that regulated firearms can be distinguished from "manufactured bodies" or "blanks" by the presence of "minor drilling and machining activities," ATF0290, Ruling 2015-1 formally embraced the mechanistic "solidity/machining" approach.

Ruling 2015-1's interpretation was confirmed by "Q&As" relating to the subject of "Receiver Blanks" published on ATF's website.  One "Q&A" response stated:

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the GCA.  The ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the ***fire-control cavity area is completely solid and un-machined*** have not reached the "stage of manufacture" which would result in the classification of a firearm per the GCA.

ATF0364 (emphasis added).  Another website Q&A response confirmed that "[t]he GCA does not impose restrictions on receiver blanks that do not meet the definition of a 'firearm.'"  ATF0365.[8]

## V.     ATF's Classification Letters to Polymer80.

After issuing the 2015 Interpretive Rule, ATF continued to apply its bright-line solidity/machining rule in classification letters.  As relevant here, ATF issued a series of letters to Polymer80, Inc., a company that "designs and develops innovative firearms."  Polymer80, About Us, available at https://www.polymer80.com/about-us.  Polymer80 specializes in gun-building kits that include unfinished frames and receivers, which it refers to as "80% Kits."

On February 18, 2015, in response to a Polymer80 request, ATF issued a letter determining that a Polymer80 "AR-15 pattern receiver casting" was not a firearm.  ATF0225–0228.  The letter explained "that an AR-15 type receiver casting which is completely solid in the area of the trigger/hammer (fire-control) recess might not be classified as a firearm."  ATF0225.  Repeating guidance it had given before, the letter further explained: "We have determined that in order to be considered 'completely solid in the fire-control recess area,' the takedown-pin lug clearance area [TPLCA] must be no longer than .800 inch, measured from immediately forward of the front of the buffer-retainer hole."  ATF0225.  Thus, because the Polymer80 sample had a TPLCA "less than .800 inch," and "incorporate[d] a solid fire control cavity area . . . cast in a homogenous manner," it was "NOT a firearm receiver, or a firearm."  ATF0225–0026.

---

[8] The Q&As were first published on the ATF website in 2015, 56.1 Statement ¶59, but also were the subject of an October 2014 ATF press release.  *See* ATF0585–0590

Similarly, in November 2015, ATF determined that an "AR10-type item identified by [Polymer80] as a 'WARRHOGG BLANK' as well as a Glock-type 'GC9 Blank'" were not firearms. ATF0229–0247. In addition to listing "machining operations" and "design features" that were and were not yet "present or completed" (with the number "present or completed" more than *double* the number that were not for both items), ATF again relied on the length of the TPLCA for the AR10 sample, noting that "the most forward portion of the rear take down pin lug clearance area measures approximately 1.32 inches in length, less than the maximum allowable 1.60 inch threshold." ATF0230–0232. Based on all this information, ATF concluded that the two submitted items were "not sufficiently complete" to be classified as firearms. ATF0231.

Then, in 2017, ATF determined that two additional Polymer80 "Glock-type" "blank" frames were not firearms. ATF0253–0259. In doing so, ATF again listed several "machining operations" and "design features" that were and were not yet "present or completed" and concluded the "blanks" were not "sufficiently complete" to be classified as "firearms." ATF0253–0255.

None of these letters in any way engaged with the GCA's criteria for determining whether a nearly completed frame or receiver is a "firearm": whether such receivers and frames were either designed to be or readily could be converted to be operable firearms.[9]

---

[9] The administrative record indicates that Polymer80 had submitted additional AR-15 receiver designs for ATF's consideration, leading ATF to issue two other determination letters in February 2015 concluding that an alternative Polymer80 "AR-15 pattern receiver casting kit" and another "AR-15 pattern receiver casting" *were* firearms—even though these two exemplars also had a TPLCA "less than .800 inches"—with the only apparent difference being that these unfinished receivers, unlike the one ATF determined was not a firearm, each had a "partially formed fire control cavity . . . cast in a non-homogenous manner" "using a two stage production process." ATF0219–0221; ATF0222–0224. Polymer80 also expressly had told ATF that the receiver deemed a firearm in ATF0219–0221 was being sold as a "kit" along with a jig, drill bits, screws, and a link to "instructions to finish the lower receiver," and had provided the full kit to ATF. ATF0195–0200 at ATF0195–0196, ATF0200.

13

**VI.     The Petition for Rulemaking.**

On December 11, 2019, Plaintiff Everytown submitted a Petition for Rulemaking that urged ATF to adopt a definition of "firearm frame or receiver" that would accurately reflect the statutory "designed to or may readily be converted to" standard, 18 U.S.C. § 921(a)(3), and, as a result, would cover the frames and receivers used to make ghost guns.  ATF0366–0388; 56.1 Statement ¶13.  Specifically, the Petition proposed amending 27 C.F.R. § 478.11 to read:

> Firearm frame or receiver.  That part of a firearm which provides housing for the trigger group, including any such part (1) that is designed, intended, or marketed to be used in an assembled, operable firearm, or (2) that, without the expenditure of substantial time and effort, can be converted for use in an assembled, operable firearm.

ATF0387; 56.1 Statement ¶13.

The Petition also detailed, through statistics, police reports, statements from ATF officials, court filings, and case studies, how ATF's determination that unfinished frames and receivers are not  "firearms" resulted in the rapid proliferation of ghost guns, which are increasingly becoming the weapon of choice for violent criminals and those prohibited by law from obtaining or possessing firearms.  ATF0366–0388; 56.1 Statement ¶¶13; *see also id.* ¶¶25–37, 45. It explained that ghost guns had been used in many shootings in 2018 and 2019, including a November 2019 school shooting in California that resulted resulting in the death of two students and three others being shot and wounded (including Mia Page-Tretta, a member of Plaintiff Everytown). ATF0376–0377; *see also* 56.1 Statement ¶44a.  Additionally, the Petition explained how sellers of gun-building kits have exploited ATF's approach through online advertisements highlighting how easily these unregulated products can be purchased online, shipped across state lines, and turned into operable firearms.  ATF0373–0376.  For example, one manufacturer boasted that it is

"ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."  ATF0373; *see also* 56.1 Statement ¶¶54-55 (additional evidence of how quickly and easily unfinished frames and receivers can be turned into operable weapons).

On December 13, 2019, Defendants ATF and DOJ acknowledged Everytown's Petition. 56.1 Statement ¶14.  After four months of silence, Everytown sent a follow-up letter urging ATF to respond to the Petition because "[e]ach day that DOJ and ATF fail to take action increases the risk to the public safety of all Americans."  ATF0389–0391 at 0391. Everytown cited several data points further demonstrating the "urgent" need for rulemaking including: huge increases in ghost gun recoveries in Washington, D.C., from 26 in 2018 to 115 in 2019, and in Philadelphia, from 13 in 2018 to 95 in 2019; and a "pandemic buying surge" and "unprecedented order volume" reported by sellers of gun-building kits in the early days of the COVID-19 pandemic.  ATF0390; *see also* 56.1 Statement ¶45.  In the summer of 2020, each of Plaintiff Cities joined Everytown's Petition. 56.1 Statement ¶16.  Neither ATF nor DOJ has responded since.  56.1 Statement ¶17.

## VII.    This Lawsuit.

On August 26, 2020, Plaintiffs filed the Complaint.  It alleges (in Counts I-IV) that the 2015 Interpretive Rule and the three Polymer80 classification letters are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, and thus must be "h[e]ld unlawful and set aside."  *See* 5 U.S.C. § 706(2)(A).  Complaint (ECF No. 1) ¶¶168-198.  The Complaint also alleges (in Count V) that ATF's continuing failure to respond to Plaintiffs' Petition for Rulemaking constitutes "unreasonabl[e] delay" under the APA, and that the Court should "compel" a response to the Petition.  *See id.* § 706(1).   Complaint ¶¶199–206.

The Complaint details how Plaintiff Cities have experienced drastic increases in ghost-gun related crimes and recoveries in recent years, including Polymer80 ghost guns showing up at crime

scenes in significant and disproportionate numbers.  For example, as of the filing of the Complaint, Plaintiff Syracuse's police department had recovered 25 ghost guns in 2020 alone, a 30% increase from 2019, and Plaintiff San José's police department had recovered dozens of ghost guns over the past several years.  Complaint ¶17d.  Polymer80 ghost guns represent 90% of ghost guns recently recovered by Plaintiff Syracuse, 56.1 Complaint ¶138, and 80% of ghost guns recently recovered by the District of Columbia.  Complaint ¶6.[10]  These and other facts underlying the harm to Plaintiff Cities from ATF's determination that ghost gun components are not firearms are now updated and confirmed in sworn declarations from each Plaintiff City, 56.1 Statement ¶¶25–37, and other evidence, 56.1 Statement ¶¶ 45–46.

### VIII.   The Administrative Record.

In November 2020, the Defendants produced the administrative record, which is marked as ATF0001–ATF0780, and has been filed by the Government (Docket No. 60).  The record includes numerous additional ATF determination letters and related correspondences not previously available to Plaintiffs, representative examples of which are cited above, as well as a small number of internal analyses and agency statements, including the 1976 Assistant Chief Counsel's opinion and the 1987 letter to a member of Congress, also cited above.  No document in the administrative record explains how ATF's current mechanistic "solidity/machining" approach to assessing unfinished frames and receivers takes account of and applies the GCA's definition of "firearm," including its "designed to or may readily be converted" language.

---

[10] The cities' police departments are able to identify recovered ghost guns as Polymer80s because the company's frames and receivers, while lacking serial numbers, are generally stamped with a "P80" insignia.  56.1 Statement ¶12.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  However, in an APA case where the primary question is whether the "agency acted in excess of statutory authorization, not in accordance with law, arbitrarily and capriciously, or 'in some other way that violates 5 U.S.C. § 706,'" the "usual Rule 56 summary judgment standard 'does not apply.'"  *New York v. U.S. Dep't of Health and Human Servs.,* 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (internal citation omitted).  Instead, "'the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'"  *Id.* (citation omitted).

 "[J]udicial review of administrative action is generally 'based on the full administrative record that was before the [agency decisionmaker] at the time he made his decision.'"  *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 630 (S.D.N.Y. 2019) (citation omitted), *aff'd in relevant part,* 139 S. Ct. 2551, 2574 (2019).  "[T]he 'whole administrative record' mandated by the APA consists of all documents and materials directly or indirectly considered by agency decision-makers, including 'evidence contrary to the agency's position.'"  *Id.* at 632 (citation omitted).

In addition to the administrative record, a reviewing court may consider evidence outside the record "to illuminate a complex record and to help the court better understand the issues involved" as well as "to evaluate whether an agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices."  *New York*, 351 F. Supp. 3d at 633.  Extra-record evidence may also inform review of a claim of unreasonably delayed agency action.  *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 231 (E.D.N.Y. 2006).

Plaintiffs have submitted certain extra-record material—including multiple declarations—to provide evidence demonstrating their standing and the harm from unreasonable delay, consistent with their Complaint allegations, and to illuminate the record and assist the Court in better understanding the issues involved.

## ARGUMENT

Below, Plaintiffs establish the following points.  First, the Court may adjudicate Plaintiffs' claims  because Plaintiffs have Article III standing and challenge final agency actions.  Second, the 2015 Interpretive Rule and the Polymer80 Letters are contrary to law because they rely on an impermissible construction of the GCA.  Third, those actions are also arbitrary and capricious due to ATF's failure to explain its decision-making and its unexplained change in approach.  Fourth, Defendants' nearly year-long failure to respond to Plaintiffs' Petition for Rulemaking is unreasonable—indeed, unconscionable—in the face of the clear and growing threat to public safety directly attributable to ATF's determination that ghost gun components are not firearms. Accordingly, summary judgment should be granted for Plaintiffs on all counts.

**I.     This Court Has The Authority To Adjudicate Plaintiffs' Claims.**

**A. Plaintiffs Have Article III Standing.**

Standing requires that plaintiffs have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "It is well settled that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citation omitted).

*Injury in Fact.*  Plaintiff Cities are harmed by the proliferation of ghost guns resulting from ATF's regulatory actions.  This harm is to the Cities themselves and to their proprietary interests.  *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (city has standing to sue "an arm of the federal government when a harm *to the city itself* has been alleged"); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197-99 (9th Cir. 2004) (municipality "may sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens," including "management, public safety, [and] economic[ ] . . . harms").  In recent years, the Cities have experienced rapidly increasing numbers of ghost guns recovered from crime scenes.  56.1 Statement ¶¶18, 25–35.  Each City incurs substantial costs connected to each gun crime, including ghost gun crimes; these include law enforcement costs and—in the case of fatal and non-fatal shootings—additional costs from emergency services.  56.1 Statement ¶¶21, 22.  San José alone, for example, has identified over $1.2 million in costs arising out of multiple criminal investigations specifically involving ghost guns between 2018 and 2020.  56.1 Statement ¶¶31, 32.

Above and beyond the well-recognized costs of gun violence and gun crime, increasing numbers of ghost gun recoveries pose special and added challenges to law enforcement because ghost guns lack serial numbers and can be obtained without background checks, making them more attractive and accessible to criminals and other prohibited persons and rendering them more difficult if not impossible to trace.  56.1 Statement ¶¶19–24.  As the U.S. Department of Justice recently argued in a criminal prosecution: "Ghost guns are of particular concern to law enforcement because they are preferred by violent criminals who do not want their weapons traced back to them or their associates." Esty Decl. Ex. 15.  As a result, Plaintiff Cities face the twin harms of (1) greater difficulty in investigating rising numbers of crimes committed with untraceable ghost guns compared to "regular" gun crime, often leading to added costs, 56.1

Statement ¶¶20, 22–23, and (2) broader and growing impairment of the ability of their police departments to solve gun crime, trace crimes guns to their sources, hold criminals accountable and prevent future gun crime, *id.* ¶¶23–24; *see also* ATF0585–90 at ATF0587 (October 2014 ATF Press Release, acknowledging that when unserialized "firearms made from [] receiver blanks are found at a crime scene, it is usually not possible to trace the firearm or determine its history, which hinders crime gun investigations jeopardizing public safety"); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (explaining that "[f]irearms without serial numbers are of particular value to those engaged in illicit activity" and their prevalence "makes it more difficult for law enforcement to gather information on firearms recovered in crimes").[11]

*Traceability.*   The Plaintiff Cities' injuries are "fairly traceable" to ATF's actions and failure to act, which have a "predictable effect . . . on the decisions of third parties," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)—*i.e.*, the businesses that sell unfinished frames and receivers and the individuals who obtain and use ghost guns to perpetrate crime.  The "likely reaction of third parties" can be gleaned from "a variety of evidence," including "'the agency's own factfinding,'" "affidavits submitted by the parties," "evidence in the administrative record," and "arguments 'firmly rooted in the basic laws of economics[.]'"  *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) (citations omitted).

As explained above, manufacturers of unfinished frames and receivers, including Polymer80, expressly rely on, tout, and directly link to ATF's rulings and determination letters to promote their products as exempt from regulation.  56.1 Statement ¶¶8-10, 11, 48.  The precise

---

[11] To be clear, that ghost guns are especially attractive to and sought out by prohibited persons and criminals does not mean that there are not also law-abiding hobbyists who enjoy and/or prefer building their own guns.  As the government defendants have acknowledged: "Some firearms enthusiasts make their own firearms as a hobby.  Others make firearms because they prefer that the guns not have serial numbers and, therefore, be untraceable.  For others, especially felons or other prohibited persons, the desire is much more sinister."  ATF0296–0303 at 0298.

flaw with ATF's decisions—reliance on a mechanical "solidity/machining" approach that is detached from the statutory definition of "firearm"—has been exploited by ghost gun manufacturers and sellers who design, advertise, and sell these products without regulation while representing that they can be made into functioning firearms in just a few hours or less.  56.1 Statement ¶¶49–55.

As also noted, ghost guns are especially attractive to prohibited individuals, traffickers, and others intent on using guns to commit crimes, because they are unserialized, untraceable, and do not require a background check.  56.1 Statement ¶¶19, 20.  The fact that ATF's actions have led to the proliferation of ghost guns and their criminal misuse was therefore readily foreseeable and predictable.  Indeed, ATF predicted this exact result in a 1987 letter to a member of Congress, acknowledging that attempts to sell unfinished firearms and "thereby avoid[] recordkeeping and transfer restrictions" raised grave concerns because "prohibited persons may be able to acquire mail order firearms in kit form bearing no serial number or marks of identification."  ATF0023– 0046 at ATF0023–24; *see also* ATF0296–0303 at ATF0301–0302 (November 2015 U.S. Attorney Bulletin warning that self-made firearms "present[] an attractive avenue for a felon … to obtain a firearm").  A predictable injury is traceable to government action "even if the third parties act unreasonably or unlawfully."  *Walker v. Azar,* No. 20-CV-02834, 2020 U.S. Dist. LEXIS 148141, at *17 (E.D.N.Y. Aug. 17, 2020).  In short, the Plaintiff Cities' harms from the proliferation of ghost guns are a natural consequence of ATF's decision not to classify as "firearms" many of the nearly finished frames and receivers used to build those guns, in contravention of the GCA.

***Redressability.***  A decision by this Court to set aside ATF's actions and direct a response to the Petition would redress Plaintiff Cities' injuries.  "[A]ll that the redressability inquiry requires" is a showing that a ruling in Plaintiffs' favor "would reduce [the] risk" that "third parties

will undertake [the] activities" that cause Plaintiffs' injuries.  *NRDC, Inc. v. DOI*, 397 F. Supp. 3d 430, 440-441 (S.D.N.Y. 2019).  If the 2015 Interpretive Rule and Polymer80 letters are vacated, Polymer80 and other purveyors of ghost gun components will no longer be able to rely on and use these ATF letters and actions to advertise their products or skirt the GCA's substantive requirements of serialization and background checks.  Rather, going forward, ATF would need to classify unfinished frames and receivers consistent with the requirements of the GCA.

*Everytown's standing.*  While the Cities' standing supports all claims, Everytown also has standing.  "[A]n organization can 'have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" *NYCLU v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (citation omitted).  Everytown need demonstrate "only a 'perceptible impairment' of [its] activities" to make out an injury.  *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (citation omitted).  Because of Defendants' flawed determination that ghost gun components are not "firearms," Everytown was forced to divert resources, including to: (a) research, draft, and submit a Petition for Rulemaking, and (b) research and produce a lengthy and detailed report on ghost guns and engage in additional advocacy to raise public awareness of the growing threat to public safety.  56.1 Statement ¶¶40–41.  Everytown's efforts come with a "perceptible opportunity cost" that constitutes an injury because those efforts are an "expenditure of resources that could be spent on other activities[.]"  *Nnebe*, 644 F.3d at 157; 56.1 Statement ¶¶40–41.  More broadly, Defendants' determination that ghost gun components are not "firearms" continues to directly undermine a wide range of Everytown's advocacy efforts to prevent gun violence, including advocacy to ensure that background checks are conducted on all gun sales and that guns cannot be obtained by those who are legally prohibited from possessing them.  *Id*.

**B.  The Challenged Actions Are Final Agency Action.**

The 2015 Interpretive Rule and the Polymer80 Letters are "final agency action[s] for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and are thus properly reviewable under the APA.  In general, "two conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997).  "First, the action must mark the 'consummation' of the agency's decisionmaking process."  *Id.* at 177–78.  "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (citation omitted)*.*

The 2015 Interpretive Rule—encompassing ATF's Ruling 2015-1 and its related Q&As— was "the consummation of [ATF's] decisionmaking process" with respect to when unfinished frames and receivers constitute "firearms."  *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see Make the Road N. Y. v. Pompeo*, No. 19-CV-11633, 2020 U.S. Dist. LEXIS 134493, at *39 (S.D.N.Y. July 29, 2020) (finding consummation where the agency "gave no indication that the standards and procedures outlined therein were 'merely tentative or interlocutory'") (citation omitted).

Ruling 2015-1, which was signed by then-ATF Director B. Todd Jones, is an ATF ruling, and therefore "represent[s] the conclusions of [ATF] on the application of the law to the entire state of facts involved."  27 C.F.R. § 70.701(d)(2)(i)(A).  It accordingly constitutes a reviewable interpretive rule.  *See York v. Secretary of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985) (finding that ATF Ruling 83-5 was an "interpretative rule" subject to APA review).  Likewise, ATF's publicly posted Q&A on this topic reflect the agency's official views on the topics at issue. Legal consequences flow from the 2015 Interpretive Rule, which publicly states ATF's official "solidity" interpretation of the GCA, and which ATF has continued to apply since.

In short, Ruling 2015-1 and the related Q&A's together "crystallize[d] an agency position into final agency action." *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (explaining that "final agency action may [also] result 'from a series of agency pronouncements rather than a single edict'") (citation omitted).  *See also Oakley v. DeVos*, No. 20-CV-03215, 2020 U.S. Dist. LEXIS 106092, at *16–18 (N.D. Cal. June 17, 2020) (repeated agency statements—including updated guidance on agency's website and posting of "unofficial copy" of anticipated rulemaking—constituted final agency action).

Each of the Polymer80 classification letters also constitutes final agency action properly reviewed under the APA.  *See, e.g., Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (noting that the "parties agree that ATF's issuance of a classification letter is a 'final agency action' that is reviewable under the [APA]"); *Innovator Enters. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014) (vacating ATF classification letter); *Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29 (D.D.C. 1998) (upholding ATF's interpretation of the GCA in a challenge to ATF's letter classifying a rifle as a "firearm" and not an "antique firearm" under the GCA).

## II.    The 2015 Interpretive Rule and the Polymer80 Letters are Contrary to Law.

The GCA requires ATF to classify unfinished frames and receivers as "firearms" if they are "designed to" be or can "readily be converted" into operable firearms.  18 U.S.C. § 921(a)(3). By failing to apply this unambiguous statutory requirement and instead adopting a mechanistic "solidity/machining" approach unmoored from the statute, the 2015 Interpretive Rule and the Polymer80 determination letters are "not in accordance with law" and must be "set aside."  5 U.S.C. § 706(2)(A).

In assessing the legality of an agency's statutory interpretation, the court first must "determine whether Congress has 'directly spoken to the precise question at issue.'"  *Encino*

*Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016) (citing *Chevron U.S.A. Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)).  "If so, 'that is the end of the matter;

for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress.'"  *Id.* at 2125 (citing *Chevron*, 467 U.S. at 842–43); *see Rodriguez v. Carson*, 377 F.

Supp. 3d 401, 409 n.7 (S.D.N.Y. 2019) ("Because the Court concludes that the relevant statutory

language is unambiguous, the Court accords no deference to HUD's interpretation.") (citing

*Catskill Mts. Chptr. of Trout Unlimited, Inc. v. United States EPA*, 846 F.3d 492, 509 (2d Cir.

2017)).

Here, Congress has so spoken.  The GCA's clear text requires ATF to regulate as a

"firearm" any frame or receiver that "is designed to or may readily be converted to" become an

operable weapon.  18 U.S.C. § 921(a)(3).  The complete text of the "firearm" definition is as

follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or
> ***is designed to or may readily be converted*** to expel a projectile by the action of an
> explosive; (B) ***the frame or receiver of any such weapon***; (C) any firearm muffler
> or firearm silencer; or (D) any destructive device. Such term does not include an
> antique firearm.

*Id.* (emphasis added).

This provision defines "firearm" to include the "frame or receiver of any ***such weapon***,"

with the term "such weapon" in (B) referring back to the formulation of "weapon" in (A), which

includes a weapon "which will or is designed to or may readily be converted to expel a projectile

by the action of an explosive."  *Id.*  In other words, "such weapon" in (B) incorporates the

definition in (A) that includes not only items that are presently configured to fire, but also items

that are "designed to or may readily be converted" into operable firearms.  *See Local Union No.*

*38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 81 (2d Cir. 2003) (explaining that

statutory phrase describing "any such action" "refers back to" previous phrase providing right to "*institute* an *action* in any court" (emphasis in original)).[12]

That definition encompasses as "firearms" the nearly finished frames and receivers used to make ghost guns that ATF, contrary to statute, has determined are not "firearms." When Congress enacted the GCA, "design" was ordinarily understood to mean "to plan or have in mind as a purpose." *Webster's Third New International Dictionary of the English Language Unabridged* 611 (1965) (attached to Esty Decl. as Ex. 1). In turn, "readily be converted" was understood to mean "changed from one state to another" "without much difficulty" or "with fairly quick efficiency." *See id.* at 499 (defining "convert"); *id.* at 1889 (defining "readily").[13] Thus, the GCA unambiguously requires ATF to regulate as "firearms" unfinished frames and receivers that are (1) intended to become operable firearms as reflected by their design ("designed to") and/or (2) can be turned into operable firearms without much difficulty ("may readily be converted"). *Accord United States v. Wick*, No. 15-CR-00030, 2016 WL 10637098, at *1 (D. Mont. July 1, 2016) ("a plain reading of § 921(a)(3) indicates that if the receiver of a weapon can be readily converted to

---

[12] *See also, e.g., Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 872 (9th Cir. 2005) ("'[a]ny such facility' refers back to the phrase 'terminal, dock, or other facility'"); *Bonin v. Calderon*, 77 F.3d 1155, 1161 (9th Cir. 1996) ("any such proceeding" in a statute "refers back" to an earlier phrase: "for any matter involved in the habeas corpus proceeding" (citing 28 U.S.C. § 2251 (1996))); *Poling v. Farrah*, 131 F. Supp. 2d 191, 193 (D.D.C. 2001) ("The phrase 'any such district' refers to the preceding sentence in the section, which provides that criminal proceedings 'may be brought in the district wherein any act or transaction constituting the violation occurred.'").

[13] *See United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421–22 (6th Cir. 2006) (interpreting phrase "readily restored," in the context of converting a weapon to shoot automatically, to "describe[] a process that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process," and finding that a weapon could be "readily restored" where it would take up to 6 hours); *United States v. Smith*, 477 F.2d 399, 400-01 (8th Cir. 1973) (welded receiver of submachine gun could be "readily" restored to shoot where it would take "about an 8-hour working day in a properly equipped machine shop" to make it operable); *United States v. 16179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 465 (2d Cir. 1971) (inoperable starter gun that "can be converted by a relatively simple [drilling] operation taking only a few minutes is a 'firearm' and subject to federal controls and seizure").

expel a projectile, then that receiver can be considered a 'firearm' under the statute"), *aff'd on other grounds*, 697 F. App'x 507 (9th Cir. 2017).[14]

The 2015 Interpretive Rule and the Polymer80 Letters contravene this statutory definition by using a mechanistic "solidity/machining" approach that is untethered to the GCA's definition of "firearm."  Ruling 2015-1 provides that frames and receivers are not firearms if they lack "minor drilling and machining activities in or on the fire control area or other critical areas"—*i.e.*, are solid in those specified areas.  ATF0290–0295 at ATF0290.  The related Q&As reiterate that unfinished receivers are not firearms if "the fire-control cavity area is completely solid and un-machined."  ATF0364; *see also* October 23, 2014 ATF Press Release ATF0585–0590 at ATF0585.  Similarly, the Polymer80 Letters state that receivers and frames are not "firearms" if they are "completely solid in the fire-control recess area," or do not have a long enough list of "machining operations" or "design features" to make them "sufficiently complete."  ATF0225–0228 (February 2015 Polymer80 letter relying on "solidity" of fire control cavity area to conclude receiver is not a firearm); ATF0229–247 at ATF0230–0231 (November 2015 Polymer80 letter, classifying an AR-10 receiver based on whether it was "completely solid and un-machined in the fire-control recess area," and classifying a pistol frame based on which machining operations and design features were completed and whether it was "sufficiently complete"); ATF0253–0259 at ATF0255 (2017 Polymer 80 letter, using same "sufficiently complete" analysis as to "Glock-type" blanks).

The first flaw with the ruling and Polymer80 letters is that they entirely ignore the "designed to" prong of the statutory standard for defining "firearm."  If an unfinished frame or

---

[14] In *Wick*, the Department of Justice expressly acknowledged that the broad and inclusive "designed" and "readily be converted" language in subsection (A) of § 921(a)(3) also applies to frames and receivers that qualify as firearms in subsection (B), arguing that "a receiver, even one in two or three pieces, that can readily be converted into a functioning gun with the addition of some other parts and a weld or two is a firearm."  *U.S. v. Wick*, 2017 WL 774210 at 29 (9th Cir. Feb. 22, 2017).

receiver is "designed" or has as its clear purpose to become an operable weapon—as the nearly finished frames and receivers at issue here plainly are and do, with many sold as gun building kits —that is an independent and complete basis for determining that a frame or receiver is a firearm under the GCA.  ATF's disregard of this statutory standard alone renders ATF's challenged actions contrary to law.

Further, ATF's approach does not confront or comply with the GCA's alternative basis for determining that an unfinished frame or receiver is a "firearm"—whether it may "readily be converted" into an operable weapon.  Indeed, ATF's mechanistic "solidity/machining" approach is so reductionist as to be divorced from the statutory text altogether.  In contrast, ATF's prior approach in the decades following the GCA's passage grappled with and applied the statutory standard, such as by assessing the time it would take to turn a frame or receiver into a firearm, or the ease with which that process could be completed.  There is simply no basis in the statute to support ATF's current mechanistic view that if a frame or receiver is solid in the fire-control area, or lacks certain machining or design features, it cannot be a firearm, irrespective of how quickly and easily it can be converted into a functioning weapon.

Ghost guns prove this point.  The frames and receivers in ghost gun kits—which ATF's approach excludes from regulation—are expressly designed to become operable firearms.  Indeed, that is their **only** purpose, as Defendants well know.  *See* ATF0299 (2015 U.S. Attorneys' Bulletin acknowledging that "[e]ven though this [firearm blank] **could never really be anything but an AR-15-type lower receiver**, it is not yet a firearm [under ATF's approach] because the fire-control cavity has not been machined" (emphasis added)).  And the frames and receivers at issue can be

28

converted into such firearms in a matter of hours, if not minutes.[15]  Yet ATF's approach disregards these basic inquiries required by statute.  Accordingly, ATF's rulings are contrary to law and cannot stand.[16]

## III.   The 2015 Interpretive Rule and the Polymer80 Letters are Arbitrary and Capricious.

In addition to adopting an interpretation of the GCA that is contrary to the statute, ATF's challenged actions are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

### A.   ATF Failed to Articulate a Rational Explanation for its "Solidity" Approach.

To survive APA review, the 2015 Interpretive Rule and the Polymer80 Letters must be supported by a "satisfactory explanation . . . including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  "In reviewing that explanation," the Court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Id.*  (citation omitted).  If the Court determines that ATF "has relied on factors which Congress has not intended it to consider, entirely failed to

---

[15]Numerous websites and web resources confirm how quickly and easily a purchaser can produce an operable weapon from a range of unfinished receivers and frames that ATF has determined are not firearms under the GCA.  56.1 Statement ¶¶50-52, 54, 55.  In addition, Everytown asked one of its volunteers—a veteran and gun owner—to build a Polymer80 Glock handgun, using the same model of unfinished frame that ATF determined was not a firearm in the challenged 2017 Polymer80 determination letter.  As described in his declaration, it took a total of 86 minutes to turn the Polymer80 Glock handgun kit – which included an unfinished frame, a jig, drill bits and other parts – into an operable firearm using common tools easily available on Amazon.  *See* 56.1 Statement ¶53 (citing McFarlin Decl., attached to Esty Decl. as Ex. 34)**.**

[16] Even were the definition of "firearm" in 18 U.S.C. § 921(a)(3) ambiguous (which it is not), ATF's interpretation of that language in the 2015 Interpretive Rule and the Polymer80 letters is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984), for many reasons, including (but not limited to) because: (1) ATF did not engage in formal procedures such as notice and comment rulemaking, *see U.S. v. Mead Corp.*, 533 U.S. 218, 230–31 (2001) (explaining that although the absence of "formal process does not alone . . . bar the application of *Chevron*," the "overwhelming number of . . . cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication"); (2) interpretive rules generally "enjoy no *Chevron* status as a class," *id.* at 232; and (3) the ruling and determination letters contravene and fail to take account of the GCA's statutory text and adopt an approach contrary to the statutory purposes.

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the Court must set aside ATF's actions. *Id.* Here, ATF's 2015 Interpretive Rule and the Polymer80 letters are arbitrary and capricious under the *State Farm* framework for three main reasons.

**First**, an agency must "engage[] in reasoned decisionmaking"—it must choose an approach "with adequate support in the record" and "intelligibly explain[] the reasons for making that choice." *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760, 784 (2016). Each of ATF's actions fail in this regard. In adopting a "solidity/machining" test to determine whether a frame or receiver is a "firearm," Ruling 2015-1 summarily concludes, without any further explanation, that the statute's application turns on the absence or presence of "minor drilling and machining activities in or on the fire control area or other critical areas." ATF0290–0295 at ATF0290. Thus, even were "solidity/machining" an available interpretation of the statutory definition (and as explained above, it is not), ATF has failed to provide a reasoned justification to support that interpretation. Similarly, the corresponding "Q&A" merely states that "receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacturer' which would result in the classification of a firearm per the GCA." ATF0364. The Polymer80 determination letters follow the same approach for AR receivers and a similar mechanistic approach for Glock-type frames. ATF reached these conclusions without explaining what is significant or dispositive about a solid "fire control cavity area" or the absence of certain machining or design features or—more importantly—why those characteristics necessarily exclude a frame or receiver from qualifying as a firearm within the meaning of the GCA's definition. Images in the administrative record comparing unfinished receivers and frames

30

that ATF has determined to be firearms and not to be firearms vividly illustrate the point—showing that ATF's dividing line is untethered to what the items are clearly designed to be or can be readily converted into (as the GCA directs), and instead draws distinctions based on minor differences in holes and cavities. *See* Appendices C-F, attached hereto.[17]

**Second**, ATF concluded that certain frames and receivers are not firearms without engaging with the required statutory factors. Even if an agency provides a "laundry list of reasons not to regulate," the agency must "comply with . . . clear statutory command[s]." *Massachusetts v. EPA*, 549 U.S. 497, 533-34 (2007). Here, the statutory standard is clear: ATF must regulate frames or receivers that are "designed to or may readily be converted to" be an operable firearm. 18 U.S.C. § 921(a)(3). But in the challenged ruling and letters, ATF ignored entirely and failed to ask—much less answer—these statutorily prescribed questions. As discussed, Ruling 2015-1 and the Polymer80 letters fail to explain **why** the absence of machining in the fire control area or elsewhere, or the absence of certain design features, means that a receiver or frame is **not** readily converted to an operable firearm. And in none of the challenged actions has ATF even attempted to explain why such frames and receivers—which have no purpose **other than** to become part of operable firearms—are not "designed to" be part of an operable firearm. A searching examination of the administrative record likewise provides no such analysis. To the contrary, as noted above, Defendants have acknowledged that objects like an unfinished AR-15 receiver "could never really be anything but" a core component of a firearm—even while concluding that such a receiver "is

---

[17] Occasionally, ATF has very generally stated its claimed methodology, but in vague and conclusory terms disconnected from the "designed" or "readily convertibility test" tests in the GCA. *See e.g.*, 2016 ATF Determination Letter, ATF0661–0666 at ATF0663 ("ATF looks to whether a vital line has been crossed, a critical step has been reached, or a particular feature is formed on the receiver that would be necessary for a complete weapon to operate when the receiver is finished.").

not yet a firearm [under ATF's approach] because the fire-control cavity has not been machined." ATF0296–0303 at ATF0299.

In addition, ATF did not undertake testing or other factual development that might have supported its classification decisions within the terms of the statute.   An ATF classification decision may not be arbitrary and capricious if ATF "perform[s] sound testing" on a given item to determine its fit with the relevant statutory definition.  *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 605 n.5 (1st Cir. 2016) (where "ATF did perform sound testing" on a part that it classified as a silencer, ATF's determination that part met the statutory definition of silencer was not arbitrary and capricious).   But here, the 2015 Interpretive Rule and the Polymer80 letters are bare conclusions without meaningfully engaging with the statutory terms or any testing or assessment to ascertain whether the receivers or frames could be turned into operable weapons—in ATF's own words— "within a few hours['] time using common hand tools, or simple grinding, cutting, drilling or welding operations."  *1980 ATF Classification Letter* ATF0014–0016 at ATF0016.[18]

***Third***, ATF's actions are arbitrary and capricious because the agency "fail[ed] to explain" why its adopted standard "comports with Congressional purposes in enacting [the statute]." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 85–86 (2d Cir. 2006).  This failure is particularly salient here, given that the GCA was intended to help state and local law enforcement fight gun crime and violence, and to keep firearms out of the hands of prohibited persons—purposes undermined by ATF's actions.  *See Abramski v. United States*, 573 U.S. 169, 172 (2014) ("Federal law has for over 40 years regulated sales by licensed firearms dealers, principally to prevent guns from falling

---

[18] While the 2015 Polymer80 letter reveals that ATF cut the submitted AR-15 receiver in pieces, ATF0225-0228 at ATF0226, that appears to have been solely for the purpose of a backward-looking determination of how it was manufactured and whether the fire control area was solid and "homogenous"; no effort was made or testing undertaken to determine on a forward-looking basis whether the submitted receiver was designed to be or readily could be converted into the receiver of an operable AR-15 firearm.

into the wrong hands."); Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (principal purpose of the Gun Control Act is to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence").  Indeed, ATF's determinations that ghost gun components are not "firearms" have *invited* the emergence of an interstate market in mail-order firearms completely outside of federal regulation—exactly the problem the GCA was intended to address—thereby providing prohibited persons with new access to firearms and undermining the GCA's central purpose.  *See* S. Rep. No. 90-1097, at 20 (1968) (1968 Crime Bill); S. Rep. No. 90-1501, at 22 (1968) (GCA).

Nothing in the record shows that ATF weighed the risk that the 2015 Interpretive Rule or the Polymer80 letters would undermine these central purposes of the GCA.  ATF did not provide any explanation for why its actions were consistent with—much less furthered the purposes of—the GCA, even though ATF knew or should have known that: (a) unfinished but nearly completed frames and receivers exist and were being sold along with easy-to-use kits and instructions for the express and only purpose of being converted into operable firearms; and (b) its classification of unfinished frames and receivers as non-firearms was enabling an unregulated market in gun-building kits and creating a new and limitless source of unserialized, untraceable firearms easily obtained without background checks and particularly attractive to prohibited persons and gun traffickers.  ATF's failure to substantiate its classification decisions in terms of Congress's intent in enacting the GCA highlights its failure to provide a satisfactory explanation for its actions.  *See New York v. U. S. Dep't of Homeland Sec.*, 969 F.3d 42, 81–82 (2d Cir. 2020) (agency's rationale for its rule was arbitrary and capricious where it failed to provide a "satisfactory explanation" and its reasoning was "unmoored from the nuanced views of Congress"); *see also Humane Soc'y of the U. S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (the "failure to address 'an important aspect of

the problem' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking") (quoting *State Farm*, 463 U.S. at 43).

***

ATF had a straightforward assignment from Congress in classifying frames and receivers: apply the definition of "firearm" set forth in the GCA, consider the consequences for firearm law enforcement more generally, and make a reasoned judgment based on actual evidence. ATF did none of these in issuing the 2015 Interpretive Rule and the Polymer80 letters, and its actions therefore are arbitrary and capricious and must be set aside.

**B. ATF Did Not Adequately Explain its Decision to Abandon its Previous Approach.**

Although "[a]gencies are free to change their existing policies," an agency "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 136 S. Ct. at 2125–26 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 2126 (citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

For decades after the GCA's enactment in 1968, and before ATF fully embraced its current mechanistic "solidity/machining" approach, ATF repeatedly focused on the time and relative ease with which unfinished frames and receivers could be "converted" into operable firearms. For example, as noted previously, a 1983 classification letter stated that the agency had completed a sample receiver and measured the difficulty and length of that process:

> For test purposes, the interior of the sample was drilled out using a 5/8 inch drill and then finished with a 1/2 inch rotary file. Approximately 75 minutes time was required to make the receiver functional.

34

*1983 ATF Classification Letter* at ATF0020; *see also* ATF0016 ("[c]ertainly, if an unfinished receiver could be converted to functional condition within a few hours time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm").  Additionally, ATF's past approach expressly grappled with at least part of the statutory definition, applying the "readily be converted" standard (if not "designed to be").  *See supra* at pp.6–8.

The ATF actions challenged here depart without explanation from the agency's approach in the decades following the GCA's enactment.  Neither the 2015 Interpretive Rule nor the Polymer80 letters mentions the agency's prior implementation of the "firearm" definition in the GCA.  An agency "is not locked into the first interpretation of a statute it embraces, [but] it cannot simply adopt inconsistent positions without presenting some reasoned analysis." *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2002) (citation omitted).  By failing to "display awareness" that it had changed approaches—let alone explain why regulation should turn on an examination of solidity/machining instead of whether an unfinished frame or receiver was designed to be or readily convertible into an operable firearm—ATF's actions were arbitrary and capricious.  ATF additionally never "identif[ied] any actual defect" in its prior approach—an oversight that is particularly glaring given that its modified approach "stray[ed] from congressional intent." *New York*, 969 F.3d at 82.

## IV.   ATF Has Unreasonably Delayed in Responding to the Petition for Rulemaking.

Given the exploding public safety crisis tied to the proliferation of ghost guns, ATF has violated federal law in an additional way: "unreasonably delaying" its response to Plaintiffs' Petition for Rulemaking.  Accordingly, the Court should "compel" ATF to respond to the Petition. *See* 5 U.S.C. § 706(1).

To determine "whether a federal agency's failure to respond to a petition is unreasonable under the APA," courts apply a six-factor test derived from the D.C. Circuit's decision in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir.1984) ("*TRAC*"):

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Fams. for Freedom v. Napolitano*, 628 F. Supp.2d 535, 540 (S.D.N.Y. 2009) (citing *TRAC*, 750 F.2d at 80). Consideration of the *TRAC* factors boils down to "three basic inquiries" in a case like this, where Congress has not established a timeline within which the agency must act on a petition for rulemaking,[19] there is no claim of impropriety, and Plaintiffs seek action because "health and human welfare at stake":

> First, is there any rhyme or reason—congressionally prescribed or otherwise—for the [administrative agency's] delay (factors one and two)? Second, what are the consequences of delay if the Court does not compel the Administration to act (factors three and five)? Finally how might forcing the agency to act thwart its ability to address other priorities (factor four)?

*Ctr. for Sci. in the Pub. Interest v. FDA.*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014). Each of these inquiries demonstrates that ATF's delay is unreasonable.

**First**, there simply is no "rhyme or reason" for ATF's nearly year-long delay in responding to the Petition. Because Congress has not supplied a regulatory timeframe, "[t]he only applicable standard against which to measure that action is the APA's requirement that [federal agencies] act

---

[19] *See* 18 U.S.C. § 926(a) (setting forth authority of Attorney General to prescribe rules and regulations to carry out provisions of GCA, but not prescribing any timeline for responding to petitions for rulemaking); 28 C.F.R. § 0.130(a)(1) (noting that this rulemaking authority has been delegated to ATF).

'within a reasonable time.'" *CSPI*, 74 F. Supp. 3d at 301 (quoting 5 U.S.C. § 555(b)).  And while what is "reasonable" depends on the facts and circumstances, "'a reasonable time for agency action is typically counted in weeks or months, not years.'" *Fams. for Freedom,* 628 F. Supp. 2d at 540 (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004)).

Here, after a full year Defendants apparently have not done a single thing to consider Plaintiffs' urgent Petition and have not taken any other action to address the growing public safety threat of ghost guns.  In light of "the gravity of the problems" Plaintiffs described in the Petition, Defendants' "delay in even responding to plaintiffs 'saps the public's confidence in [the] agency's ability to discharge its responsibilities,' and therefore runs afoul of the APA." *Id.* at 541.  This is especially true given that the record makes clear that: (a) asserting regulatory authority over ghost guns is a public safety priority that was raised at the highest levels of ATF and DOJ well before the Petition for Rulemaking was filed in December 2019, *see* 56.1 Statement ¶43 (quoting former ATF Acting Director, who stated on *60 Minutes* that, prior to retiring in April 2019, he recommended that ATF assert regulatory control over ghost guns as a matter of public safety), and (b) the public safety risks of unserialized, no-background-check ghost guns have been clearly known to Defendants for years (*see, e.g.,* ATF0296-0303 at ATF0301–0302 (November 2015 U.S. Attorney Bulletin warning ATF that self-made firearms "present[] an attractive avenue for a felon … to obtain a firearm…"); ATF0585-0590 at ATF0587 (2014 ATF press release acknowledging that untraceable firearms "hinder[] crime gun investigations jeopardizing public safety")), if not decades (*see* ATF0023–0025 at ATF0023–0024 (1987 ATF letter to Congressman noting that ATF was "extremely concerned that the availability of unfinished frames and receivers would provide an avenue whereby prohibited persons may be able to acquire mail order firearms in kit form bearing no serial number")).

37

Nor can Defendants argue that they cannot reasonably be expected to begin the process of correcting a flawed and dangerous interpretation of the GCA in a year's time.  The recent example of bump stocks is illustrative:  as the Petition for Rulemaking lays out, in the wake of the mass shooting in Las Vegas on October 1, 2017, by a gunman using an unregulated bump stock, the Department of Justice published an advanced notice of rulemaking to prohibit bump stocks *less than three months later* (on December 26, 2017).  *See* Bump-Stock-Type Devices 83 Fed. Reg. 66514-01 (December 26, 2018) (to be codified at 27 C.F.R. §§ 447, 478 and 479).  The rule itself was finalized by December 26, 2018.  *Id.*  There is no sound reason Defendants cannot and should not be directed to act similarly expeditiously here.[20]

***Second***, the public safety and welfare consequences of Defendants' delay here are clear and grave.  As the Petition laid out in detail, and as ATF well knows, ghost guns are being recovered from felons, traffickers, criminal gangs, drug dealers, and minors in alarmingly increasing numbers all across the country; they have been used to carry out violent and deadly crimes including multiple mass shootings, incidents of domestic violence, and terroristic plots; and they have become the firearm of choice for those intent on doing harm and committing crimes. 56.1 Statement ¶¶13, 18, 19, 25-30, 33–35, 42–45.

The record before this Court also establishes that ATF's delay in responding to the Petition has prejudiced and continues to severely prejudice Plaintiffs.  In Plaintiff Syracuse's jurisdiction, over 70% more ghost guns had already been recovered as of November 2020 than in the entirety

---

[20] While it may be true, as government counsel suggested to this Court at the initial conference, that changing the agency's interpretation of "firearm" to capture unfinished frames and receivers and gun building kits will have a range of implications for enforcement of the GCA, that alone cannot justify doing nothing for nearly a year, especially in the face of the continuing harms and threat to public welfare and safety.  It also bears emphasizing that the rule change sought in the Petition would not interfere with any rights of law-abiding hobbyists who wish to continue to assemble their own firearms; it would simply require that nearly finished frames and receivers and most gun building kits bear a serial number, and that internet and retail purchasers pass a background check, as the GCA plainly requires.  And it would not criminalize otherwise lawful possession of previously built unserialized firearms by anyone not prohibited by law from possessing a firearm.

of 2019.  56.1 Statement ¶¶25, 26.  Plaintiff Chicago's ghost gun recoveries more than tripled from 2018 to 2019, with a significant further increase in 2020.  56.1 Statement ¶33.  Other cities also continue to see an alarming uptick in ghost gun recoveries: for example, Washington, D.C. recovered over 4 times as many ghost guns in 2019 as it did in 2018, and, as of May 2020, was on track to double the 2019 number in 2020.  56.1 Statement ¶45.

"[D]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *Geneme v. Holder,* 935 F. Supp. 2d 184, 193 (D.D.C. 2013) (internal quotations and citation omitted).  And when—as here—the danger to human lives is clear, immediate, widespread and growing, courts have not hesitated to intervene to direct agencies to act promptly.  *See, e.g., Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157-58 (D.C. Cir. 1983) (ordering "expedited" rulemaking from Occupational Safety and Health Administration in light of "the significant risk of grave danger" and the court's determination that "such a command [would not] seriously disrupt other rulemakings of higher or competing priority"); *Fams. for Freedom v. Napolitano*, 628 F. Supp. 2d at 541–42 (ordering Dept. of Homeland Security to respond to petition for rulemaking concerning substandard conditions of DHS facilities within 30 days, finding the delay "more egregious" because detainees were dying). This Court should do the same here.

***Third***, there is nothing in the administrative record to suggest that the need to address higher administrative priorities has caused Defendants' delay.  To the contrary, it is difficult to imagine a higher priority for defendants than keeping American cities safe from the rapid proliferation of gun violence and gun crime being carried out with unregulated ghost guns.  *See* ATF, https://www.atf.gov/ (last visited November 23, 2020) ("ATF is a law enforcement agency . . . that protects our communities from violent criminals, criminal organizations, [and] the illegal

use and trafficking of firearms").  Indeed, the GCA's primary purpose is to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213.

In sum, the *TRAC* factors overwhelmingly favor judicial intervention to compel prompt action, especially in light of the urgent public safety and welfare concerns presented here.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered for Plaintiffs:  this Court should vacate and set aside the 2015 Interpretative Rule and Polymer80 determination letters challenged in Count I-V, and it should order ATF to begin a rulemaking process consistent with the GCA within 30 days of a decision on this motion with respect to Count V.

Respectfully Submitted,

EVERYTOWN LAW

By: ___*/s/Eric Tirschwell*_____
        Eric Tirschwell (ET-3023)
        Len Kamdang (LK-3895)
        Aaron Esty (4793329)
        Krystan Hitchcock (5270202)
450 Lexington Avenue, P.O. #4184
New York, New York 10024
Telephone:  (646) 324-8222

Daniel Grooms
Elizabeth B. Prelogar
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 776-2042

*Attorneys For Plaintiffs*

# Appendix A



Excerpted from Plaintiffs' Complaint for Declaratory and Injunctive Relief, ECF No. 11 at ¶¶ 56, 57.

# Appendix B



Excerpted from ATF0279 (ATF Firearms Technology Branch Technical Bulletin 14-01, titled "Unfinished '80%' AR-15 Type Receivers" (Nov. 1, 2013)).

# Appendix C



Excerpted from ATF0280-282 (ATF Firearms Technology Branch Technical
Bulletin 14-01, titled "Unfinished '80%' AR-15 Type Receivers" (Nov. 1, 2013)).

# Appendix D



Excerpted from ATF0245-247 (Letter from Michael R. Curtis, Chief, Firearms Technology Division, ATF to Mr. Jason Davis, The Law Offices of Davis & Associates (Nov. 2. 2015) (classifying Polymer80's "Glock-type 'GC9 Blank'") ("firearm" and "not a firearm" annotations added)).

# Appendix E

Sample item "A" (not a firearm):



Sample item "B" (firearm):



Excerpted from ATF0520-522 (Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF to Mr. Brett McGinnis, Daytona CNC Inc. (Sept. 10, 2013) ("not a firearm" and "firearm" annotations in original).

# Appendix F



Excerpted from ATF0253-259 (Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF, to Mr. Jason Davis, The Law Offices of Davis & Associates (Jan. 18. 2015) (determining that Polymer80's "Glock-type 'PF940C Blank'" "is not a 'firearm' as defined in the GCA") ("Not a firearm" annotation added).