# Exhibit 15

NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
DAVID T. RYAN (Cal. Bar No. 295785)
Assistant United States Attorney
Terrorism and Export Crimes Section
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4491/4850
    Facsimile: (213) 894-2979
    E-mail:    david.ryan@usdoj.gov
           frances.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>BENJAMIN JONG REN HUNG,<br><br>        Defendant. | No. CR 20-452-SVW<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW OF DETENTION ORDER; DECLARATION OF DIAMOND OUTLAW; EXHIBITS |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys David T. Ryan and Frances S. Lewis, hereby files its Opposition to defendant's Application for Review of Detention Order (Dkt. 30).

//

This Opposition is based on the attached memorandum of points and authorities, the attached Declaration of Diamond Outlaw, the attached exhibits, the files and records in this case, and any further evidence or argument the Court may allow.

Dated: October 29, 2020

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

_____/s/_____
DAVID T. RYAN
FRANCES S. LEWIS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Through straw purchases and illegal transfers, defendant amassed an arsenal of more than 30 firearms, including several assault rifles and modified short-barrel rifles that are illegal to possess under federal and state law.  Upon defendant's arrest in this case last month, law enforcement seized some – but not all – of those firearms, as well as over 70,000 rounds of ammunition, and tens of thousands of dollars of tactical assault equipment.  Throughout 2020, defendant and a group of associates, who called themselves the "Shooters of the Nest," wrote about their efforts to train for urban combat, and their desire to amass an arsenal to confront and kill members of "antifa."

On May 31, 2020, defendant took one of his illegally obtained semiautomatic handguns, along with loaded high-capacity magazines, an 18-inch machete, a metal pipe, and a megaphone, and drove his truck nicknamed "War Rig" through a group of peaceful protestors and plainclothes police officers in Pasadena.  The night before, defendant similarly confronted protestors in Los Angeles, screaming "Fuck you!" and "I will kill you!" and "coal rolling" groups of people in his War Rig.

After his arrest on May 31, defendant lied to police officers, bragged that the War Rig had become a "national icon," accelerated his stockpiling of tactical assault equipment, and sent increasingly alarming messages about "eradicating" the "scum" who would "pray for a quick death" when he confronted them with his arsenal.

Based on these objective facts and evidence, including defendant's recent conduct, recent statements, and recent seizures, the United States Probation Office recommended that defendant be

detained pending trial, and United States Magistrate Judge Patricia A. Donahue ordered defendant detained. (See Ex. 1). Since Judge Donahue reached that conclusion, newly obtained evidence has only reinforced it, revealing additional evidence of defendant's intent to assault protestors, his lies to the government, the significantly larger scope of his conspiracy to illegally obtain and transport firearms across state lines, and his possession of illegal short-barrel rifles and assault weapons. Based on this new evidence, the government is now evaluating several additional felony charges and is in contact with the United States Attorney's Office for the Eastern District of California regarding potential charges arising in that district.

Defendant's appeal of Judge Donahue's six-page written order offers nothing new to alter her finding; instead it relies predominantly on hyperbolic rhetoric and mischaracterizations of facts, and otherwise simply ignores salient evidence that directly bears on defendant's present risk of danger to the community. This Court should affirm Judge Donahue's decision.

**II. FACTUAL BACKGROUND**

    A.    May 31, 2020: Defendant Intentionally Drove Through a Crowd of Protestors

As set forth in the Complaint, on May 31, 2020, defendant drove his truck bearing the license plate "WAR R1G" into a crowd of peaceful demonstrators in Pasadena who had been protesting against racial injustice, causing them to run out of the way to avoid being struck. (Ex. 2, ¶¶ 19-34). As Judge Donahue found, based on the totality of the evidence, "defendant's argument that a reasonable

2

interpretation of these events is that he was trying only to get people to move out of the way is unpersuasive." (Ex. 1 at 3.) Indeed, the overwhelming evidence of defendant's intent to drive into the crowd of protestors comes from the most reliable source of such evidence – his conduct and statements before, during, and after the incident.

Before the incident, on May 29, 2020, defendant wrote to his wife and other associates about his efforts to find and confront protestors in his War Rig, stating: "Antifa has been avoiding me or something. I can never seem to find them when I'm out war rigging??" An associate replied, "they hear the war rig coming and want no fucking part mi liege." (Ex. 2, ¶ 33(b).) The next night, May 30, 2020, a video posted online shows defendant confronting and "coal rolling" protestors in his War Rig in downtown Los Angeles.[1] (Id. ¶ 28.) According to defendant's associate ("CW-1") who was in the War Rig truck with defendant on May 30, defendant first drove through Pasadena looking to confront protestors, but after failing to find protestors he decided to drive to downtown Los Angeles. (Declaration of Diamond Outlaw ("Outlaw Decl."), ¶ 2.) CW-1 said that when they came upon groups of protestors downtown, defendant would scream at them, "Fuck you!" and "I will kill you!" and then coal-roll them before driving away to confront a new group. (Id.) As defendant and CW-1 left downtown that night, CW-1 recalled that defendant was "amped up" by the encounter and in awe of seeing the protests in

---

[1] "Coal rolling" refers to intentionally rapidly accelerating a car or truck in order to spew an excessive amount of exhaust fumes at a targeted person or item.

3

person.  (Id.)[2]  The next day, May 31, 2020, hours before defendant drove into the crowd in Pasadena, an associate sent him and his wife a picture of protestors blocking traffic on a highway, and defendant's wife replied, "That's why you don't stop on the freeway for these people and have a gun . . . If they try this on my car, I'm running them over."  (Ex. 2 ¶ 33.)[3]

During the incident, videos, witnesses, and Pasadena Police Department officers all indicated that a line of cars in front of defendant was slowly making U-Turns to avoid the protestors in the intersection.[4]  (Id. ¶¶ 20-21.)  Instead of turning around, and without any apparent provocation, defendant blared his modified, loud, train-like horn, causing the remaining cars in front of his truck to move out of the way.  (Id.)  Defendant than accelerated from a complete stop toward the crowd in the intersection, causing protestors and two plainclothes Pasadena Police Department detectives to run out of the way.  (Id.)  As video taken by defendant's wife from inside the truck shows, after defendant accelerated from a complete stop and began to drive into the intersection directly towards the protestors who had not engaged defendant or his wife up to that point, a protestor threw a cup at the truck, as defendant's wife yelled out, "train horn his ass!" and defendant blared his horn,

---

[2] CW-1 provided these statements after the initial detention hearing in this case, so they are newly obtained evidence that further confirm Judge Donahue's finding regarding defendant's intent on May 31 and his danger to the community.

[3] Of note, defendant's wife is one of his proposed sureties.

[4] Defendant misleadingly cites to news articles showing that, at other unspecified times during the day, other cars did not make u-turns but attempted to drive through the intersection.  (Motion at 7-8).  But defendant does not and cannot dispute that at all relevant times (namely, when defendant was there), all of the cars in front of him slowly made u-turns to avoid entering into the intersection.

leaned out his window, and yelled "fuck you guys!" (Outlaw Decl. ¶ 3.)

After defendant turned the corner, Pasadena Police Department officers pulled defendant over and found inside his truck a black fanny pack that contained a loaded Glock 26 9mm semiautomatic handgun with a 17-round magazine, a second loaded 15-round magazine, a trigger guard, and a flashlight. (Ex. 2 ¶ 24.) Also in the truck, officers found an 18-inch machete, a backpack containing $3,200 in cash, an 18-inch long metal pipe, and a megaphone. (Id.) The pipe was wedged between the driver's seat and the backseat, such that it was easily accessible to defendant as he drove. (Id.) Officers asked defendant and his wife what had happened and they falsely told police officers they had been shopping at a nearby Sephora store and were trying to leave when they were charged by protestors. (Outlaw Decl. ¶ 4.) In fact, however, the Sephora store had been closed and boarded up since March 2020. (Id.)[5] Officers then asked defendant if the truck and the items inside it belonged to him, and defendant said no, it was "not my truck, it's just a work truck that we use for our business," and "a lot" of the items inside did not belong to him. (Id. ¶ 5.) In fact: (1) neighbors and associates have reported, and photographs seized from defendant's phone show, that defendant

---

[5] Defendant makes much of a Michael's receipt from earlier that afternoon, arguing that because he had been shopping before driving to the protests, he must not have intended to assault the protestors. But defendant's argument that he was out for a simple shopping trip is undermined not only by his own statements before and after the incident, but by the truck itself: if defendant was just out shopping at a craft stare, why did he stock up the truck with weapons, adorn it with four giant flags, "coincidentally" come upon protestors and drive through them screaming and cursing, and then, when given a chance to invoke this alibi at the scene, instead lie to police about where he had been?

5

routinely used the War Rig truck throughout 2020; (2) video seized from defendant's phone shows defendant wearing the black fanny pack on April 12, 2020, and practicing quickly pulling a firearm from it; and (3) text messages and business records show that CW-1 bought the Glock 26 for defendant in December 2017 and defendant possessed the Glock 26 from that point on. (Ex. 2 ¶¶ 36, 43-47, 54; Outlaw Decl. ¶ 6.)

Finally, in the months after the incident, defendant bragged about the notoriety he had received, writing to an associate in August 2020 that the "war rig is a national icon" and that neighbors had recently approached him "like I was some kind of greek god of a patriot" and wanted to "shake my hand and pat my truck." (Outlaw Decl. ¶ 7.) Defendant said the neighbors were "ready to fight the full civil war if need be." (Id.)

B. Defendant Illegally Acquired and Illegally Possessed An Arsenal of Firearms

As set forth in the Complaint affidavit, records from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") show that the Glock 26 found in defendant's truck was purchased by CW-1 in Oregon on December 26, 2017. (Ex. 2 ¶ 36.) Between December 26, 2017 and January 3, 2018, defendant and CW-1 exchanged text messages in which CW-1 confirmed that he bought the firearm for defendant and transported it to California for him. (Id. ¶¶ 39-47.) Agents also seized videos and pictures from defendant's phone taken inside the firearm store on December 26, 2017. (Outlaw Decl. ¶ 8.)

Since Judge Donahue ordered defendant detained, CW-1 has admitted to the FBI that he bought the Glock 26 as well as a Glock 43

6

for defendant on December 26, 2017, and then transported both firearms across state lines for defendant the next week, delivering them to defendant's "training grounds" at his family's vineyard in Lodi, California.[6]  (Id. ¶ 9.)  In total, CW-1 admitted that he made seven different straw purchases of firearms for defendant between 2014 and 2018.  (Id.)  CW-1 recalled that defendant first asked if he had an Oregon driver's license, and when CW-1 said he did, defendant asked if CW-1 would buy firearms for him.[7]  (Id.)  CW-1 described several times when defendant would drive him to a firearm store, select one or more firearms, take him outside and hand him cash, and then send him back inside to buy the firearms with the cash and falsely certify on the ATF forms that he was the actual transferee/buyer.  (Id.)

On September 23, 2020, FBI agents executed search warrants at defendant's house and his family's vineyard in Lodi, California. From defendant's house, agents seized seven rifles, two pistols, over 10,000 rounds of ammunition, several loaded high-capacity magazines, and large quantities of tactical assault equipment including body armor, holsters, suppressors (silencers), sights, and scopes.  (Id. ¶ 10.)  From the vineyard, agents seized ten rifles, ten pistols, over 60,000 rounds of ammunition, and similar tactical assault equipment.  (Id.)  Agents also found on defendant's phone the below photograph, which was taken at defendant's house just a month prior

---

[6] CW-1 provided this information pursuant to use immunity, which prohibits the government from utilizing CW-1's statements to prosecute CW-1.  CW-1 has no other agreement with the government.

[7] Generally speaking, Oregon is viewed as having less restrictive firearms restrictions than California.

(April 2020) to his driving the War Rig into Pasadena protestors and shows some (but not all) of the items agents later seized:



(Id. ¶ 11.)

As detailed in the Complaint, defendant repeatedly communicated with associates about storing firearms, ammunition and tactical assault equipment at his house and the vineyard, and using the vineyard as a training ground to prepare for civil disorders. (Ex. 2 ¶¶ 58-72.) Defendant has not, however, registered a single firearm in the state of California. (Id. ¶ 48.)

Agents also seized from both locations numerous firearm parts, such as upper and lower receivers used for manufacturing and modifying firearms. (Outlaw Decl. ¶ 10.) As detailed in the Complaint, in April 2020, defendant exchanged messages with an associate about using gun parts to assemble "ghost guns," which are homemade guns that do not have serial numbers and are not registered.

8

(Ex. 2 ¶ 62.) Ghost guns are of particular concern to law enforcement because they are preferred by violent criminals who do not want their weapons traced back to them or their associates. In addition to the gun parts, agents also found evidence that some of the firearms had been illegally modified. Specifically, just last week, ATF Special Agents completed their review of the firearms and determined that three of the AR-15 semi-automatic rifles seized from defendant's house had been modified into short-barrel rifles, possession of which is prohibited under federal law, and three of the rifles seized from the vineyard had been modified and qualified as assault rifles, possession of which is prohibited under California law. (Id. ¶ 12.)

Notwithstanding agents' seizure of more than 30 firearms, at least four remain unaccounted for. Specifically, as discussed in the Complaint, in March 2020 defendant bought three rifles from a store in Oregon and then transported those firearms across state lines to Lodi, California, in violation of federal law. (Ex. 2 ¶¶ 50-57.) Agents have yet to locate two of those three rifles. (Outlaw Decl. ¶ 13.) Agents also have not located a firearm defendant bought in Oregon from a different store on March 29, 2020, or the second firearm that CW-1 bought for defendant in December 2017. (Id.) The existence of defendant's four unaccounted for firearms that he could potentially access if released on bond heightens the significant risk of danger that he poses to the community.

9

C. June-September 2020: HUNG Stockpiles Tactical Assault Equipment and Expresses Desire to Confront and Kill "Antifa"

In another example of defendant's increasing danger to the community, he was apparently undeterred by his arrest on May 31 after targeting protestors; instead, defendant accelerated his accumulation of tactical assault equipment and his statements regarding his desire to confront and kill "antifa."

Bank and PayPal records show that while defendant bought at least $8,500 worth of tactical gear and ammunition between 2018 and May 2020, he bought approximately $20,000 worth of similar equipment between June and August 2020. (Id. ¶ 14.)

During that same period, defendant exchanged numerous text messages with a group of associates regarding their efforts to prepare to engage in civil disorders in response to perceived abuses by government officials. As set forth in the Complaint, in March 2020, defendant and his wife and other associates exchanged messages asserting that health restrictions implemented in response to the COVID-19 pandemic were in fact a cover for a "deep state" military operation, referred to as the "#QANON storm." (Ex. 2 ¶¶ 55-56.) As described by the Anti-Defamation League, a national anti-hate organization, QAnon is a "global, wide-reaching and remarkably elaborate conspiracy theory" . . . "with marked undertones of antisemitism and xenophobia."[8]

According to CW-1, after CW-1 moved to Los Angeles in early 2020, he and "the boys," including several of the same individuals on

[8] https://www.adl.org/qanon. The ADL also states, "While the ADL does not believe that all QAnon adherents are inherently extremists, this is a dangerous theory that has inspired violent acts."

10

the group text messages, would get together when defendant visited Los Angeles. (Outlaw Decl. ¶ 15.) CW-1 said that defendant would assert that health restrictions ostensibly due to COVID-19 were actually a plot by the government to "control us," that the government was purposefully allowing civil unrest as a pretext to use the military to take away guns and other freedoms from citizens, and that they needed to be ready when things got out of hand. (Id.)

Between June and September 2020, defendant and a group of associates began calling themselves the "Shooters of the Nest,"[9] and exchanged messages regarding obtaining firearms and related equipment, training at defendant's family's vineyard, and confronting perceived "antifa." (Id. ¶ 16.) For example, on August 31, 2020, defendant sent a video to the Shooters of the Nest of what appears to be a protest where certain individuals are smashing car windows and wrote that it was a "target rich environment . . . what do you need an AR-15 for." (Id.) On September 6, 2020, an associate wrote a message to the group, which defendant "Liked," showing a hunter standing over a killed boar and the text, "gunna be replaced with Antifa soon if they keep acting up." (Id.) On September 10, 2020, shortly after wildfires broke out in Oregon, defendant wrote to the group, "Antifa terrorists caught setting fires," to which an associate replied, "fuckers need to be burned at stake." (Id.) On September 11, 2020, defendant sent photographs to the group showing him outfitting a helmet with night vision goggles next to two AR-15s, and an associate replied, "Antifa worst nightmare . . . can you imagine Antifa rolling up in Lodi thinking its sweet and the King

---

[9] Based on the context of text messages, it appears the "Nest" is a reference to defendant's house.

11

Bernardo hunts you down." Defendant replied, "no fly zone where things magically disappear or become grape fertilizer." (Id.)

Defendant also sent himself a message on August 22, 2020, describing in vivid and dark detail what he would do if the "mob" came through his neighborhood, writing, "If you come to intimidate or harm me and mine, better come ready for the 7th level of hell. You won't find me in bed, startled and frantic. I will be death from the shadows, you will never see or know I was there. A ghost. Disturbing the peace and safety of our babies in the middle of the night will come at the ultimate price. I will be operating a $10,000 night vision setup and a $5000 mk18 rifle behind a pile of fully loaded 100 round drum mags. Come to our neighborhood and threaten our babies?!? These scum will pray for a quick death and hope we don't bring em back to our subterranean 'interrogation' chamber. Where the fun really begins and I make them tell me where their families live. These scum are a lethal disease to the future prosperity and well being of our children. We will eradicate them accordingly." (Id. ¶ 17.)

**III. ARGUMENT**

To determine whether pretrial detention is warranted, the Court considers: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. See 18 U.S.C. § 3142(g). All four factors here weigh in favor of detention.

12

As set forth above and in the criminal complaint, defendant illegally obtained a stockpile of more than 30 firearms through a combination of straw purchases, illegal transfers, and illegal modifications, as well as over 70,000 rounds of ammunition and tens of thousands of dollars of tactical assault equipment. He carried one of his illegally obtained guns while intentionally driving through a crowd of protestors after seeking them out for days. After his arrest for that incident, he showed no remorse, but instead accelerated his stockpiling of tactical assault equipment and his expressions of desire to use his arsenal to confront and assault protestors in the future.

The evidence of defendant's commission of the charged firearms crimes, as well as several additional potential firearms crimes, is overwhelming. The evidence is based on his own text messages, travel records and location data, the seizure of firearms from his person and his house, and now, the admissions of his co-conspirator and straw-purchaser, CW-1.

In addition to the evidence of defendant's criminal conduct and violent and conspiracy theory ideology, his failure to be truthful raises an additional concern about his willingness to comply with terms of pretrial release. As noted above, to carry out the charged crimes, defendant directed CW-1 to lie on ATF Forms regarding the firearms CW-1 was purchasing for defendant. Then, contrary to defense counsel's false assertion that defendant was "immediately responsive and cooperative" with police officers on May 31, (Mot. at 10), in fact defendant lied to the police, saying that he had been shopping at Sephora, and that the truck and the items inside it were

13

not his.  Similarly, even more recently and after being arrested again (in this case), defendant falsely told the United States Probation Office that he does not use illegal drugs and had only tried marijuana.  In fact, at defendant's house, agents found a bong, a marijuana pipe, and multiple pill bottles filled with marijuana, and CW-1 admitted that for the several years that he has known defendant, defendant has used marijuana daily, regularly provided marijuana to CW-1 and the rest of "the boys" during gatherings, and also used cocaine and ecstasy.  (Outlaw Decl. ¶ 19.)  If defendant cannot be truthful with law enforcement on recent and repeated occasions, it provides little assurance to this Court that it should put its trust in him to comply with the stringent conditions proposed by his counsel, even if the Court could somehow assure itself that defendant no longer posed a danger to the community.  Moreover, defendant's statements to his other like-minded compatriots suggest, at bare minimum, a distrust in government authority that further raises concerns about his willingness to comply with court orders.

It is not apparent whether and to what extent defendant's proposed sureties and supporters–his parents and other family associates—were aware of defendant's illegal conduct or violent ideology.  To the extent defendant's parents were unaware of his conduct, his ability to conceal it from them while accumulating an arsenal of illegal weapons at their vineyard and converting a portion of their vineyard into a tactical training ground for the Shooters of the Nest raises significant concerns about their ability to now serve as effective sureties.  Similarly, defendant's wife, who is a proposed surety, exchanged messages with defendant regarding

14

assaulting protestors, was in the War Rig on May 31 encouraging defendant to "train horn his ass!" while defendant drove through the intersection, and lied to police about shopping at Sephora before the incident. Defendant's wife also falsely stated to FBI Special Agents after defendant's arrest that defendant did not own any firearms. (Outlaw Decl. ¶ 20.) Thus, in addition to her potential criminal liability in this case, defendant's wife is also a percipient witness. She is not an appropriate surety in this case.

As Magistrate Judge Donahue found, "defendant has demonstrated by his actions and statements that he presents a significant danger to the public." (Ex. 1 at 5.) Since Judge Donahue reached that conclusion, newly obtained evidence has only reinforced it, highlighting defendant's lies to the government, and revealing the broader scope of his illegal conduct, leading the government to evaluate several additional felony charges. Furthermore, due to defendant's intentional efforts to conceal his ownership of firearms through straw purchases, illegal transfers, the creation of "ghost guns," and the failure to register any firearms, the government still has been unable to locate at least four firearms. Finally, defendant's (and his wife's) lies to law enforcement and a court officer only exacerbate the risk of his release. For these reasons, Judge Donahue's conclusion that defendant's proposed bail package will not mitigate the danger he poses to the community remains correct, and the Court should affirm her order.

**IV. CONCLUSION**

For the foregoing reasons, this Court should affirm the decision to order defendant detained pending trial.

15