Exhibit 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
:
CITY OF SYRACUSE, NY, et al.,                :
:    No. 1:20-CV-06885-GHW
Plaintiffs,          :
:
v.                :    DECLARATION OF
:    TED ROBERT MILLER, PhD
:    IN SUPPORT OF PLAINTIFFS'
:    MOTION FOR SUMMARY
BUREAU OF ALCOHOL, TOBACCO,          :    JUDGMENT
FIREARMS AND EXPLOSIVES, et al.,       :
:
Defendants.          :
:
-----------------------------------------------------------X

I, Dr. Ted Robert Miller, PhD declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 as follows:

1.     The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2.     I submit this sworn declaration in support of Plaintiffs' motion for summary judgment, in the above case relating to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and application of the Gun Control Act to unfinished firearm frames and receivers that are sold over the internet as part of do-it-yourself gun building kits, referred to herein as "ghost guns" because they lack serial numbers.

3.     I was asked to provide my expert opinion about the number and costs of firearm injuries nationally and in Chicago, IL, Columbia, SC, San Jose, CA, and Syracuse, NY. My national analysis was to focus on costs in 2018, because it is the most recent

year with complete data available. I was instructed to focus my local analysis on 2016-

2019 because the ghost gun problem largely emerged during that time period.[1] I also

was asked to provide the average cost per person shot with a ghost gun by injury

severity (fatal, hospital-admitted, or treated only in the emergency department (ED)). I

analyzed costs from the perspectives of society (public welfare costs) and the city

government.

### 4.    Summary and Findings

5.    I gathered local and national data on firearm injuries and used regional

data about urban areas to fill gaps. I costed the injuries using my published methods. As

the summary table shows, the number of people shot in the four cities in 2019 totaled

3,534, with 3,038 of those in Chicago. The average direct and measurable costs cities

incurred when a person was shot in the city in 2019 ranged from $32,064 in San Jose, CA

to $19,648 in Columbia, SC. These costs funded incident-specific emergency medical,

police, and victim services. The public welfare cost per person shot was much higher,

ranging from $322,663 to $612,101 per person shot. Across the four cities, direct city

government spending due to firearm injuries in 2016-2019 exceeded $494 million, with

a range from $13 million in Columbia to $442 million in Chicago. The city governments

spent additional funds on firearm crimes without injury and firearm-oriented violence

prevention programs, and lost property tax revenue because of shooting incidents. I did

not quantify those losses.

---

[1] American Bar Association Standing Committee on Gun Violence, Criminal Justice Section, Civil Rights and Social Justice Section. (2020, February 17). Ghost Guns: Report to the House of Delegates, 20M107A.

Summary Table: People Shot and Costs of Firearm Injury in the Four Cities, 2015-2019

|  | San Jose | Chicago | Syracuse | Columbia | Total |
|---|---|---|---|---|---|
| People Shot in 2019 | 179 | 124 | 3,038 | 193 | 3,534 |
| Cost to City per Person Shot | $32,064 | $28,662 | $28,427 | $19,648 | |
| Cost to Society per Person Shot | $612,101 | $384,968 | $404,883 | $322,663 | |
| Total Cost to City in 2016-2019 | $24,552,804 | $442,660,015 | $14,099,871 | $13,244,317 | $494,557,008 |

6.      In 2019 dollars, the public welfare costs of firearm injury nationally totaled $66 billion in 2017, the most recent year with data available. These public welfare costs exclude the value of lost quality of life, which the US government includes when analyzing the benefits of regulations addressing public welfare concerns.[2-3] Adding those would raise the national costs to at least $280 billion annually.

**7.      Supporting Information: My Credentials**

8.      I am currently a Principal Research Scientist at the 501(c)3 nonprofit Pacific Institute for Research and Evaluation and HBSA, Inc. in Calverton, MD. I received my Ph.D. in Regional Science (a subdiscipline of economics) from the University of Pennsylvania in 1975 and earlier received both a M.S. in Operations Research and a Master's in City Planning from that same university. In 1968, I received a B.S. in Engineering from Case-Western Reserve University.

---

[2] Gillette, C.: Hopkins, T. (1988). Report to the Administrative Conference of the United States: Federal agency valuations of human life. Washington, DC: Administrative Conference of the United States.
[3] U.S. Office of Management and Budget. (1989). Regulatory program of the United States. Washington, DC: U.S. Government Printing Office.

9.      As listed in the attached resume, I have published more than 325 journal articles, plus 65 proceedings papers, books, and book chapters. I also have written numerous reports to government and private-sector clients. According to Google Scholar, my publications have more than 100,000 citations, 98 have been cited at least 97 times, and 292 have been cited at least 10 times.

10.      My main areas of research have for decades focused on the costs of death, injury, illness, violence, substance abuse, and other societal ills, as well as the savings from prevention, early intervention, and harm reduction. I have published related journal articles and book chapters focused on methods for counting and costing medically treated injuries.

11.      This body of work earned me numerous awards, notably the Excellence in Science and Distinguished Career Awards from the Injury Control and Emergency Health Services Section of the American Public Health Association, the Vision Award from the State and Territorial Injury Prevention Directors Association (its highest honor), and the Award of Merit from the Association for the Advancement of Automotive Medicine (its highest honor). I served for at least 18 years on the editorial boards of 4 journals: Accident Analysis and Prevention, Injury Prevention, the Journal of Safety Research, and the Journal of Forensic Economics.

12.      I have more than 30 years of experience analyzing firearm injury costs. I first studied them in 1988-1989 as part of a team that produced a report to Congress on the cost of injury by cause in the United States. I began studying the cost of crime in the

early 1990s, leading to lead-authored articles on the costs of firearm injury in Canada (1995) and the US (1997). I worked with Phillip Cook and Jens Ludwig on a further study of the costs of firearm injury in 2000. In 2006, I was part of a team that wrote a book and related article updating the costs of injuries by cause. I co-authored a further update in 2018. In 2015, I collaborated with *Mother Jones* on an analysis of the costs of firearm injury nationally and by state. In 2018, I co-authored an article on global mortality from firearms. I currently have manuscripts under review or about-to-be-submitted on the costs of firearm injury by intent (1) nationally by demographics and (2) by state. Over the years, I have produced interim updates of my firearm injury costs, spoken at forums on the cost of firearm injury, and calculated firearm injury costs in response to requests from reporters.

13.    My cost analyses routinely adopt multiple perspectives, including an assessment of the costs borne by society and government agencies.[4-9] My modelling systems break down who pays the costs.

---

[4] Miller, T. R., Cohen, M., Swedler, D., Ali, B., & Hendrie, D. (2020). Incidence and costs of personal and property crimes in the United States, 2017. SSRN. doi: http://dx.doi.org/10.2139/ssrn.3514296

[5] Miller, T. R., Nygaard, P., Gaidus, A., Grube, J. W., Ponicki, W. R., Lawrence, B. A., & Gruenewald, P. J. (2017). Heterogeneous costs of alcohol and drug problems across cities and counties in California. *Alcoholism: Clinical and Experimental Research, 41*(4), 758-768. doi: 10.1111/acer.13337

[6] Miller, T.R., Fulton, D., Lee, D.S. (2018). The cost and consequences of sexual assault in California. Sacramento: California Coalition Against Sexual Assault.

[7] Blincoe, L. J., Miller, T. R., Zaloshnja, E., & Lawrence, B. A. (2015). *The economic and societal impact of motor vehicle crashes, 2010 (Revised)*. (Report No. DOT HS 812 013). Washington, DC: National Highway Traffic Safety Administration.

[8] Miller, T. R., & Hendrie, D. (2013). Economic evaluation of public health laws and their enforcement. In A. Wagenaar & S. Burris (Eds.), *Public health Law Research: Theory and Methods* (pp. 347-378). San Francisco: Jossey-Bass.

[9] Miller, T.R. (2012). Cost-benefit analysis of the Nurse-Family Partnership program, Final Report to Pew Charitable Trust.

14.     As a spatial economist and urban planner, I was trained in small-area estimation. I routinely apply that training to decompose national incidence and cost estimates to the state, county, and city levels. For example, as part of the Purdue Pharmaceutical bankruptcy proceeding, I produced web-published opioid damages/abatement claims for every county, city, and township in the United States. Almost all local governments that filed claims relied on my claims calculations.

15.     In addition to analyzing the costs of social problems, applying my training in operations research, I regularly analyze the incidence of the problems, their risk factors, and the effectiveness of intervention. More than 100 of my publications cover those topics.

16.     I have been an invited core member of the International Collaborative Effort on Injury Statistics since its inception in 1995. That body is tied into the process for updating the injury section of the International Classification of Diseases, which is used in mortality and hospital systems to code injury causes (e.g., assault with firearm) and diagnoses. I have acquired deep knowledge of those systems through 30+ years of usage, and have successfully proposed several improvements to the codes in the US Clinical Modification.

17.     Finally, I have expertise analyzing patterns of property valuation and property tax assessment. Notably, building on my training in spatial economics and urban planning, I led a study for the US Department of Housing and Urban Development that examined the spatial and racial equity of property tax assessments relative to

property values in eight US cities. In my work on costs of crime, I periodically review the literature on the impacts of crime on property values.

**18.    Incidence of Firearm Injury**

19.    Table 1 shows firearm injury counts in 2016-2019 for the four cities, 2016-2017 national counts, and the associated annual firearm injury rates. Columbia had the highest firearm injury rates by severity (fatal, nonfatal admitted to hospital, nonfatal treated only in the emergency department), while San Jose had the lowest. San Jose's rates were the only ones below the national average.

*20.    Incidence Methods*

*21.*    My national incidence analysis closely followed the methods used in my academic work. Indeed, the national counts and costs reported here were generated before I was approached to provide a declaration and currently are immersed in the journal submission, peer review, and revision process.

*22.    Mortality*

23.    I relied on US Vital Statistics Multiple Cause of Death (MCOD) data for counts of firearm deaths by intent nationally and by county for urban counties. Although these data can be tabulated online through the federal Centers for Disease Control and Prevention (CDC) Wonder system, I instead tabulated MCOD files that my staff and I previously obtained from the National Center for Health Statistics (NCHS) which offer more detail. The most recent MCOD data available are for 2018. The NCHS

data use agreement for spatially identified MCOD data specifically precludes sharing the raw data among litigating parties. Rather, each party is required to submit its own application for the data to NCHS, which allows NCHS to verify that the data will be stored securely, and small case counts will not be disclosed.

24.     The restricted Federal mortality census data identify the place of death by county but not by city. I developed simplistic models that allowed me to infer the city counts from the county counts. For each city, I relied on data that showed what portion of county firearm injuries were in the city. I tabulated county and city hospital and ED firearm injury counts for 3 years in Syracuse. With slightly less accuracy, I relied on the percentage of county firearm homicide inside the city for 2016-2019 in Chicago[10], 2016-2017 in San Jose[11], and 2011-2015 in Columbia[12]. Table 2 displays the relevant percentages.

25.     Firearm intent is classified in 5 categories: assault, legal intervention, unintentional, undetermined, and self-inflicted. My analysis excludes deaths and injuries coded as resulting from legal intervention. It includes all other firearm injuries. I

---

[10] Chicago Police Department. Annual Report 2017 (2018). And Chicago Police Department. 2019 Annual Report. (2020). https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/.

[11] San Jose Police Department Crime Analysis Unit. (2018, April 23). Homicide victims: Means of death -- Firearms. Report CAU # 18-345/981N.

[12] Flanagan, G. L. (2016). Drugs, gangs, domestic violence driving spike in homicides, Midlands officials say Retrieved from https://www.thestate.com/news/local/crime/article81820857.html.

included them because a ghost gun poses a risk for firearm injuries of all intents during the time period that it is stored in a home or stashed nearby. [10-15]

26.    *Hospital-treated Injury*. My national counts came from Healthcare Cost and Utilization Program (HCUP) data available from the US Agency for Healthcare Research and Quality (AHRQ). Following a federal injury classification,[16] I counted nonfatal firearm injuries by intent nationally based on ICD-10-Clinical Modification (ICD-10-CM) codes recorded in the HCUP National Inpatient Sample (NIS) and Nationwide Emergency Department Sample (NEDS). The most recent NIS and NEDS data available are for 2017. NIS builds on a simple 1 in 5 sample from every hospital in 46+ participating states plus DC, while NEDS is a complexly weighted sample drawn from 36+ of the NIS jurisdictions. The diagnosis coding system used in these files changed midway through 2015, causing that year's data to be largely unusable. I restricted my NIS and NEDS analysis to 2016-2018.

27.    Starting in 2016, the diagnosis coding system distinguished visits as initial, follow-up, or to treat sequelae. I restricted my analysis to initial visits. To avoid double-counting, I excluded ED visits that were discharged into inpatient care. The NIS and NEDS data provide a 6-category breakdown of the urbanicity of the county where the

[13] Anglemyer, A., Horvath, T., & Rutherford, G. (2014). The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. Annuals of Internal Medicine, 160(2), 101-110. doi: 10.7326/M13-1301.

[14] Butler, E. K., Boveng, H. M., Harruff, R. C., Duchin, J. S., Vavilala, M. S., Rivara, F. P., & Rowhani-Rahbar, A. (2020). Risk of Suicide, Homicide, and Unintentional Firearm Deaths in the Home. JAMA Internal Medicine, 180(6), 909-911. doi: 10.1001/jamainternmed.2020.0806, 2763812 [pii].

[15] Wiebe, D. J. (2003). Firearms in US homes as a risk factor for unintentional gunshot fatality. *Accident Analysis & Prevention, 35*(5), 711-716. doi: S0001457502000490 [pii], 10.1016/s0001-4575(02)00049-0.

[16] National Center for Health Statistics. (2019). Tools and Frameworks. Retrieved from https://www.cdc.gov/nchs/injury/injury_tools.htm.

patient resides. NIS codes residence in nine Census divisions, while NEDS codes it in 4

Census regions. Like with NCHS, AHRQ's data use agreements preclude sharing its unit

record data between litigating parties, with each party required to acquire its own copy.

28.　　For this declaration, I located, counted or calculated best approximations

of inpatient and separately of ED firearm injury cases for the four cities. Often, I

developed county data, then split out the city portion using the percentages shown in

Table2. Table 3 details the data I accessed for each city or its enclosing county and

calculations I undertook to infer missing data. The resulting counts varied in recency. I

had 2016-2019 homicide counts for Chicago. For San Jose and Syracuse, I used a simple

linear projection of 2012-2018 fatalities to approximate 2019. For Columbia, I

interpolated missing fatality counts for 2016 and 2018 from the associated county

counts and the combined ratio of city to county counts during the preceding and

subsequent year. Nonfatal counts then could be projected forward based on the

associated fatality trend.

### 29.　Details of Cost Analysis

30.　　In public welfare costs to society, I included only medical and mental

healthcare, police and criminal justice costs, injury-related work loss, and perpetrator

work loss. In costs to city government, I included only emergency medical services (EMS)

and police services including victim services. My main estimates did not quantify other

cost elements, notably quality of life losses in public welfare and prevention programs

and property tax losses in the costs to cities.

31.    Table 4 shows the unit cost per firearm victim in 2019. The cost per victimization with a ghost gun is likely to have higher costs than the average because ghost guns are more difficult to track than guns with serial numbers. That means they can require above-average investigation time and prosecutor time. A firearm homicide costs society more than any other firearm injury, more than $1.2 million. It also costs a lifetime of quality of life.

32.    Depending on intent and severity, the cost to a city of a firearm injury in its confines ranges from roughly $1,000 for an unintentional or self-inflicted nonfatal injury treated only in the ED to $155,000 for a homicide.

33.    Table 5 shows the costs of firearm injuries in the US during 2018. Clearly, firearm injuries impose a major public welfare burden. Annually, shootings cost more than $65 billion, which equates to $200 per US resident. More than half of this burden results from homicides and aggravated assaults. The costs average $592,000 per shooting.

34.    Since 1989, guidance from the US Office of Management and Budget[17] (OMB) and from the Administrative Conference of the United States[18] have required Federal agencies to include the value of lost quality of life when analyzing the life-saving benefits of regulatory proposals to address public welfare concerns. The public welfare costs of firearm injury nationally would rise to $282 billion or $2,510,000 per shooting if

---

[17] U.S. Office of Management and Budget. (1989). Regulatory program of the United States. Washington, DC: U.S. Government Printing Office.
[18] Gillette, C.: Hopkins, T. (1988). Report to the Administrative Conference of the United States: Federal agency valuations of human life. Washington, DC: Administrative Conference of the United States.

I added the monetary value of the quality of life lost (using a value toward the low end of the value range currently used by Federal agencies).[19] That exceeds the costs of alcohol-impaired driving.[20]

35.    Table 6 shows the total costs of firearm injuries in the four cities during 2016-2019 when ghost guns increasingly were recovered by the police.[21] Public welfare costs ranged from $5.9 billion in Chicago to $200 million in Syracuse. City government costs were $443 million in Chicago, $25 million in San Jose, $14 million in Syracuse, and $13 million in Columbia.

36.    The costs to city government per person shot ranged from $19,648 in Columbia to $28,427 in Syracuse, $28,662 in Chicago, and $32,064 in San Jose (Table 7). The public welfare costs per person shot were an order of magnitude larger, ranging from $322,663 to $612,101.

37.    The cost pattern is heavily influenced by the variation in population size between the cities. Per resident, the costs are only modestly higher in Chicago than in Columbia and Syracuse. Public welfare costs per resident are markedly lower in San Jose. Indeed, at $119 per resident, San Jose is the only one of the four cities with public

---

[19] For a description of my quality of life methods, see, e.g., Zonfrillo, M. Spicer, R.S., Lawrence, B.A., Miller, T.R. (2018). Incidence and costs of injuries to children and adults in the United States. Injury Epidemiology, 5:1, article 37.

[20] Zaloshnja, E., Miller, T., Blincoe, L. (2013). Costs of alcohol-involved crashes, United States, 2010. Annals of Advances in Automotive Medicine 57, 3-12.

[21] American Bar Association Standing Committee on Gun Violence, Criminal Justice Section, Civil Rights and Social Justice Section. (2020, February 17). Ghost Guns: Report to the House of Delegates, 20M107A.

welfare costs below the national average. The annual city government costs per resident are $41 in Chicago, $25 in Columbia, $24 in Syracuse, and $6 in San Jose.

38.    My analysis of city government costs understates them. I have not included the costs of preventive police enforcement and community peace efforts. For example, Chicago spends $10 million per year on gun-oriented violence prevention programs and is being pressed to spend far more.[22] Columbia has installed shot-spotter technology and has almost $750,000 committed to a pair of prevention initiatives.[23] I also did not account for the frequency or cost of non-violent firearm crimes including robbery with a firearm, firearm assault without physical injury, shots fired, trafficking, illegal possession, and illegal carry. Other than mental health care costs resulting from a loved one's murder, I did not account for the effects of firearm injury on people other than the person shot. Notably, that includes the costly effects over a lifetime of such adverse childhood experiences and toxic stresses as death of a parent or sibling, incarceration of a parent, witnessing violence, and living in an environment where gunfire is a frequent occurrence.

39.    While I did not analyze tax losses resulting from firearm injury, it is well-documented that governments lose sales and income tax revenue when firearm injury victims and incarcerated perpetrators are unable to work. More importantly, city revenue is heavily dependent on property taxes. Several recent studies provide

---

[22] Freskos, B. (2019, Oct 25), A Drop in the Bucket': Anti-Violence Leaders Blast Chicago Mayor's Budget Plan. The Trace. https://www.thetrace.org/2019/10/chicago-gun-violence-funding-lori-lightfoot-2020-budget/ .
[23] https://www.wistv.com/2019/09/24/we-have-too-many-damn-guns-streets-columbia-police-unveil-gun-intelligence-unit-designed-combat-gun-violence/

increasingly robust evidence that, in my professional opinion, indicates property values and consequently property tax revenues are depressed by firearm violence.[24-28]

40.    *Costing Methods*

41.    I applied my well-documented injury cost model to estimate the medical, work loss, and quality-adjusted life year (QALY) loss resulting from firearm injuries in the U.S. This model is the backbone of the CDC's WISQARS Cost of Injury Reports.[29] It requires ICD9-CM diagnosis data, so I ran it on 2014 HCUP files, which were the last year coded in ICD9-CM. The modelled medical costs captured emergency medical care, acute care, rehabilitation, follow-up care, long-term medical and institutional care, prescriptions, ancillary expenses, coroner services, and the costs of health insurance claims processing. Work loss included wages, fringe benefits and household work. It included short-term work loss and the present value of a lifetime's worth of wage and household work loss for a person who died or was permanently disabled. Using published ratios by intent[30] for a cohort of people with the same age-sex distribution, I

---

[24] Irvin-Erickson, Y., Lynch, M., Gurvis, A., Mohr, E., & Bai, B. (2017). A Neighborhood-Level Analysis of the Economic Impact of Gun Violence. Retrieved from https://greaterdc.urban.org/publication/neighborhood-level-analysis-economic-impact-gun-violence#:~:text=A%20Neighborhood-Level%20Analysis%20of%20the%20Economic%20Impact%20of,and%20sudden%20increases%20%28or%20surges%29%20in%20gun%20violence.

[25] Keat Tang, C., & Le, T. (2019). The Cost of Gun Crime: Evidence from Gun Offender Registry on Housing Values. *Social Science Research Network*.

[26] Rhynhart, R. (2019). Report on the Economic Impact of Homicides. Office of the City Controller: Philadelphia, PA.

[27] Ceccato, V., & Wilhelmsson, M. (2020). Do crime hot spots affect housing prices? *Nordic Journal of Criminology, 21*(1), 84-102.

[28] Klimova, A., & Lee, A. D. (2014). Does a nearby murder affect housing prices and rents? The case of Sydney. *Economic Record, 90*(s1).

[29] Lawrence, B. A., & Miller, T. R. (2014). Medical and work loss cost estimation methods for the WISQARS cost of injury module. Final Report to the Centers for Disease Control and Prevention. Calverton, MD: Pacific Institute for Research and Evaluation.

[30] Cook, P.J., & Ludwig, J. (2000). Gun violence: The real costs. New York: Oxford University Press.

adjusted from projected national average lifetime earnings losses to losses specific to the pre-incident earnings of firearm decedents.

42.    Following the methods in my latest study of crime costs,[31] for homicide and nonfatal aggravated assaults, I adopted mental health care costs from Cohen and Miller, police costs per police-reported crime from Hunt, Saunders, & Kilmer, arrest rates from FBI statistics, court and incarceration costs per arrest from Hunt, Anderson, & Saunders, and victim assistance, property damage, and perpetrator work loss from McCollister et al.[32-34] I analogized that police response and investigation costs for a fatal shooting which was not a homicide equaled those for an aggravated assault, while police costs for nonfatalities except assaults equaled the modest response costs for motor vehicle theft. I did not quantify any tax revenue lost because earnings were lost when people died, were disabled, or were incarcerated.

43.    I costed each firearm fatality case in 2018 individually based on age, sex, and place of death. The tables provide the average across the deaths. Similarly, I costed the average nonfatal medical care, work loss, and quality of life for each 2018 HCUP NIS and NEDS firearm case based on age, sex, anatomic location and nature of the injuries,

[31] Miller, T. R., Cohen, M., Swedler, D., Ali, B., & Hendrie, D. (2020). Incidence and costs of personal and property crimes in the United States, 2017. *Social Science Research Network*. doi: http://dx.doi.org/10.2139/ssrn.3514296.

[32] Cohen, M. A., & Miller, T. R. (1998). The cost of mental health care for victims of crime. *Journal of Interpersonal Violence, 13*(1), 93-110.

[33] Hunt, P., Anderson, J., & Saunders, J. (2017). The price of justice: New national and state-level estimates of the judicial and legal costs of crime to taxpayers. *American Journal of Criminal Justice, 42*(2), 231-254.

[34] Hunt, P. E., Saunders, J., & Kilmer, B. (2019). Estimates of law enforcement costs by crime type for benefit-cost analyses. *Journal of Benefit-Cost Analysis, 10*(1), 95-123.

and length of stay and discharge destination if admitted as an inpatient.[35] Beyond the

first year, I discounted costs to present value using a 3% net discount rate that is higher

than the rate used in litigation but is widely recommended and generally accepted for

use in public policy analysis.[36, 37] Discounting with a lower discount rate that accords

with recent historical bond yields (the practice I would follow in calculating personal

injury damages) would yield higher firearm injury costs than my deliberately

conservative public policy calculation. I stated all costs in 2019 dollars.[38] Finally, I used

the per capita income and CCER price indices[39] shown in Table 8 to adjust from national

to state dollars when appropriate.

44.     I computed total costs of firearm injuries in a city by multiplying the

number of injuries times the price-adjusted cost per injury. For fatalities, I used the

average cost per firearm fatality in the county. For the nonfatal injuries by level of

treatment, I used average costs per inpatient case from NIS and per outpatient case

from NEDS for the city's size and Census division or region, respectively. I excluded legal

---

[35] My injury cost model for nonfatal injury data was based on cost per case coded in the ICD-9-CM. I ran the model on 2014 HCUP datasets, which were the last full year of data that hospitals coded in ICD-9-CM, to generate the average cost per injury. ICD-9-CM codes for firearm injuries were E922.0-E922.4, E922.8, E922.9 (unintentional injuries by firearms); E955.0-E955.4, E955.6 (self-inflicted injury by firearms); E965.0-E965.4, E968.6 (assault by firearms); E97.0 (legal intervention involving firearms), E979.4 (terrorism involving firearms), E985.0-E985.4, or E985.6 (undetermined injury by firearms). Hence the lengths of stay, hospital charges, cost-to-charge ratios, and discharge destinations underlying my cost estimates came from 2014. I applied them to 2017 injury counts.

[36] National Academies of Sciences, Engineering, and Medicine & Committee on the Use of Economic Evidence to Inform Investments in Children, Youth, and Families. (2016). *Advancing the power of economic evidence to inform investments in children, youth, and families*. Washington DC: The National Academies Press.

[37] Neumann, P., Sanders, G., Russell, L., Siegel, J., & Ganiats, T. (Eds.). (2016). *Cost-effectiveness in health and medicine* (2nd ed.). New York: Oxford University Press.

[38] The price adjusters used were the Consumer Price Index, Medical Care; Employment Cost Index, Total Compensation, All Workers; and Consumer Price Index, All Items.

[39] The Council for Community and Economic Research. (2010). ACCRA Cost of Living Index, Quarterly issues. Arlington, VA: The Council for Community and Economic Research, http://www.coli.org.

intervention cases from the averages. I computed local government costs using the same assignment method used in my in-press article on costs of personal crime in the US.

45.     I reserve the right to update this declaration should further data become available.

46.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Ted Miller*

Ted Miller

Executed in Silver Spring, MD on this 9th day of December 2020.

Table 1. Annual firearm injuries by severity nationally and for the 4 cities, 2016-2019,
and injury rate per 100,000 population in 2019

| City | Severity | 2016 | 2017 | 2018 | 2019 | Rate in 2019 |
|---|---|---|---|---|---|---|
| Chicago, IL | Nonfatal ED only | 2734.5 | 2188.4 | 1791.9 | 1639.1 | 60.4 |
| | Nonfatal inpatient | 1596.5 | 1277.6 | 1046.1 | 956.9 | 35.2 |
| | Fatal | 691 | 603 | 477 | 442 | 16.3 |
| | **Total** | **5022.0** | **4069.0** | **3315.0** | **3038.0** | **111.9** |
| Columbia, SC | Nonfatal ED only | 84.6 | 107.2 | 107.4 | 119.8 | 90.9 |
| | Nonfatal inpatient | 25.4 | 32.1 | 32.2 | 35.9 | 27.2 |
| | Fatal | 26.1 | 33.1 | 33.2 | 37.0 | 28.1 |
| | **Total** | **136.1** | **172.5** | **172.8** | **192.7** | **146.2** |
| San Jose, CA | Nonfatal ED only | 82.0 | 86.0 | 66.3 | 66.0 | 6.7 |
| | Nonfatal inpatient | 55.4 | 65.1 | 59.4 | 59.4 | 6.0 |
| | Fatal | 55.4 | 63.5 | 53.8 | 53.3 | 5.4 |
| | **Total** | **136.1** | **172.5** | **172.8** | **192.7** | **18.1** |
| Syracuse, NY | Nonfatal ED only | 45.3 | 59.1 | 54.5 | 54.3 | 37.7 |
| | Nonfatal inpatient | 38.6 | 38.7 | 38.7 | 38.7 | 26.8 |
| | Fatal | 38.2 | 27.5 | 31.1 | 31.2 | 21.6 |
| | **Total** | **122.1** | **125.3** | **124.3** | **124.2** | **86,1** |
| United States | Nonfatal ED only | 50,840 | 54,357 | 40,981 | | 16.7* |
| | Nonfatal inpatient | 39,525 | 30,235 | 31,340 | | 9.3* |
| | Fatal | 38,658 | 39,931 | 39,849 | | 12.3* |
| | **Total** | **129,023** | **124,523** | **112,125** | | **38.3*** |

Actual counts are reported as whole numbers. Projected and allocated counts are reported to
one decimal place.

* National rates are for 2017 because 2018-2019 counts are not yet available.

Table 2. Percentage of county firearm deaths and injuries in the city, and basis for this split, by city.

| City | % in City | Basis | Source (see text for citations) |
|---|---|---|---|
| Chicago, IL | 83.9% | 2016-2019 firearm homicides | Chicago Police Annual Reports; county tabulated from vital statistics file |
| Columbia, SC | 32.5% | 2011-2015 firearm homicides | Newspaper article reporting coroner counts |
| San Jose, CA | 80.4% | 2016-2017 firearm homicides | San Jose Police Department[40] |
| Syracuse, NY | 88.8% | 2009-2012 nonfatal firearm injuries treated in hospitals | Tabulated from HCUP state discharge census files for New York |

Table 3. Data available and calculations used to compute firearm death and injury counts by county/city

| City | Data Available | Calculations |
|---|---|---|
| Chicago, IL | City police shooting counts, 2016-2019[41] | Split between inpatient and ED using the proportion for large Midwest cities from HCUP |
| Columbia, SC | City police shooting counts, 2014-2015[42] | Trended forward proportionately to fatalities, split between inpatient and ED using the proportion for medium-sized southern cities from HCUP |
| San Jose, CA | County inpatient & ED counts, 2007-17[43, 44] | Trended forward proportionately to fatalities; city share computed using the ratio from Table 2 |
| Syracuse, NY | City inpatient & ED counts, 2009, 2011, 2012[45] | Trended forward proportionately to fatalities |

---

[40] San Jose Police Department Crime Analysis Unit. (2018, April 23). Homicide victims: Means of death -- Firearms. Report CAU # 18-345/981N.

[41] Chicago Police Department. Annual Report 2017 (2018). And Chicago Police Department. 2019 Annual Report. (2020). https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/.

[42] Flanagan, G. L. (2016). Drugs, gangs, domestic violence driving spike in homicides, Midlands officials say Retrieved from https://www.thestate.com/news/local/crime/article81820857.html.

[43] Firearms in Santa Clara County. Public Health Santa Clara, 2018, https://www.sccgov.org/sites/phd/hi/hd/Documents/firearms-facts-2018.pdf .

[44] Prevention Institute.  Learning Session: Reviewing and refining our public health approach to violence prevention. Powerpoint presentation. 12/4/2019.

[45] Tabulation I prepared from HCUP discharge census files for NY.

Table 4. Cost per firearm injury by severity marker and intent,
United States, in 2019 dollars

| All Intents | Fatal | Admitted | ED only | Any |
|---|---|---|---|---|
| Total | $1,520,792 | $166,858 | $15,141 | $532,056 |
| Medical Care | $7,083 | $69,150 | $2,467 | $18,959 |
| Mental Health Care | $13,964 | $305 | $245 | $4,659 |
| Emergency Transport | $653 | $386 | $33 | $318 |
| Police | $64,901 | $5,627 | $5,015 | $24,367 |
| Criminal Justice | $198,205 | $5,022 | $3,829 | $66,449 |
| Employer Cost | $11,003 | $2,700 | $434 | $4,373 |
| Perpetrator Work Loss | $41,182 | $682 | $311 | $13,507 |
| Victim Work Loss | $1,183,801 | $82,986 | $2,807 | $399,424 |
| Assault | Fatal | Admitted | ED only | Any |
| Total | $2,125,047 | $187,269 | $26,999 | $678,462 |
| Medical Care | $10,673 | $88,061 | $2,653 | $25,475 |
| Mental Health Care | $13,964 | $305 | $245 | $4,264 |
| Emergency Transport | $679 | $386 | $33 | $327 |
| Police | $154,582 | $10,104 | $10,104 | $52,232 |
| Criminal Justice | $541,943 | $10,146 | $10,146 | $165,213 |
|   Adjudication | $41,233 | $1,968 | $1,968 | $13,417 |
|   Sanctioning | $500,710 | $8,178 | $8,178 | $151,795 |
| Employer Cost | $11,003 | $2,700 | $434 | $4,193 |
| Perpetrator Work Loss | $112,604 | $1,378 | $825 | $33,585 |
| Victim Work Loss | $1,279,599 | $74,189 | $2,559 | $393,173 |
| Self-Inflicted | Fatal | Admitted | ED only | Any |
| Total | $1,160,821 | $350,904 | $8,230 | $1,073,455 |
| Medical Care | $3,582 | $150,974 | $2,766 | $10,700 |
| Mental Health Care | $13,964 | $305 | $245 | $12,697 |
| Emergency Transport | $638 | $386 | $33 | $607 |
| Police | $10,022 | $944 | $944 | $9,198 |
| Employer Cost | $11,003 | $2,700 | $434 | $10,187 |
| Victim Work Loss | $1,121,612 | $195,595 | $3,808 | $1,030,066 |
| Unintentional | Fatal | Admitted | ED only | Any |
| Total | $1,269,420 | $154,927 | $6,955 | $56,291 |
| Medical Care | $13,859 | $72,295 | $2,343 | $15,341 |
| Mental Health Care | $13,964 | $305 | $245 | $423 |
| Emergency Transport | $638 | $386 | $33 | $136 |
| Police | $10,022 | $944 | $944 | $1,651 |
| Employer Cost | $11,003 | $2,700 | $434 | $1,177 |
| Victim Work Loss | $1,219,934 | $78,297 | $2,956 | $37,563 |
| Unknown | Fatal | Admitted | ED only | Any |
| Total | $1,329,912 | $160,702 | $6,992 | $211,148 |
| Medical Care | $12,430 | $85,597 | $2,548 | $21,507 |
| Mental Health Care | $13,964 | $305 | $245 | $1,920 |
| Emergency Transport | $638 | $386 | $33 | $226 |
| Police | $10,022 | $944 | $944 | $2,490 |
| Employer Cost | $11,003 | $2,700 | $434 | $2,481 |
| Victim Work Loss | $1,281,855 | $70,770 | $2,788 | $182,524 |

NB: Excludes effect on property values, quality of life, and adverse childhood experiences.

Table 5. Total and per-resident costs of firearm injury
by intent, United States, 2018, in 2019 dollars

| Intent | Cost | Cost per Resident |
|---|---|---|
| All | $65,485,058,970 | $200 |
| Assault | $32,829,481,748 | $100 |
| Self-Inflicted | $29,323,005,640 | $90 |
| Unintentional | $2,685,118,625 | $8 |
| Undetermined | $647,452,957 | $2 |

NB: Excludes effect on property values, quality of life, and adverse childhood experiences.

Table 6. Public welfare costs of firearm injury by cost category and costs to city government,
four cities, 2016-2019, in 2019 dollars

| Total by Cost Category | San Jose, CA | Chicago, IL | Syracuse, NY | Columbia, SC |
|---|---|---|---|---|
| Medical | 30,179,284 | 458,212,674 | 12,648,279 | 13,427,108 |
| EMS | 293,911 | 3,796,353 | 141,235 | 152,000 |
| Police | 24,258,893 | 438,863,662 | 13,958,636 | 13,092,317 |
| Adjudication | 5,487,734 | 107,183,163 | 3,362,635 | 3,029,129 |
| Sanctioning | 60,543,711 | 1,143,710,296 | 36,991,841 | 31,771,310 |
| Employer | 4,330,016 | 43,860,376 | 1,293,092 | 1,727,642 |
| Subtotal-Direct | 125,093,549 | 2,195,626,523 | 68,395,718 | 63,199,505 |
| Work | 343,612,283 | 3,749,817,898 | 132,430,827 | 154,297,193 |
| Total Public Welfare | 468,705,831 | 5,945,444,421 | 200,826,545 | 217,496,698 |
| | | | | |
| Total to City Government | 24,552,804 | 442,660,015 | 14,099,871 | 13,244,317 |

NB: Excludes effect on property values, quality of life, and adverse childhood experiences.

Table 7. Costs of firearm injury per resident and per person shot, four cities, 2019

| Cost Per Person Shot | San Jose, CA | Chicago, IL | Syracuse, NY | Columbia, SC |
|---|---|---|---|---|
| Public Welfare Cost | $612,101 | $384,968 | $404,883 | $322,663 |
| Cost to City Government | $32,064 | $28,662 | $28,427 | $19,648 |
| | | | | |
| Cost Per Resident | San Jose, CA | Chicago, IL | Syracuse, NY | Columbia, SC |
| Public Welfare Cost | $119 | $547 | $348 | $412 |
| Cost to City Government | $6 | $41 | $24 | $25 |

NB: Excludes effect on property values, quality of life, and adverse childhood experiences.

Table 8. Price adjusters from national to local costs by city

|  | Medical | All items | Work Loss |
|---|---|---|---|
| Chicago, IL | 1.037 | 1.165 | 1.066 |
| Columbia, SC | 1.012 | 0.967 | 0.888 |
| San Jose, CA | 1.149 | 1.493 | 1.327 |
| Syracuse, NY | 0.919 | 0.992 | 0.674 |

Source: CCER, ACCRA Index, various years; Census Quick Facts – 2018