# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF SYRACUSE, NY, CITY OF SAN JOSE, CA, CITY OF CHICAGO, IL, CITY OF COLUMBIA, SC, EVERYTOWN FOR GUN SAFETY ACTION FUND and EVERYTOWN FOR GUN SAFETY SUPPORT FUND, <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, REGINA LOMBARDO, in her official capacity as Acting Director of the Bureau of Alcohol, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and WILLIAM BARR, in his official capacity as ATTORNEY GENERAL, U.S. Department of Justice, <br><br> Defendants. | No. 1:20-cv-06885-GHW |

## BRIEF OF *AMICI CURIAE* BRADY UNITED AGAINST GUN VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Roberta L. Horton
*Pro hac vice application pending*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C.  20001
202-942-5000
Roberta.Horton@arnoldporter.com

Lucy S. McMillan
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
212-836-8000
Lucy.McMillan@arnoldporter.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

STATEMENTS OF INTEREST OF *AMICI CURIAE* ...................................................................1

PRELIMINARY STATEMENT ..............................................................................................2

ARGUMENT .......................................................................................................................5

I.    ATF'S INCORRECT INTERPRETATION OF THE GUN CONTROL ACT
      VITIATES THE AGENCY'S ESSENTIAL ROLE IN COMBATING ILLEGAL
      GUN TRAFFICKING ....................................................................................................5

      A.    ATF Has a Legislative Mandate to Enforce Gun Control Laws............................5

      B.    Background Checks are a Critical Step in the Sale of a Gun..................................6

      C.    Ghost Gun Purchasers Avoid the Safeguards in Place to Prevent Firearms
            Trafficking ..........................................................................................................9

      D.    ATF's Audits Do Not Extend to Ghost Gun Sales .............................................12

      E.    Ghost Gun Sellers Capitalize on Purchasers' Ability to Evade Background
            Checks................................................................................................................14

II.   ATF MUST NOT BE PERMITTED TO EXEMPT GHOST GUNS FROM
      SERIALIZATION REQUIREMENTS ............................................................................16

III.  THE EXEMPTION OF 80% COMPONENTS AND GHOST GUN KITS FROM
      REGULATION ESPECIALLY HARMS BLACK AND BROWN
      COMMUNITIES THAT SUFFER DISPROPORTIONATE RATES OF GUN
      VIOLENCE...............................................................................................................20

CONCLUSION...................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014).................................................................................5, 6, 7

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
501 F. Supp. 2d 369 (E.D.N.Y. 2007) ...................................................18

*Corporan v. Wal-Mart Stores East, LP*,
No. 16-2305, 2016 WL 3881341 (D. Kan. July 18, 2016) ......................9

*District of Columbia v. Heller*,
554 U.S. 570 (2008)...................................................................................1

*Huddleston v. United States*,
415 U.S. 814 (1974)...................................................................................5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)...................................................................................1

*N.A.A.C.P. v. AcuSport, Inc.*,
271 F. Supp. 2d 435 (E.D.N.Y. 2003) ...................................................17

*Shawano Gun & Loan, LLC v. Hughes*,
650 F.3d 1070 (7th Cir. 2011) ..................................................................9

*State of California et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al.*,
3:20-CV-06761-EMC (N.D. Cal. Sep. 29, 2020) ....................................2

*United States v. Carney*,
387 F.3d 436 (6th Cir. 2004) ...................................................................10

*United States v. Hayes*,
555 U.S. 415 (2009)...................................................................................1

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010)................................................................16, 17

*United States v. McSwain*,
No. CR 19-80 (CKK), 2019 WL 1598033 (D.D.C. Apr. 15, 2019) ...................................16, 19

## Statutes

18 U.S.C. § 921(a)(3)................................................................................................16

18 U.S.C. § 921(a)(3)(B) ...........................................................................................3

18 U.S.C. § 921 *et seq.* (the "GCA") .................................................................... *passim*

18 U.S.C. § 923(i)......................................................................................................16

18 U.S.C. § 923(g)-(i).................................................................................................12

18 U.S.C. § 923(g)(1)(A)...........................................................................................12

18 U.S.C. § 923(g)(2)................................................................................................12

18 U.S.C. § 923(g)(3)(A)...........................................................................................12

18 U.S.C. § 923(g)(4)................................................................................................12

18 U.S.C § 923(g)( 5)................................................................................................11

18 U.S.C. § 923(g)(6).........................................................................................10, 11

18 U.S.C. § 923(g)(6).........................................................................................11, 12

26 U.S.C. § 5861(i)....................................................................................................16

Brady Handgun Violence Prevention Act of 1993 .....................................................7

CAL. PENAL CODE § 29180-84..................................................................................15

Conn. Pub. Act No. 19-6...........................................................................................15

N.J. STAT. ANN. § 2C:39-9........................................................................................15

National Firearms Act.................................................................................................5

REV. CODE WASH. (RCW) § 9.41.090......................................................................15

## Other Authorities

27 C.F.R. §§ 478.9-103...............................................................................................5

27 C.F.R. §§ 478.41-78...............................................................................................6

27 C.F.R. §§ 478.121-134.....................................................................................12, 13

27 CFR § 478 *et seq.*..................................................................................................2

27 CFR § 478.124 ............................................................................................12

Alcohol, Tobacco, Firearms and Explosives, *Fiscal Year 2021 Congressional Budget Submission* (February 2020) ....................................................4, 5

Alycia Santilli et al., *Bridging the Response to Mass Shootings and Urban Violence: Exposure to Violence in New Haven, Connecticut* ..........................................20, 21

Ashwini R. Sehgal, MD, *Lifetime Risk of Death From Firearm Injuries, Drug Overdoses, and Motor Vehicle Accidents in the United States*, 133 AM. J. OF MEDICINE 1162 (Oct. 2020)..........................................................................20

*ATF Answers Questions on 80 Percent Lower Receiver Blanks*, AMMOLAND (Nov. 7, 2014) .......................................................................................16

Christina Caron, *"Ghost Guns," Homemade and Untraceable, Face Growing Scrutiny*, THE NEW YORK TIMES (Nov. 27, 2017) ...................................13

Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, National Institute of Justice, 2007 .........................................13

Evan Sernoffsky, *'Ghost Guns' Continue to Elude California's Firearms Laws*, GOVERNMENT TECHNOLOGY (Nov. 21, 2017) .........................................16

*FFL Compliance Inspections*, Bureau of Alcohol, Tobacco, Firearms and Explosives Fact Sheet (February 2013) ........................................12

Howard, Jacqueline, *The disparities in how black and white men die in gun violence, state by state*, (Apr. 24, 2018) (citing data from the Centers for Disease Control and Prevention's Wide-ranging Online Data for Epidemiologic Research database............................................................21

Richard Reeves, et al., *Guns and race: The different worlds of black and white Americans* (Dec. 15, 2015) ...............................................................21

S.P. Sullivan, *Cocaine bust led cops to 'ghost gun' network that sold untraceable AR-15s* ...................................................................................13, 15

U.S. DEP'T. OF JUSTICE, FIREARMS TRACING GUIDE: TRACING FIREARMS TO REDUCE VIOLENT CRIME 1-5 (2011), https://www.atf.gov/file/58631/download .............................................17

U.S. DEP'T OF THE TREASURY, ATF, COMMERCE IN FIREARMS IN THE UNITED STATES 19 (February 2000), https://www.hsdl.org/?view&did=1624.......................17, 18, 19

U.S. DEP'T OF TREASURY, ATF REGULATORY ACTIONS: REPORT TO THE SECRETARY ON FIREARMS INITIATIVES 4 (Nov. 2000)............................................19

Yolanda T. Mitchell and Tiffany L. Bromfield, *Gun Violence and the Minority Experience*, National Council on Family Relations (Jan. 10, 2019).......................................20

## STATEMENTS OF INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* submit this brief in support of Plaintiffs' Motion for Summary Judgment to require the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF" or "the Bureau") to define the frames and receivers used to build "ghost guns" as "firearms" under the Gun Control Act of 1968.

Brady United Against Gun Violence ("Brady") is the nation's longest-standing nonpartisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring Americans' fundamental right to live, and in public policies that protect individuals, families, and communities from the effects of gun violence. Brady has filed amicus briefs in numerous high-profile cases involving firearm regulations, including *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *United States v. Hayes*, 555 U.S. 415 (2009), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") has a core mission of saving lives from gun violence by shifting culture, changing policies, and challenging injustice. Formed after a mass shooting at a California law firm more than 25 years ago, the group changed its name to Giffords Law Center after joining forces with the gun safety organization founded by former Congresswoman Gabrielle Giffords, who was critically injured when she was shot in the head during an assassination attempt.

Giffords Law Center has devoted substantial resources and human capital to educate the public about the dangers that unregulated ghost guns pose to public health, and addressing ghost

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. Amici Brady and Giffords Law Center sought ATF's consent to file this brief. ATF responded that it takes no position on the proposed filing.

guns and the violence they facilitate is one of the organization's top policy and legislative priorities.  Over the last six years, Giffords Law Center has contributed technical assistance to or monitored and analyzed over 100 state and federal bills pertaining to ghost guns.  The organization has launched a series of ghost gun initiatives including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public.  On September 29, 2020, together with California Attorney General Xavier Becerra and the parents of two teenagers killed at their school with a ghost gun, Giffords Law Center filed a lawsuit to compel federal regulators to address ghost guns and the dangers they pose.  *See State of California et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al.*, 3:20-CV-06761-EMC (N.D. Cal. Sep. 29, 2020).

## PRELIMINARY STATEMENT

As the federal agency tasked with overseeing the gun industry, ATF's role in detecting and deterring illegal firearms trafficking is critical to combatting our national gun violence epidemic.  Consistent with its broad public safety mission, ATF has an explicit legislative mandate to enforce the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq*. (the "GCA").  Pursuant to this mandate, ATF ensures that Federal Firearms Licensees ("FFLs"), namely, those who manufacture, sell, or import firearms, comply with the GCA and take steps to prevent firearms from entering the criminal gun market.

ATF reviews and issues licenses to firearms dealers; requires such dealers to conduct background checks prior to transferring firearms to prevent prohibited purchasers from acquiring them; makes dealers maintain accurate inventory and transaction records and report theft or loss of inventory; and traces the serial numbers of guns recovered in connection with crimes back to their last retail purchase, to help law enforcement identify suspects and potential sources of

firearms trafficking.  *See* 18 U.S.C. § 921 *et seq*.; 27 CFR § 478 *et seq.*  The frames and receivers of any weapon that fires projectiles are explicitly defined as "firearms" under the GCA.  18 U.S.C. § 921 (a)(3)(B).  This regulatory framework created by the GCA allows ATF to identify and take enforcement action against the small number of irresponsible FFLs that supply the overwhelming majority of guns recovered in crime, and, therefore, to combat firearms trafficking.

In keeping with this mandate and to further its public safety mission, ATF should treat the key components of ghost guns and the kits used to build them as what they are—firearms—and ATF should regulate them consistent with federal law.  "Ghost guns" are so named because they lack serial numbers or other identifying marks on their receivers or frames, and therefore cannot be traced by law enforcement.  Purchasers assemble ghost guns from unserialized parts that are sold in do-it-yourself ("DIY") gun kits, easily acquired online, at gun shows, or at brick-and-mortar gun stores.

Although ATF acknowledges its mandate to regulate frames and receivers as firearms, ATF has determined that the kits and parts used to build ghost guns are not subject to federal regulation because the key components used to build ghost guns—known as the "frame" of a handgun or the "receiver" of a rifle or shotgun—are sold in an unfinished form.  Colloquially called "80%" frames or receivers, consumers can finish these components very quickly and easily, using ordinary household tools.  Once completed, these components can be assembled with the other parts sold in ghost gun kits into fully operable firearms.  At that point, they are functionally indistinguishable from traditional firearms that are subject to extensive regulation.

Because ATF has refused to apply the GCA to unfinished frames and receivers, individuals who may be prohibited from possessing firearms can purchase ghost gun kits without

3

submitting to a background check. Sales of these kits are not tracked and are not subject to ATF's recordkeeping requirements. The absence of background checks and ATF oversight, coupled with the lack of serial numbers, are the very features of ghost guns that render them at once attractive to criminals, challenging for law enforcement, and in critical need of agency regulation.

ATF's improper determination that unfinished frames and receivers are not "firearms" that require serial numbers and background checks contravenes the agency's mandate, encourages the diversion of firearms to the black market, and exacerbates the gun crisis, especially in U.S. cities. Anyone unable to obtain a gun through a licensed gun dealer, including people convicted of felony crimes or subject to domestic violence restraining orders, can obtain an operable gun without any background check by buying a ghost gun. They can buy unserialized ghost gun kits in any quantity, and readily assemble and use deadly weapons that law enforcement cannot trace. Moreover, precisely because law enforcement cannot trace ghost guns when they are recovered in connection with a crime, they are swiftly becoming the weapons of choice for criminal traffickers of illegal guns.

In addition, the rising prevalence of ghost guns in American cities will most heavily burden underserved communities of color, which already suffer from disproportionate rates of gun violence carried out with regulated firearms.

## ARGUMENT

I.   ATF'S INCORRECT INTERPRETATION OF THE GUN CONTROL ACT VITIATES THE AGENCY'S ESSENTIAL ROLE IN COMBATING ILLEGAL GUN TRAFFICKING

    A.   ATF Has a Legislative Mandate to Enforce Gun Control Laws

ATF's mission is "to reduce violent crime involving firearms, explosives, and arson." Bureau of Alcohol, Tobacco, Firearms and Explosives, *Fiscal Year 2021 Congressional Budget Submission* (February 2020), https://www.justice.gov/doj/page/file/1246271/download ("ATF Congressional Budget Submission") at 21.  One of ATF's principal roles as a governmental agency is to enforce the Gun Control Act.  *See id.* at 1 ("ATF enforces the Gun Control Act (GCA) and the National Firearms Act (NFA); the two primary laws enacted by Congress to address firearms violence.").  To that end, "ATF regulates the firearms and explosives industries from the point of manufacture and/or importation through retail sale." *Id*. at 2.  The regulatory framework established by the GCA is the primary tool that law enforcement has to combat gun trafficking. That statute, and accompanying regulations, require licensed dealers to take measures so that they, as well as ATF, can identify sources of illegal guns moving through the marketplace.[2]

Specifically, in exchange for receiving and maintaining a firearms license from ATF, Federal Firearms Licensees ("FFLs") must comply with federal requirements designed to ensure that prohibited persons do not obtain potentially dangerous weapons.  27 C.F.R. §§ 478.9-103.[3] The dealer plays a central role in making sure that guns do not fall into the wrong hands.

---

[2] Because individuals are not required to undergo a licensing process to sell ghost gun kits, sellers of these kits may very well be individuals who would not qualify for a license to sell firearms.

[3] *See Abramski v. United States*, 573 U.S. 169, 172 (2014) ("Under [18 U.S.C.] § 922(g), certain classes of people— felons, drug addicts, and the mentally ill, to list a few—may not purchase or possess any firearm.").

5

Completing a background check on every gun purchaser prior to transferring a firearm is a major part of the dealer's responsibilities.  As discussed herein, FFLs must also adhere to specific reporting and recordkeeping requirements that facilitate the detection of suspicious gun sales or changes in inventory.  Simply put, "[t]he principal agent of federal enforcement is the [FFL] dealer," who "directly controls access to weapons by users."  *Huddleston v. United States*, 415 U.S. 814, 824-25 (1974).

To assist FFLs with their responsibilities, ATF educates them about firearms laws, and conducts regulatory inspections to ensure that the FFLs are complying with federal requirements. 27 C.F.R. §§ 478.41-78.  If ATF determines that an FFL transferred a firearm to an unlicensed person, failed to run a background check on a sale, or is otherwise noncompliant with the GCA, it can recommend administrative action against a dealer, including suspension or revocation of the dealer's license to engage in the business of selling firearms.  *Id*. § 478.73.

Yet, as a result of ATF's determination that the GCA does not apply to 80% frames and receivers and ghost gun kits, none of the federal requirements applies, and dealers do not play their part in preventing ghost guns from getting into the wrong hands.  This functionally eliminates the role of ATF and individual FFLs in thwarting prohibited purchasers from obtaining guns and criminals from diverting the supply of legal guns to the black market. Widespread availability of unregulated ghost guns undermines the federal framework designed to deter the criminal use of firearms and reduce gun violence.

B.     Background Checks are a Critical Step in the Sale of a Gun

Background checks are critical to the enforcement of gun safety laws as they ensure that FFLs do not transfer firearms to individuals prohibited from possessing them, either directly or through a straw purchase, as discussed *infra* Section I.C.  The GCA, as administered by ATF,

6

calls for FFLs to adopt an exacting screening process to "check and make use of certain identifying information from the buyer." *Abramski*, 573 U.S. at 172.  In practice, before a dealer sells a firearm, the following steps must occur:

- The FFL completes Section A of the Firearms Transaction Record, ATF Form 4473 ("Form 4473"), detailing the identifying information about the firearm at issue, including its serial number;

- The prospective purchaser completes Section B of Form 4473, setting forth his or her identifying information and certifying that he/she is buying the firearm for himself or herself (*i.e.*, not for someone else who may be evading a background check) and certifying a number of statements designed to ensure that the purchaser is not prohibited by law from owning a firearm because of a felony conviction, a domestic violence incident, a mental illness or otherwise;

- The FFL reviews the purchaser's identification information and submits the purchaser's data to the National Instant Criminal Background Check System ("NICS"), a system administered by the Federal Bureau of Investigation, to ensure that the purchaser is not prohibited from possessing the firearm;[4]

- The NICS system returns a result from the check—indicating to proceed with the sale, to deny the sale, or to delay because of an incomplete check—and the FFL then completes Section C of the Form 4473 specifying whether the weapon is a handgun, long gun, frame, or receiver, which type of identification the FFL reviewed, as well as the results of the NICS background check; and

- Finally, if the FFL approves the sale, it certifies in Section E that "it is [the FFL's] belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section B."  By making this statement, the FFL affirms that it is transferring the firearm to an individual who is not a prohibited purchaser, or not otherwise prohibited by law from possessing a firearm.

*See* ATF Form 4473 (5300.9) (Revised May 2020); *see also Abramski*, 573 U.S. at 173.  This multi-step process highlights the role of the FFL in ensuring that it is selling the firearm to the

---

[4] The background check process, contained in an amendment to the GCA, is required by The Brady Handgun Violence Prevention Act of 1993, or "Brady Act," named for the founder of Amicus Brady.

individual who has submitted to the background check for his or her own personal use, and that the individual is not legally prohibited from possessing that firearm.

Because ATF has exempted the unfinished frames and receivers used to build ghost guns from regulation, sellers of these products are relieved of any legal obligation to prevent prohibited purchasers from acquiring them, or to aid law enforcement in identifying the source of guns used in crimes. As such, those who sell ghost gun kits have no idea if a purchaser would be flagged in a background check as someone who is prohibited from buying a firearm. Indeed, it is exactly because 80% components and ghost gun kits can be bought without background checks that they are particularly appealing to those purchasers who are prohibited from obtaining firearms.

The risk posed by ATF's failure to apply the GCA to unfinished frames and receivers poses a serious and growing threat — concrete evidence shows that ghost guns are increasingly being used in crimes. *See* Pls.' Br. at 15 ("Plaintiff Cities have experienced drastic increases in ghost-gun related crimes and recoveries in recent years"). People otherwise prohibited from owning guns can easily acquire them from ghost gun manufacturers and sellers who leverage the lack of regulations in their marketing. *See, e.g.*, JSD Supply, https://jsdsupply.com/80-ar-15/ (last visited Dec. 2, 2020) ("With our 80% AR lower parts and kits, you can have a sidearm for personal use without the usual concerns regarding serial numbers, background checks, and government fees."). Indeed, ATF itself acknowledges that unserialized ghost guns are recovered from crime scenes and from prohibited persons. ATF, *Firearms Q&As,* https://go.usa.gov/x7pEG (last visited Dec. 2., 2020).

C.     Ghost Gun Purchasers Avoid the Safeguards in Place to Prevent Firearms
       Trafficking

ATF's improper determination that ghost gun kits are not firearms has created a new

means for illegal purchasers to acquire the building blocks for deadly weapons.  Traditionally,

the licensed gun dealer played a crucial part in preventing the diversion of firearms to the

criminal market through theft and "straw purchases" *i.e.*, gun purchases made by someone who

can pass a background check and legally buy a gun, on behalf of someone else, usually a

prohibited purchaser.  Straw purchasers have long been a significant source of gun trafficking.[5]

While ATF has made strides in combating straw purchases, the sale of ghost gun kits presents a

new danger altogether.  The illicit buyer need not even engage in the charade of a straw

purchase, and can avoid creating any record of the buyer's identity, as occurs during the sales of

traditional firearms.  Rather, he or she can simply purchase a DIY ghost gun kit online, or even

in a store, and avoid a background check and the dealer's scrutiny entirely.  The dealer's role as a

safeguard is eviscerated by ATF's improper determination that 80% components and ghost gun

kits are not firearms.

While ATF has developed and uses means to combat straw purchases, its approach to

ghost guns virtually nullifies these crime-fighting measures.  As set forth above, Form 4473

requires certification that "the *dealer* believes, based on the information disclosed in the [4473]

form, that it is not unlawful for the dealer to transfer the firearm to the prospective purchaser."

*Corporan v. Wal-Mart Stores East, LP*, No. 16-2305, 2016 WL 3881341, at *3 (D. Kan. July 18,

2016) (emphasis added).  ATF has also partnered with the National Shooting Sports Foundation,

---

[5]*See* ATF, Following the Gun:  Enforcing Federal Laws Against Firearms Traffickers (2000) at 10 ("Nearly 50
percent of the ATF investigations involved firearms being trafficked by straw purchasers either directly or
indirectly.").

the leading trade association of the firearms industry, to develop the "Don't Lie for the Other Guy" program, which is designed to prepare firearms dealers to fulfill their responsibility to identify and prevent straw purchases.  *See* The Firearm Indus. Trade Ass'n, *Don't Lie for the Other Guy*, http://www.dontlie.org/ (last visited Dec. 2, 2020).[6]

An FFL that does not take steps to stop straw purchasers can face serious consequences, including revocation of its license and civil and criminal liability.  *See, e.g., Shawano Gun & Loan, LLC v. Hughes*, 650 F.3d 1070, 1077-79 (7th Cir. 2011) (affirming ATF's revocation of defendant's federal firearms license when dealer "had reason to believe that the purchaser was purchasing the firearm for another person. . . ."); *United States v. Carney*, 387 F.3d 436, 442-50 (6th Cir. 2004) (upholding criminal convictions of two FFLs who, on multiple occasions, sold handguns and rifles to a prohibited purchaser who had been previously convicted of a felony through six different "straw woman" purchasers).

Yet, none of the tools that ATF employs to combat straw purchases is available to prevent prohibited purchasers from acquiring ghost guns.  There is no ATF Form 4473 involved. Sellers of 80% components and ghost gun kits need not certify that their customers are legally permitted to own firearms.  Nor do buyers have to avow that they are free from felony convictions or other conditions that would prevent them from owning guns.  Neither ATF nor any trade association has created any industry standards for ghost gun kit sellers to ensure that the assembled firearms are not acquired by prohibited purchasers.  Moreover, there are no regulatory or legal consequences for irresponsible ghost gun kit dealers.  Nor are ghost gun kit dealers trained in identifying suspicious purchases or straw purchasers.  Indeed, because

---

[6] The program makes training materials and seminars available to FFLs and provides a recommended sales protocol for FFLs to use in screening suspicious purchasers, ferreting out the identity of the actual purchaser, and refusing the sale unless the dealer has no doubts as to the identity of the purchaser.

prohibited purchasers can easily purchase ghost gun kits in any quantity without scrutiny, there is little need for prohibited purchasers to even use straw purchasers when acquiring ghost guns.

The ready availability of ghost gun kits poses additional hindrances to law enforcement. The supply of ghost gun kits obviates the need for prohibited persons to obtain firearms through the sorts of gun thefts that ATF and dealers can detect and prevent. The GCA requires FFLs to report gun theft to the ATF and local authorities within 48 hours of discovering that firearms are missing from their inventories. 18 U.S.C. § 923(g)(6). From 1994 to the present, a staggering 200,000 firearms were reported to ATF's Stolen Firearms Program as either stolen or lost. ATF, *Safety and Security Information for Federal Firearms Licensees*, https://www.atf.gov/firearms/ docs/guide/safety-and-security-information-federal-firearms-licensees-atf-p-33172/download, p. 1 (last accessed Dec. 11, 2020). ATF is not only able to use this information to prosecute individual perpetrators, but also to identify broader trafficking patterns. *Id.* The Stolen Firearms Program highlights the role of licensed dealers as "the first line in maintaining the security and lawful transfer of firearms." *Id.* Firearms that are under the control of FFLs are capable of being carefully inventoried and identified, and "[w]ithout accurate identification of these firearms, law enforcement officials face considerable obstacles in investigating [] firearm thefts." *Id.* at 5.

Just as ATF's policy on ghost guns allows prohibited purchasers to obtain these weapons without scrutiny and avoid the risks associated with using straw purchasers, criminals no longer need to steal firearms from licensed dealers to get their hands on guns. The improper determination that ghost gun kits are not firearms undermines virtually every measure the federal government has put in place to prevent the operation of a secondary illegal gun market.

Indeed, rather than acting as part of the solution—a shield against firearms trafficking— the sellers of 80% frames and receivers and ghost gun kits become part of the problem. ATF is

11

effectively sanctioning illegal firearms transfers by these sellers, and fueling our national gun violence epidemic.

      D.    <u>ATF's Audits Do Not Extend to Ghost Gun Sales</u>

As part of its mission, ATF ensures that FFLs are complying with federal firearms laws by conducting compliance audits.  Because ATF does not regulate the sale of ghost gun kits, the Bureau does not audit those sales.  This is true whether the ghost gun sale is online or even by a licensed gun dealer at retail.  Functionally, ATF treats the sale of a ghost gun kit no differently than the sale of a souvenir T-shirt or hat, and entirely *unlike* the sale of a preassembled firearm.

ATF audits are critical because they allow the agency to determine if an FFL is not complying with background checks and other federal requirements, and thus whether it is potentially supplying guns to prohibited purchasers.  During the audit inspection process, ATF ensures that dealers are following the recordkeeping requirements and maintaining an accurate inventory of their firearms.  Under the GCA's recordkeeping requirements, 18 U.S.C. § 923(g)-(i), these FFLs must maintain records of sales and other dispositions, which include ensuring that Form 4473 is completed by each ultimate gun purchaser and that all firearms are appropriately identified by a serial number.[7]  *See FFL Compliance Inspections*, Bureau of Alcohol, Tobacco, Firearms and Explosives Fact Sheet (February 2013), https://www.atf.gov/resource-center/docs/factsheet-ffl-complaincepdf-0/download ("Compliance inspections . . . serve to protect the public in that they promote voluntary internal controls to prevent and detect diversion of firearms from lawful commerce to the illegal market.").

Audits also allow ATF to ensure that FFLs are complying with federal requirements to: (i) notify ATF when multiple handguns are sold or transferred to the same person within a five-

---

[7] *Id.* at § 923(g)(1)(A); (2); 27 CFR § 478.124.

day period (a red flag of criminal activity);[8] (ii) contact ATF within 48 hours after the loss or

theft of firearms in a licensee's inventory;[9] and (iii) transfer required records to the licensee's

successor or ATF when a licensee ceases business operations.[10]  In addition, FFLs must maintain

accurate records of firearms sales so that, if a firearm sold by an FFL is recovered in a crime, law

enforcement can trace the firearm back to the dealer to learn the identity of its purchaser.  27

C.F.R. §§ 478.121-134.

Inconsistencies and/or errors in dealer records are telling because they show that dealers

are potentially selling guns without performing background checks, not reporting thefts or losses,

not reporting multiple sales of firearms, or otherwise providing guns to individuals who are

prohibited from possessing them under federal law.  *See id*.  There is a disproportionate

likelihood that these guns will be used in crimes, as statistics cited by Plaintiffs demonstrate.

*See, e.g.*, Pls.' Br. 15-16.[11]

Because ATF does not regulate sales of ghost gun kits, none of these numerous audit

requirements apply.  This is true whether the ghost gun seller is an unlicensed dealer selling only

---

[8] 18 U.S.C. § 923(g)(3)(A).

[9] *Id.* at § 923(g)(6).

[10] *Id.* at § 923(g)(4).

[11] Studies show that handguns sold in multiple sales were up to 64% more likely to be used in crime than handguns sold individually and approximately 20–25% of all handguns recovered at crime scenes were originally purchased as part of a multiple sale.  Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, National Institute of Justice, 2007, https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf.  Additionally, there is an emerging trend of people buying multiple ghost gun *kits* and completing the ghost guns for illegal sales.  *See, e.g.*, Christina Caron, *"Ghost Guns," Homemade and Untraceable, Face Growing Scrutiny*, THE NEW YORK TIMES (Nov. 27, 2017), https://www.nytimes.com/2017/11/27/us/ghost-guns-gabby-giffords.html ("In 2013, Michael Yarbrough of Corpus Christi, Tex., was sentenced to 10 years in prison for buying more than 900 parts kits and firearm receivers and selling AK-47 type firearms for transport to Mexico."); S.P. Sullivan, *Cocaine bust led cops to 'ghost gun' network that sold untraceable AR-15s, AG says*, NJ.COM (March 18, 2019), https://www.nj.com/politics/2019/03/cocaine-bust-led-cops-to-ghost-gun-network-that-sold-untraceable-ar-15s-ag-says.html (Suspects were assembling and trafficking AR-15s; authorities recovered six unregistered AR-15s as well as the parts to build two more.).

80% components and ghost gun kits, or whether it is a licensed gun dealer selling the parts and kits used to build ghost guns alongside the sales of regulated guns subject to audit.

      E.     <u>Ghost Gun Sellers Capitalize on Purchasers' Ability to Evade Background Checks</u>

      As Plaintiffs make clear, ghost guns are attractive to prohibited purchasers precisely because they can obtain these weapons without undergoing background checks, and because these weapons cannot be traced to their source.  Pls.' Br. at 19.  Due to ATF's improper exemption of 80% components and ghost gun kits from the GCA, a prohibited gun buyer need not even go to a gun store to buy what is needed to build a ghost gun, since that buyer need only visit one of the dozens of websites selling DIY ghost guns and provide a credit card and mailing address.  Simply put, purchasing everything needed to build your own ghost gun is as easy as ordering a book from Amazon.com.

      Indeed, some websites lure purchasers by expressly advertising that they can avoid background checks and registration.  For example:

- AR15 Site tells consumers, under the headline "Three Reasons You Want To Buy An AR 80 Lower":  "Because an 80% lower is not legally considered a firearm, you, the buyer, are not required to register it.  After all, this is legally just a hunk of aluminum." http://ar15.site/ar-80-lower/ (last visited Dec. 2, 2020).

- M-16 Parts Supply LLC lures customers by specifically emphasizing that their ghost gun purchases will not be subject to background checks:  "The 80% Lower Receiver is not an FFL (Federal Firearms License) item. This receiver is machined to 80 percent and still requires machining to be completed.  *We do have a copy of the determination letter and update stating this is not a firearm and can be shipped directly to your home without a background check*."  https://www.m-16parts.com/contents/en-us/p553_Anodized-AR-15-80-percent-Receivers.html (last visited Dec. 2, 2020).

- Likewise, JSD Supply, while telling purchaser to consult their local laws, states:  "With our 80% AR lower parts and kits, you can have a sidearm for personal use without the usual concerns regarding serial numbers, background checks, and government fees". https://jsdsupply.com/80-ar-15/ (last visited Dec. 2, 2020).

- The aptly-named "Always Armed" states:  "The 80% lower is the first step for your next AR15, AR-10, AR-9 or Handgun Build.  An 80 percent lower receiver provides a Path to

complete [your] own AR style rifle, pistol or handgun without any paperwork or FFL (Federal Firearm License) transfer."  https://alwaysarmed.com/80-lowers/ (last visited Dec. 2, 2020).

The sale of 80% components and ghost gun kits by these and many other websites illustrates a pervasive problem:  vendors of these do-it-yourself, easily-assembled guns know they can fly under the radar, and shield their buyers from detection as well, precisely because ATF has refused to properly enforce federal law and regulate the sale of ghost guns.[12]  The very language on the sellers' websites, noted above, makes this clear.  In a regulated gun sale, the time it takes both buyer and seller to complete the Form 4473 to initiate the background check, and the resulting paper trail, can help uncover any red flags in the transaction.  Yet, because ATF does not regulate ghost guns like traditional guns, neither licensed dealers nor online sellers take any of these precautions when selling ghost gun kits, and the market is flooded with weapons freely available to prohibited persons.

Although a small number of states have enacted laws regulating ghost gun kits and the 80% frames and receivers used to build ghost guns, *see, e.g.*, N.J. STAT. ANN. § 2C:39-9; CAL. PENAL CODE § 29180-84; REV. CODE WASH. (RCW) § 9.41.090; CONN. PUB. ACT NO. 19-6, the vast majority of states have not passed laws to fill the void that ATF's unlawful determination has created.  As a result, the unregulated sale of ghost guns continues unabated across much of the nation.

Moreover, individual states' efforts to stem gun violence by tightening gun legislation are undermined by trafficking across state lines from states that do not regulate ghost guns and states

---

[12] The ATF admits that at least some ghost guns remain unregulated by the agency.  *See* ATF, *Are "80%" or "unfinished" receivers illegal?*, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Dec. 2, 2020) (indicating that receivers with an un-machined fire-control cavity are not subject to regulation under the GCA).

receiving an influx of illegal guns are powerless to act.  Currently, illegal traffickers are able to avoid state ghost gun laws by purchasing ghost guns in states without restrictions and transporting them across state lines.  *See, e.g.,* S.P. Sullivan, *Cocaine bust led cops to 'ghost gun' network that sold untraceable AR-15s, AG says*, NJ.COM (March 18, 2019), https://www.nj.com/politics/2019/03/cocaine-bust-led-cops-to-ghost-gun-network-that-sold-untraceable-ar-15s-ag-says.html ("When New Jersey banned untraceable 'ghost guns' in November, one of the suspects allegedly told an associate they'd have to 'go across the border' and have the gun parts delivered to an address in Pennsylvania instead.").  Both ghost gun frames and receivers and assembled ghost guns are increasingly being trafficked across state lines and used in crimes.  Only ATF, and not the individual states, has the mandate to stamp out this dangerous nationwide trend.

## II.   ATF MUST NOT BE PERMITTED TO EXEMPT GHOST GUNS FROM SERIALIZATION REQUIREMENTS

### A.   Ensuring Serialization of All Firearms is Part of ATF's Mandate

In addition to background checks and record-keeping requirements, the use of serial numbers is integral to ATF's ability to carry out its critical oversight function.  Generally, U.S. law requires licensed manufacturers and importers of all firearms to provide a unique serial number on the frame or receiver of the weapon.  18 U.S.C. § 923(i).  The serial number allows law enforcement to trace the firearm to its first point of retail sale, including in the aftermath of a shooting or other gun crime, without hindering the operation of the firearm at all.  *See United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("the presence of a serial number does not impair the use or functioning of a weapon in any way")[13]  A firearm frame (in handguns) or

---

[13] The importance of serial numbers in firearms regulation is emphasized by the ban on receiving and possessing firearms without a serial number.  26 U.S.C. § 5861(i); *see United States v. McSwain*, No. CR 19-80 (CKK), 2019

receiver (in long guns) is the component of the gun that qualifies as a "firearm" under federal law,[14] and those that meet ATF's definition of "firearm" must bear serial numbers[15]

But, as noted by Plaintiffs (Pls.' Br. at 11, Section IV), ATF has determined that unfinished, so-called "80%" frames and receivers do not qualify as "firearms." Thus, according to ATF, although finished ghost guns operate in the exact same manner as serialized guns, the unfinished frames and receivers used to build them are not subject to federal regulation and do not have to be serialized at the point of sale. Buyers can finish the few remaining steps to complete a frame or receiver using common household tools like files and drills,[16] and then assemble the firearm by adding its remaining components (e.g., a stock, barrel, slide, and trigger mechanism) to complete a fully-functioning firearm in just an hour or two—or even less.[17] Consumers may convert unfinished ghost gun components into handguns, AR-15 and AK-47 style rifles, and other types of firearms—none of which, because of ATF's misguided approach, possess serial numbers.

B. Serial Numbers Facilitate "Tracing" of Guns Used in Crime

"Tracing" is a tool used by federal and local law enforcement to determine the history of a firearm recovered at a crime scene. *See* U.S. DEP'T. OF JUSTICE, FIREARMS TRACING GUIDE:

---

WL 1598033, at *1 (D.D.C. Apr. 15, 2019) (denying modification of conditions of release where defendant was charged with possession of a "ghost gun" in violation of 26 U.S.C. § 5861(i)).

[14] 18 U.S.C. § 921 (a)(3) ("The term 'firearm' means . . . the frame or receiver of any such weapon"); Evan Sernoffsky, *'Ghost Guns' Continue to Elude California's Firearms Laws*, GOVERNMENT TECHNOLOGY (Nov. 21, 2017) http://www.govtech.com/public-safety/Ghost-Guns-Continue-to-Elude-Californias-Firearms-Laws.html.

[15] *ATF Answers Questions on 80 Percent Lower Receiver Blanks*, AMMOLAND (Nov. 7, 2014) https://www.ammoland.com/2014/11/atf-answers-questions-on-80-receiver-blanks/#axzz5bCuWnN62.

[16] A handheld drill can be used; indeed, one company, 80 Percent Arms, streamed a video on its Youtube channel showing how: *Drill out an 80% AR-15 Lower in 5 min with hand drill - 80% Arms Easy Jig*, https://www.youtube.com/watch?v=ccO1Day60sA.

[17] One ghost gun seller touts that its 80% receiver can be completed "in under 15 minutes with excellent results." The Router Jig Pro Multiplatform – AR-15 / AR-9/AR-45/.308/AR-10, 5D Tactical, https://www.5dtactical.com/multiplatform-80-lower-jig-p/5d-pmj.htm.

TRACING FIREARMS TO REDUCE VIOLENT CRIME 1-5 (2011), https://www.atf.gov/file/58631/

download.  The tracing process follows the path of a firearm from the manufacturer to the

distributor to the FFL to the last known purchaser.  *See* U.S. DEP'T OF THE TREASURY, ATF,

COMMERCE IN FIREARMS IN THE UNITED STATES 19 (February 2000),

https://www.hsdl.org/?view&did=1624 [hereinafter COMMERCE IN FIREARMS REPORT]; *see also*

*N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 505 (E.D.N.Y. 2003) ("Tracing provides

investigative leads to law enforcement agencies so that if an initial purchaser of a recovered gun

is identified, law enforcement officers can attempt to learn both the history of the gun and the

circumstances surrounding how the gun reached its possessor."); *Marzzerella*, 614 F.3d at 100

("serial number tracing also provides agencies with vital criminology statistics—including a

detailed picture of the geographical source areas for firearms trafficking and 'time-to-crime'

statistics which measure the time between a firearm's initial retail sale and its recovery in a

crime—as well as allowing for the identification of individual dealers involved in the

trafficking").

When a gun is recovered at a crime scene, law enforcement sends "trace requests" to

every licensee in the distribution chain—from manufacturer to wholesaler to retail dealer—"to

identify broader trafficking patterns" and identify who purchased the gun and who could be a

suspect in the crime or a valuable lead.  COMMERCE IN FIREARMS REPORT at 1-2.

When "multiple crime guns [are] traced to an FFL or first retail purchaser" *id*. at 22, ATF

deems this an indicator of gun trafficking.  According to the Bureau, "[t]race information can

indicate, for instance, that a purchaser—possibly a straw purchaser or other unlicensed seller—is

repeatedly buying firearms from a dealer, or that crime guns from a particular area are repeatedly

originating from a particular licensed dealer."  *Id*. at 2.

As of 1998, tracing has shown that the overwhelming majority of dealers (about 86%) sell zero crime guns in a given year, while about 7.2% of dealers sell almost 90% of crime guns. COMMERCE IN FIREARMS REPORT at 23.  Thus, tracing allows ATF to target enforcement of such noncompliant dealers and helps the agency determine "if the FFL or someone else [*i.e.*, the buyer] is violating the law."  COMMERCE IN FIREARMS REPORT at 2, 23.  Law enforcement can use tracing to determine which individual retailers are responsible for patterns of sales of crime guns trafficked throughout the country.  *See, e.g., City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 376-78 (E.D.N.Y. 2007).

ATF focuses its inspection efforts on firearms dealers who have had a relatively large number of traces to, among other things, "identify improvements that could be made in the dealers' business practices to make them less susceptible to straw purchasers or other traffickers."  U.S. DEP'T OF TREASURY, ATF REGULATORY ACTIONS: REPORT TO THE SECRETARY ON FIREARMS INITIATIVES 4 (Nov. 2000).  Indeed, a study of firearms dealers that had more than ten traces in one year revealed that those dealers, as a group, were "more likely" to have violated the Gun Control Act than the general dealer population.  *Id.* at 14-15.

C.  Unserialized Ghost Guns Cannot be Traced

Just as ATF's abdication of its responsibilities under the law allows ghost gun purchasers to elude background checks, it also allows them to build weapons with no serial numbers.  These unserialized weapons, in turn, including those guns used to commit crimes, cannot be traced by law enforcement.  *See, e.g.*, *McSwain*, 2019 WL 1598033, at *3 ("The present charges also involve a weapon that lacks a serial number; this 'ghost gun' is therefore untraceable by law enforcement.").

19

Ghost gun sellers capitalize on this fact in their marketing efforts.  A review of several active websites shows sellers expressly touting the absence of serial numbers on their DIY kits, including:

- The Ghost Guns website, which advertises "Ghost Gunner mill:  'Legally manufacture unserialized rifles and pistols in the comfort and privacy of home.'" https://ghostguns.com/product-category/ghost-gunner/ (last visited Dec. 2, 2020);

- SS-Arms, seller of AR 80% lower receivers and lower AR 15 receiver parts, endorsing its products as "[m]ake your own AR-15 without the hassle of serial numbers and registration."  https://www.ss-arms.com/category-s/1851.htm (last visited Dec. 15, 2020);

- As noted *supra* at 14, the site JSD Supply advertises both the absence of serial numbers and lack of background checks:  "With our 80% AR lower parts and kits, you can have a sidearm for personal use without the usual concerns regarding serial numbers, background checks, and government fees"  https://jsdsupply.com/80-ar-15/ (last visited Dec. 2, 2020); and

- Atomic Engraving also stresses that serial numbers are generally not required.  In the FAQs on its website, it states:  "Federal law DOES NOT require an individual building a firearm for personal use to mark it with a serial number UNLESS YOU LIVE IN CALIFORNIA." https://www.atomicengraving.com/faq/ (last visited Dec. 2, 2020) (emphasis in the original).

Thus, because ATF allows ghost gun sellers to ply their trade unfettered by regulations, they have created a thriving market for individuals who want firearms that cannot be traced.

III.     THE EXEMPTION OF 80% COMPONENTS AND GHOST GUN KITS FROM REGULATION ESPECIALLY HARMS BLACK AND BROWN COMMUNITIES THAT SUFFER DISPROPORTIONATE RATES OF GUN VIOLENCE

ATF's improper exemption of the parts used to make ghost guns from regulation not only perpetuates crime generally, but it also disproportionately affects Black and Brown communities that experience the burden of pervasive gun violence.  A recent study published by the American Public Health Association emphasizes: "We cannot address gun violence in America's cities

without confronting the racial inequities, racism, and stigma at the heart of urban violence."[18]

Indeed, "the homicide rate for Black Americans in all 50 states is, on average, eight times higher

than that of Whites (CDC, 2017). . . . Black people specifically are 500 times more likely to die

[by gun violence] [than by international terrorism.]" [19]  If current death rates hold, one in 38

Black men will be killed by a gun.[20]  This pattern carries over to school children in our country.

Nearly 3,000 children are shot and killed annually in the United States, with gun violence being

responsible for ten times more deaths of Black children than White children.[21]

Numerous studies bear out the dramatic disparity between homicide rates (including by

gun violence) among Blacks and Whites.  For instance:

- An Annals of Medicine study (published April 23, 2018) reports that there were "drastic differences in how black and white men experience fatal gun violence between 2008 and 2016", with Black men experiencing 27 more firearms homicides per 100,000 per year nationwide (29.12 for Black men vs. 2.1 for White men).[22]

- The Brookings Institution reports on U.S. gun deaths by race and gender, noting that nearly 35 Black men per 100,000 suffered gun deaths between 2011 - 2013, while approximately 16 White men during the same period.[23]

---

[18] Alycia Santilli et al., *Bridging the Response to Mass Shootings and Urban Violence:  Exposure to Violence in New Haven, Connecticut*, AM. J. PUBLIC HEALTH, Mar. 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5296698/.

[19] Yolanda T. Mitchell and Tiffany L. Bromfield, *Gun Violence and the Minority Experience*, National Council on Family Relations (Jan. 10, 2019), https://www.ncfr.org/ncfr-report/winter-2018/gun-violence-and-minority-experience.

[20] Ashwini R. Sehgal, MD, *Lifetime Risk of Death From Firearm Injuries, Drug Overdoses, and Motor Vehicle Accidents in the United States*, 133 AM. J. OF MEDICINE 1162 (Oct. 2020), https://www.amjmed.com/article/S0002-9343(20)30363-6/pdf.

[21] Mitchell et al., *supra* note 19.

[22] Howard, Jacqueline, *The disparities in how black and white men die in gun violence, state by state*, https://www.cnn.com/2018/04/23/health/gun-deaths-in-men-by-state-study/index.html (Apr. 24, 2018) (citing data from the Centers for Disease Control and Prevention's Wide-ranging Online Data for Epidemiologic Research database, https://wonder.cdc.gov/).

[23] Richard Reeves, et al., *Guns and race:  The different worlds of black and white Americans* (Dec. 15, 2015) (hereinafter "*Guns and race*") (data drawn from *CDC Injury Prevention & Control database.* .https://www.brookings.edu/blog/social-mobility-memos/2015/12/15/guns-and-race-the-different-worlds-of-black-and-white-americans/

- A survey specific to residents in six low-income neighborhoods in New Haven Connecticut, conducted largely by the Yale School of Public Health, concluded that "[g]un violence disproportionately occurs in communities experiencing social and economic inequities." Among other things, the study found:

  o Although Black men comprise only 6% of the population, they represent over half of gun homicide victims (indicating this was a nationwide figure).[24]

  o Of those responding, 80.1% of Black residents reported hearing multiple gunshots in the neighborhood compared to only 56.7% of White residents.[25]

  o Nearly one quarter (24.2%) of Black residents responding to the survey reportedly had a family member or close friend killed by violence, two and a half times the rate reported by White respondents (9.7%).[26]

The Brookings Institution concluded its 2015 "*Guns and race*" article by stating: "Gun violence is part of a vicious cycle of race and inequality in the U.S., reflecting existing social inequalities, and also making it even more challenging for young black people, especially young black men, to escape poverty and violence."[27]

As Plaintiffs' opening brief demonstrates (see Pls.' Br. at 19-20), ghost gun violence is on the rise across the country, exacerbating existing disparities in which Black and Brown communities already suffer disproportionate harm. By fulfilling its legal duty and regulating these previously unregulated guns, ATF can break this cycle.

---

[24] Santilli et al., *supra* note 18, (citing Rich, JA, Wrong Place, Wrong Time: Trauma and Violence in the Lives of Young Black Men (2011)).

[25] *Id.*

[26] *Id.*

[27] Reeves et al., *supra* note 23.

## CONCLUSION

ATF's decision not to apply serialization and background check requirements to the sale of ghost gun kits and parts is contrary to law and arbitrary and capricious.  The Court should grant Plaintiffs' motion for summary judgment.


Dated:  December 16, 2020                              Respectfully submitted,


                                                        /s/ Roberta L. Horton
                                                        Roberta L. Horton
                                                        *Pro hac vice application pending*
                                                        Arnold & Porter Kaye Scholer LLP
                                                        601 Massachusetts Ave., NW
                                                        Washington, D.C.  20001
                                                        202-942-5000
                                                        Roberta.Horton@arnoldporter.com

                                                        Lucy S. McMillan
                                                        Arnold & Porter Kaye Scholer LLP
                                                        250 West 55th Street
                                                        New York, NY 10019
                                                        212-836-8000
                                                        Lucy.McMillan@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2020, an electronic copy of the foregoing Amicus Brief was filed with the Clerk of Court for the United States District Court for the Southern District of New York using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon registered CM/ECF participants.

Dated:  December 16, 2020

Respectfully submitted,

/s/ Roberta L. Horton
Roberta L. Horton
*Pro hac vice application pending*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C.  20001
202-942-5000
Roberta.Horton@arnoldporter.com

Lucy S. McMillan
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
212-836-8000
Lucy.McMillan@arnoldporter.com

*Counsel for Amici Curiae*