UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF SYRACUSE, NY, *et al.*,

                              *Plaintiffs*,

              v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

                              *Defendants*.

No. 1:20-cv-06885-GHW

**BRIEF OF *AMICUS CURIAE* PROSECUTORS
AGAINST GUN VIOLENCE IN SUPPORT OF PLAINTIFFS**

RICHARDS KIBBE & ORBE LLP

Lee S. Richards
Arthur S. Greenspan
David B. Massey
Jacob Taber
Rebecca L. Salk
200 Liberty Street
New York, NY 10281-1003
(212) 530-1800

*Attorneys for Amicus Curiae
Prosecutors Against Gun Violence*

## **TABLE OF CONTENTS**

IDENTITY AND INTEREST OF AMICUS CURIAE ..................................................................1

INTRODUCTION ...............................................................................................................2

ARGUMENT ......................................................................................................................3

I.      Defendants' Failure to Regulate Ghost Guns Undermines Federal and State Prohibitions on Firearm Possession by Persons Previously Convicted of a Felony and Other Higher-Risk Individuals ......................................................................................................... 3

          A.      The Prohibition on Firearm Possession By Persons Previously Convicted of a Felony Enhances Public Safety....................................................................... 4

          B.      Prosecutors Understand the Threat to Public Safety Posed By Unregulated Gun-Building Kits ............................................................................................. 6

II.     Defendants' Failure to Regulate Ghost Guns Undermines the Legal System's Protections for Domestic Violence Survivors..................................................................... 12

          A.      The Current System of Protections for Domestic Violence Survivors Is Designed To Keep Guns Out of the Hands of Those Who Have Committed Abuse .......... 14

          B.      Non-Regulation of Ghost Guns Increases the Risk of Death for Domestic Violence Survivors.................................................................................... 16

CONCLUSION....................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barrett v. United States*,
   423 U.S. 212 (1976)................................................................................5

*United States v. Bass*,
   404 U.S. 336 (1971)................................................................................5

*Huddleston v. United States*,
   415 U.S. 814 (1974)................................................................................5

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) .................................................................6

*United States v. McSwain*,
   Crim. No. 19-80 (CKK), 2019 U.S. Dist. LEXIS 64053 (D.D.C. Apr. 15, 2019 ..................12

*San Jose Police Dep't v. Piseno*,
   20GV000033 (Cal. Sup. Ct. Fam. Div. 2020) ......................................18

*United States v. Trujillo*,
   817 F. App'x 634 (10th Cir. 2020) .......................................................9

*United States v. Villasenor*,
   2:20-cr-00050-KJM (E.D. Cal.).............................................................17

**Statutes**

18 U.S.C. § 921(a)(32).................................................................................14

18 U.S.C. § 922(d)(9) ..................................................................................14

18 U.S.C. § 922(g)(8) ..................................................................................14

Federal Firearm Act, 52 Stat. 1251 § 2(f) ..................................................4

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ....................4

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82
   Stat. 197. ...............................................................................................4

Violence Against Women Act, 108 Stat. 1902 et seq. (1994). ...............14, 16

**Other Authorities**

104 Cong. Rec. S11,2266 (daily ed. Sept. 25, 1996) .......................................................14

Aaron Edward Brown, *This Time I'll Be Bulletproof: Using Ex Parte Firearm Prohibitions to Combat Intimate-Partner Violence*, 50 Colum. Human Rights L. Rev. 159 (2019) ........................................................................................................15

Amanda Michelle Gomez, *DC Recovered 115 Ghost Guns in 2019, Up From 25 the Year Before*, Washington City Paper, Jan. 10, 2020 ............................................7

Amanda Taub, *A New Covid-19 Crisis: Domestic Abuse Rises Worldwide*, N.Y. Times, Apr. 6, 2020 ....................................................................................................18

Benjamin Weiser, *Ross Ulbricht, Creator of Silk Road Website, Is Sentenced to Life in Prison*, N.Y. Times, May 30, 2015, at A15 ......................................................3

Caroline Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257 (2017) ...............12, 14

Everytown for Gun Safety, *Domestic Violence.* .....................................................14, 15

Everytown For Gun Safety, *Untraceable: The Rising Specter of Ghost Guns*, May 14, 2020 ......................................................................................................................16

Federal Bureau of Investigation, *Federal Denials*, November 30, 1998 – October 31, 2020 ....................................................................................................................14

Giffords Law Center, *Domestic Violence & Firearms.* ...........................................12, 15

Giffords Law Center, *Firearm Relinquishment.* ..............................................................15

Giffords Law Center, *Firearms Prohibitions.* ....................................................................3

Jane K. Stoever, Intimate Partner Violence and Restorative Justice: Firearms and Domestic Violence Fatalities: Preventable Deaths, 53 Fam. L.Q. 183 (2019) ...........13, 15, 16

Janon Fisher, *Junkie NYPD officer Nicholas Mina Pleads Guilty to Stealing Guns from Station, Selling Them to Dealer*, N.Y. Daily News, Oct. 22, 2012 ................................12

Jeff Benziger, *Modestan With Ghost Gun, History of Domestic Violence, Arrested After Chase With Police*, Ceres Courier, Oct. 1, 2020 ............................................18

Jennifer L Vainik, *Kiss, Kiss, Bang, Bang: How Current Approaches to Guns and Domestic Violence Fail to Save Women's Lives*, 91 Minn. L. Rev. 1113 (2007) ....................13

John Finerty, *State Struggles to Bolster PFA Orders*, June 27, 2020 ...........................17

Josh Cain, *Gang members arrested in raids; 10 suspected of building more than 50 homemade unregistered firearms*, San Gabriel Valley Tribune, July 7, 2018, at A2 ................................................................................................................10

Kellie Descrochers, *Municipalities Are Not Kingdoms: Regulating Gun Ownership in Cases Involving Domestic Violence in Light of the* Pauler *Decision*, 29 B.U. Pub. Int. L.J. 277, 285 (2020) ...........................................13, 14

Marcia Moore, *UPDATE Fernanders' Murder Charges Headed to Snyder County Court*, Sept. 29, 2020 ........................................................................................17

Nick Corasaniti, *The Target Was A Drug Ring.  They Found 'Ghost Guns.'*, N.Y. Times, Mar. 18, 2019, at A23 .....................................................................11

NJ OAG Press Release, *Leading Member of Criminal Ring That Trafficked Untraceable "Ghost Gun" Assault Rifles and Cocaine Sentenced to 14 Years in State Prison*, July 10, 2020 ................................................................................11

*Police officer charged with illegally making, selling guns*, Associated Press, Mar. 2, 2019....................................................................................................................9

S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968) .................................................5

Tess Owens, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, VICE, March 27, 2020....................................................18

Tom Lininger*, An Ethical Duty to Charge Batterers Appropriately*, 22 Duke J. Gender L. & Pol'y 173 (2015) ............................................................................12

Tracy Sauro, *Don't Leave Me Now! – A Domestic Violence Victim's Right to Be Armed Because Their Abusers Are Dangerous*, 40 Women's Rights L. Rep. 171 (2019) ............................................................................................................13

USAO Press Release, *15 Charged on Drugs and Guns Charges as Part of Anti-Gang Sweep in Concord and Surrounding Areas*, Sept. 15, 2020..........................10

USAO Press Release, *Baltimore Man Sentenced to 21 Years in Federal Prison for Five Bank Robberies, Five Armed Robberies of Liquor Stores, and Related Firearms Charges*, Nov. 12, 2020. ...........................................................................7

USAO Press Release, *D.C. Felon Pleads Guilty in Federal Court in Maryland to Illegal Possession of a "Ghost Gun" Firearm and Ammunition*, Sept. 22, 2020.........................................................................................................................8

USAO Press Release, *Eight Men Indicted for Manufacturing and Dealing AR-15 Type Rifles and Silencers Without a License*, Oct. 15, 2015. ...................................10

iv

USAO Press Release, *Felon sentenced to more than five years in prison for arsenal of 'ghost guns' and smuggled silencers*, Oct. 9, 2020. ..................................................8

USAO Press Release, *Ghost Gun and Machine Gun Conversion Device Dealer Pleads Guilty*, Sept. 29, 2020..................................................................................9

USAO Press Release, *L.A. Man Sentenced to Nearly 4 Years in Federal Prison for Illegally Manufacturing Assault Rifles and Silencers He Intended to Sell,* Mar. 12, 2018...................................................................................................9

USAO Press Release, *Man Sentences for Straw Purchasing Firearms for Convicted Felon*, Apr. 16, 2019..........................................................................11

## IDENTITY AND INTEREST OF AMICUS CURIAE

Prosecutors Against Gun Violence ("PAGV") is an independent, nonpartisan coalition that identifies and promotes prosecutorial and policy solutions to the national public health and safety crisis of gun violence.  PAGV's membership comprises 50 prosecutors, and serves over 76 million Americans in 24 states.  Its mission includes sharing best practices for prosecuting gun offenders and defending common-sense gun safety policies.

Prosecutors, and other local law enforcement agencies with which they collaborate daily, play a critical role in promoting citizen safety—the highest objective of state and local governments.  The issue before this Court is whether mail-order gun-building kits, which customers can easily convert to usable pistols or rifles with just an hour or two of work, must be regulated as firearms.  As local leaders in the nationwide effort to curb gun violence and promote public safety, prosecutors witness every day the tragic effects of the government's failure to enforce the federal gun laws with respect to ghost guns, and the limitations this places on their ability to investigate, prosecute, and ultimately prevent gun violence.

PAGV therefore submits this amicus brief to underscore the harm to public safety caused by the federal government's manifestly erroneous interpretation of the Gun Control Act of 1968. Allowing the unrestricted sale of 80%-finished frames, receivers, and gun-building kits—and, in effect, the unregulated sale of untraceable firearms to anyone with a credit card—makes it easier for persons previously convicted of a felony or domestic violence offenses, and other higher-risk individuals to unlawfully obtain and use firearms.  Moreover, the absence of serial numbers on such firearms makes it much more difficult for prosecutors and other law enforcement personnel to do their jobs.

1

## **INTRODUCTION**

As prosecutors working on the front lines of the nation's efforts to deter and reduce gun violence, members of Prosecutors Against Gun Violence are in a special position to observe the damage done by the rise in the use of internet-ordered gun-building kits, which purchasers can use to easily assemble what are known as "ghost guns."  Indeed, prosecutors and other law enforcement agencies in cities like Washington D.C., Philadelphia, Syracuse and Denver have reported dramatic increases in the use of ghost guns in crimes in their cities, and the ghost gun industry has been thriving, especially during the pandemic.  Plainly, the fact that such guns are unregistered, untraceable, and so easy to obtain, explains this disturbing increase in the sale and use of these kits.

With that increase, the burdens on prosecutors' efforts to prosecute and convict those who unlawfully possess or misuse guns are manifold and undeniable.  Prohibitions on gun ownership by classes of higher-risk individuals, including those previously convicted of felonies and domestic violence offenses, as well as requirements that guns carry serial numbers so that they can be traced, are obviously critical tools for prosecutors.  Those tools are openly flouted by the ghost gun industry and a significant part of its customer base.

For these and many other reasons, Prosecutors Against Gun Violence respectfully urges this Court to recognize that 80%-finished frames and receivers, whether sold alone or as part of a gun-building kit, are the functional equivalent of guns and must be regulated as such to avoid undermining existing state and federal gun control laws that keep our communities safe.

**ARGUMENT**

I.    **Defendants' Failure to Regulate Ghost Guns Undermines Federal and State Prohibitions on Firearm Possession by Persons Previously Convicted of a Felony and Other Higher-Risk Individuals**

Federal law and the laws of a majority of states prohibit individuals who have been convicted of, or who are under indictment for, a felony from acquiring or possessing firearms.[1] Some states further restrict access to firearms among people convicted of specified misdemeanors, often those involving violence or the misuse of firearms.[2]  The purpose of these restrictions is simple—to promote public safety by preventing the category of individuals most likely to engage in acts of gun violence from purchasing or possessing firearms.

The rise of mail-order gun-building kits,[3] which can be purchased from the privacy and safety of one's home without a background check, seriously undermines our laws by radically increasing the accessibility of firearms—including handguns, high-powered rifles, and even automatic weapons—to that higher-risk category of individuals prohibited from buying them. Although firearms have long been available to individuals who could not legally purchase them from licensed gun dealers, a flourishing and unregulated online market in gun-building kits further decreases public safety by bringing the anonymity and ease of online shopping to the black market.[4]  Firearms acquired on the black market are typically more difficult, dangerous, and costly

---

[1]  Giffords Law Center, *Firearms Prohibitions*, https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/firearm-prohibitions/.

[2]  *Id.*

[3]  This brief will use the term "gun-building kit" to refer to both 80% complete frames and receivers as well as more comprehensive kits that include the jigs, drill bits, and other tools needed to finish machining the gun.  *See* Complaint ¶¶ 95-105.

[4]  This increased danger is akin to the danger posed by the online drug bazaar Silk Road, which facilitated 1.5 million anonymous online transactions in illegal drugs before it was shut down and its founder sentenced to imprisonment for life.  Benjamin Weiser, *Ross Ulbricht, Creator of Silk Road Website, Is Sentenced to Life in*

to acquire than a firearm with a serial number purchased from a licensed firearm dealer. Unregulated ghost guns, by contrast, are even easier to acquire than regulated firearms—they make it effortless for persons previously convicted of a felony to unlawfully obtain firearms and have created new gun manufacturing and distribution opportunities for gangs and other criminal enterprises.  And without serial numbers, ghost guns are untraceable, further hampering the ability of prosecutors and other law enforcement personnel to investigate gun crime and diminishing the deterrent effect of our gun laws.

### A.    The Prohibition on Firearm Possession By Persons Previously Convicted of a Felony Enhances Public Safety

In 1938, Congress enacted a prohibition on the receipt of a firearm that had traveled in interstate commerce by "any person who has been convicted of a crime of violence."[5]  Congress expanded that federal prohibition in the Gun Control Act of 1968, which declared it unlawful for anyone "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[6]  Section 1202(a) of the Omnibus Crime Control and Safe Streets Act of 1968 similarly prohibited any person who has been convicted of a "felony" from "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm."[7]

---

*Prison*, N.Y. Times, May 30, 2015, at A15, available at https://www.nytimes.com/2015/05/30/nyregion/ross-ulbricht-creator-of-silk-road-website-is-sentenced-to-life-in-prison.html.  Silk Road, like online sellers of gun-building kits, made it easier and safer for buyers to evade laws governing acquisition and possession and made it more difficult for government to trace contraband back to sellers.

[5]  Federal Firearm Act, 52 Stat. 1251 § 2(f).

[6]  Pub. L. No. 90-618, 82 Stat. 1213.

[7]  Pub. L. No. 90-351, 82 Stat. 197, 236.

These laws were intended to promote public safety.  Motivated by both the rise in gun violence and the political assassinations of the tumultuous 1960s, the Gun Control Act aimed to limit access to firearms by "specified classes of especially risky people," including persons previously convicted of a felony.[8]   In enacting them, Congress was "concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest."[9]  The prohibitions on possession were adopted in response to the "increasing rate of crime and lawlessness and the growing use of firearms in violent crime,"[10] and were intended to "make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency."[11]

Congress "determined that the *ease with which firearms could be obtained* contributed significantly to the prevalence of lawlessness and violent crime."[12]  The House Report states that restrictions on the possession and acquisition of firearms by persons previously convicted of a felony were adopted to "control the indiscriminate flow of firearms and ammunition across State borders" so as to give "States and local communities the capacity and the incentive to enforce effectively their own gun control laws."[13]  Gun-building kits undermine the clear legislative

---

[8]  *United States v. Bass*, 404 U.S. 336, 345 (1971); *see also Barrett v. United States*, 423 U.S. 212, 218 (1976) ("The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible or dangerous.")

[9]  *Huddleston v. United States*, 415 U.S. 814, 824 (1974).

[10]  State Firearms Control Assistance Act of 1968, H. Rep. at 7.

[11]  S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968).

[12]  *Huddleston*, 415 U.S. at 824 (emphasis added).

[13]  State Firearms Control Assistance Act of 1968, H. Rep. at 7, 10.

purpose of these laws precisely because they make it so much easier for firearms to be obtained, even in states that have chosen to regulate ghost guns.

Federal and state prohibitions on the purchase and possession of firearms by certain classes of higher-risk persons are no twentieth-century innovation, but rather are rooted in and consistent with English and early American law.[14]  Such prohibitions have their origins in English laws like the Militia Act of 1662, which empowered officers of the Crown to disarm anyone adjudged to be "dangerous to the Peace of the Kingdom."[15]  This historical analysis complements the legislative history and further demonstrates that the Gun Control Act of 1968 and similar laws serve an important public safety function—keeping the most dangerous weapons out of the hands of those people most likely to use them to harm their fellow citizens.  Prosecutors rely on these laws to prevent recidivism and deter previously convicted persons from acquiring, possessing, or carrying firearms.

**B.     Prosecutors Understand the Threat to Public Safety Posed By Unregulated Gun-Building Kits**

The currently lawful sale of gun-building kits to persons previously convicted of a felony and other higher-risk individuals obviously thwarts the purpose and intent behind state and federal legislative actions meant to keep guns out of the hands of such individuals.  Moreover, by eliminating the traditional firearm evidence of serial numbers, these kits create a disturbing and unnecessary hurdle for prosecutors seeking to prevent gun violence and prosecute those who perpetrate it.

---

[14]  *See Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

[15]  *Id.* at 456 (citing Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)).

Prosecutors are noting a sharp uptick in the manufacture and distribution of ghost guns and the use of ghost guns in violent crimes.  Law enforcement in Washington, DC recovered 115 ghost guns in 2019, an increase of 342% over the 26 ghost guns recovered the year before.[16]  Police in Cambridge, MA recovered 30 ghost guns in 2018, and the Boston Police Department recovered 23 ghost guns in the last 18 months.[17]  A Baltimore man who had a prior felony conviction and was prohibited from acquiring or possessing a firearm was recently sentenced for a spree of ten armed robberies committed using a ghost gun that had been assembled from a gun-building kit.[18]  Seattle police have recovered numerous polymer 9mm pistols apparently assembled using gun-building kits—which, in addition to being untraceable, may be invisible to walk-through metal detectors—that were used in the commission of drive-by shootings, armed robberies, and felony harassment.[19]  And the LAPD recovered more than 600 ghost guns in 2020, at least 231 of which were used in serious or violent crimes such as murder and attempted murder, kidnapping, and carjacking, and 145 of which were recovered from persons previously convicted of a felony who are prohibited from owning or possessing firearms.[20]  More than 80% of the ghost guns recovered by the LAPD are handguns, which are subject to further purchase restrictions under California law.[21]  Of course, this increase in the prevalence of ghost guns creates a significant roadblock to

---

[16]  Amanda Michelle Gomez, *DC Recovered 115 Ghost Guns in 2019, Up From 25 the Year Before*, Washington City Paper, Jan. 10, 2020, *available at* https://washingtoncitypaper.com/article/323393/dc-recovered-115-ghost-guns-in-2019-up-from-25-the-year-before/.

[17]  Data compiled by Donna Pantaloon, General Counsel, Suffolk County District Attorney.

[18]  USAO Press Release, *Baltimore Man Sentenced to 21 Years in Federal Prison for Five Bank Robberies, Five Armed Robberies of Liquor Stores, and Related Firearms Charges*, Nov. 12, 2020, *available at* https://www.justice.gov/usao-md/pr/baltimore-man-sentenced-21-years-federal-prison-five-bank-robberies-five-armed-robberies.

[19]  Data compiled by Erica Franklin, Assistant City Attorney, Seattle City Attorney's Office.

[20]  Data compiled by Mike Feuer, Los Angeles City Attorney.

[21]  *Id.*

7

prosecutors' efforts to enforce the prohibitions on possession of firearms by persons previously convicted of a felony.

Individuals previously convicted of a felony and others who cannot pass a background check instead buy gun-building kits online, allowing them to unlawfully obtain a firearm without the risks associated with participation in the black market.  A Washington, D.C. resident who had previously been convicted of passing counterfeit bills pleaded guilty to unlawful possession of a firearm after he was pulled over while carrying a .40-caliber pistol, loaded with ten rounds of ammunition, that had been manufactured from a firearms parts kit.[22]  A Washington State man who had been convicted of a number of felonies, including a prior conviction for unlawful possession of a firearm, was sentenced to 70 months in prison after agents seized a weapons cache of 17 pistols and 24 rifles from his home, nearly all of which were ghost guns that he had manufactured using parts purchased online.[23]  These defendants could not have purchased a gun from a licensed dealer, but were easily able to order a gun-building kit using the internet.  Remarkably, under the ATF's current interpretation of the law, a person previously convicted of a felony or other prohibited person can easily acquire the parts and tools needed to readily assemble an unregistered and untraceable firearm without violating any federal law—only after its final assembly by the purchaser does a ghost gun become a firearm subject to prohibition.

Gun-building kits also make it easy for both individuals and, worse still, organized criminal syndicates, to become unlicensed gun manufacturers and distributors.  With just a few tools and

---

[22] USAO Press Release, *D.C. Felon Pleads Guilty in Federal Court in Maryland to Illegal Possession of a "Ghost Gun" Firearm and Ammunition*, Sept. 22, 2020, *available at* https://www.justice.gov/usao-md/pr/dc-felon-pleads-guilty-federal-court-maryland-illegal-possession-ghost-gun-firearm-and.

[23] USAO Press Release, *Felon sentenced to more than five years in prison for arsenal of 'ghost guns' and smuggled silencers*, Oct. 9, 2020, *available at* https://www.justice.gov/usao-wdwa/pr/felon-sentenced-more-five-years-prison-arsenal-ghost-guns-and-smuggled-silencers.

some knowhow, a criminal entrepreneur can easily turn frames and receivers purchased over the internet into untraceable finished, usable, and salable guns.  For example, the Tenth Circuit recently affirmed the substantive reasonableness of an 87-month sentence for a hobbyist who used gun-building kits to manufacture and sell ghost guns—including fully automatic pistols and silencers—in his basement.[24]  The court took note of the danger posed by the defendant's business and found the sentence necessary to specifically deter others from manufacturing illegal and untraceable weapons using easily available kits and tools.[25]  Similarly, a young man in Fairfax, Virginia recently pleaded guilty to unlawfully dealing firearms without a license—he too purchased gun-building kits online, used them to manufacture untraceable ghost guns, and sold them to anyone with enough money, regardless of whether the purchaser could lawfully possess a firearm.[26]  A Los Angeles man offered to manufacture and sell 100 AR-15-style rifles to an undercover agent, whom he believed to be a gun smuggler; the ghost gun manufacturer was sentenced to 46 months' imprisonment.[27]  And a New York City Department of Environmental Protection police officer allegedly used gun-building kits to manufacture and sell dozens of handguns and rifles to people who could not legally possess them, including members of motorcycle gangs.[28]  Gun-building kits have made it much easier to become an illegal weapons

---

[24] *United States v. Trujillo*, 817 F. App'x 634, 636 (10th Cir. 2020).

[25] *Id.* at 640.

[26]  USAO Press Release, *Ghost Gun and Machine Gun Conversion Device Dealer Pleads Guilty*, Sept. 29, 2020, *available at* https://www.justice.gov/usao-edva/pr/ghost-gun-and-machine-gun-conversion-device-dealer-pleads-guilty.

[27]  USAO Press Release*, L.A. Man Sentenced to Nearly 4 Years in Federal Prison for Illegally Manufacturing Assault Rifles and Silencers He Intended to Sell,* Mar. 12, 2018, *available at* https://www.justice.gov/usao-cdca/pr/la-man-sentenced-nearly-4-years-federal-prison-illegally-manufacturing-assault-rifles.

[28]  *Police officer charged with illegally making, selling guns*, Associated Press, Mar. 2, 2019.

manufacturer and black-market dealer.   These kits allow anyone with a few simple tools to manufacture and distribute untraceable firearms from the comfort of home.

Gun-building kits have also fueled the rise of larger illegal gun-dealing enterprises.   In 2015, eight men in the Sacramento, California area were arrested and charged with manufacturing and dealing firearms without a license.[29]   Federal agents recovered 238 ghost guns and silencers from this operation, including 67 untraceable firearms that defendants manufactured and sold to an undercover agent.   The LAPD in 2018 arrested ten members of a street gang involved  in the manufacture and sale of ghost guns, and seized approximately 50 rifles and handguns manufactured by the gang for sale on the black market.[30] And in September 2020, federal prosecutors charged 15 members of the Sureños street gang in Concord, California with operating an illicit outdoor bazaar out of a shopping center parking lot where they distributed both drugs and illegal firearms, including ghost guns.[31]   In addition to manufacturing and selling ghost guns at scale, gangs (many of whose members may be unable to pass a background check) also manufacture ghost guns for use in their other criminal endeavors.

The lack of uniform regulation of gun-building kits undermines one of Congress's primary purposes in enacting the Gun Control Act of 1968—controlling the interstate flow of guns in violation of state gun control laws.   In March 2019, for example, New Jersey prosecutors broke up

---

[29]   USAO Press Release, *Eight Men Indicted for Manufacturing and Dealing AR-15 Type Rifles and Silencers Without a License*, Oct. 15, 2015, *available at* https://www.justice.gov/usao-edca/pr/eight-men-indicted-manufacturing-and-dealing-ar-15-type-rifles-and-silencers-without.

[30]   Josh Cain, *Gang members arrested in raids; 10 suspected of building more than 50 homemade unregistered firearms*, San Gabriel Valley Tribune, July 7, 2018, at A2.

[31]   USAO Press Release, *15 Charged on Drugs and Guns Charges as Part of Anti-Gang Sweep in Concord and Surrounding Areas*, Sept. 15, 2020, *available at* https://www.justice.gov/usao-ndca/pr/15-charged-drugs-and-guns-charges-part-anti-gang-sweep-concord-and-surrounding-areas.

a gun smuggling and manufacturing ring.  Although the sale of gun-building kits was, by then, illegal in New Jersey (and could not easily be purchased there), they remained effectively unregulated in the neighboring state of Pennsylvania.[32]  Defendants—who were allegedly involved in a large cocaine ring—thus evaded New Jersey's regulations by having the kits shipped to Pennsylvania and then manufacturing untraceable AR-15-style rifles and selling them in New Jersey.[33]  Plainly, the uncontrolled interstate flow of weapons makes it substantially more difficult for prosecutors to enforce state and federal gun laws and prevent gun crime.

Finally, ghost guns threaten public safety by impairing prosecutors' ability to investigate and charge gun crime.  The deterrent power of our state and federal gun laws—including long sentences for unlawful possession of a firearm—lose their force when more gun crimes go undetected or unsolved by law enforcement.  The serial numbers engraved in legally-manufactured firearms are critical investigatory and evidentiary tools.  Following the Manhattan DA's successful prosecution of a gun trafficking ring, for example, federal prosecutors were able to use the serial numbers of the seized weapons to identify and prosecute ten straw purchasers who had supplied the ring.[34]  And when an NYPD officer stole handguns from work and sold them to feed his drug habit, investigators were able to restore the serial numbers he had defaced and trace the firearms

---

[32]  Pennsylvania's efforts to regulate gun-building kits as "firearms" under Pennsylvania law are the subject of ongoing litigation.

[33]  Nick Corasaniti, *The Target Was A Drug Ring.  They Found 'Ghost Guns.'*, N.Y. Times, Mar. 18, 2019, at A23, *available at* https://www.nytimes.com/2019/03/18/nyregion/ghost-guns-nj.html.  Several of the defendants have since pleaded guilty, and one of the ringleaders was sentenced to 14 years' imprisonment on the gun charges and related drug-trafficking charges.  NJ OAG Press Release, *Leading Member of Criminal Ring That Trafficked Untraceable "Ghost Gun" Assault Rifles and Cocaine Sentenced to 14 Years in State Prison*, July 10, 2020, *available at* https://www.nj.gov/oag/newsreleases20/pr20200710a.html.

[34]  USAO Press Release, *Man Sentences for Straw Purchasing Firearms for Convicted Felon*, Apr. 16, 2019, *available at* https://www.justice.gov/usao-edva/pr/man-sentenced-straw-purchasing-firearms-convicted-felon.

back to the defendant's precinct.[35]  The lack of serial numbers on ghost guns plainly undermines prosecutors' ability to investigate and prosecute gun crime, and also makes illegal use or possession of a ghost gun a particularly serious offense.  Thus, a district court reviewing a magistrate judge's pretrial detention order regarding a person previously convicted of a felony indicted for the possession of a "'ghost gun' [that] is . . . untraceable by law enforcement" concluded that the absence of a serial number made the charged conduct more dangerous than a typical felon-in-possession case.  The Court concluded that pretrial detention was necessary to "reasonably assure community safety."[36]  Flooding the market with untraceable guns will ultimately increase rates of gun violence and make our communities less safe.

## II.  Defendants' Failure to Regulate Ghost Guns Undermines The Legal System's Protections For Domestic Violence Survivors

The link between access to guns and intimate partner homicides is undeniable.  Indeed, "the single most accurate predictor of homicide with a firearm is a background of domestic violence."[37] Where a domestic violence perpetrator has access to a gun, a survivor's risk of being killed increases "at least five-fold."[38]  In addition, across the country, "a woman is shot by her

---

[35]  Janon Fisher, *Junkie NYPD officer Nicholas Mina Pleads Guilty to Stealing Guns from Station, Selling Them to Dealer*, N.Y. Daily News, Oct. 22, 2012, *available at* https://www.nydailynews.com/new-york/junkie-pleads-guilty-stealing-guns-article-1.1189430.

[36]  *United States v. McSwain*, Crim. No. 19-80 (CKK), 2019 U.S. Dist. LEXIS 64053, at *7-9 (D.D.C. Apr. 15, 2019).

[37]  Tom Lininger*, An Ethical Duty to Charge Batterers Appropriately*, 22 Duke J. Gender L. & Pol'y 173, 177 (2015).  Notably, domestic violence also correlates with mass shootings.  *Id.*  57% of shootings of four or more persons included a family member or current or former intimate partner of the shooter.  *Id.*

[38]  Caroline Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1274-75 (2017); *see also* Giffords Law Center, *Domestic Violence & Firearms*, https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/domestic-violence-firearms/ ("[D]omestic violence assaults involving a gun are 12 times more likely to end in death than assaults with other weapons or physical harm.").

domestic partner every sixteen hours [in the United States]."[39]  Even when not fired, guns are used to exercise control over survivors of domestic violence.[40]  "Abused women frequently report that their intimate partners brandish guns to threaten deadly force."[41]  Of women alive today, 4.5 million have reported that an intimate partner threatened them with a gun.[42]  Once threatened, "women are more likely to endure long-term abuse out of fear that leaving the relationship will result in their death or the death of their children."[43]

To address these risks, Congress and over half the states have passed laws that prohibit specific classes of persons likely to threaten their intimate partners with gun violence from obtaining guns.[44]  The success of such laws, however, is predicated upon the regulation of all firearms.  It is beyond dispute that the very existence of ghost guns seriously jeopardizes the protections afforded to domestic violence survivors under the law.

---

[39]  Tracy Sauro, *Don't Leave Me Now! – A Domestic Violence Victim's Right to Be Armed Because Their Abusers Are Dangerous*, 40 Women's Rights L. Rep. 171, 171 (2019).

[40]  Jennifer L Vainik*, Kiss, Kiss, Bang, Bang: How Current Approaches to Guns and Domestic Violence Fail to Save Women's Lives*, 91 Minn. L. Rev. 1113, 1117 (2007); *see also* Jane K. Stoever, *Intimate Partner Violence and Restorative Justice: Firearms and Domestic Violence Fatalities: Preventable Deaths*, 53 Fam. L.Q. 183, 185 (2019) ("[A] domestically abusive individual is likely to use the firearm to perpetrate abuse against an intimate partner and children.).

[41]  Vainik, *supra* note 40 at 1117.

[42]  Stoever, *supra* note 40 at 186.

[43]  Vainik, *supra* note 40 at 1117.

[44]  *See* Kellie Descrochers, *Municipalities Are Not Kingdoms: Regulating Gun Ownership in Cases Involving Domestic Violence in Light of the* Pauler *Decision*, 29 B.U. Pub. Int. L.J. 277, 285 (2020).

A. **The Current System of Protections for Domestic Violence Survivors Is Designed To Keep Guns Out of the Hands of Those Who Have Committed Abuse**

In 1994, Congress passed the Violence Against Women Act, which bars "intimate partners"[45] subject to domestic violence restraining orders from possessing or receiving a firearm.[46] Since that time, "federal and state legislatures and courts have worked together to provide a patchwork system regulating gun ownership for people who are convicted of domestic violence offences."[47] Shortly after passage of the Violence Against Women Act, Congress passed the Lautenberg Amendment to the Gun Control Act of 1968, which "prohibits the receipt or possession of a firearm that has traveled in interstate commerce by anyone who has been convicted of or pled guilty to a misdemeanor crime of domestic violence."[48] Significantly, the Lautenberg Amendment's ban on possession of a firearm by a domestic violence misdemeanant is "essentially permanent."[49] According to the Federal Bureau of Investigation, a conviction for a domestic violence misdemeanor is the fourth-most frequent reason for denial of an application to purchase a firearm.[50]

---

[45] An "intimate partner" includes a current or former spouse, a parent of a child in common with the abuser, or an individual with whom the abuser does or has cohabitated. 18 U.S.C. § 921(a)(32). Many states have passed laws that prohibit others, such as abusive boyfriends and girlfriends, from buying and possessing firearms. *See* Everytown for Gun Safety, *Domestic Violence*, https://maps.everytownresearch.org/navigator/trends.html?dataset=domestic_violence.

[46] *See* 18 U.S.C. § 922(g)(8); *see also* Descrochers, *supra* note 44 at 280–81.

[47] *See* Descrochers, *supra* note 44 at 281.

[48] Ramsey, *supra* note 38 at 1262. Senator Lautenberg intended the Amendment to provide "a very clear rule." 104 Cong. Rec. S11,2266 (daily ed. Sept. 25, 1996) ("If you are convicted of beating your wife or your child . . . you lose your gun, no ifs, ands, or buts."). The Lautenberg Amendment also criminalizes the act of selling a firearm to a person who has been convicted of a domestic violence misdemeanor. 18 U.S.C. § 922(d)(9).

[49] Ramsey, *supra* note 38 at 1263.

[50] Federal Bureau of Investigation, *Federal Denials*, November 30, 1998 – October 31, 2020, https://www.fbi.gov/file-repository/federal_denials.pdf/view. New York, Illinois, Minnesota, and Massachusetts have also enacted laws that facilitate posting of domestic violence misdemeanor convictions to the national databases used for firearm

14

Thirty-one states and the District of Columbia have passed analogous laws so that state and local officials can enforce gun prohibitions against domestic violence offenders.[51]  Many states have also passed laws that provide further protections for those at risk of domestic violence.  For example, seventeen states and the District of Columbia require those convicted of domestic violence misdemeanors to turn in their firearms after conviction,[52] and twenty-eights states have enacted laws that facilitate the removal of firearms from individuals when they become subject to protective orders.[53]  The strongest state laws, such as New Jersey's, require police officers to remove firearms after the issuance of a protective order, while other states permit judges to require domestic violence offenders to surrender his or her firearms.[54]

Studies have shown that firearm relinquishment laws and background checks are critical to keeping domestic violence survivors safe from armed partners.[55]  Firearm relinquishment laws have been linked to a 16% reduction in intimate partner gun homicides,[56] and background checks have been shown to reduce domestic violence homicides by 47%.[57]  Moreover, "there has been a

---

purchaser background checks.  *See* Giffords Law Center, *Domestic Violence & Firearms*, *https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/domestic-violence-firearms.*

[51]  *See* Everytown For Gun Safety, *Domestic Violence*,  https://maps.everytownresearch.org/navigator/trends.html? dataset=domestic_violence.

[52]  *See Domestic Violence*, *supra* note 39.

[53]  *See id.*

[54]  *See id.*

[55]  *See* Giffords Law Center, *Firearm Relinquishment*, https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/firearm-relinquishment/ (citing M. Zeoli, et al., "Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations With Intimate Partner Homicide," American Journal of Epidemiology 187, No. 11 (2018): 2365–2371).

[56]  *See id.*

[57]  Stoever, *supra* note 40 at 185; *see also* Aaron Edward Brown, *This Time I'll Be Bulletproof: Using Ex Parte Firearm Prohibitions to Combat Intimate-Partner Violence*, 50 Colum. Human Rights L. Rev. 159, 180 (2019) (explaining that background checks may reduce intimate partner homicides because prohibited persons are discouraged from trying to purchase firearms illegally).

swift decline in the number of intimate-partner homicides per capita" since the enactment of the Violence Against Women Act.[58]  From 1994 to 2012, federal domestic violence-related firearm prohibitions blocked the sale of approximately 314,000 purchases of firearms.[59]

These statistics, however, were primarily gathered prior to the rise of ghost guns.  Cities across the country have seen sharp increases in ghost gun recoveries in the past year.[60]  The District of Columbia, for example, saw a 342% increase in ghost gun recoveries in 2019 when compared to 2018.[61]  Other cities, such as Philadelphia, Syracuse, and Denver have also reported rising numbers of ghost guns.[62]

This rapid increase in the prevalence of ghost guns threatens to subvert the efforts of Congress and the states to protect women from deadly domestic abuse, and to leave law enforcement without an effective mechanism to intervene in domestic violence cases before they become deadly.

**B.     Non-Regulation of Ghost Guns Increases the Risk of Death for Domestic Violence Survivors**

The protections for domestic violence survivors outlined above are severely undermined by the prevalence and non-regulation of ghost guns in two key ways.  First, ATF's failure to regulate ghost guns creates an avenue for previously convicted domestic violence offenders to obtain firearms in contravention of federal and state prohibitions.  This frustrates the clear intent

---

[58] *See* Stoever, *supra* note 40,  at 178.

[59]  *See id.* (noting that this number does not account for the people who have willingly surrendered their firearms in order to comply with federal law).

[60] *See* Everytown For Gun Safety, *Untraceable: The Rising Specter of Ghost Guns*, May 14, 2020, at 16.

[61]  *Id.*

[62]  *Id.*  In Onondaga County, New York where Syracuse is located, police recovered twenty-three ghost guns in 2019. *See id.*  Only one ghost gun had ever been recovered before 2018.  *Id.*

of the Lautenberg Amendment, as well as analogous state laws.  Moreover, it frustrates the very purpose of a protective order and makes such orders nearly impossible to enforce, which may lead to the underreporting of domestic violence abuses.  Second, ATF's failure to regulate ghost guns impedes enforcement of laws requiring relinquishment of firearms upon conviction of a domestic violence offense or issuance of a domestic violence restraining order.  Because ghost guns lack serial numbers and are not regulated, it is more difficult for law enforcement to confirm that an offender has surrendered a ghost gun.

These effects are already being seen across the country and are likely to lead to catastrophic consequences for domestic violence survivors.  For example:

- In September 2019, police officers in Chico, California responded to a call regarding a domestic violence dispute between a man and his girlfriend.  The man was already the subject of a restraining order filed by his estranged wife, which prohibited him from owning any firearms or ammunition.  Officers found ammunition, a semi-automatic AR-15 rifle with an extended magazine, and two loaded pistols.  The man was arrested for possession of illegal firearms and for being a prohibited person in possession of firearms.  Two months later, officers went to the man's residence to conduct a welfare check.  Officers found the man under a blanket with an AR-15 rifle.  The rifle was loaded with at least nine rounds and the safety selector switch was set to "fire."  Officers also found a semi-automatic handgun, a .308 rifle, and a 9mm handgun, and ammunition. The man later admitted that he knew he was not supposed to possess firearms pursuant to his restraining order.  He explained, however, that all of his guns were purchased "80% built from different online websites."  He added that **80% firearms were made for people 'like me' who needed to get around not being able to buy guns.**"[63]

- In July 2020, a man in Pennsylvania was arrested for the murder of his ex-wife and her friend in a restaurant parking lot with a ghost gun.  **The man's ex-wife had filed for two separate protection-from-abuse orders in the year before her death and the man had been required to relinquish his firearms**.[64]

---

[63]  *See United States v. Villasenor*, 2:20-cr-00050-KJM (E.D. Cal.), Dkt. No. 1 (emphasis added).

[64]  John Finerty, *State Struggles to Bolster PFA Orders*, June 27, 2020, https://www.ncnewsonline.com/news/local_news/state-struggles-to-bolster-pfa-orders/article_618d2d90-0d07-5f0e-bcb8-8a0e667a201e.html; Marcia Moore, *UPDATE Fernanders' Murder Charges Headed to Snyder County Court*, Sept. 29, 2020, https://www.dailyitem.com/news/fernanders-murder-charges-headed-to-snyder-county-court/article_41052d22-0285-11eb-9aa6-630b1abad5ed.html.

17

- In August 2020, police officers in San Jose, California arrested an individual for felony domestic violence. The survivor reported that the individual pointed a gun at her during the domestic violence incident.  When the officer explained that the individual would not be permitted to get his firearm back pursuant to a "Gun Violence Restraining Order," the individual replied, "**Then I'll just build another one.**"[65]

- In September 2020, police officers in Modesto, California arrested a man on drug charges after he "recklessly" led officers on a chase.  The man was on parole for a domestic violence offense. **Despite being prohibited from possessing a firearm or ammunition, officers found a ghost gun in his possession, along with a live 9mm round in the chamber and 15 additional rounds loaded into the magazine.**[66]

It is also worth noting that the COVID-19 pandemic increases the likelihood that these types of incidents will occur.  Research already suggests that "[m]ovement restrictions aimed to stop the spread of the coronavirus may be making violence in homes more frequent, more severe and more dangerous."[67]  Meanwhile, "[b]usiness is booming for the DIY 'ghost gun' industry, with manufacturers reporting widespread backorders and shipping delays due to a 'pandemic buying surge.'"[68]

The simple truth is that ATF's failure to regulate ghost guns will undoubtedly increase the risks to domestic violence survivors and may lead to serious injuries and deaths that federal and state laws were designed to prevent.

---

[65] *San Jose Police Dep't v. Piseno*, 20GV000033 (Cal. Sup. Ct. Fam. Div. 2020), Declaration of Officer Neal Spencer Allen In Support of Petition for Gun Violence Restraining Order, August 19, 2020 (emphasis added).

[66] Jeff Benziger, *Modestan With Ghost Gun, History of Domestic Violence, Arrested After Chase With Police*, Ceres Courier, Oct. 1, 2020, https://www.cerescourier.com/news/crime/modestan-ghost-gun-history-domestic-violence-arrested-after-chase-police/.

[67] Amanda Taub, *A New Covid-19 Crisis: Domestic Abuse Rises Worldwide*, N.Y. Times, Apr. 6, 2020, https://www.nytimes.com/2020/04/06/world/coronavirus-domestic-violence.html.

[68] Tess Owens, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, VICE, March 27, 2020, https://www.vice.com/en/article/g5x9q3/people-are-panic-buying-untraceable-ghost-guns-online-in-the-coronavirus-pandemic.

## **CONCLUSION**

In the end, there can be no doubt that the driving purpose behind the ghost gun industry is to flout gun control laws, the felon-in-possession laws and laws against domestic violence, and, in so doing, thwart the efforts of law enforcement across the country. For this and so many other reasons, Amicus urges the Court to grant the relief sought by Plaintiffs and order the ATF to enforce the gun laws against the ghost gun industry and its customers.


Dated: December 16, 2020                       Respectfully submitted,

                                                RICHARDS KIBBE & ORBE LLP


                                                 */s/ Lee S. Richards*
                                                Lee S. Richards
                                                Arthur S. Greenspan
                                                David B. Massey
                                                Jacob Taber
                                                Rebecca L. Salk
                                                200 Liberty Street
                                                New York, NY 10281-1003
                                                212-530-1800
                                                lrichards@rkollp.com

                                                *Attorneys for Amicus Curiae*
                                                *Prosecutors Against Gun Violence*