# EXHIBIT 4

```
CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

            Of the

COMMITTEE ON PUBLIC SAFETY

------------------------ X
```

                        June 27, 2019
                        Start:  10:12 a.m.
                        Recess:  1:12 p.m.


HELD AT:          250 Broadway – Committee Rm.
                  16th Fl.

B E F O R E:      DONOVAN J. RICHARDS
                  Chairperson


COUNCIL MEMBERS:  Adrienne E. Adams
                  Justin L. Brannan
                  Fernando Cabrera
                  Andrew Cohen
                  Chaim M. Deutsch
                  Vanessa L. Gibson
                  Rory I. Lancman
                  Carlos Menchaca
                  I. Daneek Miller
                  Keith Powers
                  Ydanis A. Rodriguez
                  Paul A. Vallone

**World Wide Dictation** 545 Saw Mill River Road – Suite 2C, Ardsley, NY 10502
Phone: 914-964-8500 * 800-442-5993 * Fax: 914-964-8470
**www.WorldWideDictation.com**

A P P E A R A N C E S (CONTINUED)

Oleg Chernyavsky, Executive Director of Legislative Affairs for the NYPD

James Essig, Assistant Chief of the Detective Bureau, NYPD

Marie Delus, Marine of Desert Storm, Sharpshooter, and member of Moms Demand Action for Gun Sense in America

Natalie Eisner, Moms Demand Action

Lilanna Zaragoza Representing NAACP Legal Defense Fund, Bronx Defenders & Center for Constitutional Rights

Fazia Siddiqui, Legal Intern, Girls for Gender Equity

Albert Cahn, Executive Director and Founder of Surveillance Technology Oversight Project

Yung-Mi Lee, Brooklyn Defender Services

Alex Vitale, Policing and Social Justice Project, Brooklyn College

Fidel Guzman form Blood Gang Member, and Close Rikers Campaign Member

Victor Dempsey, Community Organizer, Legal Aid Society, Criminal Justice Unit

Dave Howell, CUNY School of Law

Craig Lewis, Legal Aid Society

David Pacino, Staff Attorney, Keifer's Law Center to Prevent Gun Violence

Diane Kingston a/k/a Diane Malika Momine (sic) Houston

COMMITTEE ON PUBLIC SAFETY                              4

[sound check] [pause] [gavel]

CHAIRPERSON RICHARDS:  Alrighty, Good morning.  I'm Council Member Donovan Richards from the 31st District in Queens and I'm the Chair of the Public Safety Committee.  This is our second hearing this month, and unfortunately, just as we did earlier this month, we have to begin on a somber note as another NYPD officer took his life this morning no low-income.  This is the fourth member of the NYPD to take their own life this month, and the sixth this year.  This is a crisis that we have a responsibility to figure out how to appropriately address.  We may never know what these officers were going through, but I'm committed to working with Commissioner O'Neil to figure out how we can create better support services for our officers that provide them the freedom to come forward to speak to professionals without fear of losing a paycheck or their job.  We have to get a handle on this as soon as possible and I look forward to having more discussions with the NYPD on how the Council can help to expand the resources that available to officers and eradicating the stigma that come along with law enforcement officers speaking about their mental health.  Let's

COMMITTEE ON PUBLIC SAFETY                              5

have a moment of silence.  [moment of silence]  Thank you.  Today we are taking up several pieces of legislation.  I'll start with the two bills related to untraceable firearms that are also—that I'm also co-sponsoring, Introduction No. 1553 sponsored by Council Member Rosenthal in relation to prohibiting unfinished frames or receivers, which are items that can be purchased on the Internet and easily converted into untraceable firearms.  Introduction 1548 sponsored by myself and East Queens colleague who will be here, Council Member Miller in relation to reporting on the seizure of 3-dimensional pointed guns, and those guns or any piece of part thereof. In Resolution No. 866 also sponsored by Council Member Miller calling on the United States Congress to pass and the President to sing HR7115 also referred to as the 3D Firearms Prohibition Act.  We are also hearing a bill sponsored by Council Member Dromm that seeks to uphold the presumption of innocence that that is fundamental to our nation's justice systems, but it isn't always honored in the court of public opinion.  The bill is Introduction No. 635 in relation to prohibiting staged perp walks. Next we are hearing a bill sponsored by Council

COMMITTEE ON PUBLIC SAFETY                                6

Member Treyger who unfortunately can't be present today, Introduction No. 567 in relation to internet purchase—purchase exchange locations, which would create safe spaces for people to conduct transactions initiated online with strangers. Now, I'll turned to one of the bills I'm co-sponsoring along with my-my colleague 3D Council Member Borelli Introduction No. 1244 in relation to prohibiting certain unsolicited disclosures of intimate images.  This bill would make it a crime to send a stranger unwanted nude photographs using electronic devices and software such as Apples' iDrop.  Now, I'm all for advances in technology, but the last thing we need is another way for people to engage in sexual harassment.  Anyone who's been to one of my hearings knows I oppose the expansion of the Criminal Justice System, but there really is no justification for this kind of conduct. It's not a crime of poverty.  This is just about basic decency and protecting potential victims of sexual harassment.  Last, but certainly not least, I want to turn to a very important bill that I'm sponsoring, which follows up on a hearing we did last year addressing the NYPD's Gang Database. Preconsidered Introduction T2018-2223 would require

COMMITTEE ON PUBLIC SAFETY                                    7

the NYPD to provide notice to minors included in the Criminal—Criminal—Criminal Group's database also known as the Gang Database. This bill represents a small, but crucial first step to achieving transparency and oversight of law enforcement that raises a lot of concerns about the policing and racial equity in this city.  I was particularly alarmed last year to learn that almost 10% of the individuals who the NYPD keeps track of because they believe that that person is involved with a gang are under 18 years old, with some as young as 13 and 14 years old.  We also learned that those kids who are incident to the database are not re-evaluated until their 23rd birthday.  That means that these young kids, and they are pretty much all young black and Latino kids, 99% to be exact grow up being tracked and surveilled may be arrested more frequently for minor conduct, may be subject to other collateral consequences for their entire teenage lives, and that's true even if they had never been convicted of a crime because a criminal record is not a prerequisite to entry into the database.  Let me pause here and clarify one thing.  I am not ignoring the harms of gang violence.  It's a problem in the

COMMITTEE ON PUBLIC SAFETY                        8

very communities we have perpetually left behind.

Many of the residents in those communities including

mine want the NYPD to take actions against those

individuals who are responsible for violence. I'm not

saying the NYPD shouldn't investigate and arrest

people who are responsible for violence, and I'm not

saying that keeping track of those individuals is in

and of itself an invalid law enforcement tool, but I

am saying that when there is a history of racially

biased policing in this city that has caused far more

collateral consequences for people of color, that we

have to ensure we are not criminalizing people for

having friendship and family members in certain zip

codes wearing certain colors or posing in pictures

with people from your block and posting them

Facebook, there has to be some externa oversight

about who goes into this database and who comets out

and why. There has to be some discussion about what

is a good reason to label someone a gain member. I

believe that this bill is a good place to start.  I

think we need to give our young people a chance to

choose a different life, and we need to give them

some due process, a chance to clear their name when

they are incorrectly suspected of gang involvement.

COMMITTEE ON PUBLIC SAFETY                                    9

Our hearing last fall was the beginning of the conversation about how we police gangs.  This bill is the beginning of the conversation about what we at the Council are obligated to do to make sure that these law enforcement tactics do not perpetuate the criminalization of black and brown folks.  There are certainly other issues with the Gang Database that I've alluded to that may warrant further legislation, but for today I look forward to having a robust discussion about how we can use notifications to minors and their parents as a tool to communicate to these young people that we are concerned about the choices that they are making.  We should be focusing on getting them back on track, rather than sitting back and waiting for them to make a mistake that will land them in prison because we—because we can and we must do better than that.  So, with that, I don't see any other sponsors here of these bills.  So, we will go to our first panel, and I want to welcome NYPD Executive Director Oleg Chernyavsky.  Still learning that, and Assistant Chief James Essig from the NYPD. So, I want to thank you for being here and you may begin your testimony.

COMMITTEE ON PUBLIC SAFETY                                    10

LEGAL COUNSEL:  Do you affirm to tell the truth, the whole truth and nothing but and answer all questions to the best of your ability?

OLEG CHERNYAVSKY:  Yes. [pause]  [coughs] Good after—good afternoon, Chair Richards and members of the Council.  I am Oleg Chernyavsky, Executive Director of Legislative Affairs for the NYPD.  I'm joined here by Assistant Chief James Essig of the NYPD's Detective Bureau.  On behalf of Police Commissioner James O'Neill, I wish to thank the Council for the opportunity to comment on the bills being heard today.  We see everyday how neighborhood policing translate to building trust and solidifying relationships between the police and the communities we serve.  These collaborative efforts between the NYPD and those that live in, work in, and visit New York City make the city a better place, a safer place.  However, we must never forget that first and foremost the mission of the NYPD is to fight crime. We have driven crime to historic low—lows, while at the same time reducing the enforcement to levels rarely if ever seen in big cities.  Neighborhood policing has transformed how we fight crime by partnering with those we serve, allowing us to share

COMMITTEE ON PUBLIC SAFETY                                11

information and more effective solve cases, and precisely deploy our resources.  We know that a small fraction of our population commit a large portion of the crime in this city.  This is why precision policing focuses on finding and arresting the few who weaken the fabric of our neighborhoods through violence and intimidation.  Criminal groups operating on our streets are the drivers of a significant portion of the violence and drug trafficking in our city.  These criminal groups be they large organized groups of smaller crews hold pockets of our city hostage terrorizing law abiding citizens who live under a constant cloud of fear, fear of stray bullets, fear of getting robbed, fear that their children will fall under this spell and fall victim to the violence they inflict on one another.  Today, more and more of the violent crime stems from these crews.  They—they are often specific to a neighborhood, a block or even a single building in a housing development. These crews present unique challenges to law enforcement because they lack—their lack of a defined structure makes it difficult to predict their activities or document their associations, but they remain at as dangerous as

COMMITTEE ON PUBLIC SAFETY                                    12

their larger more structured counterparts.  Our long-term criminal group investigations are the very definition of precision policing, and their usefulness cannot be overstated.  The results speak for themselves.  When we do large takedowns, shootings drop precipally—precipitously.  A takedown of three crews in the 26 Precinct resulted in a 50% drop in shootings of the next three years.  In the 100 and 101st Precinct, shootings dropped 41% in the 18 months following a major gang takedown. This is no accident.  None of this would be possible without our ability to gather information on the structures and memberships of these groups.  To dismantle a criminal organization, we must understand that size and scope, who its member are, and what crimes the members are—have committed.  What was once stored in file cabinets, on index cards and on displace boards is now compiled in the NYPD's Criminal Group Database collecting data on members of criminal organizations is nothing new, and we must adapt the times—to—to the times, and the technology available to us.  However, our responsibility is to ensure that everyone is—that every one who is in the database is actually affiliated with a criminal group.  In this era of

COMMITTEE ON PUBLIC SAFETY                          13

precision policing the database saturated with individuals with no criminal group affiliation would severely limit its usefulness.  Let me be clear about what the database is, and what it is not.  It is a diligently maintained picture of the existing active universe of criminal groups and their membership that are operating in this city.  We have established safeguards to ensure that those unaffiliated with a criminal group are ensnared into the database. Likewise, these safeguards ensure that those that choose to leave the gang lifestyle are removed from the database.  The numbers back this up.  90.6% of our gang members have been arrested for at least one felony; 75.6% have been arrested for at least one index crime; 50.8% have been arrested for at least one robbery.  In fact, the average person in the database has been arrested 11.7 times. Six hundred and 86 of our gang members have been arrested for murder and the individuals residing in the database collectively are responsible for over 19,100 robberies.  Already this year, they have been arrested for approximately 3,219 felonies.  Our active gang members have been involved in over 4,600 shootings or homicides on either side of the gun.

COMMITTEE ON PUBLIC SAFETY                               14

More than 2,500 of our gang members have been shot at least once.  There are rigid safeguards to—for inclusion and the multi-tiered review system before someone is included in the database.  Mere suspicion or hearsay will not land anyone in the database.  This structure creates oversight to ensure that multiple investigators who have actual gang expertise agree that a person should be included.  This review is also ongoing after entry to make sure that gang members who are no longer in the life are removed.  Each person in the database is reviewed every three years as well as on their 23rd and 28th birthdays to determine if their actions and records still warrant their inclusion.  Additionally, the department has a mechanism for self-initiated review at any time.  Inclusion in the database is not evidence of a crime.  It is a lead.  Being in the database alone is not grounds for a stop and arrest or any other enforcement action.  It is not made public, and does not affect the public standing or reputations of the people included since it can only be accessed by NYPD personnel.  It does not show—show up in a person's criminal history or rap sheet when that person is fingerprinted.  Information is not with NYCHA or—or

COMMITTEE ON PUBLIC SAFETY                                    15

employers conducting background checks or educational institutions, and the database does share this information with Immigration and Customs Enforcement. New York State does not permit civil gang injunctions such as those routinely utilized in California. Unlike any states, New York does not have the sentencing enhancement for gang members.  Finally, New York does not have a statute that makes it illegal merely to be in a gang.  A person's presence in the NYPD Criminal Group Database simply does not have the collateral consequences seen in other jurisdictions.  I would now like to address various pieces of legislation being heard today. Preconsidered Intro T218-2223 would require the NYPD to notify minors under 18 of their in the Criminal Group Database unless doing so would impede and ongoing investigation, and give them enough—an avenue to appeal their inclusion.  The department respectfully opposes this legislation to the extent it requires disclosure of investi--investigatory inves—information.  As I explained earlier in my testimony, safeguards against the release and inclusion are already in place.  Although this bill acknowledges that providing notifications to

COMMITTEE ON PUBLIC SAFETY                                    16

individuals in the database would impede investigations, and seeks to avoid this result, the bill would nevertheless accomplish just that. Including a qualifying individual in the database is a lead in an investigation, nothing more, nothing less. It would make no sense to divulge intelligence gathered during the course of an ongoing short-time or long-term investigation.  Sending a letter to anyone in the database would not only alert them that they are the subject of an investigation, but would alert their criminal group that we are aware of its existence and potentially the identities of its membership.  The department shares the goal with the bill's spon—of the bill's sponsor, which is to dissuade youth from following the wrong path in life. This is why the department has both spearheaded and partnered with stakeholders on a variety of youth program to achieve just that goal.  Programs such as the Summer Youth Police Academy with over 2,000 participants between the age of 10 and 15, the Youth Leadership Council aimed at high school students ages 14 to 20 years old.  The Law Enforcement Explores Program with over 2,000 participants between the ages of 14 and 20, the Summer Youth Employment Program,

COMMITTEE ON PUBLIC SAFETY                                    17

which provides summer jobs to 300 youth citywide between the ages of 14 and 24, the My School Has Rhythm Not Violence Program, which has 720 participants between the ages of 14 and 20 since 2015.  The PIL Cops and Kids Sports League, which provides recreational spaces and summer and after school programs for youth throughout the city.  A variety of presentations, outreach and forums through—throughout each year by police officers on subjects such as bullying, drugs, gang prevention, Internet safety, personal safety, stranger danger and teen dating violence to name just a few.  The Police Commissioner for Day essay contest for high school students, and opening this fall in 2019, our Youth Community Center located at 127 Pennsylvania Avenue, which will serve as safe haven for youth between the ages of 14 and 19 years old, and provide a series of workshops encompassing educational, social and recreational resources.  This is not an exhausted list.  Utilizing technology such as Criminal Group Database is vital to keeping the city safe.  It helps the department connect the dots after a crime is committed, and anticipate retaliatory acts before they occur.  However, in the modern world, technology

COMMITTEE ON PUBLIC SAFETY                                18

both—technology works both for and against this. Turing to the other proposals before the committee, the threat that ghost guns and 3D guns pose to our ability to fight crime cannot be overstated. These are guns that do not contain a serial number and cannot be traced. The parts and instructions to make these guns are readily available online and are legal to purchase. Few states have acted—few states have acted to ban the sale and possessions of these dangerous weapons, and the recently introduced federal bill to do so has languished in committee. Intro 1553 would make it a crime to possess the unfinished receiver of a firearm without a serial number. We have all witnessed the steep decline in the number of shootings and murders that occur in the city. These achievements are due in no small part to this state's strict gun laws and law enforcement's ability to trace illegal firearms and legal firearms used for illegal ends. Allowing untraceable firearms and component parts to enter the stream of commerce will promote their use, and at that same time stymy law enforcement's ability to effectively trace such weapons used during the course of a crime. The department support this proposal and looks forward to

COMMITTEE ON PUBLIC SAFETY                                19

working with its sponsors to ensure the final version is legally sound.  Intro 1548 would require the NYPD to report on the number of 3D printed guns and ghost guns seized.  The database supports the goal of greater transparency and believes this proposal is consistent with such a goal.  I will next—I will turn next to Intro 1244.  The #Me, Too Ella has helped us all become cognizant of threats to women's ability to feel safe and feel-and free from violence and harassment, which may have previously been swept under the rug. Unfortunately, technology— technological advances have given sexual predators another tool to target—[cell phone chiming] Excuse me. [pause] Unfortunately, technology—technological advances have given sexual predators another tool to target unsuspecting victims.  The ability of these nefarious individuals to air-drop pictures or videos of a sexual nature into innocent people's phones is the latest technique being employed to intentionally harass, annoy, alarm and intimidate their victims. Intro 1244 would make such despicable activity a crime and provide the database with an enforcement tool to bring such criminals to justice before they strike again.  The department supports this

COMMITTEE ON PUBLIC SAFETY                                    20

legislation.  Intro 635 would prohibit transporting a person in custody for the purpose of allowing the person to photographed and filmed for the benefit of the media known as a perp walk.  The department transports individuals in a manner consistent with applicable law and in the normal course of duty with the primary being to facilitate a safe transfer. Many department facilities have one primary avenue of ingress and egress.  Other facilities like our Sex Crimes facilities are purposely designed to ensure victims and perpetrators do not use the same entrance or exit, thereby ensuring that a perpetrator always uses the same path.  The presence of media at these entry and exit points would effectively subject officers an detectives to allegations of violating this bill should it become law if they simply use a particular door.  The department is constrained to oppose this legislation not based on its intent, which is consistent with current department practices, but with its foreseeable impact on routine prisoner transports, which will need to be altered based on the presence of a video camera in close—in close proximity to a police facility over which the department has no control.  Finally, Intro 567 would

COMMITTEE ON PUBLIC SAFETY                                21

require the NYPD to establish purchase exchange locations at a precinct—at a precinct house or some other public location within the precinct boundaries, which must be monitored by humans, presumably officers or a video surveillance. While the department supports the goal of this legislation, we oppose this bill as currently written. Many of our facilities are over 50 years old, and are limited for space. The department must balance this limited space with the operational needs of a police facility, which includes the safe movement and intake of prisoners, the need to protect the identity of and—and interview crime victims and witnesses, the ability to allow complainants to file reports, the ability of members of the public who require police services to request such services, and the need to turn out police officers to patrol our streets, and we appreciate need for a safe environment within which to conduct commercial transactions. We would support an educational campaign aimed at creating public awareness with respect to this type—to these type of locations where these transactions could take place, but as drafted, this bill would not be operationally feasible for the department. Thank you

COMMITTEE ON PUBLIC SAFETY                              22

for the opportunity to speak about these important issues and we look forward to answering any questions you may have

CHAIRPERSON RICHARDS:  Thank you, Oleg and I want to recognize my colleagues.  We're joined by Powers, Brannan, Rodriguez, Borelli and Miller, and I'm going to go first Council Member Borelli who has a statement and then I will go to Council Member Miller for a statement as well.

COUNCIL MEMBER BORELLI:  Thank you, Mr. Chair, and thank you for co-sponsoring Intro—Intro 1244.  Now, just a brief note.  Council Member Powers advised me not to do this, but I'm going to do it anyway, and I'm just going to start AirDropping a little note to several people in this room with services that they did, but there's seven of you now within a range of my AirDrop that have your settings on to the point where you can accept and see any images that I send you.  Don't—don't get too excited.  It's only a cover sheet of today's hearing.  The problem is that this is not being use to send City Council cover sheets.  Often times this is being done on subways, in trains, in airplanes and restaurants to send nude and harassing images that some of us,

COMMITTEE ON PUBLIC SAFETY                              23

namely me, I prefer would not see or my wife sees or my children sees, and up until this point, there is no effective crime charge people with this—with—with this—what we all can define as a crime, but there is no actual statutory prohibition against this.  So, this bill is important because it will set up a way that law enforcement can actually enforce the kinds of quality of life harassment, and offensive behaviors that we all too often see.  In my day you had to have really fast running shoes if you wanted to be pervert, but now unfortunately through social media and through phones and through technology it's much easier.  So, I'm glad the Council is addressing this, and thank you very much, Chair for co-sponsoring and hearing the bill.

CHAIRPERSON RICHARDS:  Thank you.  We'll go to Council Member Miller.

COUNCIL MEMBER MILLER:  Okay.

CHAIRPERSON RICHARDS:  Well, I'd love to get your picture, by the way. Thank you.

COUNCIL MEMBER MILLER:  Thank you, Chair Richards.  New York City is a national leader in gun violence prevention, and the City Council has been at the forefront of such efforts, locally partnership

COMMITTEE ON PUBLIC SAFETY                                24

with the Mayor's Office to Prevent Gun Violence, and Community groups such as those that make up the Crisis Management System, and the Violence Interrupters.  The city will surrender its leadership role—will not surrender its leadership role on the issues—on these issues, and through legislation that will be heard today we are taking proactive steps to prevent potential for violence for violence and resulting of the use of ghost guns.  Ghost guns and its 3D-printed guns, can be purchased or their designs downloaded without background checks or unregistered, and virtually untraceable to law enforcement.  While Congress and the State Legislators continue to debate the issues of Ghost-- ghost guns, the City Council will take actions now. Along with my partner on the legislation Helen Rosenthal and the leadership of Chair Richard, I'm sponsoring Intro 1548, which would both for ghost guns and 3D prints to the NY—cause the NYPD's quarterly firearm seizure requirements. Currently, department reporting only includes three types of firearms classifications: Pistols, rifles and shotguns.  This report must be updated to reflect the new reality and threat posed by the proliferation of

COMMITTEE ON PUBLIC SAFETY                               25

ghost guns.  Additionally, I'm sponsoring 966, which calls for the federal—Reso 866, which calls for the federal—federal government to enact 3D Firearm Prohibition Act to prohibit the sales, acquisition, distribution or import of these firearms parts in kits, the marketing of such kits, and would require homemade firearms to have serial numbers.  No one should have unrestricted access to do-it-yourself kits, and equipment designed to make and assemble weapons of war such as rifles semi-automatic handguns, but while we continue to go—to continue to go unregulated in most of America, they will be illegal here in New York City.  Recent arrests in New Jersey showed that underground market for these 21st Century weapons exists, and they are legal loopholes that have been exposed by fun runners and drug traffickers.  It's only a matter of time before such activity comes to our streets here in New York City. We must give law enforcement the tools that they need to arrest gun owners such as those who confiscate their weapons determine the availability of ghost guns here in New York City.  Again, I want to thank Chair Richards for his leadership, and Council Member

COMMITTEE ON PUBLIC SAFETY                          26

Rosenthal and, of course, Speaker Johnson for getting this—hearing us today.  Thank you, Chair.

CHAIRPERSON RICHARDS:  Thank you, thank you and we're going to go to questions.

OLEG CHERNYAVSKY:  And statements.

CHAIRPERSON RICHARDS:  Okay. We'll start Oleg with as of last September around 1,400 of the 17,000 individuals in the criminal group database were under 18.  That's about 8.5%.  Has that percentage significantly since our last hearing, and are there still—where are—where are—what are the numbers now?  Have the numbers gone up in the database?  Can you just give an overview or where we're at?

OLEG CHERNYAVSKY:  Sure.  So, in terms of percentage of individuals, the—the total number of active gang—criminal group members are just over 18,000, 18,084, the percentage of individuals that are under 18 is 2.7%.

CHAIRPERSON RICHARDS:  So, the numbers have gone up--

OLEG CHERNYAVSKY:  Well, I--

CHAIRPERSON RICHARDS:  --in the last year?

COMMITTEE ON PUBLIC SAFETY                           27

OLEG CHERNYAVSKY:  I think--

CHAIRPERSON RICHARDS:  In September's hearing I think we were at a total of 17,000 individuals.  So--

OLEG CHERNYAVSKY:  Yeah, so, and I think that it's worth mentioning that if we take a look at-0-we'll take a snapshot of 2018, and take a look at how many individuals were added, how many individuals were removed to give some context.  Criminal group members added in 2018 were 2,475, criminal group members removed in 2018 was 2,125.  So, there was—I think the difference is about 350 individuals, but it shows that our review process, and I just want to highlight that.  We have auto triggers and self-initiated triggers for review.  So, the automatic triggers to review somebody for exclusion for removal form the database is their 23rd Birthday, their 28th Birthday, and every three years.  So, for argument's sake if I put you into the database on January 1st of 2015, you will come up automatically for review on January 1st of 2018 irrespective of your birthday or not.  In addition to that, there is a self-initiated review process.  So, if our criminal group, our gang experts determine based on their investigations that

COMMITTEE ON PUBLIC SAFETY                                    28

somebody in the database has left the life, for lack of a better term, they can initiate their removal without waiting for the automatic benchmarks of three years and the birthdays.

CHAIRPERSON RICHARDS:  Can you break down the age groups of the individuals, their percentage age under 18 especially?

OLEG CHERNYAVSKY:  So, right, so, we have—

CHIEF ESSIG:  [off mic] You want me to do it?  (sic)

OLEG CHERNYAVSKY:  Yeah, sure, go ahead Chief.

CHIEF ESSIG:  Thank you.  Out of the 18,000 prisoners (sic) 494 are under the age of 18, 266 is 17, 145 are 16, 61 are 15, and 19--

CHAIRPERSON RICHARDS:  Go up a little bit. Yes, so under at 17 it's 2 okay--.

CHIEF ESSIG:  Yeah, it's about 2.7% under 17.

CHAIRPERSON RICHARDS:  Now, and we need an example here. (sic)

CHIEF ESSIG:  Under 18.  I'm sorry.

CHAIRPERSON RICHARDS:  So under 18?

COMMITTEE ON PUBLIC SAFETY                              29

CHIEF ESSIG:  Is 2.7%.

CHAIRPERSON RICHARDS:  Right, the breakdown of the numbers?

CHIEF ESSIG:  By percentage, 17 are--

CHAIRPERSON RICHARDS:  [interposing] No, no, give me, give me exact numbers--

CHIEF ESSIG:  Our—our numbers--

CHAIRPERSON RICHARDS:  --how many people are in there?

CHIEF ESSIG:  Alright, 17, 266.

CHAIRPERSON RICHARDS:  Uh-hm.

CHIEF ESSIG:  15, 145.

CHAIRPERSON RICHARDS:  Uh-hm.

CHIEF ESSIG:  15, 61.

CHAIRPERSON RICHARDS:  Uh-hm.

CHIEF ESSIG:  14, 19 and 13, 3.

CHAIRPERSON RICHARDS:  And it seems like and just give me the breakdowns since the last hearing. So, September how many—of last year when we had the original database hearing, what were the number then?

OLEG CHERNYAVSKY:  I don't—I mean I think we entered that into the record.  I didn't bring last year's--

COMMITTEE ON PUBLIC SAFETY                                30

CHAIRPERSON RICHARDS:  But it seems an increase of where we were.

OLEG CHERNYAVSKY:  There—yeah, I think the-the overall increase is correct. It's a slight increase of it looks like about 350 individuals.  We removed. Hold on.  We removed 2,125, but added 2,475. So, unless my math is off, I think we have a net gain of 350.

CHAIRPERSON RICHARDS:  So, the total number is how many in the database?

OLEG CHERNYAVSKY:  Total number in the database is 18,084.

CHAIRPERSON RICHARDS: And how many under 18?

OLEG CHERNYAVSKY:  Under 18—

CHIEF ESSIG:  That would be 494.

CHAIRPERSON RICHARDS:  494 and can you just through—so how do you determine which groups to track?  In other words, what makes a group of people into a gang that the department needs to pay attention to, and starts entering into the database?

CHIEF ESSIG:  Most of these gangs they self-identify, criminal street groups involved in narcotics, involved in street robberies, involved in

COMMITTEE ON PUBLIC SAFETY                                31

violence. So, in any sort of violence.  Some of them are involved in frauds, credit card frauds.  They self-identify as a gang. So whether you're dealing narcotics or a local gang that's identified by territory that's how we identify them.

CHAIRPERSON RICHARDS:  Right, and so you posit each and every person in this database as a gang member?  Can you say on the record that every person entered into this database are you confident that each and every one of them are are--

OLEG CHERNYAVSKY:   [interposing] Yes. So, I mean I think that's what the safeguards are there for, right?  So, if we have to remove close to 2,200 just, over 2,100 in a year, it show that we're actively looking at it.  Now the criteria and—and how does somebody come in, right?  You need to be recommended.  So you need to show certain criteria, right and then the—with the presence of that criteria you can—you can be recommended by a street cop, right. You cold be recommended by a field intelligence officer that has an expertise in—in gangs, or you could be—you could be recommended by a Gang Unit investigator.  Once you're recommended, there is still a review process.  You have to make

COMMITTEE ON PUBLIC SAFETY                                     32

sure the criteria that are being met. Otherwise, the system won't even allow you to enter the person into the database, and then you need—it needs to be approved, the recommendation needs to be approved by the gang captain of a particular borough who has an even heightened—he's the executive of the borough in gang activity.  So, those are the benchmarks that you need to accomplish to really get in, and then you start—there are other benchmarks that gets you out.

CHAIRPERSON RICHARDS:  So, give me—give me—just give me an example of what criteria looks like.

OLEG CHERNYAVSKY:  Okay, yeah things like voluntary admission during the course of an investigation to independent law enforcement sources determine that you are in a gang.  This is during the course of their investigation.  It's not somebody merely in the street that are saying I know he or she's a gang member.  You have things like—and the—I mean those are some of the on social media indicators indicating membership.  You have other things that that those are criteria that as long as you have one of those, you can get recommended.  Then there is another way to go through it, which is if you have

COMMITTEE ON PUBLIC SAFETY                                33

two of—whether it's a known gang related documents, association with group members, social media accounts with group members, scars with tattoos, you know, with gang colors, gang signs.  So, it's the presence of multiple of those factors plus the recommendation of the gang investigative expert plus the approval of a gang—a gang expert executive.

CHAIRPERSON RICHARDS:  And we actually pulled the numbers.  So, it looks like 1,400 minors were in the database last year. So, it seems like you've made some progress in decreasing the numbers. Is there are specific targeted, targeted initiative to ensure teens are being taken out of the database since you went from 1,700 to 494 it looks like?

OLEG CHERNYAVSKY:  Yeah, I mean I'll say absolutely we wanted--

CHAIRPERSON RICHARDS:  [interposing] Then why did you--?

OLEG CHERNYAVSKY:  --to take a—I really didn't draw the comparison--

CHAIRPERSON RICHARDS:  Okay.

OLEG CHERNYAVSKY:  --so I don't want to—I don't want to say that, but I-I support the numbers that you've--

COMMITTEE ON PUBLIC SAFETY                                    34

CHAIRPERSON RICHARDS:  Right.

OLEG CHERNYAVSKY:  --put forward as ones that--

CHAIRPERSON RICHARDS:  [interposing] We pull them from the records.

OLEG CHERNYAVSKY:  Yes.

CHAIRPERSON RICHARDS: So, so the point is you pulled over 2,000 individuals in a—a little bit. I guess edging towards a year.  Tell me about why those individuals, and I guess you can't go into specific case, but why—how did you get such a drastic decrease?  Would you say that a lot of them may not have belonged it-

OLEG CHERNYAVSKY:  No.

CHAIRPERSON RICHARDS:  --or what—what led you to such a steep decline--

OLEG CHERNYAVSKY:  I—I wouldn't say that at all so--

CHAIRPERSON RICHARDS:  --disruption (sic) so fast?

OLEG CHERNYAVSKY:  I think what we said even at the last hearing if my memory serves me right is we set benchmarks and criteria for removal.  A database that only has us putting people into it and

COMMITTEE ON PUBLIC SAFETY                            35

it grows larger and larger, is useless as an

investigative tool.  If you have people that are not

long in the gang lifestyle or left for—for any

reason, to have then in the database only convolutes

an investigation.  It's—it's—it wouldn't help us.  So

the idea is to be vigilant in reviewing who's in

there, be vigilant in establishing strict criteria

for getting entered in the first place so you have a

database that's lean, that you can go to.  So, if you

have a gang related shooting, we can take a look and

say okay, we know the shooter is from this gang.  Who

else is in that gang?  We can see who is the victim.

Is the victim in the gang?  Who else is in that gang

that's going to potentially seek retribution against

one of the shooter's gang members or—or—so, that—

that's the usefulness. You're—I mean just to say that

oh, it's gang gun/gang violence, and it's not an

uninvolved civilian, doesn't make us feel better, you

know, going home.  We want to stop the violence.  The

fact that a gang member is getting killed, that's

still a homicide, that's still a person getting

killed.  If we—if we could prevent that, if we could

interdict in the right place, and identify who the

universe of potential victims could be or potential

COMMITTEE ON PUBLIC SAFETY                               36

shooters, that's what the gang—Gang Database is or the criminal group database is all about.

CHAIRPERSON RICHARDS:  And I guess my concern is in these that were an association, right because if you live let's say public housing in New York City or you come from a specific neighborhood, you know, you may walk to school with people who are affiliated, would you be entered into this database?

OLEG CHERNYAVSKY:  No. So, I-that's--

CHAIRPERSON RICHARDS:  [interposing] So, if you—so if you—so if you—so when you say association, just—just go a little deeper into that because, you know, I went to Jamaica High School, and there were a lot of affiliated individuals from my specific neighborhood.  By the grace of God, my parents were able to—when they saw me going a different path, you know, moved me out, but what I have been entered into a database if the guys, if I walked to school with the guys on my block and came home and, you know, walked to the bus stop on Jamaica Avenue with them would I be considered to be put into this database because I would be considered affiliated although I'm not necessarily in the gang?

OLEG CHERNYAVSKY:  No, so and—and the--

COMMITTEE ON PUBLIC SAFETY                                    37

CHAIRPERSON RICHARDS:  And do you—how do you ensure that doesn't happen as this way?

OLEG CHERNYAVSKY:  Well, that's—that's—that's actually that's the criteria, right.  So, if all you have is an affiliation and an association, that in itself will not get you in the database.  That won't even get you recommended for being put in the database.  So, if all you have is-

CHAIRPERSON RICHARDS:  [interposing] So, just—just to stop you.  So, you said you have—who oversees?  You have a Gang Unit.  So, if they saw me walking to school with individuals, that person wouldn't consider me—I'm not saying I'm in the gang, but I would not be put into this database for that reason is what you're saying?  Or would I have—what—what-what is the threshold for being put into the database?

OLEG CHERNYAVSKY:  So, the threshold is when you're talking about association with a known gang, right, that in itself would not get you into the database.  You have to have other factors present.  Let's say you have a gang tattoo. You're—you're associated plus you have a gang tattoo.

COMMITTEE ON PUBLIC SAFETY                                    38

CHAIRPERSON RICHARDS:  What are the gang tattoos?  Would have to have Crips written on me or--

OLEG CHERNYAVSKY:  Oh, I—I—mean, look I think—think we—we would—we would--

CHAIRPERSON RICHARDS:  [interposing] A lot of people have tattoos.

OLEG CHERNYAVSKY:  --we would agree that— I—I would hope we would agree that--

CHAIRPERSON RICHARDS:  Okay.

OLEG CHERNYAVSKY:  --if, you know, we have a gang unit whose sole purpose is to track gangs and criminal groups that are terrorizing this city, and they through their intelligence gathering, through their investigations, they know what tags or gang tags are, spray painting on buildings to mark territory.  They know what tats—identifying tattoos are.  I mean that's intelligence that they gather. If tats—if these tattoos come about, that's intelligence that's going to lead us to recognize the fact that a particular gang has a new tattoo.  So, I mean these are all investigative leads that we determine.  If you have a tattoo that says I love mom, I don't you're—that's going to be a-that's going to enter you into a database

COMMITTEE ON PUBLIC SAFETY                                    39

CHAIRPERSON RICHARDS:  99% of individuals still in this database are black and Latino?  I think that you reported that last year.  Can you give me the percentage?

OLEG CHERNYAVSKY:  Sure.

CHAIRPERSON RICHARDS:  And is that still true today.

OLEG CHERNYAVSKY:  Here.

CHIEF ESSIG:  The percentages:  American-Indian, Alaskan Native, there's 4 persons, 0% are—

CHAIRPERSON RICHARDS:  Say that again slow.  Yeah, you talk fast.

CHIEF ESSIG:  I'm sorry.

CHAIRPERSON RICHARDS:  Okay, thank you.

CHIEF ESSIG:  American Indian is 0%;, Asian Pacific Islander is .5%; Black 66%, Black Hispanic, 9.3%; White, 1.1%; White Hispanic, 22.4%.

CHAIRPERSON RICHARDS:  [pause]  So, 66%, Black, White, 1.1%. So, 98% and a half communities of color, and we're positive that only—there are only 1.1% white people in gangs in New York City.

OLEG CHERNYAVSKY:  So, I—I mean I think that's—that's misleading.  So, let me—let's address— let's address this head on.  The NYPD does not

COMMITTEE ON PUBLIC SAFETY                    40

control the recruitments for criminal groups. Now, if the council Member wants to hold a hearing about diversity in recruitment efforts, you know, in these groups, we'll be in the audience taking notes, but realistically, we find these groups as—as the come. Now if you take a look at traditional organized crime, right, things that we all watch movies about, those if you take a look at our—our intel on those particular groups and organizations, they would be disproportionately, if not exclusively white, and don't control their recruitment efforts either. These are investigative leads. So, the way that a particular criminal group chooses to do that recruitment we will take those leads as they come into us. If we're looking at a particular group and that group decided to recruit exclusively or predominately young men of color, that's—our intelligence or our gathering is going to reflect that. There's really not much control we have over that.

CHAIRPERSON RICHARDS: But I guess the concern would be that certain communities are surveilled more than other communities. So, if there's a heavy emphasis on black and brown

COMMITTEE ON PUBLIC SAFETY                                41

communities getting surveilled we may be at whole lot. Are the Proud Boys in this Gang Database? Are they considered a gang?

OLEG CHERNYAVSKY: I'll—I can confirm that for you. I don't—I'm not 100% sure. They very well may be. I'm not--

CHAIRPERSON RICHARDS: For an answer, I think they're a gang.

OLEG CHERNYAVSKY: Well, no they're—I can double check.

CHAIRPERSON RICHARDS: Yes.

OLEG CHERNYAVSKY: We—I'm not going to say yes or no, but I—I—let me double check and I'll let you know.

CHAIRPERSON RICHARDS: So, were white supremacists to wreak havoc—wreak havoc on our—wreak havoc on our streets, would they be put in this database?

OLEG CHERNYAVSKY: Sure.

CHAIRPERSON RICHARDS: But you're not positive of this, obviously.

OLEG CHERNYAVSKY: I'm—I'm double—I mean I mean I don't want to—so you—you mentioned the

COMMITTEE ON PUBLIC SAFETY                                42

particular group.  I—I want to make sure before I

answer under oath that the answer is correct.

CHAIRPERSON RICHARDS:  [interposing] Did

you—right, so with—so with organized crime units,

prime (sic) people be considered again.

OLEG CHERNYAVSKY:  So, so that's-they

are.  So, here's the difference. Yes, it's a it's a

yes and no, and this is—it's a yes in terms of it's a

criminal group.  in terms of inclusion into the local

database, it is a no, and there's a good reason for

that.  So, if you take a look at traditional

organized crime, they operate across state and

international borders.  Those investigations are

predominantly if not almost exclusively done as part

of the joint venture with the federal government, and

they are stored separately in—in a—in a different

method. The Criminal Group Database, is more a

tracking mechanism for local street groups.  Now, to

the extent that it's a White local street group or a

Black and Hispanic local street group, they're going

to find themselves in the Local Street Group Database

because those are almost exclusively NYPD led

investigations.  These are NYPD leads. They don't

cross state or international borders.  So, that's why

COMMITTEE ON PUBLIC SAFETY                             43

if—and that was my earlier point, if what you're going to do is take a look at for example, you know, how track these traditional organized groups, what you're going to find is predominantly, if not exclusively White.

CHAIRPERSON RICHARDS:  Okay, the Organized Crime Database?

OLEG CHERNYAVSKY:  Yes, there's a—there's tracking mechanisms for traditional--

CHAIRPERSON RICHARDS:  It's called the Organized Crime Database?

OLEG CHERNYAVSKY:  Well, I didn't—I didn't name it so I'm sure that it's called, but I can tell you--

CHAIRPERSON RICHARDS:  [interposing] And would they do very similar things?  I mean define what a gang is?  Can you define what it—what it means?

OLEG CHERNYAVSKY:  [off mic] Do you know what the difference is?

CHIEF ESSIG:  [off mic] No, I don't have anything.

CHAIRPERSON RICHARDS:  Do we have a definition of a gang?

COMMITTEE ON PUBLIC SAFETY                                44

OLEG CHERNYAVSKY:  So, we have a—I mean we have the -we have the factors that I put on the record for you. That's what would have somebody identified as a gang member.  So I would say it's a collection of the same criteria that's—that would you -that would have a particular group designated as a gang.

CHAIRPERSON RICHARDS:  Okay, well I'm just going to say this, I mean you get my drift that, you know, if you're—as you said a group of individuals who seem to be committing fraud I think you said, and guns and drugs. I mean I don't really see much daylight between a gang and peopled in the organized crime necessarily.

OLEG CHERNYAVSKY:  We don't—we don't--

CHAIRPERSON RICHARDS:  [interposing] I think that they're gang members, too.

OLEG CHERNYAVSKY:  Well, we don't—I just want to clarify, I—I did not say that there is daylight. These are groups committing crimes. I'm just saying the tracking mechanism is different because the nature of the investigations are different. One is local and one is done collaboratively with the federal government because

COMMITTEE ON PUBLIC SAFETY                               45

the crime—the crimes of traditional organized crime are of such a nature that they cross boundaries, and when you cross boundaries you need to pull in the law enforcement entities that are on the other side of that boundary.  That that's really the--

CHAIRPERSON RICHARDS:  [interposing] But I would also say that there—there investigations in NYCHA where there's a lot of collaboration with other entities such as federal feds as well, right.

OLEG CHERNYAVSKY:  Sure.

CHAIRPERSON RICHARDS:  You know, in takedown things. So, I don't, you know, I'm just trying to understand how these numbers went from 1.1% White when we know there's a whole—a whole lot more out there, and the move from that, but, you know, what I'm getting at is there's a historical relationship, right and what—I'll key goal is to make sure that there are innocent young black and men who are not being dragged into this database especially teenagers, especially who we should be diverting services to, and doing everything we can possibly do to ensure they're being connected to services so, they're not stigmatized and that if they get in trouble for a minor crime then their case is—their

COMMITTEE ON PUBLIC SAFETY                                46

case is not being padded or they're not being

considered a danger to public safety over something

or a level--

OLEG CHERNYAVSKY:  [interposing] So--

CHAIRPERSON RICHARDS:  --being flagged in

that database. Do defense attorneys have access to

this database?

OLEG CHERNYAVSKY:  No. So—no, they don't,

and to your point, we're in agreement with you. I—I

mean I just want to make sure that you understand

there's not daylight in that respect.  I mean our

opposition to the bill is the fact that we are

looking at particular groups, particular individuals

to let somebody know that you're leading an

investigation and here's a mechanism for you to

appeal being the lead in an investigation.  That's

just incongruent with the ability for us to

investigate crime.  Now to your point of getting

folks, and getting kids on the right path, I listed a

variety, and that's not an exhaustive list of

programs, and you know because you partnered with us

on some of them, programs we do in order to get kids

on the right path, in order to get—to make—to ensure

that they never enter into a criminal group in the

COMMITTEE ON PUBLIC SAFETY                                47

first place or at least educate them on the dangers if—if they're approached by criminal groups trying to recruit them.  So, we're on the same page when it comes—when it comes to interdicting, and trying to get kids on the right path, and I think our actions and our programs reflect that.

CHAIRPERSON RICHARDS:  Okay, I'm going to go to my colleagues for questions as soon as I can, but I do want to know with these 494 individuals in the current database, what outreach, what services are you directly connecting them to?  So, I heard Summer Youth, and that's very vague because some of these individuals may not even be in school.  So, you know, we have programs like the Crisis Management System.  Has there been a strategic effort made to target these kids, and I don't want a broad interpretation of--

OLEG CHERNYAVSKY:  Yeah.  No, it's—it's—I'm—I'm going to be very direct with you.  I—I think that there is an effort made.  To the extent that somebody is a lead, and we cannot—we cannot advertise that lead, then I would probably say that outside of a normal outreach and not a specific focused outreach on the individual, but our broader outreach to the

COMMITTEE ON PUBLIC SAFETY                              48

communities then you probably have—that's the—that would be the limitation on the outreach.  If you have individuals that we deem that, you know, they can come out of the database or that it would not hamper an investigation, there may very well be a direct outreach at the point of them being removed or even at the point that they would be in there, but again, that decision is going to be based on, you know, our review of the situation and whether or not doing so would compromise a larger investigation.

CHAIRPERSON RICHARDS:  Right and out of those 20-over 2,000 people that were removed, did you send a notification to them that they're removed?  Is there a process for communities or teenagers or their parents to find out if they're in the database, and to be removed or to appeal?

OLEG CHERNYAVSKY:  Well, no. I think that that's—that's really the point is this is an investigative lead.  We're not going to, you know, we never advertise to—to those folks that they were a lead in an investigation, and nor do we in any crime that we investigate we don't tell somebody that's a suspect in an investigation, hey, you're a suspect in an investigation and here's a letter you stopped

COMMITTEE ON PUBLIC SAFETY                              49

being a suspect in an investigation today.  It's—

that's just not the way investigations are done.

CHAIRPERSON RICHARDS:  What I wanted to

know?  How do I find out if I was in the database?

OLEG CHERNYAVSKY:  Yeah, I mean--

CHAIRPERSON RICHARDS:  [interposing] Is

there a process to do that?

OLEG CHERNYAVSKY:  No, because that's an

investigative lead, and to answer that question would

potentially compromise an investigation.

CHAIRPERSON RICHARDS:  What if I'm not in

a gang, and I wanted appeal, I believe that you've

entered me into this database because I'm being

stopped on the street more often?  You know, are

teenagers targeted more if they're in this database?

OLEG CHERNYAVSKY:  No, no.

CHAIRPERSON RICHARDS:  Are they followed,

are they interrogated--

OLEG CHERNYAVSKY:  No,

CHAIRPERSON RICHARDS:  --or if there's a

shooting would they—would you show up at their doors?

OLEG CHERNYAVSKY:  I mean if—I—look, I

can tell you that if you have a shooting, if you have

criminal activity, and it's—they—our intelligence are

COMMITTEE ON PUBLIC SAFETY                               50

all investigative leads and lead us to believe that

the shooting was committed by a particular gang and

here is the universe of the gang members we're aware

of, well certainly—maybe they are going to be

approached and spoken to in the context of the

investigation.  It won't be in the context of, you

know, we know that you're in a gang.  It could be,

you know, if--

CHAIRPERSON RICHARDS:  [interposing]

Would you—but—so, what I'm getting at is parental

notification.  Would you notify the parent before you

had that conversation?

OLEG CHERNYAVSKY:  Well, well, I think—

well, if you're talking--

CHAIRPERSON RICHARDS:  [interposing]

around the—the

OLEG CHERNYAVSKY:  --if you're talking

about a minor--

CHAIRPERSON RICHARDS:  Yeah, minors.

OLEG CHERNYAVSKY:  --I mean that—that's—

interrogating the minor has—has a protocol for—for

interrogating the juvenile, you know.  So, those are

the protocols that you find.

COMMITTEE ON PUBLIC SAFETY                                51

CHAIRPERSON RICHARDS: [interposing] I'm sure that that has not always occurred but I don't go to the incident in Central Park 5, right, to have this conversation? And I'm not saying that this is continuing to happen, but we certainly saw that, you know, in the past. So, are we positive that if these children are being entered into the data base, and you want to interrogate them that their parents are being notified?

OLEG CHERNYAVSKY: So, I mean I know attempts are made to notify the parents. I can get you—I'll get you the Patrol Guide Procedure related to interrogation of juveniles, and maybe that will more comprehensively answer your question.

CHAIRPERSON RICHARDS: Right, and I say that to say--

OLEG CHERNYAVSKY: [interposing] But it's done based on—I wasn't clear. It's done based on the established state law. There's many strains of case—many strains of case law that address the exact topic of juvenile interrogation.

CHAIRPERSON RICHARDS: Right.

COMMITTEE ON PUBLIC SAFETY                                    52

OLEG CHERNYAVSKY:  That's what's followed, our patrol guide procedure, and our procedures reflect the evolution of case law.  So--

CHAIRPERSON RICHARDS:  Right, and I'm just—I'm going to close on this, and I'll come back around but, you know, I do have concerns with minors be entered into this database, and no parental notification obviously, because these are individuals who possibly can—I'm not saying in all instances be approached on the street because they would be flagged as known gang members. So I think there would be especially for—I'm sure there are sectors that cover certain communities.  If you are flagged in this database for just being associated or not even being a gang member, it does intensify and increase the chances that you will be stopped by an officer.

OLEG CHERNYAVSKY:  That's-that's not true. It's—it's—I'm sorry, but that's—I—I need to correct that.

CHAIRPERSON RICHARDS:  Right.

OLEG CHERNYAVSKY:  It's—that's not true. The fact that you're in the gang database, in a criminal group database does not—does not meant that if I see you walking down the street, if a police

COMMITTEE ON PUBLIC SAFETY                              53

officer sees you walking down the street, then he

stops you, that's not what it means.  It's an

investigative lead.  If there's a shooting, and we

know that a particular criminal group did the

shooting or the particular criminal group is going to

be retaliated against as a result of the shooting,

we're going to know the universe of people that we

either (1) need to interview, or (2) need to

intervene and protect.

CHAIRPERSON RICHARDS:  Right.

OLEG CHERNYAVSKY:  That—that's--

CHAIRPERSON RICHARDS:  But—but what my

concern with that, and once again that's good.  We're

just making sure that there's parental, you know,

notification if you're going to interrogate.

Alright, I'm going to go to my colleagues Powers and

to Miller.  Alright, and we're joined by Council

Member Deutsch.

COUNCIL MEMBER POWERS:  Thank you and

thank you for the opportunity to ask questions.

Thank you for your testimony.  I'm just following up

on some of the questions from the Chair.  So, one—one

question I had is as we're talking about enforcement,

is there a way that a patrol officer for instance

COMMITTEE ON PUBLIC SAFETY                              54

would know if there's a gang unit who has accessed this information?  Is there a—is there a place where a patrol officer for instance would have access to know, to stop—if the concern is around stopping somebody based on affiliation, is there a—a way that our mechanism in that effort to be able to have that information, and--? [background comments] -in terms of the concern on stops?  [background comments]

CHIEF ESSIG:  Yeah, somebody, somebody at the precinct has access--

COUNCIL MEMBER POWERS:  Could access it.

CHIEF ESSIG:  --but they're not going to stop somebody just simply because he's in a database.

COUNCIL MEMBER POWERS:  Okay. [coughs] The—are there other similar databases where it's an—it's not about necessarily a crime you committed, but about an affiliation, organized crime for instance?

OLEG CHERNYAVSKY:  Yeah.  I mean and that's what we were talking about. They're certainly tracked.  I—I mean I'm thinking domestic violence, recidivists,

COUNCIL MEMBER POWERS:  But those are about you have committed an offense.  This one even

COMMITTEE ON PUBLIC SAFETY                          55

if someone has a criminal affiliation—has a criminal background.

OLEG CHERNYAVSKY:  Not, but that's—that's an interest—that's an interesting point is, you know, say for example if you're looking a domestic violence, and we know that there is a, you know, there's a significant number of domestic violence incidents that—where the victim doesn't—doesn't follow through.

COUNCIL MEMBER POWERS:  So, if they don't, if they don't follow through in terms of personal weighing it like a criminal charging?

OLEG CHERNYAVSKY:  Right, but we at the same time know that maybe our Domestic Violence Officer should do a home visit.  You know, it's—it's—it's a normal occurrence unfortunately for if you have spouses or domestic partners for-for a situation to escalated for the police to be called, and then ultimately the victim doesn't follow through and wants to drop charges.  At the same time if we see a pattern of such activity, maybe it would be beneficial for the victim of DV to have a Domestic Violence Officer visit to make sure he ore she are issues—are offered services, you know. So there are-

COMMITTEE ON PUBLIC SAFETY                         56

there are avenues, you know, there are other examples where--

COUNCIL MEMBER POWERS:  Is there an organized crime database?

OLEG CHERNYAVSKY:  Yeah, it's—we do that collaboratively with our federal partners just again based on the nature of those investigations crossing state and federal lines, crossing state lines and international lines so--

COUNCIL MEMBER POWERS:  What in—in terms federal cooperation?  Are there—is this—is information from the gang database shared with any federal agencies or federal databases?

OLEG CHERNYAVSKY:  No, and that's—that's the point.  The NYPD has exclusive access to our own database.  We don't share access to our database with Immigration or with ICE or—or DAs as you've mentioned.

COUNCIL MEMBER POWERS:  And no, no federal agency has--

OLEG CHERNYAVSKY:  Nobody has access to our database other than NYPD.

COUNCIL MEMBER POWERS:  And I-I assume that if they had a warrant or something like that or

COMMITTEE ON PUBLIC SAFETY                              57

they had an open investigation, they would come to you and ask you for that information.

OLEG CHERNYAVSKY:  Right, they can come based on the warrant.  They—the warrant would not grant them access to the database.

COUNCIL MEMBER POWERS:  Okay.

OLEG CHERNYAVSKY:  It would not grant them access to information.

COUNCIL MEMBER POWERS:  And on the -just back to the point around the DV, I would not think that there is still a difference between affiliation. I the DV instance you're talking about an incidents where somebody has done something.  I understand that the spouse may not be or the partner may not be pursuing a charge, but I think you're still—you're still addressing a situation based on an event, oh yeah, sorry. Sorry. Still have the database based on an event that that happened versus and affiliation.

OLEG CHERNYAVSKY: Well, but that's-that's—that's important. It's-they—the Criminal Group Database is not based on an affiliation.  So, if we're—if we're drawing the correlation to something happening then the individuals as I went through the list of crimes that the individuals that populate our

COMMITTEE ON PUBLIC SAFETY                                    58

Criminal Group Database are responsible for, to be a group you need to be engaged in-in criminal activity.

COUNCIL MEMBER POWERS:  I'm talking about an individual not a group.

OLEG CHERNYAVSKY:  Well, but the—it's—well--

COUNCIL MEMBER POWERS:  So the affiliation is then-

OLEG CHERNYAVSKY:  One individual standing alone is not a criminal group, right so that individual would be in connection with others, right. They have similar, you know, they identify as we are Group A, we're Gang A, and we have tattoos that have an A on us.  We wear group gang—Group A colors.  We have Group A hand signals.  We have commit crimes as a group, and, you know, we have territorial disputes this is Group A's territory.  So there—there are a variety of things that lead you there has been activity, much like, you know, as we highlight DV. That's one example.  I'm just really thinking on the fly, but that—that was something that popped out. There's been action. So over here you have a group has been engaged in the past criminal action or a current criminal action.

COMMITTEE ON PUBLIC SAFETY                              59

COUNCIL MEMBER POWERS:  Is the—the—I note that you had shown some stats on your balance, the criminal background of 96%--90.6 have been arrested for at least one felony, 75.6 for at least one index crime, 50.8% have been arrested for at least one robbery. The average person has been arrested 11.7 times.  Those don't mean that those crimes put you into the database necessarily.  They mean that you're just calculating the outreach here--

OLEG CHERNYAVSKY:  Right.

COUNCIL MEMBER POWERS:  --of people in it. Is that correct?

OLEG CHERNYAVSKY:  Right.

COUNCIL MEMBER POWERS:  And they're individuals I—I presume who have none of the above?

OLEG CHERNYAVSKY:  You.

CHIEF ESSIG:  Yes, we have for less than 2% of less than--

COUNCIL MEMBER POWERS:  [interposing] And that's great to have—

CHIEF ESSIG:  No arrests.

COUNCIL MEMBER POWERS:  Okay. The—I mean I—I can accept a lot of what you're saying around the open investigation and the need for the agency to be

COMMITTEE ON PUBLIC SAFETY                          60

able to do its work, and to both be preventative, but also be able to—in—in case of an incident to be able to understand the dynamics in terms of the gain, and understanding the—how to—how to proceed with an investigation.  I think that the concern that the Chair has raised is who's in it?  We've had this conversation in past hearing as well.  Who's in it, and obviously as I understand it, I said this to the concerns that informing somebody then it may compromise an open investigation or other actions that the agency has, but at the same time understanding the way somebody gets into it. I think that my feeling is when you're talking about affiliation, that is obviously way more discretion—there's a more discretion involved in that than some of—some of the other databases you're talking about.

OLEG CHERNYAVSKY:  Yeah, just—just to—just to highlight.  I'll fill in and that's I—I keep repeating this because I think it's an important point to highlight because we—we keep focusing on affiliation as being some sort of an automatic trigger to get into—into the database.  It is not. Mere affiliation will not even get you recommended for inclusion into the database let alone get you

COMMITTEE ON PUBLIC SAFETY                             61

entered into the cluster housing.  You wouldn't even be recommended.  If you were hanging out, as the Chair mentioned, if he's hanging out with a couple of people that happen to be in the gang, is he affiliated and now in the Gang Database?  No, he's— he's not.  He wouldn't even be recommended for inclusion in the—in the Criminal Group Database.

COUNCIL MEMBER POWERS:  And just remind me one more time what then would be the criteria for— for inclusion?

OLEG CHERNYAVSKY:  So, you have, you know, and I—I know that the Chair found it hard to believe the last time we had this hearing, but a significant, yeah, a significant number of the folks self=self identify, self admit.  I mean that's not an uncommon. That is a very common occurrence, you know, because that is something that I—I would assume that gives them stature, you know, so they—they're actually proud of their involvement and they make that admission.  So, an admission during the course of an investigation by law enforcement if we have not one but two independent law enforcement sources saying this person is in a gang.  So, it's not only one investigator, but -but two, two law enforcement

COMMITTEE ON PUBLIC SAFETY                              62

sources making that determination.  Social media indicators indicating membership.  That would get—one of those would get in, right.  So, that's the high bar.  The other option is a combination of the following which could be, you know, gang related documents, association with a criminal group and not standing alone, but with other factors, social media and association with groups including pictures, scars of tattoos associated with a group colors and gestures reflecting, you know, association with a group, and it's not one of those things being present, it's a combination of those things being present will only get you to the point of being recommended.  It will not get you automatic entry.  There is no automatic entry.  There is—there are these triggers that will get you recommended by not a mere police officer on the street, by—but by a detective or a field intelligence sergeant that has expertise in gang activity will--  They will recommend you based on a combination of these factors and then an executive in—in the gang unit, the captain of a particular borough would then have to review that recommendation and evaluate it for inclusion.  Again, our goal is to keep that database

COMMITTEE ON PUBLIC SAFETY                          63

as lean as possible. Because an over-populated database is a useless investigative tool.

COUNCIL MEMBER POWERS: Okay, I appreciate that, and just a final question on this topic and I have one more after that is the-the self-admission. What is that? What is the mechanism if I want to self-identify I should say with a particular gang?

CHIEF ESSIG: If somebody was arrested and they're the precinct, then they're going to be debriefed on crimes in the area, they would self admit, I'm a Blood, I'm a Crip, et cetera, et cetera. That's a self-admission.

COUNCIL MEMBER POWERS: Okay, thank you. Just switching topics to a different bill, which came up earlier Council Member Borelli's legislation around the AirDrop, and I will confirm I did tell him they're in people's phones. The—it made me check my own settings, but you're—you're supportive of that legislation based on the category of picture that's being or information that's being sent. Is there a more—are you—are you supportive of a more expansive effort to—I mean there's all privacy concerns. I

COMMITTEE ON PUBLIC SAFETY                          64

meant there's two concerns.  One is, you know, over regulating--

OLEG CHERNYAVSKY:  Uh-hm.

COUNCIL MEMBER POWERS:  --here, but also the concern is that there's a concern about people invading other people's personal privacy using technology that's now available.  Is that concern for the NYPD go further than the specific category that Council Member Borelli's bill is discussing?

OLEG CHERNYAVSKY:  So, I mean I think we— we need to be balanced here. I think we would all agree that, you know, there are implications that we— we need to withstand legal scrutiny in order for bills such as this to be able to pass.  In a situation of an AirDrop when you confine it to intimate image, you know, you have defined, easily defined an identifiable subject matter, and if you send it with the intent to harass, annoy, alarm another individual who's an unwilling recipient, you can pretty accurately identify that.  Of course as law enforcement we need to still develop the intent of actor, and we need to develop who was the actual sender, right.  So, those are challenges, but, you know, that's something we're going to work through as

COMMITTEE ON PUBLIC SAFETY                                    65

we work through in every investigation.  I think when we talk about a course of conduct sending somebody messages with intent to harass or annoy or alarm them, that then rise to the level of intimate images, a pattern of conduct would currently fall under the aggravated harassment statute in the Penal Law.  I think the question you're asking is do you want to have a one text trigger--

COUNCIL MEMBER POWERS:  Yes.

OLEG CHERNYAVSKY:  That's--

COUNCIL MEMBER POWERS:  I mean that would seem unenforceable to me for what it's worth, but I don't know.(sic)

OLEG CHERNYAVSKY:  [interposing] So I mean I think it's—I think--

COUNCIL MEMBER POWERS:  I would love to enforce.

OLEG CHERNYAVSKY:  Right, but there—I mean these are difficult things to enforce but it's not—I don't think it's insurmountable, and having a tool for somebody that's legitimately victimized versus having not tool at all, we'll—we'll choose the option of having a tool, and we'll work with our DA

COMMITTEE ON PUBLIC SAFETY                                66

partners to try to get a prosecution on it and

prevention. (sic)

COUNCIL MEMBER POWERS:  Okay, thank you

that testimony, and taking time to answer questions.

Thank you, Chair for offering me the opportunity.

Thanks.

CHAIRPERSON RICHARDS:  Thank you, Council

Member Powers.  Let's go onto Council Member Miller.

COUNCIL MEMBER MILLER:  Thank you, Mr.

Chair.

OLEG CHERNYAVSKY: Good morning.

COUNCIL MEMBER MILLER: Good morning. Okay

before we—we address the—the legislation, let me

just—if—if someone, and we're talking affiliations

and associations, if there was an ongoing

investigation and you happen to be walking to school

with someone involved in that investigation, if you

happen to play some ball in the afternoon beyond

that, does that then trigger a concern beyond the

normal—the normal criteria because that you are

having relations, ongoing relationships with others

involved in the investigation?

OLEG CHERNYAVSKY:  No.

COMMITTEE ON PUBLIC SAFETY                                67

COUNCIL MEMBER MILLER:  That-that was a pretty emphatic no.

OLEG CHERNYAVSKY:  That's a—it's—it's as clear-cut as it can be. That's—the criteria is build around not capturing that individual.

COUNCIL MEMBER MILLER: Okay because in the license they have of a member, you know, it comes becomes involved with a bunch of folks that just holistically within there, right, throughout the community.  If—how long has this database been existence?  [background comments]

OLEG CHERNYAVSKY:  Yeah, can I [background comments/pause] Yeah.  I mean I know it was revised and seriously overhauled in '14 at the beginning of this Administration where it's—it's a lot smaller than what it used to be, but it—it wasn't--

COUNCIL MEMBER MILLER: So--

OLEG CHERNYAVSKY:  --the prior version was a red.

COUNCIL MEMBER MILLER: [interposing] As-as we go back to that data, too, and look what that universe looked like then does it look the same as it does now?

COMMITTEE ON PUBLIC SAFETY                              68

OLEG CHERNYAVSKY:  No, because I—I think the—I—I think the danger, you know, the learning lesson was is that, and I think, look, I think realistically we—we can say the same thing about street stops, right?  If you go back a decade you had 680,000 and you took this broad approach right, and what it, you know, versus now you have under 12,000 stops--

COUNCIL MEMBER MILLER:  [interposing] Okay I don't need a course in—in directions.  (sic)

OLEG CHERNYAVSKY:  No, no, this is what I'm saying is-

COUNCIL MEMBER MILLER:  That wasn't question I asked. I wasn't look for the entire universe.  I was looking for the demographics within the universe. It would look significantly different from when they look now.

OLEG CHERNYAVSKY:  I—I don't know, to answer that, but I—I—I-I no, I mean I—I do--

COUNCIL MEMBER MILLER:  [interposing] So, it's been around for a little while, you know--

OLEG CHERNYAVSKY:  I don't think it would be different.

COUNCIL MEMBER MILLER:  -the gangs--

COMMITTEE ON PUBLIC SAFETY                          69

OLEG CHERNYAVSKY:  --I don't--

COUNCIL MEMBER MILLER: --and—and I-I-trust me.

OLEG CHERNYAVSKY:  I don't think it would be, but I'm agreeing with you in the sense that I don't think it would be significantly different.

COUNCIL MEMBER MILLER:  To go back 10 years, the communities that were being impacted by gang proliferation throughout the city if you go back 20 years, the—the impact that those gangs had on those communities I would even submit what we see now has not even begun to touch the surface of what we've seen then.  I am—the question in it is best practice, why don't we see those—why aren't those gangs no longer active or represented here if they're not active.  I don't believe that they are in the communities that were represented in years past. What was done then to eliminate that?  Are we using those best practices to address that, or are we just--

OLEG CHERNYAVSKY:  I mean are you--?

COUNCIL MEMBER MILLER:  --this is the sense?

CHIEF ESSIG:  Well, you're talking about the gangs in general, right, how we're lessening

COMMITTEE ON PUBLIC SAFETY                              70

them?  I think you just look—look at the number of homicides and shootings. We've gone through 5,200 to just under—under 800. So, a lot of these shootings are gang related. So, we are having a significant impact on the gangs from what we had years and years ago.

COUNCIL MEMBER MILLER: Are we seeing the same gangs that we saw 10 years ago, 15 years ago?

CHIEF ESSIG:  No.

COUNCIL MEMBER MILLER:  I know you had smaller crews and stuff like that now--

CHIEF ESSIG:  Yes.

COUNCIL MEMBER MILLER: --but locations, demographics.  Here clearly 98% are—are Black and Hispanic, and that wasn't the case 10 years ago or 10 years.  In fact, I think we can all agree that that that wasn't the case and the impact that they had on communities certainly hasn't then risen to that level that it was back then.  I'm merely saying that if they don't exist, that's a great thing.  What as the best practices that we can use to make sure that we're addressing that in these communities that—that--that they're impacting now?

COMMITTEE ON PUBLIC SAFETY                                71

OLEG CHERNYAVSKY:  I mean I—I think if I understand your question and I think I do, I think the—the answer is the precision policing.  You know, when we focus on the small number of the crime drivers that are driving crime, you know, they, you know, we—we—we make sure that you—you have—we focus our resources rather than these broad approaches, and they have caught up other groups or other individuals, and we focus on the few that we know are driving our crime numbers.  When you see that happening, when you see our resources focused on the locations where the crime is happening, you know, you see less crime starting to happen when that—when-when that's the result of this, and then, you know, and I know I mentioned this this in my opening statement which is neighborhood policing.  I mean it's going into those same neighborhoods after we've addressed, you know, specific individuals from Precision Policing going into that community and—and with our NCO, with our scepter cops, and actually we build in trust, rebuilding trust, you know, developing that one-on-one relationship where the community knows the cop and the cop knows the community.

COMMITTEE ON PUBLIC SAFETY                          72

COUNCIL MEMBER MILLER:  Okay, so—so clearly this predated community policing, but I don't want to languish on that too much.  How early has the department observed 3Ds and—and ghost guns entering into the cities? [background comments]  When—when—when—when did that get laid out if at all?

OLEG CHERNYAVSKY:  I know, when did they start entering the city?  When—

CHIEF ESSIG:  I just think the last two years.

OLEG CHERNYAVSKY:  Yes, I mean we—we're taking a look at—what we did was we took a look at the last three years in terms of numbers.  We didn't go back further.  The number—so I think it's important to highlight the numbers aren't really drastic in terms of recoveries of 3D guns or recovery of ghost guns, but—but that—that's actually a good thing, and—and I'll tell you why this is a good thing.  You know, what--we always seem to find ourselves reacting, right.  What you're doing wit this legislation is you're being proactive.  What we're seeing happening on the west coast that's going to wind up moving its way here, you're not waiting until it gets here, you're actually addressing it

COMMITTEE ON PUBLIC SAFETY                                    73

before it gets here, and these receivers that are untraceable that, you know, you can basically build your own gun, you have somebody with a level of expertise that goes on the Internet, gets instructions, buys a component part that they can buy on the Internet or buy somewhere else.  Before you know it, they're building, 200, 300, 400 guns, giving it out to some of the criminal groups that are now using untraceable weapons.  What you're with this legislation is you're getting way ahead of the curve before it becomes an epidemic in the city , and you're basically saying, look, if you have that untraceable component part, even before you build it into a lethal weapon, we're going to make that an unclassified misdemeanor.  We're going to give the police a tool to be able to seize it, to—to arrest somebody for—for—for having it, and that's—that's a good thing.

COUNCIL MEMBER MILLER:  Is there a way to determine whether or not one of these was used in a shooting incident. [background comments]

CHIEF ESSIG:  We enforce this.

OLEG CHERNYAVSKY:  Yeah it would—

COMMITTEE ON PUBLIC SAFETY                           74

CHIEF ESSIG:  It would be a ballistics match.  So, if one of those guns was involved in a shooting, we would get them.  Bullistics would send it to our lab, and we count the Ballistics and the recovered firearm.

COUNCIL MEMBER MILLER:  So, you need the recovered firearms.

CHIEF ESSIG:  Absolutely.

COUNCIL MEMBER MILLER:  Absolutely yes.

OLEG CHERNYAVSKY:  So, outside of that there's no way to really determine if or how many—if you haven't recovered the firearm as a result of the incident, then there's no way to determine whether or not specifically a ghost guns or 3D was used in a shooting incident.  So, to this point, it can't be documented. Is that accurate.

COUNCIL MEMBER MILLER:  So, to the point of your bill?

OLEG CHERNYAVSKY:  To—to this point that if-if—of all the shootings that have occurred, if you don't have and actual 3D or ghost guns to match it up with, you cannot determine whether or not they were actually involved in the shooting or not?

OLEG CHERNYAVSKY:  So, yeah.

COMMITTEE ON PUBLIC SAFETY                              75

CHIEF ESSIG:  [off mic] So, yeah we—[on mic] we need the firearm to match up to the bullets.

COUNCIL MEMBER MILLER:  Have there been any seizures?

CHIEF ESSIG:  Yes. So, in the last three years--

COUNCIL MEMBER MILLER:  Uh-hm.

CHIEF ESSIG:  --three years ago stating from 7—2017 we had 32 seizures.  In 2018 we had 14 and in 2019, 21.

COUNCIL MEMBER MILLER:  Were they multiple seizures or--

OLEG CHERNYAVSKY:  Uh, I--

COUNCIL MEMBER MILLER:  --just individual?

CHIEF ESSIG:  I think there was a few multiples, but we could get that information how many seized back to you.  Most of them like my previous job was in Gun Violence where we did the firearms and firearms tracking, and we're seeing these guns coming from Nevada and California, pieces like that.  So, it—it would be really important in our firearms, investigation or firearms trafficking investigations to stop this because we can't track the source dates,

COMMITTEE ON PUBLIC SAFETY                          76

we can't track who manufactured them or who sold

these guns.  So, this is—

COUNCIL MEMBER MILLER:  So, I have other

questions, but it, but it seems like that the

database is supportive.  So, I'll just ask do you

think that as currently constituted that this

legislation is going to be helpful?  Do you see

anything that could be added to this that would give

you the tools and resources to—to address what we

anticipate as a potential problem?

OLEG CHERNYAVSKY:  Yeah, I think --

COUNCIL MEMBER MILLER:  So give us some

information.

OLEG CHERNYAVSKY:  Yeah, I think we're

going to—we'll work together, of course with central

staff, and-and on figuring out the right language

because, you know, we have federal statutes, state

statutes, all of that in play. So, we are supportive

unquestionably of the legislation and we're going to

work together with you to make sure that it

withstands legal requirements to make sure that it's,

you know, that we could actually use it and the

statute doesn't get stricken down. We want to have

this tool.

COMMITTEE ON PUBLIC SAFETY                              77

COUNCIL MEMBER MILLER:  Have you noticed in those arrests or seizures a-that they occurred in a particular demographic part of town, age demographic or whatever.

OLEG CHERNYAVSKY:  Or where they go?

COUNCIL MEMBER MILLER:  This is random.

OLEG CHERNYAVSKY:  I, you know, I'll get you the number.  We-we took—we kind of ran the totals of what we took in in those three years, but let me see if I can break it down by precinct and, you know, maybe that will give you some insight.

COUNCIL MEMBER MILLER:  Okay, thank you.  Thank you very much.  Mr. Chair, thank you.

CHAIRPERSON RICHARDS:  Thank you, alrighty, back to the database again for a few more questions.  So, you, you said in your testimony you stated 90.-90.6% of the individuals I the database have been arrested.  How many convictions.

OLEG CHERNYAVSKY:  I don't have the conviction numbers on it.

COUNCIL MEMBER MILLER:  So, you'll get that back to the committee?

OLEG CHERNYAVSKY: I will see if we can access that.  That—those are VA numbers.

COMMITTEE ON PUBLIC SAFETY                          78

CHAIRPERSON RICHARDS:  Okay.

OLEG CHERNYAVSKY:  So, I'll—I'll see if we can—what we could get on that.

CHAIRPERSON RICHARDS:  Yeah, yeah and then how many individuals in the database have a felony conviction?

OLEG CHERNYAVSKY:  Okay.

CHAIRPERSON RICHARDS:  Alright, so if we can get those numbers.  So, you'll get those numbers back.

OLEG CHERNYAVSKY:  I'll—I'll see if we can get them.  I just qualify it by these are defense attorney numbers, and Court Administration numbers.

CHAIRPERSON RICHARDS:  Okay.

OLEG CHERNYAVSKY:  So, to the extent that we can get it, I'll—I'll do my best.

CHAIRPERSON RICHARDS:  I sure you get the numbers.

OLEG CHERNYAVSKY:  They might.

CHAIRPERSON RICHARDS:  You work with them right. [laugh]

OLEG CHERNYAVSKY:   I work with them.

CHAIRPERSON RICHARDS:  Right.

COMMITTEE ON PUBLIC SAFETY                          79

OLEG CHERNYAVSKY:  I work—I work with you, too.  [laughs]

CHAIRPERSON RICHARDS:  [laughs]  Isn't it true that officers of detectives—so you spoke of self-admitting of being in a gang.  So, just run me through that. So, like you're in an interrogation room, and you're being interrogate—interrogated, and just voluntarily are like I'm Blood, by the way. People do that?  [laughs]

OLEG CHERNYAVSKY:  Yeah. So they—like you were surprised the last time a year ago we were before you, but as I said, look for a lot of—for a lot of folks who are selective about who's in—who's in the database, and I've highlighted all the criteria, but for the folks that are in it, there's a lot of folks that are proud members of criminal groups.  That's a status symbol for them to identify and to admit yes, this is who I am.  They're posting it on their social media accounts.  They're—it—that—it's not a far fetched thing.  I know you found it hard to believe a year ago.

CHAIRPERSON RICHARDS:  Yes, I do.

COMMITTEE ON PUBLIC SAFETY                              80

OLEG CHERNYAVSKY:  It sounds like you find it hard to believe still, but that's—that's the truth of the matter.

CHAIRPERSON RICHARDS:  But, I would also say that perhaps in some interrogations, and maybe I'm not aware of—obviously, not aware of what goes on in every interrogation that, you know, detectives could give leading questions, right, like so you're a Crip, right?  And I would assume that those individuals or maybe in some cases may respond, No, I'm not a Crip.  I could be a blood.  So, I guess my concern is, you know, during an interrogation where techniques are being used, are there lead questions that would--?

OLEG CHERNYAVSKY:  I mean we follow—we follow the law when it comes to interrogations.  I mean that's been long established, you know, through case law.  If—f we don't follow the law, the statements get suppressed.  So, it doesn't benefit anybody by us asking inappropriate questions that will lead to inadmissible evidence.

CHAIRPERSON RICHARDS:  Right, and do you believe that notifying teen-agars could serve as a deterrent?  And I'll—I'll just speak for myself.  You

COMMITTEE ON PUBLIC SAFETY                            81

know, if my mom got a notification I was in a gang, I probably would be more scared of my mom than you. [laughter] But do you think this could serve as a—as a deterrent in some cases?   And then, you know, we spoke of direct outreach, and—and if there's no plan, that's okay.  I think that's the point of having this hearing, you know, could there be if you have 496 individuals and you stick 4—94 in a database, you know, you have Cure Violence groups.

OLEG CHERNYAVSKY:  Uh-hm.

CHAIRPERSON RICHARDS:  Could we do a better job at connecting the Cure Violence groups with these teen-agers or people who are not even teen-agers who may be in a database?  Not notifying them, but technically there are ways still to go around that to ensure that perhaps their information gets to a crisis management system through some of the local precincts or whatever to ensure that they are being connected to services, which then can ensure that we're putting these young people on a path to success.

OLEG CHERNYAVSKY:  Yeah, I mean I think, and I sand this in the testimony in the prepared statement, and I'll say it to you as well, I—to the

COMMITTEE ON PUBLIC SAFETY                              82

extent that it does not jeopardize an investigation. You're not going to see us opposed to getting kids back on the right track.  We—a lot of our programs are aimed at getting them on the right track before they get on the wrong track. Some of them are aimed at getting them on the right track even if they took the wrong track.  So, I just—I think the issue here is sending our notifications and alerting individuals whether they be third parties or otherwise that somebody is an investigative lead.

CHAIRPERSON RICHARDS:  [interposing] I'm mot saying you have to do that. (sic)

OLEG CHERNYAVSKY:  I know, I know, but I'm—but when you talk about the universe of programs that are out there, I think we're open to programs to the extent that they don't compromise investigations.

CHAIRPERSON RICHARDS:  Right, and I think you have youth officers in most precincts, right?

OLEG CHERNYAVSKY:  Uh-hm.

CHAIRPERSON RICHARDS:  So, perhaps strategically working with a youth officer to say hey, John Doe at Andrew Jackson is in this gang. Perhaps, you know, mention it.  I don't know if there could be coordination with say a guidance counselor,

COMMITTEE ON PUBLIC SAFETY                                    83

a social worker or, you know, some of the crisis

management organizations to flag those things and

say, Hey, you may want to have a conversation with

these individuals about services and other things.  I

want to move from that and just lastly ask just a few

more questions.  One more on this.  You know, there

have been calls to eliminate the Gang Database, and,

you know, one of the things I want to know is

couldn't you do investigations without a database,

and then with—if we were to eliminate these things,

would this preclude you from being able to still have

investigations and still carry on the work that

you're doing now minus having a database?

OLEG CHERNYAVSKY:  But, you know, it's—

you—when you--

CHAIRPERSON RICHARDS:  [interposing] And

there are other cities that have eliminated it,

right?

OLEG CHERNYAVSKY:  Right, but there's—the

idea is why—why would you not take advantage of

technology that's out there that could help you more

precisely target the individuals that are driving

your crime, that are enabling you to connect the dots

to see who's responsible for crime, enabling you to

COMMITTEE ON PUBLIC SAFETY                                84

connect the dots to see who can possibly be the recipient of because this gang shot at this gang. So, now we know there's going to be retribution to—to make that more difficult, to create, to set up index cards, you know, would be the equivalent of let's not use a cell phone and let's yell across the courtyard at each other through our windows or communicate that way.  Why would you do that?  You know, there's— there's a more efficient way to leverage technology to more effectively drive down crime, and we've done that and I-and, you know, I know that—that you're— you're supportive of that.  When we see arrests down 140,000 from five years ago in a given year, when we some—see criminal courts summonses down in the high 70s, 78%, street stops from 680,000 to 112,000, the jail population below 9,000.  I mean these are all things that are not done by accident. We're focusing on the drivers of crime, but in order to focus on them effectively, we need to leverage the technology that's out there now. It—it just makes no sense to have us use antiquated techniques or to hamstring the Police Department, and leave dangerous folks out there for any longer than they need to be out there to victimize somebody else.

COMMITTEE ON PUBLIC SAFETY                              85

CHAIRPERSON RICHARDS:  Have we seen increases in crimes—in crime where we've—where they've eliminated the database?

OLEG CHERNYAVSKY:  I haven't--

CHAIRPERSON RICHARDS:  Maybe with other cities?

OLEG CHERNYAVSKY:  I mean I haven't studied, you know, cities that eliminated the database, but realistically, you know, those cities—every city is unique, every city has their unique needs.  I mean we have our needs as the most densely populated city in the country.  You know, we have millions of people in a relatively small area.  We need to keep everybody safe, and we are not—we're not supportive of eliminating the necessary tools to do that.

CHAIRPERSON RICHARDS:  And I think that technology would be there whether you had a database or not, but I think the concern is that there could be in a sense people labeled in this database, and although I'm, you know, I'm hearing you, you're saying that other individuals don't have access to this database, I want to believe it, but there's--

COMMITTEE ON PUBLIC SAFETY                          86

OLEG CHERNYAVSKY:  I want you to believe it.

CHAIRPERSON RICHARDS:  --but there is historical [laughs], you know, relationship that for instance, you know, DOI releases a report yesterday on biased crimes and in that report, you know, we—you have not substantiated one, not like one, but biased labeling by police officers or individuals.  You have not substantiated one biased complaint ever.  So, I want to work with you, but it just becomes hard to believe that there are not innocent people entangled in this database and should not be in there, and be labeled gang members, and then not only that, I still—my opinion is that you could still do the work that you're doing without have a database and still be successful.  I don't see how that minimizes your investi—investigatory tools to actually--

OLEG CHERNYAVSKY:  [interposing] I think that's--

CHAIRPERSON RICHARDS:  --work on, you know, individuals who may be associated or may not be associated, but I think our concern is that there may be teenagers, there may be individuals who are labeled as gang members, which does in a—although

COMMITTEE ON PUBLIC SAFETY                          87

you're saying it doesn't, you know, I don't want to say you're not saying it matter—

OLEG CHERNYAVSKY:  [interposing] Oh, it probably matters.

CHAIRPERSON RICHARDS:  -- but they're going to have line on the streets.

OLEG CHERNYAVSKY:  It certainly matters--

CHAIRPERSON RICHARDS:  Yeah.

OLEG CHERNYAVSKY:  --but what it doesn't do is have the collateral consequences that you see in other states.  You're not getting penalty enhancements or sentence enhancements.  You're not being criminalized for solely being in the database. You're not being stopped in the street because you're in the database solely for that reason.  You're not- you're not—your ability to get an apartment, your ability to enter school, nobody is informed of this. It is a law enforcement tool that we use to address criminal activity by criminal groups.

CHAIRPERSON RICHARDS:  Okay, I'm going to move from that.  I have a difference of opinion, though we won't resolve it right now .  Let's go to staged perp walks for a second.  Does the database have a policy on notifying the media when suspects

COMMITTEE ON PUBLIC SAFETY                                88

are being transported from precincts to Central Booking?

OLEG CHERNYAVSKY: No. So, the department, the department complies with, and there was a case law I believe in the early 2000s a federal case that spoke directly to staged perp walks, and that's not something that we do. Our—our problem—I guess our concern with the bill as written is that it would actually hamstring our ability to do routine work. Now, of course, I—I know what the follow-up question is going to be. We have a carve-out for you to routinely transport individuals outside of precincts, but, you know, the—it's—staging a—let's— I'll use the terminology staging the perp walk is—is really an amorphous term right. So, if we have for example, you know, our hearings on sex crimes in the Unit in Sex Crimes Investigations, one of the things that was raised, one of the recommendations of DOI's report, and something that Council Member Rosenthal has and yourself have—have—have held our feet to the fire on is to get the sex crimes facilities as recommended up and running. Well, the recommendation is to have separate entrances for victims and separate entrances for perpetrators. So, by default

COMMITTEE ON PUBLIC SAFETY                                89

what we're having is in a high profile sex crime, the media would know that the individual, the perpetrator is going to be coming in and out of a particular doorway. There could be a gaggle of media there, a lot of cameras there.  We need to set them off on the side to be able to use the door.  So, if we put a barricade there, are we now walking out a perpetrator or bringing them into a facility. We staged arguably media by clearing the doorway, by telling them stand on this side.  Are we staging a perp walk? It opens up police officers and detectives to the potential of violating the Local Law for simply doing their job. Now, in terms of, you know, and there's other facilities that are older facilities that really only have—I mentioned sex crimes, but they only have one means—one means of ingress and egress.  So, you'll have the same situation happening there, but no, we— we don't stage the movement of a prisoner for the media, but passing a law that would effectively I--I guess prohibit that would place officers in a situation where they could potentially be violating the law by simply doing their job.

COMMITTEE ON PUBLIC SAFETY                              90

CHAIRPERSON RICHARDS:  I think what we're getting at is just ensuring that, you know, innocent until proven guilty.

OLEG CHERNYAVSKY:  Sure, then but that's what—that's what I ready said.

CHAIRPERSON RICHARDS:  [interposing] And I think the reception unfortunately, I mean I just go back to the Innocent Five how they were walked and paraded out of this precinct, right, innocently, and unfortunately, they were guilty before they even got a fair shake, you know, you know, in the public's eyes because and I--you know, because of the media technically as well.  And so, you're saying you don't call media at all?

OLEG CHERNYAVSKY:  [ice clinking] Sorry.

CHAIRPERSON RICHARDS:  Are you cooling off?  Is it hot in here for you now?

OLEG CHERNYAVSKY:  We're talking a little here.

CHAIRPERSON RICHARDS:  Right. [laughter] So, NYPD has a policy or is there no policy on calling the media?

OLEG CHERNYAVSKY:  I mean I don't—I'm not aware of aware of a written policy, but after we're

COMMITTEE ON PUBLIC SAFETY                                    91

done with the hearing I'll call the CPI and see if they have something in writing that I can share with you.

CHAIRPERSON RICHARDS:  Okay, and does staging a—the media taking photos of the suspect in handcuffs is there any law enforcement on desiccatory purpose?

OLE CHERNYAVSKY:  It doesn't serve a law enforcement or an investigatory purpose that I can think of, but I mean I think— Can you—can you repeat the question one time?

CHAIRPERSON RICHARDS:  I'll be—I'll make it easy.  Can you support a bill that would say you can't call the media?

OLEG CHERNYAVSKY:  Would I support the bill—I--

CHAIRPERSON RICHARDS:  [interposing] Support a bill that says you cannot call the media?

OLEG CHERNYAVSKY:  I mean I—I think you need to balance what—what you're saying with the fact that we routinely call the media when we have a wanted outstanding suspect that we through our partners in the media we alert the—we alert the public that this person is wanted.  They put out

COMMITTEE ON PUBLIC SAFETY                          92

through whether it's New York 1 or—or any of the other media outlets they put out, they're kind enough to put out--

CHAIRPERSON RICHARDS:  [interposing] And that's fine.  I'm not—I'm not getting at that. That's fine.  We don't want to go with those three. (sic)

OLEG CHERNYAVSKY:  [interposing] It stems, but ultimately what stems from that is—is when you actually take this dangerous criminal off the street--

CHAIRPERSON RICHARDS:  [interposing] Alleged and then the alleged--

OLEG CHERNYAVSKY:  Alleged dangerous criminal off the street--

CHAIRPERSON RICHARDS:  Uh-hm.

OLEG CHERNYAVSKY:  --the public already saw the wanted poster.  They know this person is wanted.  The media provides them with some sort of closure.  So, is there going to be a question about has there been an apprehension made?  Are we now then not going to be allowed to close the loop?  They put out the wanted poster.  They want to know--

COMMITTEE ON PUBLIC SAFETY                          93

CHAIRPERSON RICHARDS:  [interposing] No, but I think you can still put a statement out. That's fine that, you know, this individual is in custody.

OLEG CHERNYAVSKY:  I'll—I'll take a look at the bill as it's written, and I'll make an assessment there. I just wouldn't want to speculate.

CHAIRPERSON RICHARDS:  Alrighty. Just on Internet purchase and exchange locations, do you have receive complaints of robberies or other crimes that are arise from trans—transactions that people negotiate online using sites like Craig's List, and what stakes or what steps do the department takes to make those transactions safer?

OLEG CHERNYAVSKY:  So, we ran some numbers and I—I don't—I know you mentioned a particular website.  This is not—I'm—I'm—these numbers are not now in--

CHAIRPERSON RICHARDS:  Take me through an example.

OLEG CHERNYAVSKY:  Yeah, but it's not married to crimes that happened as a result of purchases on that website.  This is overall reported robberies is it?  Yeah.

COMMITTEE ON PUBLIC SAFETY                           94

CHIEF ESSIG: Yes.  Just for the last three years the social media exchanged robberies, in 2017 you had 203.  In 2018, 213 and year-to-day 2019, 81. Equivalent about 2017 it's about 1.4% of our robberies; '18 about 1.6% and this year 1.4% of our robberies are the social media type.

CHAIRPERSON RICHARDS:  And are there any things—can you just speak to any initiatives or things you're doing just to keep these transactions as safe as possible?  I don't mean you to be able to resolve all of them, but--

CHIEF ESSIG:  Well—

CHAIRPERSON RICHARDS:  --in, you know—

CHIEF ESSIG:  Well, the investigation into the social media are handled by our Robbery squads, which are experts on robberies.  They're not hold—held by the local squads.  They have more of an expertise at robbery investigations going in the social media and seeing, right. Getting websites and speaking to people.  So, every one of our Social media robberies is handled by our Robbery Squad not the local squad, and they also look to see if there's any connections and patterns, anything around citywide.

COMMITTEE ON PUBLIC SAFETY                                95

CHAIRPERSON RICHARDS:  Alrighty, well some—Alrighty, I think that is it for me. [background comments/pause]  Okay, awesome.  So, we're going to let you go.  Let me just ask on the Airdropping.  What role do private companies like Apple play during investigations?  Is there more that you think they should be doing around the Airdrop options?  Are you responsive to concerns? [background comments/pause]

CHIEF ESSIG:  Yeah, when—when we subpoena Apple and most of the social media companies, they're very receptive as well we have the proper--

CHAIRPERSON RICHARDS:  [interposing] And when someone Airdrops a photo, does the sender's phone leave any kind of digital footprint that can be tracked?  [background comment]

OLEG CHERNYAVSKY:  Let—let me—let me look into it. I just—I don't want to, yeah, I don't want to say something that's—

CHAIRPERSON RICHARDS:  [interposing] And have you given any suggestions to Apple on this at all?  Has there been any conversation?  Not just Apple but any of these companies that have these sort of Airdrop options?

COMMITTEE ON PUBLIC SAFETY                          96

OLEG CHERNYAVSKY:  I mean we have—we—we do have a partnership.  I know there-there are certain issues that clearly, you know, we don't—we—we wouldn't agree on, but there's other—we routinely partner with technology companies on solving these crimes.  I'll find out—

CHAIRPERSON RICHARDS:  [interposing] Right.

OLEG CHERNYAVSKY:  --for you if there has been any conversation about, you know, whether them updating their software to making, you know, to put safeguards in place or whether there are unique identifiers in an Airdrop.

CHAIRPERSON RICHARDS:  One friendly suggestion could just be make sure the person's cell phone number shows up when you Airdrop the photos. So that may be—that's gong to be something we recommend for them, but it would be helpful from a law enforcement standpoint if you did that as well.  I think that would resolve a lot of issues if people knew that their phone numbers would directly show up after Airdropping the photo.

OLEG CHERNYAVSKY:  Sure.

COMMITTEE ON PUBLIC SAFETY                              97

CHAIRPERSON RICHARDS:  Alright.  I want to thank you.  We have a lot more work to do to ensure that we have a just—do you have a question?

COUNCIL MEMBER:  [off mic] No.

CHAIRPERSON RICHARDS:  Oh, okay—a more just city. You got my points on the Gang Database.  I still think we have as lot of work to do to ensure that we're not interacting especially young people who we should really ensure has the services to pull them out of gangs.  We still have a lot more work. We see this as the beginning of the conversation on the database.  We look forward to working with you further on it.  Keep driving those numbers down. Thank you.

OLEG CHERNYAVSKY:  Thank you.
[background comments/laughter/pause]

CHAIRPERSON RICHARDS:  Alrighty, panel Marie Delus, Moms Demand Action for Gun Sense in America; Natalie Eisner, Moms Demand Action; Lilianna Zaragoza, NAACP Legal Defense Fund; Center for Constitutional Rights, Bronx Defenders and Fazia Siddiqui, Girls for Gender Equity.  We'll now put three minutes on the clock for each person. [background comments/pause]  Thank you.  I'm going to

COMMITTEE ON PUBLIC SAFETY                              98

let--Council Member Rosenthal is going to read a statement first, and then we're going to go each panel.  Each panelist will have three minutes for their—to read their testimony. Council Member Rosenthal.

COUNCIL MEMBER ROSENTHAL:  Thank you so much, Chair Richards.  Thank you for holding this important hearing.  I appreciate hearing from the NYPD.  I really appreciate Moms Demand Action.  Because of you and because of your constant vigilance, we make changes, and that's true for moms.  So, shout out.  I'm pleased that my legislation Intro 1553, which prohibits the possession of an unfinished frame or receiver of a firearm is being heard today.  36,383 people die each year from gun violence, another 100 or a 120 are injured, and while—sorry.  36,380 people die each year from gun violence.  Another 100,120 are injured.  While New York City stands our for its common sense gun laws and declining homicide rates, a critical loophole in gun safety has emerged in the form of untraceable firearms also known as ghost guns.  One common method of creating a ghost gun is through purchasing an unfinished receiver, which is essentially 80% of a

COMMITTEE ON PUBLIC SAFETY                          99

gun.  From there all it takes is a quick trip to the local hardware store one-minute Google search to find what you need to complete the firearm.  These guns have no serial numbers making them especially popular among individuals who are unable to purchase guns legally. This makes them virtually untraceable by law enforcement, and allows criminals to bypass background checks and licensing laws.  My legislation will make it illegal to possess or to dispose of an unfinished frame or receiver in New York City. Violators will be charged with a misdemeanor punishable by a maximum fine of $1,000 or imprisonment for a year or both.  I really want to thank—sorry—before I say that—California and New Jersey are currently the only states that regulate these weapons.  New York City has the opportunity to be at the forefront of this issue and set an important precedent that other cities and states should allow.  I'm proud to sponsor the legislation around—along with Council Member Miller, Chair Richards and the Public Advocate, and I'm very honored to have the support of Everytown for Gun Safety and Moms Demand Action, and I am pleased that the NYPD supports this legislation, and look forward

COMMITTEE ON PUBLIC SAFETY                              100

to swiftly passing the law, and look forward to hearing from you today. Thank you very much.

CHAIRPERSON RICHARDS:  Thank you, Council Member Rosenthal.  You may begin. State your name for the record and the organization you belong to. On the mic there's a button.  There you go.

NATALIE EISNER:  Okay, I'm on.  Okay. My name is Natalie Eisner.  I'm representing Moms Demand Action.  Like previously said, there is decrease in gun violence, but people are still dying in our streets.  One life is too many.  Many can agree that there are a lot of unregistered and illegal guns in our community, basically in black and brown communities. Having an unregistered ghost guns and being able to make it your own at home will only exacerbate the issue in our community.  This is just another threat in our community.  I personally know how illegal and unregistered guns can impact our lives.  On September 15, 2011, my brother was walking his girlfriend home where he was shot by two men by two illegal guns.  He was shot 15 times.  He did not survive.  There are many children that die in our streets everyday because of illegal and unregistered guns.  We should not have any more lives they are

COMMITTEE ON PUBLIC SAFETY                              101

ghost guns.  We should take preventative action.  We

should not wait until many more lives and many more

funerals where we say we have to do more.  We have to

do more now.  Prevent it before it actually happens

to someone you love, your friends and even in your

community.  Thank you.

CHAIRPERSON RICHARDS:  Thank you for your

testimony.

MARIE DELUS:  Thank you.  My name is

Marie Delus.  I always like to start with an

introduction.  This is my Nephew Pia Portia Paul

(sp?), Jr.  He was actually killed on November 11,

2008.  He was killed in a Cambia Heights, Queens.

They actually found 10 bullets in the scene.  So, he

was shot at 10 times, and 7 of the bullets actually

impacted his body.  The one that killed him was the

one that hit his heart, and he was also walking with

a young lady that he just saw that he particularly

liked, and then they were just going into the

McDonald's on the corer of Springfield when the

perpetrator approached him from behind and shot him.

My family, I guess we were fortunate enough to get—we

get what we call justice because the perpetrator was

actually caught, but the perpetrator was caught

COMMITTEE ON PUBLIC SAFETY                                    102

because of eye witness. They didn't find the gun that

the perpetrator had, and if they find the gun at

least whether it has serial numbers or not at least

we would be able to identify the gun if it impacts

other people, right.  If he shoots other people we

could—the gun will have a body.  By having ghost guns

without serial number untraceable, that is going to

be nearly impossible.  I should also note that I'm a

former Marine even though I'm not a combat vet, but I

am a former Marine of Desert Storm, and I'm also a

sharpshooter.  So, I know how to mantle and dismantle

weapons.  I've seen these guns.  They could print out

every—almost every component except for the pin on

these guns.  They could get the actual hardware from

anywhere to build.  Eighty percent of the guns could

be built by ghost guns.  I am a survivor a fellow

survivor and Natalie is a fellow survivor, and I also

want to say thank you to very much for actually

bringing these bills, and I want to thank Moms Demand

Action for being here, but as a fellow survivor, I

want to say that these gungs are going to make it

more difficult for officers to catch our killers—our

killers out there the killers, and I definitely would

love to endorse Intro 1553, and Intro 1548 to make it

COMMITTEE ON PUBLIC SAFETY                                    103

safer for us in New York City because they will come. I know that they're—they—they talked about—the NYPD talked about they already captured 27—in 2017, 32 ghost guns already here in New York. In 2018, 14. Some people will say okay 32 to 14 is—is a decline but then in 2019, we already have 21.  It already started.  Now, we really need to do something.  I do not want anyone else to lose family members to gun violence, and by having these ghost guns actually for guns it's going to make it more and more difficult to capture a perpetrator.  I was lucky.  Natalie, was your—did they find the killer of your brother?

NATALIE EISNER:  Only one was caught because he [bell] it was basically people said it was him, but there was another person that still wasn't caught yet.

MARIE DELUS:  And a lot of our survivors have the same problem.  We have a lot of survivors in our group who have not been able to go and approach it.  It will make it a lot more difficult to catch our perpetrators—the perpetrators that kill our families with these guns.  Thank you.

CHAIRPERSON RICHARDS:  Thank you and I share a common story with you.  My childhood best

COMMITTEE ON PUBLIC SAFETY                          104

friend was also murdered. You know, unfortunately, they never found his killer.  We know who it is. Everybody knows who it is, but no justice.

LILIANNA ZARAGOZA:  Good morning.  Thank you, Chairperson Richards and Council Members.  I'm actually here today to talk about Intro 2223 on behalf of the NAACP Legal Defense Fund, the Bronx Defenders and the Center for Constitutional Rights. I'm particularly humbled to be here. I actually met some Moms who Demand Action, and, you know, it's a coincidence since—since I'm not commenting on that bill, but the answer to tragedy in black and brown communities is not over-policing, and perpetuating pernicious stereotypes of black and brown communities and youth.  As Donovan Richards, the Chairperson spoke about earlier today, we were here nearly a year ago, and we talked about these same dangers, and—and not much has changed.  In fact, the Gang Database has actually, has actually grown, and the NYPD we heard them earlier today talk about how there are no collateral consequences to this, but we know that now it's about 98 almost 99% black and brown.  It remains that way, and the fact that there exists—that there is an almost exclusively black and brown list, this

COMMITTEE ON PUBLIC SAFETY                    105

inherently tells people it—it perpetuates the stereotype both within NYPD and our community at large that black and brown youth but also emerging adults also equally are 25-year-old parents, a 45-year-old uncle or father—father figure is a criminal, a gang member or potentially a thug. And, although the NYPD earlier said that there are on collateral consequences, this database actually exposes people to increased surveillance and scrutiny. And even thought the NYPD testified earlier that they may not be stopping people because they are simply on the list, people are almost certainly targeted because of it, or on high alert for these particular individuals. So, today although I take—we take no explicit position on the-on the bill introduced today, we do think that it is a modest first step. We appreciate the bravery of addressing this issue, but we think that it's not only the monitoring of minors that deeply troubling, it is the racial imbalance, the race profiling that is equally troubling, and the vagueness and overbroad contours of the criteria that the NYPD talked about earlier today. You know, repeatedly they assured us that Chairperson Richards you would not be on the list,

COMMITTEE ON PUBLIC SAFETY                                    106

but last year you we told that you would be if you simply wore red colors, the you viable data, and earlier today they talked self admission.  That is certainly a possibility.  You know, we'll just accept that as true, but the—the reality is that individuals on social media may be taking pictures with their neighbors. They may be taking pictures with individuals.  They maybe sitting on their stoop, and it may not simply that walk to the bus that we talked about earlier, but you cannot help if your brother is in a gang.  What if, you know, you're going to help the company [bell] that you keep, and the criteria criminalizes innocent behavior, and it is unchecked? So, under this bill we do have a concern that even for the about 8% of individuals or perhaps 2% now even for them, the NYPD ultimately has the sole discretion about whether to provide notice, about whether the exception for an active investigation should apply without any additional oversight. And in addition it provides no process or right for appeal. We think that some of these elements are incredibly important, we think that the racially disproportionate impact and the-the complete discretion run amuck for the NYPD without check is a

COMMITTEE ON PUBLIC SAFETY                         107

problem, and for that, we would love to have a further conversation about what needs to be done in the future.

CHAIRPERSON RICHARDS:  Thank you for your testimony.  Thank you.

LILIANNA ZARAGOZA:  Thank you.

FAZIA SIDDIQUI: Good afternoon Chair Richards and Council Members.  My name is Fazia Siddiqui, and I'm a legal intern for Girls for Gender Equity. Thanks for holding this important Public Safety Committee hearing, and giving me the opportunity to speak today.  Chair Richards, I would like to thank you especially for your proposed bill demanding NYPD transparency with respect to the so-called Criminal Groups Database.  Thank you for doing the work to help us move towards a safer and more accountable New York City.  A GGE, we share a common goal with your initiative to protect young people from unethical and often unconstitutional race-based policing.  GGE is a Youth Development and advocacy organization based in New York City committed to the psychological, physical, social and economic development of girls.  GGE challenges structural forces including racism, sexism, transphobia,

COMMITTEE ON PUBLIC SAFETY                        108

homophobia, and economic inequities, which constricts the freedom for expression and rights of transgender and cisgender girls, and women of color.  We are offering testimony today to highlight the intersections between the NYPD's gang policing strategies, school policing and the so-called school decision pipelines.  Expanding is helpful, but it does not fully capture the experience of girls and non-binary youth of color.  We instead use the term pushout coined by Scholar Monique Moore to characterize the race of girls and non-binary youth end leaving school before graduation.  When our young people are arbitrarily added to the NYPD's surreptitious Gang Database, they are preemptively fast tracked into entering the juvenile often illegal.  The Gang Database is yet another system put in place to incarcerate young people for non-violent crimes under the guise of gang membership.  Gang association by itself is not a crime in New York, but inclusion in the database is a well known police tactic used to bolster a misdemeanor charge into a felony.  Chair Richards' proposed bill to create an appeals process is a crucial first step towards NYPD accountability.  So, I urge Council Members to push

COMMITTEE ON PUBLIC SAFETY                              109

this legislation even further by challenging the

criteria the NYPD uses for gang membership

identification in the first place.  The process for

designating young people as a so—called identified

gang member relies on information for the school

safety agents and often unidentified outside agency

sources who provides little to no substantive—

substantive proof of actual gang membership.  A hunch

based on solely colors, tattoos, scars, and

tangential associations with known gang members

should never be enough to condemn a young person to a

lifetime of NYPD surveillance. Last week the

Department of Education and the NYPD released new

Memorandum of Understanding to address the

problematic presence of school safety agents in

public schools.  Per the MOU, NYP—NYPD personnel are

not permitted to interfere with non-criminal

misconduct in schools such as uniform violations,

low-level Marijuana possession or disorderly conduct.

This is a huge win for GGE'w work toward

significantly reducing NYPD's presence in schools,

and before we were discussing they're using Pushout

girls and women of color—color.  [bell] [coughs]  So,

in short I implore the City Council to take the

COMMITTEE ON PUBLIC SAFETY                              110

NYPD's momentum in stride and work towards further transparency—transparency in NYPD's surveillance and database building.  Thank you again for this opportunity to speak.

CHAIRPERSON RICHARDS:  Thank you so much, and can you just speak to just a few more recommendations you had on the database on this bill?

FAZIA SIDDIQUI:  Sure so for example let me actually turn to the—the particular flaws.  Is that—is that what you'd like to hear about.

CHAIRPERSON RICHARDS:  Yes, yes. Sure.

FAZIA SIDDIQUI:  Sure. So, you know, we really think that obviously it's deeply troubling that—that minors are on this database.  That isn't going today, you know, even introducing this bill may—may do little if the NYPD is already starting to kind of cull their list and remove minors.  It is no less troubling like that there are other individuals who equally, you know, will—will not be given any notice, and—and, you know, ironically I think it's interesting that the NYPD earlier today talks about the danger of notice but, you know, outside of, you know, certain investigative tools that they may be worried about.  If people are being chilled from

COMMITTEE ON PUBLIC SAFETY                            111

engaging in criminal activity because they know that they're being surveilled, you know, what—what is the problem?  Isn't that exactly their goal?

CHAIRPERSON RICHARDS:  Uh-hm.

FAZIA SIDDIQUI: So, in terms of having this process be more transparent for everyone, I think that it—that that can only be of interest for everyone, and it would ensure that—that if they do indeed want this list to be, you know, a few hundred people, people who they talked about, I think it was in the hundreds of people who have committed homicides. For example, you know, if that's the goal that is—this database is not—is not working toward that end.  You know, I find the—the database to be inherently problematic even for the minors that this—that this bill is intended to benefit the notice requirement.  So, the exception for active criminal investigations, in the context of—of gang policing and enforcement, you know, this is really characterized by, you know, the mass raids that-that earlier today we were talking about—NYPD was about as being incredibly effective.  I'm not sure if that is actually the case particularly in light of I know Professor Howell who will be speaking later today

COMMITTEE ON PUBLIC SAFETY                                  112

issued the Bronx 120 Report in April and, in fact, there's—there's no requirement that any crime be committed at all, and within the—the mass legal indictments that, you know, have been coming down after for example the Bronx 120, many individuals, you know, allocated to-to very low level conduct, perhaps selling Marijuana, right, and so, in terms of the sweep for the potential, you know, the potentials for the NYPD to say no we won't give notice even to minors because there's an active criminal investigation, you know, is there is there an investigation six degrees of separation from that particular minor, right.  What does that—what does that mean?  When will the exception apply?  It could swallow the rule of notice in the first place.  And then, you know, even if there is notice, there-that is complexly within the discretion of the NYPD to, you know, once—once that notice is given, the burden is also on the child and the family potentially to contest this designation.  It's unclear, you know, from the bill and from—from how the NYPD is operating the secretive Gang Database whether, you know, what level of information the family would be given. There's an information like symmetry, right where

COMMITTEE ON PUBLIC SAFETY                                113

they wouldn't necessarily even be able to conduct it even if the individual is not in the database. Finally, I discussed a little bit earlier about how there's no, you know, listed process to appeal. There's no oversight, right. Inherently now in the Gang Database there's no oversight over the initial designation. Under this bill there's also no oversight over the NYPD's internal kind of review of whether notice should be given or whether the designation was erroneous. So, I think that that is one—one big issue, right, the transparency—the transparency in reporting. So, we—we do appreciate that, you know, I think it's Subsection D of the bill, which talks about reporting every year to the City Council, and then providing certain information online, but the reality is that that this is really functioning as black box in so many ways that even, you know, providing a little bit of due process may be a hollow victory because it—it just simply might not be feasible to attack something that you don't know enough about.

CHAIRPERSON RICHARDS: And I think that's the purpose of--

FAZIA SIDDIQUI: Right.

COMMITTEE ON PUBLIC SAFETY                                    114

CHAIRPERSON RICHARDS:  --at least getting it.

FAZIA SIDDIQUI:  Right.

CHAIRPERSON RICHARDS:  It's not been easy to get there,  [laughs] but at least starting to move it into that direction, and at the end of the day I would love to see it abolished period--

FAZIA SIDDIQUI:  And we think--

CHAIRPERSON RICHARDS:  --but, you know, we're going to take these steps that we ensure that there's more transparency as of now because it's right now, you know, we're just starting to get there around it, right?  I mean you've been doing the work around it.  I commend al the advocates. So, look forward to working with you further to keep chipping away at this. Thank you for all you've done.  Thank you all for coming out.

FAZIA SIDDIQUI:  Thank you.

CHAIRPERSON RICHARDS:  Thank you, thank you.

CHAIRPERSON RICHARDS:  Alrighty, thank you.  Next panel Albert Cahn, Surveillance Tech Oversight Project; Fidel Gorman, Just USA.  I think that's right.  Alright, Yung Mi—Yung-Mi Lee, Brooklyn

COMMITTEE ON PUBLIC SAFETY                          115

Defender Services.  Alex Watalli, Policing and Social

Justice Project, Brooklyn College. [pause] Alex.

ALEX VITALE:  Vitale.

CHAIRPERSON RICHARDS:  Vitale, Vitale,

Alex Vitale.  Oh, here you go. Yes, come on down.

Alright. Is that four?  Okay.  [pause] Come on down

Alex.  Alrighty, you may begin, Albert.

ALBERT CAHN:  Good afternoon.  My name is

Albert Cahn, and I'm the Executive Director and

Founder of the Surveillance Technology Oversight

Project at the Urban Justice Center.  We're a non-

profit advocacy group that fights for New Yorkers'

civil rights and privacy and we really commend Chair

Richards and the Committee for taking these important

steps to protect New York's privacy both through the

reform of the Gang Database and through the measures

to reform so-called perp walks, which allow the NYPD

to really have tremendous power to coerce criminal

suspects who have not been indicted or let alone

convicted of any crime.  My remarks are going to be a

shorter excerpt of the longer statement I've

submitted to the record, and with the Gang Database

I—from our perspective as a privacy organization we

see the current Gang Database as nothing less than

COMMITTEE ON PUBLIC SAFETY                                    116

the continuation of Stop and Frisk.  It is digital Stop and Frisk.  It a systematic effort to try to over-police communities of color that have endured this sort of mistreatment by law enforcement not for years but for decades, and the measures we see the committee reviewing today are important.  They're a crucial first step, but like my colleagues from the civil rights community we believe that they are only a first step that further reforms must be include protections for the adults who wrongly included in the database.  You do not age out of core constitutional rights.  You do not age out of the need for due process, and the adults who are wrongly labeled as being affiliated with gangs simply because of where they live or because of the color of their skin or the clothes that they're wearing. Those individuals, those New Yorkers deserve the right to have their names cleared, and at this moment where we see the Trump Administration attacking communities— immigrant communities, using information often from local and state agencies the need to end this database or at the very least expand protections to all New Yorkers is quite crucial.  With regards to process, we view it as completely unconstitutional to

COMMITTEE ON PUBLIC SAFETY                          117

have a process by which police officers are able to tarnish the reputation of New Yorkers who have not had their day in court.  People deserve trial in a court of law not trial by the court of public opinion, and we believe it is essential to end this practice, which we know has been used to attack in some cases irreparably, the reputations of so many New Yorkers arrested for crimes they never committed. This practice has no place in our city, and it must end, and these measures are crucial, but they deal with specific silos of privacy concerns, and we at STOP believe that systemic privacy reforms are needed, and that's why we would also like to bring the committee's attention to the POST Act Bill we've been championing since we were founded, a bill that provide system privacy reforms against NYPD data collection surveillance, a bill that would be one of the weakest police oversight bills on surveillance in the country, and long overdue, but as with the Gang Database reforms, it would be an indispensable firs step and at a moment when progressive cities across the country like Oakland and San Francisco are taking radical steps, progressive steps, are banning facial recognition, banning some of these technologies.  The

COMMITTEE ON PUBLIC SAFETY                                118

POST Act is indispensable because while it doesn't ban a single tool, while it doesn't stop the NYPD from conducting surveillance, it creates due process, it creates standards, it creates privacy protection and it creates the framework to have further reforms because as the Gang Database has show us, when we allow these tools to operate without oversight, without regulation and without redress, the pattern of discrimination is quite clear.  Thank you very much.

CHAIRPERSON RICHARDS:  Thank you so much for your testimony. [bell]

YUNG MI-LEE:  Thank you.  Good afternoon. My name is Yung Mi-Lee. I'm a Supervising Attorney at Brooklyn Defender Services.  I want to thank you for inviting BDS to give testimony.  Today, I'd like to focus my comments on 2223 in relation Gang Database notifications.  My written testimony goes into greater detail on this and other legislation that's under consideration today.  BDS urges the Council not to advance this legislation and instead to meet with advocates and experts who have been working to address so-called gang enforcement in our city. Collectively, we have urged the city to abolish the

COMMITTEE ON PUBLIC SAFETY                                    119

Gang Database, a Criminal Group Database.  At a previous hearing BDS testified before this committee and we called for an end to profile based policing and a reallocation of resources towards supporting rather than profiling marginalized communities.  This bill, which appears to be well intended, with entrenched gang designations as legitimate, and would create an extremely limited and possibly ineffectual process for subgroup of New Yorkers to determine whether they have been included in this database, and only then petition to the NYPD to be removed subject to the complete discretion of the department, which originally included them.  Specifically, the bill directs the NYPD to notify—to notify only those 17 and under if they have been into the Gang Database, inexplicably leaving out New Yorkers and other age groups, and offers the department two broad exceptions that may completely swallow the new rule. It creates a very limited mechanism to contest the gang label, but only for those in this age group who have already received notice from the NYPD and gives the department full discretion to reject the petition with no due process or standards.  In short, the bill allows NYPD to police itself with no other oversight.

COMMITTEE ON PUBLIC SAFETY                                    120

The mechanism of relief is more limiting that existing Article 78 challenges, which New Yorkers of any age may pursue.  The significant challenges of filing and winning an Article 78 are not improved upon in this legislation.  Lastly, this legislation would establish in law an extremely broad definition of a gang.  It would define gangs as formal or informal groups of three or more people who commit a crime and, for example, follow the same clothing trends.  Given the expansiveness of our criminal legal system, this definition would include nearly anyone, but we know that predominantly black and Latino people would be targeted particularly if this definition is later used in sentencing in sentencing enhancements—sentencing enhancement legislation or additions to the Penal Law.  We all know that almost 99% based on prior testimony of those in the Gang Database are black or brown.  This legislation would also require annual reporting of this data.  Yet important questions would—would remain include—including how does one get entered into the cluster housing and how does one get out?  These federal agencies including ICE have access to this database.  There was testimony from NYPD earlier today stating

COMMITTEE ON PUBLIC SAFETY                              121

that they do—they do not share this information with law enforcement—with prosecutors, ICE, federal agencies.  However, as a practicing criminal defense attorney, I have seen this information being shared. It's in the police reports, and if you are arrested, and it appears that more than 90% of these people in the database have been arrested, it's clearly shared with—with the prosecutors.  It's in there.  The prosecutors use it against our clients.  I've also seen it being used against complaining witnesses because they are sometimes also in the database, and that works against them. The Gang Databases and gender mass surveillance, extremely harsh treatment in the criminal legal system, and ultimately increased marginal—marginalization, which do not improve public safety.  I was going to talk about the Bronx 120 Report, but I just heard that Dave Howell will be testifying.  So, I will leave that portion to her. Thank you very much.

CHAIRPERSON RICHARDS:  Thank you so much for your testimony.

ALEX VITALE:  Good afternoon.  My name is Alex Vitale. I'm a Professor of Sociology.  I teach in sociology and author of those kinds of studies,

COMMITTEE ON PUBLIC SAFETY                          122

Department and offer those kinds of studies (sic) Department at Brooklyn College where I coordinate the policing and Social Justice Project as well, and we've played  coordinating role on the work on trying to investigate and critique gang policing in New York City, and we've been doing that work for the past three and a half years.  I've been working policing issues for the last 30 years in a variety of capacities domestically and internationally.  Last year we gathered before this committee to send a strong message that the NYPD's use of the Gang Database is deeply problematically—problematic and needlessly harms those placed on it while undermining the long-term health and safety of communities.  The NYPD has yet to provide a clear and comprehensive explanation of who is on this database, why they were placed there, and what purpose the database serves. Despite the testimony today, I would argue.  Despite this lack of transparency we have learned many disturbing things about the database that others have chronicled and will continue to chronicle during this hearing.  So, I will skip my list for now.  The bill before you today fails to adequately address any of these problems.  While it calls for the possibility

COMMITTEE ON PUBLIC SAFETY                              123

of notification involving juveniles, which are told

now make up less than 2% of the database, it leaves

the decision about that at the discretion of the

NYPD, which has made it clear that they view everyone

on the database as there for investigatory reasons,

and therefore, would be eligible for the exclusions

that you have put in the language of the bill.  Thus,

making it moot.  I appreciate the desire of the

committee members and staff to address some of our

concerns, but this bill does not do that, and

therefore, I cannot support it.  A much more

comprehensive approach to the database is needed that

include—that could include eliminating its use and

existence altogether.  Several jurisdictions around

the country have ended the use of such databases or

significantly restricted their role, and provided

great due process protections than are contained in

this bill. Before such comprehensive bill could be

produced wherever we need it, a great deal of

additional information about the nature of this, we

have spent the last two years urging the Office of

the Inspector General of the NYPD to undertake such

and investigation, and it is my hope that one is

underway.  Similar investigations in other cities

COMMITTEE ON PUBLIC SAFETY                                        124

have uncovered wildly inaccurate information, racial bias in the formation of the database, and abusive and illegal practices based on the information in the database, and I've provided references to a number of such reports of abusive gang database practices. Therefore, I urge the committee to withdraw this bill, and upon the completion of the OIG investigation to meet with advocates working on this issue to develop both a comprehensive response to the database that builds on best practices nationally, and an overall re-evaluation of how the city of New Yorker responds to the very real problems of youth violence in our communities.  We need additional investment in non-punitive community based interventions such as Cure Violence initiatives, family supports, housing stability and high quality health services including trauma counseling, not more criminalization of young people.  Thank you.

CHAIRPERSON RICHARDS:  Thank you.

FIDEL GUZMAN:  Chairman Richards and member of the New York City Council on Public Safety. My name is Fidel Guzman.  Thank you for the opportunity to speak to day. I'm here today to express I'm totally against this bill T2018-2223.

COMMITTEE ON PUBLIC SAFETY                                    125

Based on my life experience as a former gang member, I was a member of the Bloods. I live in neighborhood that's Bloods, Crips, Lion Kings and the Dalios. There is not a safety problem, everybody.  I got people on my block.  Everyone on my block drives, everyone is working.  I'm a native New Yorker from Harlem now Community Organizer for Just Leadership USA. I've been working with the Close Rikers Island Campaign since it first started.  A lot of my friends have been caught up in the Gang Database and the gang raids.  Friend that I grew up.  I got 20 years.  I was just 16 years—I was just 16 years old. I was incarcerated with them.  I know that they feel that society gave up on them.  I never met a so-called criminal.  I only met human beings that society gave up on them before they can expect—expand their full potential.  The Gang Database is a stop and frisk 2.0. It's a sign that the city has given up, but our community can't give up. We understand young people need resources especially in a crucial teen and young adult.  Knowing that their brains doesn't fully develop until 25.  When a white kid with resources get in trouble they are—they are bailed out and access to therapy.  When a Black and Latin kid get in

COMMITTEE ON PUBLIC SAFETY                              126

trouble put in the School to Prison Pipeline.  That's now including the database.  I understand the intentions of this bill to limit harm and build transparency and accountability, but what this lacks, the impact that we need we—we need—we are encouraging that if you want to do something, we ask you that you look at the people that have been the most harm on the war on gangs that's been targeting and dehumanizing young people that's black and brown. Impact the communities is being the right advocates in the defense organizations.  We—we are saying to eliminate and abolish the Gang Database.  This will allow the NYPD to continue undermining the safety of our community.  To begin with, only kids 18 years old and younger that are informed that they're in the database, it's unfair to all people.  Then again the database they have the power to deny notification for anyone who is in a Gang Database.  One thing that I haven't seen is a major question is about how many people are in that Gang Database that have jobs, right.  How many people are in there that lost family or—or had family that's incarcerated?  A more deep root asked questions about that, and I want to argue about the NYPD how they operate in their community

COMMITTEE ON PUBLIC SAFETY                               127

policing.  If the community policing is actually stopping in front of or parking in front our neighborhood, then that is not community policing, and I also want to put this up in the air.  This bill community platform that does leadership also [bell] with 50 organizations that went to all five communities.  They asked all five communities what does safety look like, or what does a healthy community look like.  We also because I work on the Close Rikers Island Campaign, we know there's going to be 540 men and guys left over.  We have something really major.  We have people who were gang related former gang members, people from the community organizations asking real serious questions of people in the community:  What does it look like to have more investments in the community. As a person who has really been impacted by, you know, not by the Gang Database, but what they used to have a gang book.  That has a really intention for us as New York City to be bold and create what it exact need to be safety—a safe community, and a safe community doesn't mean having the police, you know, criminalize or watch over us. What it really looks like--and this is a 30-page paper—is more investments in our community,

COMMITTEE ON PUBLIC SAFETY                                128

and this is coming from someone who was a former Blood, and the last thing I really want end this out as, there's a lot of Bloods and Crips and Lion King and Padres who are working at non-profits right now who are starting—who started their businesses, and also working or going to Wall Street with suits. This is—I think there's a false idea that the NYPD is saying that people are not reachable, and I think I want to really challenge that because the problem becomes when we start looking at people who are black and brown or in that they need the right services that everyone else needs. The basic three pillars to be successful in life.  I put on the table a real folding (sic) document and they closed on them. So, I think there's a—I—I have to say that and I know there's a lot of people that are not here right now who are, you know, Crips and Bloods because they feel like this is not the space for them, and I really just want to encourage them out there to really know that if we're serious about building our community, then we have to do it through the deep roots of what's keeping our community underfunded, over-incarcerated and over police, and lastly, I want to end at—I'm sorry it's—you have an individuals that's

COMMITTEE ON PUBLIC SAFETY                                129

in front of you that the police talked about like I was a number that I talked-that they talked about like I was an animal, and you have someone who is in front of you who have experience and been through a lifestyle of being a Blood, growing up in a lifestyle where all my friends was Blood, and it never just started just as being Blood.  It was just started from us coming back and forth from school together, and what happens, the label of gang started existing when police are criminalizing and stopping us, and not asking us what is our basic need as human beings to be successful?

CHAIRPERSON RICHARDS:  Thank you for your testimony. An encouraging story.  Council Member Rosenthal, you have a question.

COUNCIL MEMBER ROSENTHAL:  I do want to thank everyone here for really powerful testimony. Basically, I just wanted to ask you specifically about the bills that I've sponsored, which you—which Brooklyn Legal Defense's Defender Services is opposing which is 1553 about the ghost guns.

YUNG-MI LEE:  Yes.

COUNCIL MEMBER ROSENTHAL:  I've read your testimony here, and if you could tell me more about

COMMITTEE ON PUBLIC SAFETY                          130

the opposition—if you could tell me more—if you could explain a little better to me.  I mean I've read prosecution of New Yorkers who might be unintentionally owning the receivers or rodnicks (sic) is that—is that super frequent?  Is that something that's happening in communities that we need to be mindful of or do you think that's happening in arenas where are going to be vulnerable to police intrusion?

YUNG-MI LEE:  I think the concerns is that many different types of objects can be criminalized and—and really the focus should be more on whether it's a true weapon in the sense that it's operable.  So, if there's just a piece of what may be a weapon or that may be perhaps a component of weapon, which could an already inoperable antique gun, and the can be criminalized.  So, there's a— there's a concern that it's overbroad, and we would urge the Council to focus on also the intent.  There should be the unlawful intent to make a weapon that can cause physical injury or—or obviously death, but also on whether it's a real weapon and whether and whether it is, in fact, operable at that moment where it can then cause that physical injury.

COMMITTEE ON PUBLIC SAFETY                              131

COUNCIL MEMBER ROSENTHAL:  It's a challenging line, right because you could see a home, and we've heard stories about this.  We know that of instances of this where yes they're inoperable pieces in one moment, and if you read it I guess in your home and you hide the other component and parts where you're building a gun, hypothetically they're not in use, but I just—I'm trying—I'm really trying to understand who's owning something that doesn't have a serial number on it that is something that could be, you know, in five minutes you could create a gun with it with a few pieces that you get from the hardware store what is that object?

YUNG-MI LEE:  I understand what you're saying.  I think our concern is that there are components that just because of where that piece belongs and the entire weapon that's built that's just do not have a serial number.  Not every component.  The serial number is in one place on one complete weapon, but there might be components that don't necessarily have that.  So, our concern is that it's too—its overbroad, it's too encompassing.  It can capture a lot of innocent possession of and in the Penal Law there is a defense where if you are in

COMMITTEE ON PUBLIC SAFETY                          132

possession of an antique gun even that that's a difference. So, that's our concern that it might capture too many people that merely innocent possession of certain objects might be criminalized.

COUNCIL MEMBER ROSENTHAL:  I need to follow up with you--

YUNG-MI LEE:  Sure.

COUNCIL MEMBER ROSENTHAL:  --on this. I mean I understand the words you're saying--

YUNG-MI LEE:  Yes.

COUNCIL MEMBER ROSENTHAL:  --but I think what I'd like to see are examples of those situations, who we're talking about that's in those situations, and whether or not the have the ability to explain away what they have.

YUNG-MI LEE:  Sure.

COUNCIL MEMBER ROSENTHAL:  I mean obviously we don't want to over-criminalize people, but I don't understand this application in this particular case where there's so much damage done by people right now having unsterilized guns and being able to get away with having those parts, and in their home possession of it with the intent, as you say, making an operable gun for the purpose of

COMMITTEE ON PUBLIC SAFETY                              133

killing people in the instances that we heard about.

So, I really need to understand this further.  I want

to understand it further, but I look forward to

meeting with you about it.

YUNG-MI LEE:  Okay.

CHAIRPERSON RICHARDS:  Thank you, thank

you all for your testimony, and we're going to go to

the next panel Professor Dave Howell, CUNY School of

Law; Victor Dempsey, Legal Aid Society; Talon Murphy,

Legal Aid Society; Craig Lewis, Legal Aid Society.

I'm going to really ask everybody because out of this

room by 1:00 to really try to adhere to the three

minutes.

CHAIRPERSON RICHARDS:  [background

comments]  Okay, okay.  I guess I could bring up--

[background comments/pause] Okay.  You may begin.

Press your button.

DAVE HOWELL:  I'm Dave Howell.  Thank you

so much for taking on this incredibly important issue

for being brave enough to know and to recognize that

the label gang, the title Precision Policing does not

allow the NYPD to move forward with impunity playing

on our fears on our trust.  As you mentioned earlier,

other cities have abolished the Gang Database.

COMMITTEE ON PUBLIC SAFETY                               134

You're probably asking why the crime go down, and I was like oh, I should look that up, but I think we would have heard if-if crime had died off of it.  I will check into that.  New York City, New York State itself in 2010 prohibited the NYPD from keeping a database of everyone they stopped or Stopped and Frisked in the absence of a criminal summons for arrest. That's New York Penal Law New York Penal Law 140.50 (4). There's precedence for preventing electronic database maintenance of the NYPD of people who are not accused of criminality or not in that situation accused of criminality.  Gang Databases that have not yet been abolished show signs of the same kinds of weakness we see in New York City Gang Databases.  A California audit, Chicago Audit and the International report on the London Gang Database all of these show that many, many of the people in the Gang Databases do not have criminal histories, and they're overwhelmingly Black or Brown.  New York City takes the cake with 99% Black and Latino.  I would urge that we await the Inspector General Eure's Report. One of my colleagues said, you know, we're trying fix this.  It's like doing surgery before you the MRI results.  So, while I appreciate the—the

COMMITTEE ON PUBLIC SAFETY                                135

steps towards trying to know the rate the harm to the Gang Database, I with my colleagues would propose waiting and getting the Inspector General's Report. We're letting them know we'd like it as soon as possible and meeting more with the affected communities. We've heard a lot about the Gang Database. In my submission I will include the IDS Gang Datasheet, Gang Data Entry Sheet, which they gave me in 2013 in response to a FOIL. Everything they say suggested those are still the criteria being used. Self-admission, which to be clear they do select these kids. They stop them, you know, you're hanging out with these, or you're—who do you roll with, et cetera, et cetera. So that makes you. I saw on social media. I'm going to force you to unlock your phone, et cetera. They—this self-admission may very well just be I saw on our social media X image, which I say makes you a gang member and you're representing. A very interesting thing [bell] that obscures the notion that there-that these—this database is not based on association and appearance if they keeping repeating that the average arrest—number of arrests or Gang Database entries or are 11 arrests. That is a huge number of arrests,

COMMITTEE ON PUBLIC SAFETY                                136

and when Operation Crewcut was announced, then—then Chief Commissioner Kelly said we will stop these for everything, for riding bikes on the sidewalks for everything to try to get information. They're stopping, they're debriefing them. Being in the Gang Database makes these kids incredibly vulnerable. Now, they say it's precision and I just finished a report and I will leave copies with you. The Bronx 120 was supposed to be the biggest gang takedown of two violent Crews in the Bronx. 120 people were swept up in a militarized pre-dawn raid, their families traumatized, doors broken in, slashed balconies, helicopters above, slot keys. Sixty of those people were not gang members according to the prosecutor's submission. Eighty were not convicted based on any kind of violent conduct only about one in six was convicted of possession—possessing a gun. Many of them not accused of using the guns. So, the notion that this is precision is totally a nonsense label that we do need to resist. The report has more details, but despite the fact that two-thirds have never had a felony conviction before growing up in the--this neighborhood heavily policed all but five ended up with felony convictions. Three were

COMMITTEE ON PUBLIC SAFETY                                    137

declined prosecution, two were allowed to plead to misdemeanors, two went to trial and got a felony conviction after trial, and in each of those cases the evidence was so weak that I think if you had tried to it with the whole Rico conspiracy in the state court appears, they would have come out not guilty on most or all of the charges.  Many of the people convicted for the felonies had Marijuana distribution as the basis of their narcotic felonies and repeat prosecution for conduct that happened before and it was adjudicated in New York State's— State Courts.  So, someone who finished the programs and finished probation double jeopardy does not bar those retrials, and at least half of them were retrials—retried for—for previous conduct. I do have a quick

CHAIRPERSON RICHARDS:  You're going to have to wrap up.

DAVE HOWELL: Okay.  The—on the specific proposed I would ask you to hold back because there's a risk of increasing youth vulnerability to gangs. Police labeling—you mentioned you were afraid of your mother.  In some of these cases kids are in foster care or with guardians.  They could get thrown out on

COMMITTEE ON PUBLIC SAFETY                            138

the street with inaccurate gang allegations.  Even accurate one can make parents respond punitively and push kids into gangs.  Inaccurate or accurate put them in—in pre-trial detention in gang units.  The best way to increase gang violence is to do what the NYPD are doing in terms of suppressing gangs.  You're putting out fire with gasoline here.  So, I would say that there is no safe way to notify minors, and it should and—and this should at least abolish as to minors and then if you—if you must comprise, you know, notice and real due process for adults.  And then finally we know New York has been successful.  Why do we now have so much gang?  What brought it down?  Those were questions that were being asked earlier.  We used street outreach workers in the '50s and '60s. We now have Cure Violence.  They told you to Stop and Frisk, Broken Windows all these things prevented crime, and now they're telling you Precision Policing was really started last week, you know.  We know what to do.  The City Council has been very supportive of those good efforts, and I would say put more effort there. Bring gangs even into the States as Ecuador and Barcelona have done. Work with

COMMITTEE ON PUBLIC SAFETY                                139

them because they are members of our communities who can and will contribute.  Thank you.

CHAIRPERSON RICHARDS:  Thank you.

VICTOR DEMPSEY:  Good afternoon.  My name is Victor Dempsey.  I'm the Community Organizer for Legal Aid Society's Criminal Justice Unit. As you may know, we work directly with the Cure Violence sites in all five boroughs, which is 24 sites at this moment.  The Legal Aid Society submits its testimony to the Committee on Public Safety to share perspectives on why the proposed law to amend the Administrative with the city of New York in relation to providing notice of minors including the Criminal Group Database was insufficient to address broader problems of having the database and being labeled gang involved.  We thank Chair Richards for the opportunity to address this important topic.  I won't take up too much time, but I do want to give some key points that are very key to us.  We know for a fact that this is over-inclusive and inaccurate, too, of law enforcement.  This unfortunately targets black and brown youth.  We're working with our Cure Violence sites in all these boroughs.  We have a direct line and it's open communication in

COMMITTEE ON PUBLIC SAFETY                          140

relationship to all the communities that it is

directly affecting.  We see these cases numerously.

We have clients and community members who come up to

his being our legal agency in that area and speak

directly about these cases.  I worked at the Cure

Violence organization enforcement and it has allowed

us to do so also.  We know right now that—sorry. It's

really good.  We know right now that doing workshops

going into the communities, training youth, putting

everybody—bringing awareness to what's going on, we

start to there and day what the youth comments have

to say, Well, this is what I noticed, and this is

what's been happening to me.  A lot of times there

are criminal investigations that are happening. So, I

listened to the testimony prior or a little bit

earlier today, and I can see that being in

contradiction there.  We have youth come up to us

that's being targeted because they may know someone

else in the communities, and they're being shaken

down by officers trying to get to someone else in

some cases.  We've also seen instances where this

label is targeting these folks, and allowing, and not

allowing them to move forward in their lives whether

they were prior affiliated or associated or not.  I—I

COMMITTEE ON PUBLIC SAFETY                                141

shared a testimony with you all.  I would like if you can turn to Exhibit 1 on page 11.  Legal Aid has launched a four-year Self Campaign where we have allowed folks in a community to FOIL themselves to ask NYPD if they are on this database.  On that exhibit on page 11, you can see from the NYPD's language their responses to us.  I don't know if you have it. [coughs]

COUNCIL MEMBER MILLER:  [off mic] Page 11?

VICTOR DEMPSEY:  Yes, page 11. [pause] Well, page 12.  Sorry. [laughs]  It's next to it.  Yeah, so those—those are responses and Appeal Responses from NYPD.  We know from our own FOIL submission is that the NYPD does not comply with FOIL requests, and that they used the same boilerplate—boilerplate responses to the 90 petitions for removal under this bill.  We've done over 350 requests submitted and ever single one of them has been denied.  We do this so we can empower the communities to know if they're being targeted or to know if they're being house to the database just to give them the opportunity to either change their lifestyle or change patterns or also connect them with our Cure

COMMITTEE ON PUBLIC SAFETY                              142

Violence sites.  We have been denied the access by NYPD under this law as well, which is very concerning, and really to point out when they do respond they're such language blatantly saying if this goes, it will reveal now routine techniques and procedures.  So, in this we take it that they're acknowledging the fact that they're surveilling folks unwilling and not giving them any type of due process to move on from it.  I do also want to point out when it comes to sharing data as well, unfortunately, we know that's a blatant lie.  I've used that term previous.  The reason why because the clients that we work with regularly they come to us then with housing issues.  If someone has been accused of being affiliated, NYCHA is trying to kick their families out.  They're putting them on permanent schools and lists.  We also know that it does affect folks' employment.  We have clients that's come to us where they tried for a school safety or things of that nature, and they're getting this information within the department, and they're saying they're being washed out from just applying to that with no criminal activity or no priors as well.  We are willing to submit that information, and it will be

COMMITTEE ON PUBLIC SAFETY                           143

redacted, of course, but we do want to provide that as well.

CHAIRPERSON RICHARDS:  Can I ask you to wrap up?

VICTOR DEMPSEY:  No problem.  Lastly, I wanted to— Lastly, I'll just say we feel this bill— this bill is insufficient to address the larger problem with the database, and it will create a burden for the minor to begin the petitioning process when it really should be something that's automatic like the errand. (sic)  So, we just say from Legal Aid we do not like want this bill to be passed, and we think there are alternatives that we're looking into, and look forward to talking to you about it later.

CHAIRPERSON RICHARDS:  Great.

CRAIG LEWIS:  Good afternoon. It's a pleasure to speak to you guys on this situation—this serious situation. I'm directly speaking on the Gang Database and gang policing and Precision Policing. My name is Craig Lewis.  I was directly affected by gang policing, and the Gang Database.  I was swept up in a federal gang sweep due to my childhood interactions with my friends. I was a part of the

COMMITTEE ON PUBLIC SAFETY                                    144

Bronx 120 that she just spoke about.  My evidence was Facebook post, using videos and the government's interpretation of my Wiatel.  I had no criminal record, and I was in school for six to seven years. I was in grad school when they came for me.  I had one more semester left to become someone like you.  I spent 22 months in jail, and I don't believe that me sitting in jail with no criminal record and no evidence of a crime due to a database is right. I shouldn't be in the same facility as El Chapo.  I feel as though my rights were violate, but I'm here to speak on behalf of the youth in my neighborhood because I have to go back, and I had the degree in criminal justice, and I got the job to become a lawyer.  So, what do I tell them that's down there getting gang police, and—and—and—and stop and search and beat up in my neighborhood in the Bronx when 120 happened.  I don't believe gang policing is right. I'm not talking politically wrong or politically right. I'm talking morally.  What happens to the kid that grows up in that—that neighborhood, gets beat on every day, goes to his brothers for protection.  He's a nerd, and he goes to Catholic school.  He doesn't even curse.  He leaves the neighborhood, and keeps in

COMMITTEE ON PUBLIC SAFETY                                        145

contact with the people that protected him his whole life, and then he falls in the Gang Database, and gets swept.  Now, he got a felony and he can't become you, he can't and I say you because a black man, and I wish I could be, but I can't now because of what they did to me, and I'm trying to stop that from happening to the youths in my neighborhood, and that's like from the bottom of my heart.  This is not about no money or politics for me.  I'm here strictly on the Gang Data—Database.  It's not right.  I get pulled over three, four times a week, and before I get to talking to the officer, I let him know that you're going to let me go.  I know how I look, but I have a degree.  I'm educated and I'm probably smarter than you, and then they look at me, and they find books like my—my Alex's book in my car, and they're looking, and now what you know about End the Policing?  I show my textbooks and—and they let me go every single time. [bell]  I'll wrap it up.  What I think we should do instead of focusing on throwing our youths in jail even if they don't have no record it seems like this is all about just control, and surveilling them.  I think we should educate them. We should focus on educating them, turning the 16-year-

COMMITTEE ON PUBLIC SAFETY                                  146

olds into lawyers instead of felons.  Turn the 16-year-olds into doctors instead of inmates.  I think maybe some safe interventions of camps, community centers.  Even if you took them instead of putting them in jail you put them in some school or military something, maybe you come back with some hope.  From 16 to 25 you're growing.  If you keep throwing 16-year-olds in jail giving them felonies, how they going to become you?  And that's—that's just-that's—that's what—that's my take on the Gang Database.  It's wrong, and something needs to be done there and stop closing us.  I was a good kid.  I was a good kid and people rarely even told me, he even said it that people make mistakes.  They made a mistake with me.  I was making a mistake on the whole community who continue doing this.  Thank you.

CHAIRPERSON RICHARDS:  Thank you and let me just add I know I look eloquent today, but I grew up in the neighborhood, too, [laughs] and, you know, by the grace of God my parents with every dollar they had shipped me out of the neighborhood.  So, I share your story because all of my friends, I know we look eloquent up here, but I grew up in South Jamaica.

CRAIG LEWIS:  I mean God bless you.

COMMITTEE ON PUBLIC SAFETY                                    147

CHAIRPERSON RICHARDS:  [interposing] God knows.

CRAIG LEWIS:  God bless you, too.

CHAIRPERSON RICHARDS:  So, so I definitely share the common goal in, you know, our goal I just to make sure we're pulling people out of this database at the end of the day.  I mean in all honesty it should be abolished, but we're taking baby steps or least keep the conversation flowing.  So, this is not the end all.  We all share, you know, I sat in a room as and elected official with gang members who I knew were doing shootings, and we were able to get them to do truces.  So, we're trying to work with them as well to make sure.  That's why we were a big proponent as well of Cure Violence in Far Rockaway, which has made a big difference, [laughs] and really working with my brothers and people I know out there as well.  So, we all share the common goal. We just got to figure a way of how to get there, but we want to keep this conversation going.  So, I appreciate all of the testimony, and I appreciate your story, and for you coming down here.  You're an inspiration to me.  I'm trying to get the grassroots.

COMMITTEE ON PUBLIC SAFETY                                148

So, if you guys [laughter] do that.  So, you know, you know, that's kudos to you.

CRAIG LEWIS:  I appreciate it.

CHAIRPERSON RICHARDS:  So, keep up doing positive work.  Don't let that define you.  Keep going.

CRAIG LEWIS:  Alright.

CHAIRPERSON RICHARDS:  Alright?

CRAIG LEWIS:  Thank you.

CHAIRPERSON RICHARDS:  Thank you all.  Alrighty, this is the last panel. I'm going to ask everybody to really stick to the time because we've got to get out of here because they have another hearing in here.  So, Hernandez, Diane Malika, Kingston and also David Pacino.  Alrighty.  So, David Pacino—Pacino, sorry. Diane Malikum, Mooman Kingston, and Oscar Hernandez. [background comments/pause]

DAVID PACINO:  Thank you very much to the—the Chair.  I'm very happy to be here today.  My name is David Pacino.  I'm a staff attorney with Keifer's Law Center to Prevent Gun Violence, which is the Gun Violence Prevention Organization founded by former Congresswoman Gabby Giffords.  I'm here today to testify in support of Intros 1548 and 1553.  I'll

COMMITTEE ON PUBLIC SAFETY                                    149

say in short that we support both bills.  We think they are fantastic, and—and really great efforts to combat the scourge of ghost guns.  I—I have in my written testimony provided some more details there. I—considering the time I don't want to dive in too deeply, but I will just say that we know that these gangs are involved in—in shootings now.  There have been a number of shootings over the past several years of the numbers increasing.  These firearms are—are trafficked in—in large quantities.  They are really a traffickers dream because they don't involve any paperwork, they don't involve any background check and once they've been sold off they can't be traced back to the trafficker in the first place. So, we're very supportive of this legislation, and really appreciate the Council's efforts to—to address this problem.  I have on Intro 1553 some suggestions about how the legislation could be strengthened. Specifically first, I would—I would encourage the Council to consider more expressly stating that the sale or transfer of unfinished firearms into the city is prohibited.  I know the work currently in there is disposed, and I have some concerns that there might be some ambiguity about whether the seller would have

COMMITTEE ON PUBLIC SAFETY                                    150

to be in city.  The reason I raise this is because the purveyors of these parts are often Internet companies who are selling from elsewhere than the United States, and I think we should be absolutely that this legislation prohibits their sales into the city.  The second suggestion I would make relates to the definition of unfinished frame or receiver.  The— the language currently would only have unserialized frames or receivers—unfinished frames or receivers capped (sic) within the definition.  So, if it had a serial number it would not be covered by the legislation.  That's great in that it would have a serial number, but the issue is that it still would not be subject to a background check.  So, under federal law a frame or receiver that finished is subject to a background check, but the unfinished one would not be, and here the serial number would—would exempt it from the background check requirement. So, what I'm suggesting instead would be to have the—the- that definition portion struck from there and then added into the prohibiter section to say that an unfinished frame or receiver can only be possessed or transferred if it has a serial number, and if the transferee or possessor has a gun with a license, and

COMMITTEE ON PUBLIC SAFETY                                    151

then the—the final suggestion I would make is that I would add record retention requirements. So, the—the current serialization requirements are those that are under federal law. I would have the record retention requirements under federal law, and that require the sellers to retain those, and that require those to be sent to the NYPD as well. So, thank you again for the opportunity to testify today. [bell]

CHAIRPERSON RICHARDS: Thank you so much.

DIANE KINGSTON: Good afternoon, good afternoon. My name is Diane Kingston also known as Diane Malika Momine Houston (sic) and I'm a mother of seven children. I grew up in tough neighborhoods all my life, and I have never been affiliated with gangs. I never wanted to be a affiliated with gangs, but I have problems with gangs in my community and in my building. Some of them work in the schools. Some of them work in the community centers. However, I'm the type of person that is a person of most high diversity. I have a track record of doing so, but it seems as though some people that are actually in the gangs and it's not necessarily Bloods and Crips. We're talking about people that come in from overseas, from Asia, Africa, from Europe that come

COMMITTEE ON PUBLIC SAFETY                                    152

into our cities and our towns where we live and they're not considered as gang members, and I find that a very serious atrocity against the people who live in the community because some of these people they actually open up businesses in other communities. So, I have a serious problem with that, and one of the other major problems I have, which I was in the other room listening to the testimony of— of you. I can't see your name so well.

CHAIRPERSON RICHARDS: Donovan.

DIANE KINGSTON: Yeah.

CHAIRPERSON RICHARDS: Donovan Richards.

DIANE KINGSTON: I'm—I'm so sorry. Yeah.

CHAIRPERSON RICHARDS: I'm trying not to give my name.

DIANE KINGSTON: Yeah, you know, I'm so sorry. I do apologize for that misunderstanding because, you know, I know I'm am affiliated with a lot of politicians. I come chasing them around basically to see what they're doing because I'm affected by laws that are being created, and so are my seven children. So, my whole point in this I do have a problem with the 60% of minorities being targeted for this Crime Database, but then again it's

COMMITTEE ON PUBLIC SAFETY                                    153

a good thing, and it could be a bad thing.  The reason why it can be a bad thing is because it does criminalize a lot of minorities, and this 1% of the Caucasians other than Blacks, and I—from what I understand, Hispanics are also considered white because I just came out of college in 2017, and according to the census, like Hispanics are also considered white.  So, what am I saying here?  It's that, you know, gang membership doesn't always mean with the people on the streets with guns and knives. It also means some people would even say NYPD is a gang.  I don't totally agree. Some people would say the government is a gang.  So, where am I going with this?  I mean I think that this proposal should be a little pause on it also so I can thoroughly examine it, and also come up with my—because I do case studies on just about everything including myself. So, I would like [bell] a—I would like a pause on this proposal so that I can thoroughly examine it because there's a lot of things in there that is very important that I feel that I would be an—and awesome contributor to the process of this bill.  I really would appreciate it.

COMMITTEE ON PUBLIC SAFETY                          154

CHAIRPERSON RICHARDS:  Thank you for your testimony--

DIANE KINGSTON:  Thank you.

CHAIRPERSON RICHARDS:  --and for coming down.

MALE SPEAKER: Good afternoon, Chairman Richards.  I would like to thank you for the opportunity to give my testimony.  I'm here today because I have been directly impacted by the New York City Gang Database. It's been over 10 years since I left gang place in Yahoo.  I'm a former member the Trinitarios.  I'm from Brooklyn, New York, you know, I've attended college.  I've graduated, you know, with an Associate in Business Administration.  I got a job.  I have a great job right now, but to date—to this day I'm still being harassed, I'm still being followed around.  I'm still being asked questions about gang affiliation and about the Trinitarios. Recently, I went through a situation where I was issued a warrant for a—a traffic violation.  I was taken to the 107 Precinct.  I was sat in a—in a—an interrogation room for about five hours.  I waited for a Gang Unit to come and see me. They wanted to come see me.  That's how I found out I'm still

COMMITTEE ON PUBLIC SAFETY                                    155

affiliated with the Gang Database.  I was asked questions about the Junior Guzman case. I was asked questions about a gang raid that happened in Astoria, Queens that I have no knowledge about.  I was asked questions about from other gang members of the Trinitarios group that I have no knowledge about. I'm 27.  When I first joined this gang I was 16 years old, you know, I made mistakes.  I paid, you know, the consequences of joining the gang, but I'm actually today, you know, that I'm, you know, I'm here today to tell you that I oppose this bill, the 2223.  It's not right for them to do an individual as myself still facing issues with the Gang Database. Here there's an analysis that says you guys are just targeting the youth, but what about those individuals that are over 18?  I'm not just speaking on behalf of myself.  I know numerous gang members and different gangs—and gangs on the New York City that have changed their life around completely, you know, have families, take care of their families and go to school.  I'm  still going to school now.  Have jobs, you know, providing for the community that they live in.  So, I don't think it's right that you guys just targeted the youth with this bill. I think you guys

COMMITTEE ON PUBLIC SAFETY                              156

should take into consideration those that are above 18.  You know, I—I had no knowledge that I was still in this, um, in this database after my probation. So, I ask you today—today just to see if you guys can not pass this bill.  There's different alternatives you guys should take in the communities.  If I was to go around New York City right now, and go to the heavily populated gang areas in New York, and ask them about programs, ask them about, you know, employment, development in the neighborhood, nobody would know anything.  The testimony of the NYPD earlier they stated that they have numerous programs that I didn't even know about. You know, if I was to go into my neighborhood, and ask youths in the high school areas that I know are gang, you know, that are heavy gang affiliated, nobody would know any programs the—the, you know, the NYPD was stating about. [bell] So, again, I want to thank you for giving my testimony, and hopefully something is done immediately.

CHAIRPERSON RICHARDS:  Thank you so much—

MALE SPEAKER: [interposing] Thank you, sir.

COMMITTEE ON PUBLIC SAFETY                              157

CHAIRPERSON RICHARDS:   --for your testimony. I want to thank everybody for coming out today I want to thank everybody especially the young men who came out to—to testify today on this legislation.  As we've said, we look forward to working with all the advocates continuing to have the conversation.  So, it's the beginning of a conversation on a database.  You know, we have a lot of work to make sure that there's a more just New York City, that the justice system is working for the people that live in my neighborhood and people who are impacted.  So, we look forward to a continued conversation on this.  I want to thank everybody for coming out today.  This hearing is now closed.

COMMITTEE ON PUBLIC SAFETY                                    158

C E R T I F I C A T E

World Wide Dictation certifies that the foregoing transcript is a true and accurate record of the proceedings. We further certify that there is no relation to any of the parties to this action by blood or marriage, and that there is interest in the outcome of this matter.



Date _____ July 14, 2019 _____