# Exhibit B
# (Application for Search Warrant )

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT FILED

for the

District of Nevada

FILED

DEC – 9 2020

U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

BY _____ DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The business and Federal Firearms Licensee ("FFL")
known as POLYMER80, Inc. ("POLYMER80"), which is
located at 134 Lakes Blvd, Dayton, NV 89403

)
)
)
)
)
)

Case No.   **3:20-mj-123-WGC**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
The business and Federal Firearms Licensee ("FFL") known as POLYMER80, Inc. ("POLYMER80"), which is located at 134 Lakes Blvd, Dayton, as further described in Attachment A, attached hereto and incorporated herein by reference.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(a)(2) and other offenses listed in Attachment B | Shipment or Transport of a Firearm by a Federal Firearms Licensee ("FFL") to a Non-FFL in Interstate or Foreign Commerce and other offenses listed in Attachment B |

The application is based on these facts:

See Affidavit of ATF Special Agent Tolliver Hart, attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tolliver Hart, ATF Special Agent
*Printed name and title*

Subscribed and sworn to before me
by reliable electronic means on:

Date:  8 December 2020

City and state:  Reno, Nevada

_____
*Judge's signature*

WILLIAM G. COBB, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Tolliver Hart, being duly sworn, declare and state as
follows:

## I.   PURPOSE OF AFFIDAVIT

1.   I make this affidavit in support of an application for
a warrant to search a business at 134 Lakes Blvd, Dayton, NV
89403 (the "SUBJECT PREMISES") as described more fully in
Attachment A.

2.   The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 922(a)(2) (Shipment or Transport of a Firearm by a
Federal Firearms Licensee ("FFL") to a Non-FFL in Interstate or
Foreign Commerce); 922(b)(2) (Sale or Delivery of a Firearm by
an FFL in Violation of State Law or Ordinance); 922(b)(3) (Sale
or Delivery of a Firearm by an FFL to Person Not Residing in the
FFL's State); 922(b)(5) (Sale or Delivery of a Firearm by an FFL
Without Notating Required Information in Records); 922(d) (Sale
or Disposition of a Firearm to a Prohibited Person); 922(e)
(Delivery of a Package Containing a Firearm to a Common Carrier
Without Written Notice); 922(g) (Possession of a Firearm by a
Prohibited Person); 922(m) (False Records by an FFL); 922(t)
(Knowing Transfer of Firearm without a Background Check); 922(z)
(Sale, Delivery, or Transfer of a Handgun by an FFL Without a
Secure Gun Storage or Safety Device); 371 (Conspiracy); and 22
U.S.C. §§ 2278(b)(2) and (c) and 50 U.S.C. § 4819 (Violations of
the Arms Export Control Act and Export Control Regulations)
(collectively, the "Subject Offenses").

1

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.    This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.    Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.    BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been
since February 2010.    I am currently assigned to the Glendale
Field Office, in Glendale, California.    I am responsible for
investigating and enforcing violations of Federal law, including
violations of Federal firearms laws.    In my career, I have
assisted with over a 100 federal and local criminal
investigations, to include investigations of firearms
trafficking, narcotics trafficking, cigarette trafficking, armed
robbery, burglary, child exploitation, and unlawful firearm
possession, many of which involved individuals who utilized the
internet and digital devices to further their illegal conduct.

5.    I graduated from the Criminal Investigator Training
Program and the ATF Special Agent Basic Training Program, both
are located at the Federal Law Enforcement Training Center in
Glynco, Georgia.    I am also an attorney, admitted to practice
law in New York State.    I received my Juris Doctor from Brooklyn

2

Law School in Brooklyn, New York. I received my Bachelor of
Arts degree in Psychology and Criminal Justice from the George
Washington University in Washington, D.C.

### III. SUMMARY OF INVESTIGATION

6.     The focus of this investigation is on the suspected
unlawful manufacturing and distribution of firearms, including
failure to properly mark or pay taxes on manufactured firearms,
shipping firearms to residents of other states, and failure to
properly conduct background investigations related to firearms
sales, by Polymer80, Inc. ("POLYMER80"), a Nevada corporation
and Federal Firearms Licensee ("FFL") owned and operated by
David BORGES and Loran KELLEY. POLYMER80's headquarters is
located at the SUBJECT PREMISES. Its products, including
firearm components and other merchandise, are shipped from the
SUBJECT PREMISES to customers.

7.     In around February 2020, I learned that, in addition
to components and other merchandise, POLYMER80 offers a product
for sale called a "Buy Build Shoot Kit." POLYMER80 advertises
to its customers that this kit "contains all the necessary
components" to build a complete firearm, including "the 80%
frame kit, complete slide assembly, complete frame parts kit, 10
round magazine and a pistol case."

8.     ATF agents purchased a number of "Buy Build Shoot
Kits" from the POLYMER80 website, which were then shipped by
POLYMER80 from the SUBJECT PREMISES to California. Utilizing
the components provided in the kit, an ATF Senior Special Agent
assembled the kit into a fully functional firearm in

3

approximately three hours. Utilizing the components provided in another kit, a confidential informant working with the ATF (the "CI") assembled a fully functional firearm in approximately 21 minutes. The ATF Senior Special Agent, who is an ATF certified firearms expert, determined that the "Buy Build Shoot Kit" as designed, manufactured, and distributed by POLYMER80, is a "firearm" as defined under federal law, as a weapon "which will or is designed or may readily be converted to expel a projectile by the action of an explosive," as well as a "handgun," defined as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand" and "any combination of parts from which a firearm . . . can be assembled."

9.     Despite POLYMER80's sales of items meeting the federal definition of a firearm, POLYMER80 appears not to abide by the rules and regulations governing the sale and disposition of firearms, including laws and regulations pertaining to FFLs. For example, it appears that POLYMER80 does not conduct investigation or required background checks on individuals purchasing firearms from the POLYMER80 website, ships firearms to individuals outside of its home state of Nevada, does not provide notice to common carriers that firearms are being shipped through their facilities, and does not keep proper records required of FFLs. Lastly, based on records obtained from third parties as part of this investigation, it appears that POLYMER80 shipped items to individuals determined to be felons and otherwise prohibited from purchasing or possessing

4

firearms or ammunition, as well as individuals located in foreign countries.

## IV. BACKGROUND ON FIREARMS AND FEDERAL FIREARMS LAWS

### A. Definitions of "Firearm" and "Handgun"

10. A "firearm" is defined in 18 U.S.C. § 921(a)(3)(A) as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." This definition includes "the frame or receiver of any such weapon."

11. A "handgun" is defined in 18 U.S.C. § 921(a)(29) as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled."

12. Unfinished frames are parts for a pistol that have not yet reached a point in the manufacturing process to be considered frames. The distinction between a finished and unfinished frame is that a finished frame is capable of receiving the components necessary to assemble it into an operable firearm. In addition, a completed pistol frame will often have rails to allow the attachment of the slide, which contains additional components such as the barrel, recoil spring assembly, and firing pin. Pistol slides are not regulated by ATF, and may be sold, purchased, or transported in interstate commerce fully assembled.

5

**B.   Background on Federal Laws and Regulations Governing FFLs and Firearm Sales**

13.   Federal law requires individuals and businesses to obtain a license in order to manufacture or sell firearms.  18 U.S.C. § 922(a)(1)(A) provides that it shall be unlawful for any person "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce . . . ."

14.   18 U.S.C. § 921(a)(10) defines "manufacturer" to mean "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution . . . ."

15.   18 U.S.C. § 921(a)(11) defines "dealer" to mean "(A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms . . . ."

16.   In addition to being authorized to manufacture firearms, a licensed manufacturer can also deal in firearms without the need for a separate firearms dealers license.  In addition to regulations requiring licensed manufacturers to mark firearms with their unique manufacturing marks and serial numbers, licensed manufacturers dealing in firearms are also required to obtain a certified ATF Form 4473 from non-licensee purchasers, conduct background checks, and are prohibited from shipping firearms across state borders to non-licensed individuals.

6

17. 18 U.S.C. § 922(t) sets forth the requirement that, prior to transferring a firearm to a non-licensee, "the licensee contacts the national instant criminal background check system established under section 103 of that Act . . . ." In addition, the transferor is required to verify "the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee."

18. 18 U.S.C. § 922(a)(2) states that is unlawful "for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector . . ." except for certain situations (e.g., returning or replacing firearms, or firearms shipped to certain government officials).

19. 18 U.S.C. § 922(b)(3) provides that it is unlawful for a licensee to sell or deliver "any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located . . . ."

20. 18 U.S.C. §922(e) states that "It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed

7

collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped . . . ."

21. The United States Postal Service maintains a document entitled Publication 52 - Hazardous, Restricted, and Perishable Mail. According to section 432.24 of this document, a licensee "must file with the Postmaster a statement on PS Form 1508, Statement by Shipper of Firearms, signed by the mailer that he or she is a licensed manufacturer, dealer, or importer of firearms." Also, the mailer must "state that the parcels containing handguns, or parts and components of handguns under 432.2d, are being mailed in customary trade shipments or contain such articles for repairing or replacing parts, and that to the best of their knowledge the addressees are licensed manufacturers, dealers, or importers of firearms."

22. According to 18 U.S.C. § 922(z), "it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer any handgun to any person other than any person licensed under this chapter, unless the transferee is provided with a secure gun storage or safety device (as defined in section 921(a)(34)) for that handgun."

23. 18 U.S.C. § 922(m) provides that "It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to

8

section 923 of this chapter or regulations promulgated thereunder."

24.    27 CFR § 478.124 further clarifies this record keeping requirement, stating that a "licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473." The rule also states that "After the transferee has executed the Form 4473, the licensee . . . Shall verify the identity of the transferee by examining the identification document (as defined in § 478.11) presented, and shall note on the Form 4473 the type of identification used . . . ."

25.    Finally, 18 U.S.C. § 922(b)(2) provides that "It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance . . . ."

## V.   BACKGROUND ON GLOCK-TYPE PISTOLS AND PRIVATELY MADE FIREARMS OR "GHOST GUNS"

26.   Glock Ges.m.b.H., trademarked as "Glock," is a firearm manufacturer headquartered in Austria.   Glock also has a subsidiary company, Glock, Inc., located in Smyrna, Georgia.   Glock primarily manufactures polymer-framed pistols of varying calibers.   Each model is identified by a "G" along with corresponding model number (e.g., G17, G18, G19, G48).   Glocks are popular among United States citizens and various law enforcement agencies (ATF issues its Special Agents Glock pistols).

27.   As discussed below, POLYMER80 manufactures frame blanks based on the Glock design.   According to POLYMER80's website, in response to the question "What generation Glock products are the PF940v2™ & PF940C™ compatible with?" POLYMER80 answered: "The PF940v2™ is compatible with components for Gen 3 3-pin: 9mm G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31. The PF940C™ is compatible with components for Gen3 30-ping [sic] 9mm G19 & .40 S&W G23."

Glock:                                POLYMER80:




28. Based on my review of ATF records and my conversations with ATF agents and other law enforcement officers, I learned the following:

a. Instead of "unfinished receiver," ATF uses the term "receiver blanks" or "frame blanks" to describe objects, similar in appearance to pistol frames, that have not yet reached a point in the manufacturing process to be classified as "firearms" as defined by 18 U.S.C. § 921(a)(3). ATF uses the term "privately made firearms" or "PMFs" to describe firearms that do not bear a licensed manufacturer's mark or serial number; however, colloquially, these are referred to as "ghost guns."

b. According to estimates based on data from ATF's National Tracing Center, approximately 10,000 PMFs or "ghost guns" were recovered by law enforcement in 2019. Approximately 2,700 were recovered in California, including from crime scenes as well as law enforcement seizures from convicted felons, members of violent streets gangs such as Mara Salvatrucha ("MS-13") and others, and individuals who were otherwise prohibited from possessing firearms. I reviewed records of these recoveries and saw that POLYMER80 completed pistols were used in hundreds of crimes throughout the United States. In 2019 and 2020, these crimes have included unlawful firearm possession, firearm trafficking, domestic violence, aggravated assault, kidnapping, carjacking, robbery, and homicide. For example, in 2019, approximately fifteen POLYMER80 handguns were recovered in California homicide investigations, and eight were recovered in

11

California robbery investigations.  One of these homicides included a 2019 home invasion robbery and murder of three individuals in Glendale, California.

c.   On September 12, 2020, two Los Angeles County Sheriff's Department deputies were shot while sitting in their patrol vehicle in Compton, CA.  The firearm used in the attack was identified as a POLYMER80, model PF940c, handgun.

d.   More recently, on November 13, 2020, a 29-year old man was shot and killed in front of his home by purported members of the Gardena 13 street gang in Gardena, California. Two of the weapons recovered near the scene of the murder were POLYMER80, model PF940c, handguns.  Three members of Gardena 13 have since been charged with violent crime in aid of racketeering related to this murder.

e.   In addition, ATF created and maintains the National Integrated Ballistic Information Network ("NIBIN"), a database containing ballistic images from firearms and cartridge casing evidence seized by law enforcement, including those recovered at crime scenes.  According to NIBIN records, in 2019, approximately 1,475 PMFs recovered in the United States were entered into the database; approximately 1,278 (over 86%) were made from POLYMER80 frames.

f.   Also, the number of POLYMER80 handguns recovered by law enforcement appears to be underreported.  Based on my understanding, many POLYMER80 pistols are misidentified and cataloged as Glock pistols.  This is often the situation when a Glock manufactured and serialized slide is placed on a POLYMER80

12

frame.  For example, in a 2020 homicide investigation in West
Virginia, local law enforcement informed the National Tracing
Center that a Glock pistol was recovered.  An ATF agent later
determined that the murder weapon was actually a POLYMER80 model
PF940v2 firearm, whose slide had been replaced with a genuine,
serialized Glock Model 17 slide.

## VI.    STATEMENT OF PROBABLE CAUSE

29.   Based on my training and experience, my own
investigation in this case, and my discussions with the UCs in
this case and other law enforcement agents, I know the
following:

### A.    Background on POLYMER80, Inc.

30.   POLYMER80 is a corporation incorporated in Nevada,
formed in December 2014.  The current address for POLYMER80 is
the SUBJECT PREMISES.  According to the most recent corporate
filings, the Chief Executive Officer for POLYMER80 is Loran
KELLEY.   The Secretary, Chief Financial Officer, and registered
agent is David BORGES.  According to documents filed with the
California Secretary of State, POLYMER80 describes its business
as "WHOLESALE-RETAIL DISTRIBUTION."

31.   In addition, POLYMER80 is also a Federal Firearms
Licensee ("FFL"), Type 07 License, Number: 9-88-019-07-2J-04702.
A Type 07 license allows POLYMER80 to be both a manufacturer and
dealer of firearms.  Type 07 license holders typically receive
additional instruction concerning the Gun Control Act, laws and

13

regulations concerning manufacturing and sales of firearms, and record keeping requirements.

32.   POLYMER80 received its FFL on or about August 24, 2016.   POLYMER80 listed its business name as "P80 TACTICAL P80." The premises address for the FFL is the SUBJECT PREMISES.   The mailing address provided for the FFL is an address in San Antonio, TX.   BORGES and KELLEY each have the title "CO-OWNER," and are listed as the responsible persons for the FFL.

## B.   POLYMER80's Initial FFL Report

33.   In 2016, prior to obtaining an FFL, an ATF Industry Operations Investigator ("IOI") created a Firearms Qualification Report documenting preapproval contacts with POLYMER80.   In the report, the IOI wrote that POLYMER80 is a "manufacturer and distributor of unfinished 80% receivers."   At the time, as reported to the ATF, POLYMER80 made three types of unfinished receivers, specifically an AR-10 type blank, an AR-15 type blank, and a Glock pistol type blank.[1]   POLYMER80 often refers to these products as "80%" receivers or frames in its promotional materials on their website.   In addition to 80% unfinished receivers, POLYMER80 also sells various firearm parts and accessories on its website.

34.   According to the initial qualification report by the IOI, POLYMER80 obtained an FFL in order to "manufacture and sell complete firearms and receivers in the near future."   Also in

---

[1] Based on my review of the website POLYMER80.COM, it appears that POLYMER80 now sells additional types of unfinished receivers and frames.

14

the report, POLYMER80 noted that they currently sold 3,000 unfinished receivers and frames, but anticipated selling up to 6,000 or more firearms per year.

35.    The report also documents the IOI's discussions with KELLEY regarding federal firearm laws, regulations, and recordkeeping requirements.  The IOI provided KELLEY with a copy of the Federal Firearms Regulations Reference Guide (ATF P 5300.4), the Federal Firearms Licensee Quick Reference and Best Practices Guide (ATF P 5300.15).  The Federal Firearms Regulations Reference Guide includes the definition of a firearm as described in 18 U.S.C. § 921(a)(3).

**C.    ATF Determination on POLYMER80 Glock-Type Frame Blanks**

36.    Based on the following, I believe POLYMER80 is aware that the compilation of components in its "Buy, Build, Shoot" kits meets the federal definition of a firearm:

37.    On or about October 6, 2016, POLYMER80 submitted for analysis two PF940C Glock-type unfinished frames, through its counsel, the Law Offices of Davis & Associates, located in Temecula, CA, to ATF's Firearms Technology Industry and Services Branch ("FTISB").  FTISB evaluated the unfinished frames to determine if they were defined as firearms and regulated under the Gun Control Act.  Photographs of the two submitted PF940C unfinished frames are as follows:

15





38. The item, as it was submitted by POLYMER80, included only the unfinished frame. The item submitted, and which ATF provided an opinion on, did not include the slide, springs, ammunition magazine, and various other parts that are included in POLYMER80's Buy Build Shoot Kit, that POLYMER80 advertises as "all the necessary components" to build a completed firearm.

39. On or about January 18, 2017, FTISB sent a determination letter to POLYMER80's counsel. FTISB notified POLYMER80 that the PF940C unfinished frame, as it was constituted and submitted by POLYMBER80, was not "sufficiently complete to be classified as the frame or receiver of a firearm and thus not a 'firearm' as defined in the GCA." The January 18, 2017 determination letter is attached hereto as Exhibit 1. FTISB also stated in the determination letter that:

> Correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular issue or item. We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

> Please be aware, this determination is relevant to the item as submitted. If the design, dimensions, configuration, method of operation, processes or utilized materials [sic], this classification would be subject to review and would require submission to FTISB of a complete functioning exemplar.

40. Additionally, a year prior to this determination, POLYMER80, through its counsel, submitted a determination request for a different Glock-type unfinished pistol frame, the

17

"GC9 Blank." Again, POLYMER80 submitted only the unfinished frame and not the other parts that comprise the Buy Build Shoot Kit, and that POLYMER80 advertises as "all the necessary components" to build a completed firearm. In its determination, dated November 2, 2015, FTISB had similar findings to the later determination. The November 2, 2015 determination letter is attached hereto as Exhibit 2. FTISB stated that this Glock-Type pistol frame blank was not "sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a 'firearm' as defined in the GCA." Similarly, FTISB wrote that the determination was relevant only to the item as submitted, and that if the design or configuration of the item was changed, the opinion expressed in the letter would not apply and a new analysis and determination would be needed. Both determination letters included the relevant portion of 18 U.S.C. § 921(a)(3), specifically that the statute "defines the term 'firearm' to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive . . . [and] . . . the frame or receiver of any such weapon . . . ."

41. POLYMER80 placed this November 2, 2015 letter on its website, under the "ATF Determination Letter" link at the bottom the main page. In addition, on the main page of its website the question "Is it legal?" is written. POLYMER80 answers the question by writing:

> The Polymer80 G150™, RL556v3™ and PF-Series™ 80% Frames are well within the defined parameters of a "receiver blank"

18

defined by the ATF and therefore has not yet reached a
stage of manufacture that meets the definition of firearm
frame or receiver found in the Gun Control Act of 1968
(GCA). As always Polymer80 advises EVERYONE to check with
their local state laws prior to making a purchase on our
website, as they may differ from federally allowed
regulations.

42. More recently, on or about December 11, 2017,
POLYMER80, through its counsel, submitted a "PF940V2 Blank" for
analysis and opinion by FTISB. This "V2" blank is a newer
version of the frame that had previously been submitted for
review by POLYMER80. Again, the item, as submitted by
POLYMER80, included only the unfinished frame and did not
include any of the other parts included in the Buy Build Shoot
Kit that POLYMER80 advertises as including "all the necessary
components" to build a completed firearm.

43. FTISB responded to POLYMER80's request for an opinion
on its "PF940V2 Blank" in correspondence to POLYMER80's counsel
dated February 20, 2018. The February 20, 2018 determination
letter is attached hereto as Exhibit 3. After describing the
features of the item submitted by POLYMER80, FTISB's February
20, 2018 letter stated: "It is clear from the above information
provided in your correspondence that the submitted sample is
only a component used in the assembly of an end-item. Research
conducted by FTISB has disclosed that a Polymer 80 Model PF940V2
is being marketed at www.polymer80.com . . . ." FTISB then
provided screenshots from POLYMER80's website, and identified
the additional components that are advertised as being sold in
combination with the PF940V2 Blank on POLYMER80's
website. FTISB's letter continued: "Clearly the submitted

19

sample is simply a component of a larger product . . . Please note, the *frame* or *receiver* of a firearm is a *firearm* as defined in [the Gun Control Act], 18 U.S.C. § 921(a)(3)(B), and any combination of parts from which a *handgun*, as defined in 18 U.S.C. § 921(a)(29), can be assembled is also a *firearm* as defined in 18 U.S.C. § 921(a)(3)."

44.   FTISB's determination letter also stated that "FTISB will not render a classification on a partial product submission.  In order to receive an evaluation and classification of your product, please submit the complete Polymer 80 Model PF940V2 80% Standard Pistol Frame Kit being marketed by your client."

45.   Based on information provided by FTISB, it is my understanding that, as of December 4, 2020, POLYMER80 had not resubmitted the complete PF940V2 pistol kit to FTISB.  Further, as discussed in greater detail below, the Buy Build Shoot Kits currently being marketed and sold by POLYMER80 include even more components than the kits that were discussed in the February 2018 FTISB letter.  Despite these communications from FTISB, notifying POLYMER80 that a combination of parts from which a handgun could be assembled would meet the federal definition of a firearm, as discussed in greater detail below, POLYMER80 began manufacturing and selling Buy Build Shoot Kits that, as advertised by POLYMER80, include "all the necessary components to build a complete PF940c or PF940v2 pistol," and that can be readily assembled into fully functional firearms in a matter of minutes.

### D.   **POLYMER80 "Buy Build Shoot Kit"**

46.   On or about February 21, 2020, I utilized an undercover ("UC") computer to access POLYMER80's website, POLYMER80.COM. On the website, I viewed multiple products for sale, including a product section labelled "Buy Build Shoot Kits." Four different products were offered on this page, including the P80 Buy Build Shoot Kit PF940C and the P80 Buy Build Shoot Kit PF940v2, along with the same two products for sale including an ammunition magazine. According to POLYMER80.COM, for orders to California, the magazine was limited to 10 round magazines; otherwise the kits included a 15 or 17 round magazine. Each of the products were described on POLYMER80's website as containing "all the necessary components to build a complete PF940c or PF940v2 pistol." According to the page, the kit included an "80% frame kit, complete slide assembly, complete frame parts kit" as well as an ammunition magazine and a pistol case:

21





47.   I have not determined when POLYMER80 began selling the "Buy Build Shoot Kits," but I did see a post on the "Polymer80" Facebook account dated March 25, 2019 which stated:

Introducing P80's NEW BBS (Buy Build Shoot) Kits for 9mm
Compact and Full Size Frames!  Every single part in this
picture has been designed and manufactured by Polymer80.
The BBS Kit includes our 80% Frame Kit (#PF940C or
#PF940v2) and a complete slide as well as a frame parts
kit!  No release date just yet as we get final components
in, and figure out pricing.



48.  Based on my review of POLYMER80's website, it appears

that POLYMER80 also sells each of the components that constitute

the Buy Build Shoot Kit as separate items.  Therefore, a

customer could buy the equivalent of the Buy Build Shoot Kit by

purchasing the necessary parts in one transaction or as a series

of individual transactions from POLYMER80.

**E.    Undercover Purchase and Assembly of POLYMER80 Buy
       Build Shoot Kit By ATF Senior Special Agent**

49.   On or about February 26, 2020, Senior Special Agent
("SSA") David Hamilton, acting in a UC capacity, accessed
POLYMER80.COM through a UC computer.  SSA Hamilton added one
"P80® Buy Build Shoot™ kit PF940v2 – 10 Round Magazine" in black
color and one "P80® Buy Build Shoot™ kit PF940C – 10 Round
Magazine" in flat dark earth color to his POLYMER80 website
shopping cart.  SSA Hamilton selected two kits with ten round
magazines to comply with California Penal Code ("CPC") § 32310
which, among other things, prohibited the importation and
receipt of any large-capacity magazine (more than 10 rounds) by
any person in the state.[2]

50.   During the checkout process, SSA Hamilton provided an
undercover name, address, telephone number, e-mail address, and
credit card number.  POLYMER80 did not request or require a date
of birth, social security number, driver's license number, or
other identifier necessary to verify the buyer's identity, and
which I know, based on my training and experience, is required
in order to conduct a National Instant Criminal Background Check
System ("NICS") background check, to allow an FFL to legally
sell or transfer a firearm.

51.   However, SSA Hamilton was asked to check a box
agreeing to the "Terms and Conditions," which included a series

---

[2] The Ninth Circuit has since invalidated California's ban
on high-capacity magazines in Duncan v. Becerra, No. 19-55376
(9th Cir. Apr. 14, 2020).

of statements similar to those on ATF Form 4473,[3] used to determine a purchaser's eligibility to acquire a firearm:

- I am not under indictment or information in any court for a felony, or any other crime, for which the judge could imprison me for more than one year.

- I have never been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned me for more than one year, even if I received a shorter sentence including probation.

- I am not prohibited by federal, state, or local laws from purchasing, acquiring, possessing, manufacturing, using or owning a firearm.

- I agree to comply all state, federal, and local laws relating to purchasing, acquiring, possessing, manufacturing, using or owning a firearm.

- I am not an unlawful user of, or addicted to, marijuana or any depressant stimulant, narcotic drug, or any other controlled substance.

- I am not a fugitive from justice.

- I have never been adjudicated mentally defective (which includes a determination by court, board, commission, or other lawful authority that I am a danger to myself or others or an incompetent to manage my own affairs

- Nor have I been involuntarily held for a mental health evaluation within the last 5 years.

- I have never been committed to a mental institution.

- I have never renounced my United States citizenship.

- I am not an alien illegally in the United States.

- I am not prohibited from possessing firearms under federal or state law.

---

[3] Unlike with the ATF Form 4473, however, POLYMER80's website does not require an attestation, nor is the form signed and submitted by the buyer under penalty of perjury.

- I have not had any suicidal thoughts or suicidal ideations now or at any time prior to my presence here today.
- I will not use any of the training and instruction provided for any unlawful purpose.
- I have read and understand all legislation that pertains to ownership of 80% products, building a firearm at home, and firearm ownership in the State that I reside in.

52. After acknowledging by checking the box on POLYMER80.COM, SSA Hamilton placed the order for the two kits, costing a total of $1300.96 ($590.00 each, plus tax).[4]  POLYMER80 did not verify any specific identifying information provided by SSA Hamilton, which would have been required in order for POLYMER80 to have conducted a NICS background check.

53. On the same date, SSA Hamilton received an email titled "Transaction Receipt from POLYMER80 for $1300.96 (USD)" from "noreply@mail.authorize.net."  Merchant contact information was listed as: POLYMER80 INC, Dayton, NV 89403 US, support@polymer80.com.

54. On or about April 10, 2020, SSA Hamilton, again acting in an undercover capacity, sent an e-mail to "support@polymer80.com" requesting an update on when shipment of the order could be expected.

55. That same day, SSA Hamilton received an e-mail from "support@polymer80.com" stating, "I am going to see if I can't

---

[4] POLYMER80 notes on its website that, in addition to payment by credit card, it accepts payment by money order, cashier's check, personal check, or company check.  Based on my training and experience, some of these forms of payment could allow for the payer to pay either anonymously or by false or fictitious name.

26

get these out in the next few days, we have a very limited crew and are trying to get stuff handled. Watch your e-mail for tracking." The e-mail was signed "Al M, Director of Customer Support." Later that day, SSA Hamilton received an e-mail from "sales@polymer80.com." The e-mail indicated that the purchased items had shipped.

56. On or about April 20, 2020, SSA Hamilton and another ATF SA obtained the items from a UC location in Los Angeles County. SSA Hamilton then transported the items to the ATF Los Angeles Field Division in Glendale, California. The package shipping label showed the SUBJECT PREMISES as the return address: Polymer80 Fulfilment Team, Polymer80, Inc., 134 Lakes Blvd., Dayton NV 89403.

57. Later that day SSA Hamilton opened the package in my presence. The package contained a POLYMER80 invoice dated February 26, 2020, and two black plastic pistol cases with "P80®" over "POLYMER80" molded into the top covers.

58. One pistol case was labelled "POLYMER80 PF940C COMPACT BBS."[5] Unlike the parts that POLYMER80 asked the ATF to render an opinion on, as I discussed above, this kit appeared to contain all components necessary to assemble a complete pistol, as well as two milling/drill bits to be used in the completion of the pistol. The slide was completely assembled, including installation of the barrel and captured recoil spring. The included magazine had a 15-round capacity, rather than the 10-

---

[5] I understand "BBS" to be an abbreviation for "Buy Build Shoot."

27

round magazine that was ordered, in violation of California Law
at the time.   Neither the frame, nor any of the component parts,
included a manufacturer's serial number.



59.   The other pistol case was labelled "POLYMER80 PF940v2
STANDARD BBS."  It appeared to contain all components necessary
to assemble a complete pistol, as well as two milling/drill bits

to be used in the completion of the pistol.  The slide was completely assembled, including installation of the barrel and captured recoil spring.  The included magazine had round count holes indicating that it has a 17-round capacity, rather than the 10-round magazine that was ordered, also in violation of California law at the time.



60.  On April 28, 2020, SSA Hamilton, who is also an ATF Firearms and Ammunition Interstate Nexus Expert, built a

complete handgun assembled from the components contained in the
POLYMER80 model PF940C Buy Build Shoot Kit that he purchased in
an undercover capacity. The build, which began at approximately
11:10 a.m., occurred at the ATF Los Angeles Field Division
office in Glendale, California, and was recorded.

61.    It took SSA Hamilton less than 19 minutes to mill the
frame blank, including his inspection, narration, and
transitions between his work areas.  The tools SSA Hamilton used
to complete this process included a power hand drill (with the
two drill bits provided by POLYMER80), a Dremel rotary tool
(with three different wheels/bits), a hobby knife, a utility
knife, sand paper, and needle nose pliers.

62.    During assembly, SSA Hamilton encountered issues
beyond those normally expected for fitting new parts to a
firearm.  The PF940C instructions provided by POLYMER80 stated
that "after the milling is completed, the build process seems to
be where most people get into trouble, particularly during
assembly and cleaning," and that some hand fitting may be
required.  At this time, SSA Hamilton determined the PF940C was
not operable in its current condition, and stopped the attempted
build, and the recording, at approximately 12:08 p.m.

63.    Over the course of the next two hours, SSA Hamilton
troubleshot the problem.  He viewed the YouTube video "pf940c
P80 g19 trigger reset issue" posted by user Thyertek.   The
presenter in the video stated that he contacted POLYMER80
regarding the inability of his trigger to reset.  According to
the video, POLYMER80 told him that this was an issue with its

30

rear rails, that there could be a burr on the metal insert where the trigger bar meets it, or the part was mis-stamped. POLYMER80 advised the presenter that a quick fix was to file off the burr, and failing that, POLYMER80 could send a replacement part. According to the video, POLYMER80 also advised that the metal arm of the part might be bent too far inward, in which case its inner edge should be filed.

64. Based on this video, SSA Hamilton determined that the issue appeared to be a quality control matter for the kit he received, rather than a design flaw of the kits generally. SSA Hamilton followed the instructions in the video and modified the part. After re-installing all the components into the frame, SSA Hamilton resumed the building of the kit, and the recording, at approximately 2:29 p.m. SSA Hamilton then completed the firearm and successfully test-fired twice using 9mm caliber ammunition that had the projectile and propellant removed. SSA Hamilton ceased the assembly at approximately 2:34 p.m.

65. SSA Hamilton determined that the purchased POLYMER80 model PF940C Buy Build Shoot Kit is a "firearm" as that term is defined under 18 U.S.C. § 921(a)(3), as a weapon designed to, or that may readily be converted to, expel a projectile by the action of an explosive.[6] In addition, SSA Hamilton determined that the purchased POLYMER80 model PF940C Buy Build Shoot Kit is also a "handgun" as that term is defined under 18 U.S.C. §

---

[6] ATF Chief Counsel has also determined that the Buy Build Shoot kits are, as a matter of law, firearms pursuant to 18 U.S.C. § 921(a)(3).

31

921(a)(29) as a combination of parts from which a firearm having a short stock and designed to be held and fired by the use of a single hand can be assembled.  The firearm is pictured as follows:



### F.   Undercover Purchase and Assembly of POLYMER80 Buy Build Shoot Kit by Confidential Informant

66.   On or about March 3, 2020, a different ATF UC purchased two Buy Build Shoot Kits from POLYMER80's website. The UC used the same procedures as SSA Hamilton to purchase the kits, as described above.  The UC purchased the same models and colors as SSA Hamilton, one "P80® Buy Build Shoot™ kit PF940v2 – 10 Round Magazine" in black color and one "P80® Buy Build Shoot™ kit PF940C – 10 Round Magazine" in flat dark earth color.  The UC obtained the kits in Riverside County, California on or about June 16, 2020.  The package shipping label showed the SUBJECT

PREMISES as the return address: Polymer80 Fulfilment Team, Polymer80, Inc., 134 Lakes Blvd., Dayton NV 89403. Each kit appeared to contain all components necessary to assemble a complete pistol. Unlike the kits received by SSA Hamilton, these two kits included the requested 10 round magazines. Neither the frame, nor any of the component parts, included a manufacturer's serial number.

67. On or about July 9, 2020, I presented an ATF Confidential Informant (the "CI"), who has experience as an automobile mechanic and who has previous experience with firearms, with the POLYMER80 model PF940v2 Buy Build Shoot Kits that was purchased by the UC. According to the CI, who is a convicted felon, the CI had never assembled a POLYMER80 pistol before. I directed the CI to attempt to assemble a complete handgun using only the components contained in the POLYMER80 Buy Build Shoot Kit. Prior to initiating the build, the CI viewed publically available YouTube videos to familiarize himself/herself with techniques to mill the frame module as well as to assemble the components.

68. The build process occurred at an ATF controlled location within Los Angeles County. SSA Hamilton and I watched the entire assembly, which we recorded. The CI used his/her own personally-owned tools to complete the build, including a C-clamp, power drill, nippers, Dremel tool, file, wire cutters, needle nose plyers, hammer, and punch tool. ATF agents did not provide any guidance on what tools or techniques to use to assemble the kit.

69. The CI began assembly at approximately 2:41 p.m., and was able to successfully complete the build of a functioning handgun by approximately 3:02 p.m. The total time to mill the frame module and assemble the components into a completed firearm was approximately 21 minutes.

70. SSA Hamilton inspected the firearm and saw that the CI did not install the trigger safety lever within the trigger shoe. The trigger safety lever is not critical to the functioning of the firearm, and is simply a safety feature. SSA Hamilton also saw the slide lock spring was installed in an incorrect orientation. Insufficient pressure to the slide lock can result in the slide coming off the handgun during dry-firing (pulling the trigger without a round of ammunition chambered), and is less secure when firing live ammunition. Because of the potentially unsafe condition, SSA Hamilton reinstalled the slide lock spring and slide lock, a process that took approximately one minute.

71. On or about July 14, 2020, SSA Hamilton test-fired the handgun using a round of commercially-available 9mm caliber ammunition that had the projectile and propellant removed. SSA Hamilton inserted the primed cartridge case into the chamber, and closed the slide. Upon SSA Hamilton pulling the trigger, the firing pin struck with sufficient force to detonate the primer. SSA Hamilton repeated the test using another primed cartridge case with the same result, and the firearm appeared operable. The firearm is pictured as follows:

34



72.   SSA Hamilton determined that the purchased POLYMER80 model PF940v2 Buy Build Shoot Kit is a "firearm" as that term is defined under 18 U.S.C. § 921(a)(3) as a weapon designed and readily converted to expel a projectile by the action of an explosive.[7]  SSA Hamilton determined that the purchased POLYMER80 model PF940v2 Buy Build Shoot kit is also a "handgun" as that term is defined under 18 USC § 921(a)(29) as a combination of

---

[7] As noted above, this determination is consistent with the determination of ATF Chief Counsel that the Buy Build Shoot kits are, as a matter of law, firearms pursuant to 18 U.S.C. § 921(a)(3).

parts from which a firearm having a short stock and designed to be held and fired by the use of a single hand can be assembled.

73.  Because POLYMER80 shipped these Buy Build Shoot Kits from the SUBJECT PREMISES, located in the state of Nevada, to a customer in California, I believe there is probable cause to believe that POLYMER80 has committed violations of 18 U.S.C. §§ 922(a)(2) (Shipment or Transport of a Firearm by an FFL to a Non-FFL in Interstate or Foreign Commerce) and 922(b)(3) (Sale or Delivery of a Firearm by an FFL to a Person Not Residing in the FFL's State), as well as 922(t) (Knowing Transfer of a Firearm without a Background Check) and other Subject Offenses, as described below.

## G.  Stamps.com and Authorize.net Records Show POLYMER80 Shipments to Potentially Prohibited Persons and Locations

74.  On or about June 5, 2020, in response to a subpoena, I received records from the company Stamps.com, which provides mailing and shipping services. According to the records, BORGES was the account holder for POLYMER80's Stamps.com account. The account was opened on May 16, 2013, and the company name is listed as "Polymer80.com." The e-mail address for the account is david@polymer80.com.

75.  The Stamps.com records also included shipping label records created by the account. These records, dated between January 1, 2019 and June 4, 2020, included date and time the labels were printed, mail class, postage cost, confirmation number, item weight, the name and address of the recipient, and the return address.

36

76. Also, on or about June 17, 2020, in response to a subpoena, I received records from the company Authorize.net, a credit card processor. POLYMER80 is listed as the business name, with the SUBJECT PREMISES, 134 Lakes Blvd, Dayton, NV listed as the address, and the website listed was POLYMER80.COM. Under principal information, the records show BORGES' name and the owner e-mail address is "sales@polymer80.com."

77. The Authorize.net records, which include records from January 1, 2019 to June 16, 2020, include date and time a payment was submitted by a customer, the amount, the name and address of the customer, the telephone number of the customer, and the e-mail address of the customer. Some of the submitted payments appear to be duplicates, so while viewing the data, I ignored multiple payments from the same individual, of the same amount, occurring at around the same time.

78. On or about October 15, 2020, in response to a subpoena, I received records from Stamps.com for its subsidiary business ShipStation. ShipStation is a shipping software company that provides online businesses with order processing, production of shipping labels, and customer communication. The records received from ShipStation are similar to those received from Stamps.com, but also includes the order price of the shipped item, as well as the item name and Stock Keeping Unit ("SKU") inventory identifier.

79. According to the ShipStation records, from January 2019 through on or about October 13, 2020, POLYMER80 shipped approximately 51,800 items throughout the United States. At

37

least 50,600 of these shipments were sent to customers located in states other than Nevada. POLYMER80 shipped approximately 9,400 items to customers in California.

80. In addition, according to the ShipStation records, from July 2019 through on or about October 10, 2020, POLYMER80 shipped at least 1,490 Buy Build Shoot kits to customers throughout the United States, at least 1,468 of which were shipped to individuals in states other than Nevada. The most recent tracking numbers show the Buy Build Shoot Kits were shipped by POLYMER80 from the state of Nevada to customers in most states, as well as the District of Columbia and Puerto Rico. According to the records, the four states that POLYMER80 did not ship Buy Build Shoot Kits to were Iowa, Kentucky, New Jersey, and North Dakota. In addition, the records show that POLYMER80 sent at least 202 Buy Build Shoot Kits to California, which was the most of any state.

81. In my review of the records, I have identified several instances where POLYMER80 firearm components appear to have been transferred outside of the United States. I also have identified instances where POLYMER80 shipped Buy, Build, Shoot kits to individuals within the United States who are prohibited from receiving or possessing firearms.

1. Records Pertaining to Export Law Compliance

82. According to 22 C.F.R. § 120.2, "The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of import or

export controls . . . The items designated . . . constitute the
U.S. Munitions List specified in part 121 of this subchapter."

83.    In addition, based on my training and experience, I
know that until March 9, 2020, under 22 C.F.R. § 121.10:
"Articles on the U.S. Munitions List include articles in a
partially completed state (such as forgings, castings,
extrusions and machined bodies) which have reached a stage in
manufacture where they are clearly identifiable as defense
articles.    If the end-item is an article on the U.S. Munitions
List (including components, accessories, attachments and parts
as defined in § 121.8), then the particular forging, casting,
extrusion, machined body, etc., is considered a defense article
subject to the controls of this subchapter, except for such
items as are in normal commercial use."[8]

84.    As a result of my training and experience, I know that
international firearm traffickers have utilized the internet to
facilitate communications, coordination, and purchases to
illegally traffic weapons and weapons parts.

85.    Based on my review of records from Stamps.com
(including ShipStation records), Authorize.net, and my own
internet research, I learned the following, which leads me to

---

[8] After March 9, 2020, all parts and items for semi-
automatic firearms were removed from 22 C.F.R. § 121.10 and
became regulated under Department of Commerce regulations.
Semi-automatic firearm parts now fall under the provisions of 50
U.S.C. § 4819, requiring an export license from the Department
of Commerce for export to specified countries as listed in 15
C.F.R. § 738.

believe that POLYMER80 firearm parts are being shipped to
international locations:

a. According to the Stamps.com and Authorize.net
records, one individual with initials K.V.,[9] providing an address
in Hyattsville, MD, was the listed recipient of five Pistol
Frame Kits (not Buy Build Shoot Kits), as well as additional
firearm accessories from POLYMER80 in August of 2019. Through a
query on the website Google.com, I learned that the Hyattsville
address is associated with an "International Courier" which
transports items between the United States and Guatemala.

b. Another address in Hawthorne, CA, was listed as a
recipient address for shipments from POLYMER80 to two different
individuals, S.M. and S.S. S.M. was the listed recipient of one
PF940CL Pistol Frame Kit (not a Buy Build Shoot Kit). S.S. was
the listed recipient of one PF940v2 pistol frame kit (not a Buy
Build Shoot kit), and one pistol slide parts kit. A query on
the website Google.com showed that the Hawthorne address is
associated with a mail forwarding company that transports items
from the United States to over 220 other countries.

c. Also, an individual with initials T.M. at an
address in Blaine, WA, was listed as a recipient for one PF45
pistol frame kit (not a Buy Build Shoot kit) shipped from
POLYMER80 in February 2019. This location is less than one mile
from the Canadian border. The recipient address is for a

---

[9] For privacy considerations, names, addresses, and other
personal identifying information for individuals have been
anonymized throughout this affidavit.

40

package and freight receiving company. I have not identified
T.M., but T.M.'s telephone number has a Vancouver, British
Columbia area code (604), and T.M.'s e-mail address is with the
Canadian internet service provider Shaw.ca.

86.  Additionally, based on my review of a recently-filed
criminal complaint, I understand that four individuals have been
charged, in the United States District Court for the Central
District of California, with allegedly selling ghost guns
without a license, and are alleged to have also shipped export-
controlled firearm parts to Lebanon.

   a.  Based on my review of records, I identified one
of the individuals charged in the case as an Inglewood, CA-based
customer who has purchased Buy Build Shoot Kits and other items
from POLYMER80.  According to records I have reviewed, this
individual has paid POLYMER80 over $22,000 for purchases in
February and April 2020 alone.

   2.  Records Pertaining to Transfers of Buy, Build,
       Shoot Kits to Prohibited Persons in the United
       States

87.  Based on my review of these and other records, I also
identified customers and shipping recipients of POLYMER80 who
appear to be prohibited from possessing firearms:

   a.  An individual with initials J.S. at an address in
Salinas, CA, was listed as the recipient of two Buy Build Shoot
Kits from POLYMER80 in September 2019.  I queried the address

41

associated with the purchase in Accurint.[10]  According to
Accurint, J.S. is associated with that address.  According to
J.S.'s criminal history records, on or about October 24, 2005,
J.S. received a felony conviction in Santa Clara County Superior
Court for Assault with a Deadly Weapon, Not a Firearm, in
violation of California Penal Code ("CPC") Section 245(a)(1).
In addition, on or about February 24, 2010, J.S. received a
felony conviction in Monterey County Superior Court for
Inflicting Corporal Injury to a Spouse/Cohabitant, in violation
of CPC Section 273.5(a).

      b.   An individual with initials M.P. at an address in
Santa Cruz, CA, was the listed recipient of one Buy Build Shoot
Kit in September 2019.  According to Accurint, M.P. is
associated with that address.  Also, according to Accurint, M.P.
was only 18 years old when the item was shipped.  Under 18
U.S.C. § 922(b)(1), it is unlawful for an FFL to sell or deliver
a handgun to any person the transferor knows or has reasonable
cause to believe is under the age of 21.  Based on my training
and experience, I know that if POLYMER80 had conducted a
background check, as required by an FFL when selling a firearm,
NICS would have likely flagged and/or denied the transaction.

      c.   An individual with initials R.P. at an address in
Chicago, IL, was listed as the recipient of one Buy Build Shoot
Kit from POLYMER80 in December 2019.  According to Accurint,

---

[10] Accurint is an online tool operated by LexisNexis that
provides access to a comprehensive database of public records
information.

42

R.P. is associated with that address.  According to his criminal history reports, the State of Illinois lists R.P. as "Disqualified" from possessing firearms.  In addition, R.P.'s criminal history records shows that R.P. has received multiple felony convictions.  On or about October 9, 1985, R.P. was convicted in Cook County Circuit Court of a felony for Manufacture/Deliver Controlled Substance, in violation of 56.5-1401-A IL.  Also, on November 6, 1989, R.P. was convicted in Cook County Circuit Court of a felony for Robbery, in violation of 38-18-1 IL.  On or about April 8, 1996, R.P. was convicted in Cook County Circuit Court of a felony for Aid, Abet, Possess, Sell Stolen Vehicle, in violation of 95.5-4-103-A-1 IL, and Vehicle Hijacking, in violation of 720 ILCS 5.0/18-3-A IL.

d.      An individual with initials T.J. at an address in Salisbury, MD, was listed as the recipient of one Buy Build Shoot Kit in August 2020.  Tracking details from UPS show that the item was sent from Nevada to Maryland.  According to Accurint, T.J. is associated with the Salisbury address.  According to T.J.'s criminal history, on or about May 30, 2019, T.J. was convicted in Wicomico County District Court of Assault in the Second Degree, in violation of CR.3.203, a misdemeanor punishable by up to 10 years' imprisonment, a conviction which precludes T.J. from possessing firearms.

e.      An individual named H.N. at an address in Elk Grove, CA, was listed as the recipient of one Buy Build Shoot Kit from POLYMER80 in December 2019.  According to Accurint, two individuals with initials H.N. are associated with the Elk Grove

43

address. According to Accurint, the younger of the two individuals was only 18 years old at the time of the shipment, and therefore was precluded from purchasing a firearm. In addition, according to the criminal history records of the older H.N., on or about January 15, 1999, H.N. was convicted in Santa Clara County Superior Court of a felony for Sex with a Minor 3+ Years Younger, in violation of CPC Section 261.5(c).

f. An individual with initials V.R. at an address in Vallejo, CA, was the listed recipient of one Buy Build Shoot Kit from POLYMER80 in April 2020. According to Accurint, two individuals with initials V.R. are associated with the address. According to Accurint, one of these individuals died in 2002. According to criminal history records, the living V.R. was convicted on or about November 4, 2003 of a felony in Mendocino County Superior Court for Second Degree Burglary, in violation of CPC Section 460(b).

g. An individual with initials Z.S. at an address in Tempe, AZ, was the listed recipient of one Buy Build Shoot Kit in March 2020. According to Accurint, Z.S. is associated with the Tempe address. According to criminal history records, Z.S. was charged with Assault with a Deadly Weapon with Force Likely to Cause Great Bodily Injury, in violation of California Penal Code Section 245(a)(4), and Battery: Serious Bodily Injury, in violation of California Penal Code Section 243(d), in July 2019, and is also subject to a restraining order in relation to these charges, both of which were pending at the time of Z.S.'s purchase of a Buy Build Shoot kit from POLYMER80 in March 2020,

44

and both of which are still pending. Like with the instances discussed directly above, I know from my training and experience that, had POLYMER80 conducted the required NICS background check to sell Z.S. a firearm, NICS would have flagged Z.S. as a prohibited individual and any firearms transaction would have been denied.

h. Also, based on my training and experience and knowledge of this investigation, I know that it is possible for individuals to purchase Buy Build Shoot Kits from POLYMER80 under false names, or in the names of other individuals. For example, a Buy Build Shoot Kit was shipped by POLYMER80 in May 2020 to "Gracie Muehlberger" at an address in Santa Clarita, CA. According to multiple media reports including USA Today and the Los Angeles Times, Gracie Muehlberger was a 15 year old girl who was killed in the shooting at Saugus High School on November 14, 2019, by a minor who was using a ghost gun.

i. Based on my review of records and research, it appears that although POLYMER80 sells directly to customers, it also sells large quantities of its products on a wholesale basis to businesses throughout the country. One such business is F&F Firearms, located in Norco, CA. According to the records, between April 2019 and February 2020, F&F Firearms (an FFL) received 11 shipments from POLYMER80 from the SUBJECT PREMISES. Between February 2019 and June 2020, F&F submitted over $200,000 in payments to POLYMER80. According to F&F's website, fandffirearms.com, it describes itself as "Your #1 source for 80% Builders." Though currently said to be out of stock on the

45

F&F website, the POLYMER80 Buy Build Shoot Kit is one of the products offered by the company on its website. Currently, manufacturing or assembling a firearm made with POLYMER80 pistol frames is unlawful in California.[11]

### H.   **POLYMER80's Instagram Account**

88.   On or about April 19, 2020, ATF SA Monica Lozano viewed the publicly-available Instagram account for polymer80inc. The account posted a video dated two days prior, on or about April 17, 2020. In the comments, polymer80inc wrote "Why P80 80% Frames are in high demand?" and followed with:

Our sponsored shooter and trainer/owner of @tacticalfitnessaustin Ron Groban explains why our 80% Pistol Frame Kits are in high demand right now. While many items are showing out of stock on our website, we are producing 80% kits as fast as possible. We advise you to visit out our dealer page at Polymer80.com for a list of our dealers! Most of what we produce is shipped to them directly, and they have been great about promoting in-stock P80 items.

89.   In the posted video, an individual is holding a completed POLYMER80 pistol and speaks directly to the camera. The individual says a lot of people contact him about their

---

[11] Since 2010, CPC § 32000(a) has prohibited the manufacturing in the state of California a handgun not listed on the roster of certified handguns found at 11 CA ADC § 4070. Effective January 1, 2019, California enacted CPC § 29180, which requires all firearms to have a unique serial number and provides additional instruction in regards to "self-made" firearms. In addition, § 29180(b)(2)(B) requires a firearm manufactured or assembled from polymer plastic to include 3.7 ounces of material type 17-4 PH stainless steel embedded within the plastic upon fabrication or construction, so that a unique serial number can be engraved or otherwise permanently affixed to the firearm. The POLYMER80 unfinished pistol frame does not contain 3.7 ounces of type 17-4 PH stainless steel embedded in it, as required under California law.

46

difficulty trying to buy firearms. The individual states that POLYMER80 allows people to build firearms themselves. He further states that "you don't have to worry about the background check." He also mentions individuals can have the items shipped to their homes. In the comments section of polymer80inc's post, user "ellipsis415" wrote "I wouldn't be touting 'don't have to worry about the background check' as a bonus to the P80 system." User polymer80inc responded "@elllipsis415 background checks are NOT an infringement?" User ellipsis415 then said, "@polymer80inc I didn't say that. I said it sounds like you're trying to market them towards people who wouldn't pass a background check." Account polymer80inc did not respond to that statement.

90. On or about June 11, 2020, in response to a subpoena, SA Lozano received subscriber records from Instagram LLC for account polymer80inc. According to the records, the account was first registered on August 3, 2015. The e-mail associated with the account is "alex.brodsky@polymer80.com."

## I.   **Surveillance of the SUBJECT PREMISES**

91. On or about October 20, 2020, I queried the SUBJECT PREMISES on the Lyon County, Nevada Property Assessor webpage. The results of the query showed that the SUBJECT PREMISES is currently owned by Polymer80 Properties, LLC. The property has been held by the current owner since December 2016. According to the records, the mailing address for Polymer80 Properties is C/O DAVE BORGES, at an address in Fairfield, CA previously associated with BORGES. The records also show that the SUBJECT

47

PREMISES property is three acres, and has a 14,745 sq. ft. one-story building structure.

92. On or about October 23, 2020, ATF Task Force Officer ("TFO") Michael Stewart conducted surveillance at the SUBJECT PREMISES. TFO Stewart took photographs and made videos of the structure and parking lot. Based on my review of the photographs, video, and Google.com satellite images, the SUBJECT PREMISES is a gray and tan building that is isolated from other properties. The SUBJECT PROPERTY appears to be over 1,000 feet away from the nearest neighboring structure. The main entrance appears to be through double glass doors on the northwest corner of the structure. At the time of TFO Stewart's surveillance, approximately 25 vehicles were parked in the parking lot of the SUBJECT PREMISES. In addition, what appeared to be multiple Conex box storage containers were in the parking lot for the SUBJECT PREMISES.

93. On or about December 4, 2020, at approximately 5:25 a.m., TFO Stewart returned to the SUBJECT PREMISES. As he drove through the parking lot, TFO Stewart saw a White Dodge Ram parked near the entry doors of the SUBJECT PREMISES. It was the only passenger vehicle parked at the business. As he continued through the lot, he saw through the window that lights in the structure were on. TFO Stewart also saw a woman sitting at a desk inside an office within the SUBJECT PREMISES. TFO Stewart then exited the parking lot and drove up the street where he could watch vehicles arriving at the SUBJECT PREMISES. At approximately 5:49 a.m., another vehicle pulled into the parking

48

lot of the SUBJECT PREMISES and parked. Approximately four additional vehicles continued to arrive over the course of the next 15 minutes. There was no more traffic into that parking lot until approximately 6:54 a.m. when vehicles began arriving again. From that time until approximately 7:58 a.m., approximately 13 more vehicles arrived at the SUBJECT PREMISES. TFO Stewart departed the area at approximately 8:05 a.m.

## VII. **TRAINING AND EXPERIENCE IN THE SUBJECT OFFENSES**

92. From my training, personal experience, and the collective experiences related to me by other ATF SAs who specialize firearms investigations, I am aware of the following:

a. Individuals and businesses who possess and regularly purchase and sell firearms, such as enthusiasts, collectors, and dealers both in black markets and legitimate markets and FFLs, generally maintain records of their firearm transactions, including receipts and certificates, as items of value, and usually keep them in their residences, places of business, vehicles, digital devices, or on their persons, where they are readily accessible and secure.

b. FFLs generally maintain certain records at their places of business, but occasionally maintain records at residences, or in vehicles, including on computers and other digital devices. These records include their firearm Acquisition and Disposition Logs, ATF Form 4473s, records pertaining to background checks, firearm importation and exportation records, as well as other customer and transaction

49

records.  Also, manufacturers of firearms generally maintain records of their suppliers and customers.  These records may be maintained within physical documents, retained digitally, or in some combination of the two.

c.   Businesses generally maintain additional records regarding business operations.  This includes records documenting the organization of the business, the officers, managers, and lower level employees.  Financial records will often also be maintained at the business.

d.   Individuals who regularly deal in and collect firearms store these firearms at their residences and places of business, often in warehouses, garages, gun safes, storage containers, or other storage locations, to safely store their firearms and limit access to others as a safety precaution, and to keep their valuable merchandise from getting damaged. Firearms are also stored in these places to prevent theft.

e.   I know that individuals and FFLs engaged in firearm manufacturing and sales often store firearms and firearm components that are in various stages of completion in their residences, places of business, or vehicles, within workshops, warehouses, garages or other places where they manufacture or store firearms or firearms parts.  These same individuals, businesses, or FFLs also store firearm tools, firearm jigs, assembly kits, CNC coding software or codes, and other firearm manufacturing devices and tools in these same work spaces within their residences, places of businesses, or vehicles.

93.    Based on my training, experience, discussions with
other law enforcement officers, and participation in firearms
investigations, including the manufacturing and sales of
firearms, and how computerized machines such as a CNC machines
are used in the manufacture of firearms, I have learned that:

a.    Firearms dealers and/or manufacturers commonly
utilize CNC mill machines that have the capability to store
programs or codes to manufacture firearms and firearms parts.

b.    Firearms dealers and/or manufacturers who utilize
CNC mill machines maintain and use other digital devices and/or
removable media to store programs or codes needed for the CNC
mill machines to manufacture lower receivers.  I know that the
CNC mill machines are computer programmed and calibrated to
specifically machine metal to the specific configurations of the
operator and is utilized by firearms manufactures to keep count
of how many firearms are produced by the CNC and to ensure
consistent machining methods are used for each firearm produced.

c.    Firearms dealers and/or manufacturers utilize
computers, iPads, flash drives and other digital devices to
store customer lists, photographs, transactions records,
firearms design and manufacturing instructions, and digital
messages that are related to and further firearms manufacturing
and sales.

d.    Firearms dealers and/or manufacturers commonly
maintain address or telephone numbers in computers and cellular
telephones that reflect names, address, and/or telephone numbers
of their associates and customers related to firearms dealing.

51

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[12]

94. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[12] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    95.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.   REQUEST FOR EARLY-MORNING SERVICE

94. As discussed above, based on surveillance, it appears that POLYMER80 employees have arrived at the SUBJECT PREMISES in the early-morning hours, between 5:00 a.m. and 6:00 a.m. Therefore, I request authorization to execute the search warrant between 5:00 a.m. and 6:00 a.m., if necessitated by the arrival of any individuals to the SUBJECT PREMISES during that time. Once an individual arrives at the SUBJECT PREMISES and sees ATF agents preparing to execute a search warrant, there is the

54

possibility for destruction of evidence if the search warrant is not immediately executed. In addition to concerns regarding preservation of evidence, I also request authority to execute the search warrant upon arrival of individuals to the SUBJECT PREMISES due to operational safety concerns. The search warrant may more safely be executed when fewer individuals are at the SUBJECT PREMISES, rather than waiting until more individuals, who would need to be secured by law enforcement, arrive. Lastly, early execution of the search warrant will help to avoid unnecessary disruption of business operations during regular business hours. Accordingly, I respectfully request authorization to execute the search warrant between 5:00 a.m. and 6:00 a.m., in the event that an individual arrives at the SUBJECT PREMISES during that time.

## X.   REQUEST FOR TEMPORARY SEALING

96.   It is respectfully requested that this Court issue an order sealing, until execution of the warrant, all papers submitted in support of this application, including the application and search warrant affidavit. I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving multiple individuals and entities, both currently known and unknown, and many of the targets of the investigation remain unaware that they are being investigated. Disclosure of the search warrant affidavit at this time, prior to its execution, would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy

evidence, change patterns of behavior, or allow flight from prosecution.   Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.   Therefore, I request that the application for search warrant, this affidavit, and all papers in support thereof remain sealed, until execution of the search warrant, at which time the documents will be unsealed.

### XI.   CONCLUSION

97.   Based on the foregoing, I request that the Court issue the requested warrant.

TOLLIVER HART, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and sworn to before me
by reliable electronic means on
this ___ day of December, 2020.

HONORABLE WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

JAN 1 8 2017

907010:WJS
3311/305402

Mr. Jason Davis
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Temecula, California 92691

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry
Services Branch (FTISB). In your letter, you asked for a classification of two Glock-type
"PF940C Blank" on behalf of your client, Polymer 80 Incorporated (see enclosed
photos). Specifically, you wish to know if each of these items would be classified as a
"firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **PF940C** has critical machining operations <u>not</u> yet "implanted" as
follows:

- *Drilling of the locking left and right block pin holes.*
- *Drilling of the left and right trigger pin holes.*
- *Drilling of the left and right trigger housing pin holes.*
- *Cutting of the left and right rail slots to allow for slide installation.*
- *Machining of the side walls that block slide installation.*
- *Machining of the cross walls that block barrel and recoil spring installation.*

As a part of your correspondence, you describe design features and the manufacturing
process of the submitted "**PF940C**" to include the following statement:

• *The submitted PF940C blank is a solid core unibody design made out of a single
casting without any core strengthening inserts. Moreover, it is void of any indicators that
designate or provide guidance in the completion of the firearm.*

Mr. Jason Davis                                                    Page 2

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and]…the frame or receiver of any such weapon…*

Also, 27 CFR Section 478.11 defines **"firearm frame or receiver"**. *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR Section 447.11, defines **"defense articles"** as—

*…Any item designated in § 447.21 or § 447.22. This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL, Section 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample **"PF940C"**, FTISB personnel found that the following machining operations or design features present or completed:

1. Trigger slot.
2. Capable of accepting Glock 17 trigger mechanism housing.
3. Capable of accepting Glock 17 trigger bar.
4. Magazine well.
5. Magazine catch.
6. Accessory rail.
7. Slide-stop lever recess.
8. Magazine catch spring recess.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Trigger mechanism housing pin machined or indexed.
3. Locking block-pin hole machined or indexed.
4. Devoid of front or rear frame rails.
5. Barrel seat machined or formed.
6. Incapable of accepting Glock locking-block.

Mr. Jason Davis                                                                    Page 3

**Note:** *The dust cover, top of the barrel seat area and locking-block recess area became damaged during this evaluation.*

As a result of this FTISB evaluation, the submitted "**PF940C**" is <u>not</u> sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a "firearm" as defined in the GCA. Consequently, the aforementioned items are therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blanks incorporating the aforementioned design features are <u>not</u> classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus each of these items are <u>not</u> a "firearm" as defined in GCA, 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR Section 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

Correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular issue or item. We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Please be aware, this determination is relevant to the item as submitted. If the <u>design</u>, <u>dimensions</u>, <u>configuration</u>, <u>method of operation</u>, <u>processes</u> or <u>utilized materials</u>, this classification would be subject to review and would require a submission to FTISB of a complete functioning exemplar.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

Sincerely yours,

*Michael R. Curtis*
Chief, Firearms Technology Industry Services Branch

Enclosure

# PF940C Blank, Submitted 10/6/16



# PF940C Blank, Dust Cover Area Damaged



# PF940C Blank, With Trigger Mechanism Housing and Slide Stop Lever



# PF940C Blank, Incapable of Accepting Glock Locking Block







*The Law Offices of*
# DAVIS & ASSOCIATES

Temecula Office: ~~41593 Winchester Rd. Suite 200, Temecula, CA 92590~~
✦ Orange County Office: 27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (866) 545-GUNS/Fax (888) 624-GUNS Jason@CalGunLawyers.com
www.CalGunLawyers.com

October 3, 2016

*EVAL.*
*305 — 402*

*RECEIVED*
*OCT 0 6 2016*
*FATD*
*BY.................*

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

*ONE*
*PISTOL*
*RECEIVER*

Re:     **IN RE: POLYMER 80, INC. PF940C BLANK**

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture pistol frame blanks. Specifically, we are asking for clarification as to whether the enclosed PF940C polymer 9mm ("PF940C") blank is a "firearm," "firearm frame," or "firearm receiver" as defined in 18 U.S.C. §921(a)(3) or a merely a casting.

We have enclosed an exemplar PF940C for your review and examination. **The submitted PF940C blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.**

We believe that the enclosed item is not a firearm or a firearm receiver. Nevertheless, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

### DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq*., primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*., stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

> (B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

Re:   **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 2

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).) Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver. A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver.* That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel. (The same definition appears in 27 C.F.R. §479.11.) "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

The statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver. Referring to ATF's definition in §478.11, an unfinished piece is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components. The definition does not include raw materials that "would provide housing" for such components ". . . if further machined."

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.) Raw material requires further fabrication. The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).) The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).) The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).) Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:   **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 3


Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation.*" (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.)  The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a frame or receiver in terms of whether it was "capable of accepting all parts" necessary for firing.  Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b).  The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).)  The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled.  He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire.  Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540.  Similar opinions were rendered by the Chief, ATF Firearms Technology Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF expressed its opinions as to what extent raw material must be machined in order to be deemed a firearm.  Specifically, in your letter dated June 12, 2014 (90350:WJS 331/302036) you stated as following in response to a submission from Tactical Machining, LLC:

> In general, to be classified as firearms, pistol forgings or castings must incorporate the following critical features:

> Slide rails or similar slide-assembly attachment features.
> Hammer pin hole.
> Sear pin hole.

That letter was responding to two submissions (Sample A and Sample B).  Those samples were described as having the following completed:

1.  Plunger-tube holes have been drilled.
2.  Slide-stop pin hole drilled.
3.  Slide-stop engagement area machined.
4.  Ejector pin hole drilled.
5.  Safety-lock hole drilled.

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 4

6. Magazine-catch area machined.
7. Grip-screw bushing holes drilled.
8. Trigger slot machined.
9. Magazine well machined.
10. Main spring housing area machined.
11. Main spring pin hole machined.
12. Sear-spring slot machined.

The critical machining operations not yet implemented in SAMPLE A and B were as follows:

1. Slide rails cut.
2. Sear pin hole drilled.
3. Hammer pin hole drilled.
4. Barrel seat machined.

The FTB determined that neither Sample A nor B meet the definition of "firearm" presented in GCA, 18 U.S.C. Section 921(a)(3).)

Similarly, the critical machining operations not yet implanted in the PF940C are as follows:

1. Drill the locking left block pin hole.
2. Drill the locking right block pin hole.
3. Drill the left trigger pin hole.
4. Drill the right trigger pin hole.
5. Drill the trigger left housing pin hole.
6. Drill the right trigger housing pin hole.
7. Cut the left rail slots in the rear to allow slide installation.
8. Cut the right rail slots in the rear to allow slide installation.
9. Machine the side walls that block slide installation.
10. Machine the cross wall that blocks barrel and recoil spring installation.

Thus, it is clear that the PF940C blank lower does not provide housing for the "hammer, bolt or breechblock, and firing mechanism" as required by law. Moreover, like the 1911 submission that was deemed not a "firearm" by the FTB, the PF940C is missing critical operations necessary to complete the product. In this regard, the operations performed on the exemplar casting are akin to the 1911 submission deemed not a "firearm" by the FTB. As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification on this point: 1) Is it the opinion of the Bureau of Alcohol, Tobacco, Firearms, and Explosives that the enclosed PF940C blank is a firearm or firearm frame or receiver.

Thank you for taking the time to address this issue. We look forward to hearing from you. Please let us know if you have any further questions or concerns. **When complete, please return the**

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:  **IN RE: POLYMER 80, INC. PF940C BLANK**
October 3, 2016
Page 5

submitted parts to 42690 Rio Nedo, Suite F, Temecula, CA 92590 via Fed-Ex using account number: 321690653.

Sincerely,

**DAVIS & ASSOCIATES**

s/ *Jason Davis*

JASON DAVIS.

# EXHIBIT 2



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

*Martinsburg, WV 25405*

www.atf.gov

**NOV 0 2 2015**

907010:WJS
3311/303738

Mr. Jason Davis
The Law Offices of Davis & Associates
41593 Winchester Road, Suite 200
Temecula, California 92590

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of Alcohol,
Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch
(FTISB).  In your letter, you asked for a classification of an AR10-type item identified by you as
a "WARRHOGG BLANK" as well as a Glock-type "GC9 Blank" on behalf of your client,
Polymer 80, Incorporated (see enclosed photos).  Specifically, you wish to know if these items
would be classified as a "firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **WARRHOGG BLANK** incorporates the following design features:

- *Magazine well.*
- *Magazine catch.*
- *Receiver extension/buffer tube.*
- *Pistol grip area.*
- *Pistol-grip screw hole.*
- *Pistol grip upper receiver tension hole.*
- *Pistol grip tension screw hole.*
- *Bolt catch.*
- *Front pivot-pin takedown hole.*
- *Rear pivot-pin takedown hole.*

As a part of your correspondence, you describe design features and the manufacturing process of
the submitted "WARRHOGG Blank" to include the following statements:

- 2 -

Mr. Jason Davis

- *The submitted WarrHogg .308 blank lower receiver blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm. This submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner using a "single shot of molten material."*

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and] ...the frame or receiver of any such weapon...*

Also, 27 CFR § 478.11 defines **"firearm frame or receiver."** *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR § 447.11, defines **"defense articles"** as—

*...Any item designated in § 447.21 or § 447.22.  This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL § 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample, FTISB personnel found that the following machining operations or design features present or completed:

1. Front and rear pivot/take down pin holes.
2. Front and rear pivot/ take down detent retainer holes.
3. Front and rear pivot/take down lug clearance areas.
4. Selector-retainer hole.
5. Magazine-release and catch slots.
6. Trigger-guard formed.
7. Rear of receiver present and threaded to accept buffer tube.
8. Buffer-retainer hole.
9. Pistol-grip mounting area faced off and drilled, but not threaded.
10. Magazine well.
11. Receiver end-plate recess.

- 3 -

Mr. Jason Davis

Machining operations or design features <u>not</u> yet present or completed:

1. Complete removal of material from the fire-control cavity area.
2. Machining or indexing of selector-lever hole.
3. Machining or indexing of trigger slot.
4. Machining or indexing of trigger-pin hole.
5. Machining or indexing of hammer-pin hole.

As a part of this evaluation, FTISB personnel noted the following markings:

<u>Left Side</u>

- **308**
- **POLYMER80**

FTISB has determined that an AR-10 type receiver blank could have all other machining operations performed, including front receiver pivot-pin and rear take down pin hole and clearance for the front receiver lug and rear take down pin lug clearance area (not to exceed 1.60 inches), but must be completely solid and un-machined in the fire-control recess area. The rear take down pin lug clearance area must be no longer than 1.60 inches, measured from immediately forward of the front of the buffer-retainer hole.

The FTISB examination of your submitted item, found that the most forward portion of the rear take down pin lug clearance area measures approximately 1.32 inches in length, less the maximum allowable 1.60 inch threshold. As a result, the submitted item is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is <u>not</u> a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated AR10-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive; and thus, it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "**CG** or **CG9**" to include the following statement:

- *The submitted GC9 blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.*

- 4 -

Mr. Jason Davis

Please note, while not indicated in the accompanying correspondence, the submitted CG or CG9 appears to have been made utilizing additive manufacturing or 3-D printing technology and not "made out of a single casting."

During the examination of your sample **"CG or CG9,"** FTISB personnel found that the following machining operations or design features present or completed:

1. Slide lock lever location indexed.
2. Upper portion of slide lock spring recess.
3. Trigger slot.
4. Capable of accepting Glock 17 trigger mechanism housing.
5. Capable of accepting Glock 17 trigger bar.
6. Capable of accepting Glock 17 locking block.
7. Magazine well.
8. Magazine catch.
9. Accessory rail.
10. Slide-stop lever recess.
11. Magazine catch spring recess.

Machining operations or design features not yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Locking block-pin hole machined or indexed.
3. Devoid of front or rear frame rails.
4. Barrel seat machined or formed.

As a result, the submitted "CG or CG9" is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR § 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

In conclusion, correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular

- 5 -

Mr. Jason Davis

issue or item.  We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Also, this determination is relevant to the items as submitted.  If the design, dimensions, configuration, method of operation, or utilized materials or processes such as changing from additive manufacturing to injection molding, this classification would be subject to review and require a submission to FTISB of an exemplar utilizing the new manufacturing process.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.  Please do not hesitate to contact us if additional information is needed.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosures

# Polymer 80, Inc. WARRHOGG Receiver Blank











# Polymer 80, Inc; GC or CG9 Receiver Blank









# Capable of Accepting Glock 17 Trigger Mechanism and Trigger Bar Assemblies



# Capable of Accepting Glock 17 Locking Block, Trigger Assembly and Slide Stop Lever



# Internal Frame Comparison to NFC Glock 17



# Frame Comparison to NFC Glock 17



# Frame Comparison to NFC Glock 17



# EXHIBIT 3



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

**FEB 2 0 2018**

907010:WJS
3311/308032

Mr. Jason Davis
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Temecula, California 92691

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry
Services Branch (FTISB). In your letter, you asked for a classification of a Glock-type
"PF940V2 Blank" on behalf of your client, Polymer 80 Incorporated (see enclosed
photos). Specifically, you wish to know if this item would be classified as a "firearm"
under the Gun Control Act of 1968 (GCA). You state that, "we believe the enclosed item
is not a firearm",

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18
U.S.C. § 921(a)(3), defines the term **"firearm"** _to include any weapon (including a
starter gun) which will or is designed to or may be readily converted to expel a projectile
by the action of an explosive...[and]...the frame or receiver of any such weapon..._

Also, 27 CFR § 478.11 defines **"firearm frame or receiver"**. _That part of a firearm
which provides housing for the hammer, bolt or breechblock, and firing mechanism, and
which is usually threaded at its forward portion to receive the barrel._

Also, the GCA, 18 U.S.C. § 921(a)(29), defines **"handgun"** to include _"a firearm which
has a short stock and is designed to be held and fired by the use of a single hand; and (B)
any combination of parts from which a firearm described in subparagraph (A) can be
assembled._

In addition, 27 CFR § 478.11 defines a **"pistol"** to mean _"a weapon originally designed,
made and intended to fire a projectile (bullet) from one or more barrels when held in one_

Mr. Jason Davis                                                          Page 2

*hand, and having (a) a chamber(s) as integral part(s) of, or permanently aligned with,*
*the bore(s); and (b) a short stock designed to be gripped by one hand at an angle to and*
*extending below the line of the bore(s)."*

During the examination of your sample "**PF940V2**", FTISB personnel found that the
following machining operations or design features present or completed:

1. Trigger slot.
2. Capable of accepting Glock 17 trigger mechanism housing.
3. Capable of accepting Glock 17 trigger bar.
4. Magazine well.
5. Magazine catch.
6. Accessory rail.
7. Slide-stop lever recess.
8. Magazine catch spring recess.
9. Metal embedded plate in dust cover.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Trigger mechanism housing pin machined or indexed.
3. Locking block-pin hole machined or indexed.
4. Devoid of front or rear frame rails.
5. Barrel seat machined or formed.
6. Incapable of accepting Glock locking-block.

It is clear from the above information provided in your correspondence that the submitted
sample is only a component used in the assembly of an end-item. Research conducted by
FTISB has disclosed that a Polymer 80 Model PF940V2 is being marketed at
www.polymer80.com, as depicted in screenshots below:



Mr. Jason Davis                                                    Page 3



**Image of Polymer 80 Model PF940V2 80%Standard Pistol Frame Kit obtained from www.polymer80.com**

FTISB also noted the following markings on the submitted sample:

- **PF40V2**
- **MADE IN USA**
- **POLYMER80, INC.**
- **DAYTON, NV**
- **P80**

The following is a description from Polymer 80's website that describes the item and what is included with the purchase of the Polymer 80 Model PF940V2 80% Standard Pistol Frame Kit:

- **The PF940v2™ is compatible with components for 3-pin 9mm G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31.**
- **Next Generation Ergonomics and Features**
- **High-Strength Reinforced Polymer Construction**
- **The ReadyMod® frame features a blank grip design that is ready for stippling and other grip customization.**
- **Picatinny/STANAG Compliant Accessory Rail**
- **Blank Serialization Plate**
- **Stainless Steel Locking Block Rail System (LBRS™)**
- **Stainless Steel Drop-In Rear Rail Module (RRM™)**
- **Hardened Pins for LBRS™ and RRM™**
- **Complete Finishing Jig, Drill bits and End Mill Included**

Clearly the submitted sample is simply a component of a larger product. In your correspondence, you reference that "the PF940V2 is missing critical operations necessary to complete the product".

Mr. Jason Davis                                                        Page 4

Please note, the *frame* or *receiver* of a firearm is a *firearm* as defined in GCA, 18 U.S.C,
§ 921(a)(3)(B), and any combination of parts from which a *handgun*, as defined in 18
U.S.C. § 921(a)(29), can be assembled is also a *firearm* as defined in 18 U.S.C. §
921(a)(3).

FTISB will not render a classification on a <u>partial</u> product submission. In order to receive
an evaluation and classification of your product, please submit the <u>complete</u> Polymer 80
Model PF940V2 80% Standard Pistol Frame Kit being marketed by your client.

We caution that these findings are based on the sample as submitted. If the design,
dimensions, configuration, method of operation, or materials used were changed, our
determination would be subject to review. The submitted sample will be returned to you
under a separate cover utilizing FEDEX account number 321690653.

We thank you for your inquiry and trust the foregoing has been responsive to your
evaluation request.

Sincerely yours,

*Miller*

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosure



Polymer 80 PF940V2

# Polymer 80 PF940V2



# Polymer 80 PF940V2



# Polymer 80 PF940V2





# THE DAVIS
## LAW FIRM

Orange County Office: 27201 Puerta Real, Suite 300, Mission Viejo, California 92691
Temecula Office: 42690 Rio Nedo, Suite F, Temecula, California 92590
Tel: 866-545-4867 / Fax: 888-624-4867 / CalGunLawyers.com

December 11, 2017   *EVAL. 308-032*

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

RECEIVED
DEC 1 8 2017
BY. *FATO*

Re:   __IN RE: POLYMER 80, INC. PF940V2 BLANK__

Dear Mr. Griffith:

I write regarding my client, POLYMER 80, INC. (P80) and their intent to manufacture pistol frame blanks. Specifically, we are asking for clarification as to whether the enclosed PF940V2 polymer 9mm ("PF940V2") blank is a "firearm," "firearm frame," or "firearm receiver" as defined in 18 U.S.C. §921(a)(3) or a merely a casting.

We have enclosed an exemplar PF940V2 for your review and examination. **The submitted PF940V2 blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.** Significantly, the PF940V2 is nearly identical to the previously submitted PF940C, except in certain dimensions. The ATF classified that submission as a non-firearm. (*See* ATF letter dated January 18, 2017, 907010:WJS 3211/305402.)

We believe that the enclosed item is not a firearm or a firearm receiver. Nevertheless, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

## DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*, primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*, stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

>(B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

THE DAVIS LAW FIRM
IN RE: POLYMER 80, INC. PF940V2 BLANK

December 11, 2017
Page 2

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).)  Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver.  A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver.*  That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.  (The same definition appears in 27 C.F.R. §479.11.)  "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

The statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver.  Referring to ATF's definition in §478.11, an unfinished piece is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components.  The definition does not include raw materials that "would provide housing" for such components ". . . if further machined."

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.*  The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled.  *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.)  Raw material requires further fabrication.  The Gun Control Act recognizes the distinction between "Assembly and "fabrication."  (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added).)  The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).)  The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).)  Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation.*" (*F.J. Vollmer Co., Inc. v. Higgins,* 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.)  The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK

THE DAVIS LAW FIRM
IN RE: POLYMER 80, INC. PF940V2 BLANK
_____

December 11, 2017
Page 3

receiver, the critical features were the lack of the attachment block and the presence of a hole";
"welding the attachment block back onto the magazine and filling the hole it had drilled" removed
the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a frame or receiver in terms of whether it was "capable of
accepting all parts" necessary for firing.  Like the term "firearm," the term "machinegun" is also
defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b).  The same
definition is incorporated by reference in 18 U.S.C. §921(a)(3).)  The Chief of the ATF Firearms
Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to
accept a full automatic sear, but the automatic sear hole was not drilled.  He opined: "in such a
condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire.
Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting
all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA."
(Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540.
Similar opinions were rendered by the Chief, ATF Firearms Technology Branch, Aug. 3 1977
(reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific
Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF expressed its opinions as to what extent raw material must be machined in
order to be deemed a firearm.  Specifically, in your letter dated June 12, 2014 (90350:WJS
331/302036) you stated as following in response to a submission from Tactical Machining, LLC:

> In general, to be classified as firearms, pistol forgings or castings must incorporate the
> following critical features:
>
> Slide rails or similar slide-assembly attachment features.
> Hammer pin hole.
> Sear pin hole.

That letter was responding to two submissions (Sample A and Sample B).  Those samples were
described as having the following completed:

1. Plunger-tube holes have been drilled.
2. Slide-stop pin hole drilled.
3. Slide-stop engagement area machined.
4. Ejector pin hole drilled.
5. Safety-lock hole drilled.
6. Magazine-catch area machined.
7. Grip-screw bushing holes drilled.
8. Trigger slot machined.
9. Magazine well machined.
10. Main spring housing area machined.
11. Main spring pin hole machined.
12. Sear-spring slot machined.

THE DAVIS LAW FIRM
IN RE: POLYMER 80, INC. PF940V2 BLANK

December 11, 2017
Page 4

The critical machining operations not yet implemented in SAMPLE A and B were as follows:

1. Slide rails cut.
2. Sear pin hole drilled.
3. Hammer pin hole drilled.
4. Barrel seat machined.

The FTB determined that neither Sample A nor B meet the definition of "firearm" presented in GCA, 18 U.S.C. Section 921(a)(3).)

Similarly, the critical machining operations not yet implanted in the PF940V2 are as follows:

1. Drill the locking left block pin hole.
2. Drill the locking right block pin hole.
3. Drill the left trigger pin hole.
4. Drill the right trigger pin hole.
5. Drill the trigger left housing pin hole.
6. Drill the right trigger housing pin hole.
7. Cut the left rail slots in the rear to allow slide installation.
8. Cut the right rail slots in the rear to allow slide installation.
9. Machine the side walls that block slide installation.
10. Machine the cross wall that blocks barrel and recoil spring installation.

Thus, it is clear that the PF940V2 blank lower does not provide housing for the "hammer, bolt or breechblock, and firing mechanism" as required by law. Moreover, like the 1911 submission that was deemed not a "firearm" by the FTB, the PF940V2 is missing critical operations necessary to complete the product. In this regard, the operations performed on the exemplar casting are akin to the 1911 submission deemed not a "firearm" by the FTB. As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification on this point: 1) Is it the opinion of the Bureau of Alcohol, Tobacco, Firearms, and Explosives that the enclosed PF940V2 blank is a firearm or firearm frame or receiver.

Thank you for taking the time to address this issue. We look forward to hearing from you. Please let us know if you have any further questions or concerns. **When complete, please return the submitted parts to 42690 Rio Nedo, Suite F, Temecula, CA 92590 via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s / *Jason Davis*

JASON DAVIS.

**ATTACHMENT A**

PREMISES TO BE SEARCHED

The business and Federal Firearms Licensee ("FFL") known as POLYMER80, Inc. ("POLYMER80"), which is located at 134 Lakes Blvd, Dayton, NV 89403 (the "SUBJECT PREMISES").

The SUBJECT PREMISES is a three acre plot of land containing a large single story tan and gray building, located on the northwest side of Lakes Blvd, and southeast of the Dayton Air Park airstrip.

The area to be searched at the SUBJECT PREMISES includes all rooms, trash containers, debris boxes, locked containers and safes, cabinets, garages, warehouses, or storage containers or other storage locations assigned to the SUBJECT PREMISES.

i

Overhead view of SUBJECT PREMISES



SUBJECT PREMISES



Main Entrance to SUBJECT PREMISES



**ATTACHMENT B**

## I.    ITEMS TO BE SEIZED:

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(a)(2) (Shipment or Transport of a Firearm by a Federal Firearms Licensee ("FFL") to a Non-FFL in Interstate or Foreign Commerce); 922(b)(2) (Sale or Delivery of a Firearm in Violation of State Law or Ordinance); 922(b)(3) (Sale or Delivery of a Firearm by an FFL to Person Not Residing in the FFL's State); 922(b)(5) (Sale or Delivery of a Firearm by an FFL Without Notating Required Information in Records); 922(d) (Sale or Disposition of a Firearm to a Prohibited Person); 922(e) (Delivery of a Package Containing a Firearm to a Common Carrier Without Written Notice); 922(g) (Possession of a Firearm by a Prohibited Person); 922(m) (False Records by an FFL); 922(t) (Knowing Transfer of Firearm without a Background Check); 922(z) (Sale, Delivery, or Transfer of a Handgun by an FFL Without a Secure Gun Storage or Safety Device); 371 (Conspiracy); and 22 U.S.C. §§ 2278(b)(2) and (c) and 50 U.S.C. § 4819 (Violations of the Arms Export Control Act and Export Control Regulations) (collectively, the "Subject Offenses"), namely:

a.    "Buy, Build, Shoot" kits and components of "Buy, Build, Shoot" kits compiled or arranged in close proximity to one another indicating they were intended to be compiled into "Buy, Build, Shoot" kits;

b.    Handguns bearing no serial number;

v

c.      Communications and records concerning the manufacture, design, marketing, sale, shipment, and transfer of "Buy, Build, Shoot" kits;

d.      Communications and records concerning federal, state, and local firearms laws and regulations;

e.      Communications and records concerning "Buy Build Shoot" kits, or any other similar grouping of components that can be readily assembled into a firearm;

f.      Communications and records of payments for and shipments of "Buy Build Shoot" kits or any other similar grouping of components that can be readily assembled into a firearm;

g.      Communications and records concerning the sale or shipment of firearms and firearm components to individuals prohibited from possessing firearms;

h.      Communications and records concerning the sale or shipment of firearms or firearm components to individuals or locations outside of the United States;

i.      Records concerning the sale or transfer of firearms, including FFL Acquisition and Disposition records, ATF Form 4473s, NICS inquiries and background checks, and other records required to be maintained by FFLs;

j.      Communications and records concerning the sale or transfer of firearms and firearm components to locations or individuals outside of the United States;

k.      Information relating to the identity of the person(s) who communicated about matters discussed above;

vi

l.     Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.     With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.   evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.     evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

vii

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

### Non-Digital Evidence

5. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between an attorney, or to contain the work product of an attorney, and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

6. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged

ix

information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

7. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

x

Digital Evidence

8.     The Search Team will search for digital devices
capable of being used to facilitate the Subject Offenses or
capable of containing data falling within the scope of the items
to be seized.   The Privilege Review Team will then review the
identified digital devices as set forth herein.   The Search Team
will review only digital device data which has been released by
the Privilege Review Team.

9.     The Privilege Review Team will, in their discretion,
either search the digital device(s) on-site or seize and
transport the device(s) to an appropriate law enforcement
laboratory or similar facility to be searched at that location.

10.    The Privilege Review Team and the Search Team shall
complete both stages of the search discussed herein as soon as
is practicable but not to exceed 180 days from the date of
execution of the warrant.   The government will not search the
digital device(s) beyond this 180-day period without obtaining
an extension of time order from the Court.

11.    The Search Team will provide the Privilege Review Team
with a list of "privilege key words" to search for on the
digital devices, to include specific words like names of any
identified attorneys or law firms or their email addresses, and
generic words such as "privileged" or "work product".   The
Privilege Review Team will conduct an initial review of the data
on the digital devices using the privilege key words, and by
using search protocols specifically chosen to identify documents
or data containing potentially privileged information.   The

Privilege Review Team may subject to this initial review all of
the data contained in each digital device capable of containing
any of the items to be seized.  Documents or data that are
identified by this initial review as not potentially privileged
may be given to the Search Team.

12.  Documents or data that the initial review identifies
as potentially privileged will be reviewed by a Privilege Review
Team member to confirm that they contain potentially privileged
information.  Documents or data that are determined by this
review not to be potentially privileged may be given to the
Search Team.  Documents or data that are determined by this
review to be potentially privileged will be given to the United
States Attorney's Office for further review by a PRTAUSA.
Documents or data identified by the PRTAUSA after review as not
potentially privileged may be given to the Search Team.  If,
after review, the PRTAUSA determines it to be appropriate, the
PRTAUSA may apply to the court for a finding with respect to
particular documents or data that no privilege, or an exception
to the privilege, applies.  Documents or data that are the
subject of such a finding may be given to the Search Team.
Documents or data identified by the PRTAUSA after review as
privileged will be maintained under seal by the investigating
agency without further review absent subsequent authorization.

13.  The Search Team will search only the documents and
data that the Privilege Review Team provides to the Search Team
at any step listed above in order to locate documents and data
that are within the scope of the search warrant.  The Search

xii

Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

14.  In performing the reviews, both the Privilege Review Team and the Search Team may:

a.  search for and attempt to recover deleted, "hidden," or encrypted data;

b.  use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.  use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

15.  Neither the Privilege Review Team nor the Search Team will seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

16.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

17.  If the search determines that a digital device does contain data falling within the list of items to be seized, the

xiii

government may make and retain copies of such data, and may access such data at any time.

18. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

19. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

20. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

21. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

xiv

custody and control of attorneys for the government and their support staff for their independent review.

22. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the Subject Offenses listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

23. The special procedures relating to digital devices found in this warrant govern only the search of digital devices

xv

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.