UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITY OF SYRACUSE, *et al.*,

                Plaintiffs,

      v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *et al.*,

                Defendants.

No. 20 Civ. 6885 (GHW)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2799/2822
Fax: (212) 637-2686/2702
E-mail: alexander.hogan@usdoj.gov
        talia.kraemer@usdoj.gov

ALEXANDER J. HOGAN
TALIA KRAEMER
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................3

I.    Statutory and Regulatory Background...........................................................3

      A.  The GCA's Definition of "Firearm" .................................................3

      B.  ATF's Classification of Unfinished Receivers .................................5

II.   Plaintiffs' Allegations .................................................................................9

ARGUMENT ........................................................................................................11

I.    Plaintiffs Lack Standing...............................................................................11

      A.  Legal Standards................................................................................11

      B.  Standing of the City Plaintiffs..........................................................11

      C.  The Organizational Plaintiffs' Standing ..........................................14

II.   The 2015 Ruling and Q&As Are Not Final Agency Action Regarding
      Unfinished Frames and Receivers ................................................................16

      A.  The 2015 Ruling Is Not Final Agency Action Regarding Unfinished
          Frames and Receivers ......................................................................16

      B.  The Q&A Is Not Final Agency Action .............................................18

III.  Defendants Have Not Violated the APA .......................................................18

      A.  Legal Standards................................................................................18

      B.  The GCA Unambiguously Excludes Unmachined Frames or
          Receivers From the Statutory Definition of a Firearm ....................19

          1.  An Unmachined Frame or Receiver Is Not "Designed To"
              Expel a Projectile ...................................................................21

          2.  An Unmachined Frame or Receiver Cannot Be Readily
              Converted Into a Device that Expels a Projectile ...............26

      C.  Even If the GCA Is Ambiguous As to the Meaning of "Readily

be Converted," ATF's Interpretation Is a Reasonable One ...........................29

    1.  ATF's Interpretation Is Consistent and Longstanding..............................30

        i.  The General Standard Applied by ATF ................................................30

        ii.  Classification Letters to Polymer80....................................................34

    2.  ATF's Interpretation Reasonably Balances the Purposes of the GCA ......36

    3.  ATF's Expertise ........................................................................................37

    4.  Plaintiffs' Remaining Challenges to ATF's Classification Decisions Are Meritless...............................................................................................40

  D.  Plaintiffs' Petition for Rulemaking .................................................................41

CONCLUSION...................................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aleutian Capital Partners, LLC v. Scalia,*
   975 F.3d 220 (2d Cir. 2020)...................................................................................... 20

*Allison Engine Co. v. United States ex rel. Sanders,*
   553 U.S. 662 (2008).................................................................................................. 24

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001)................................................................................ 19

*Ardestani v. Immigration and Naturalization Serv.,*
   502 U.S. 129 (1991).................................................................................................. 21

*Ass'n of Proprietary Colls. v. Duncan,*
   107 F. Supp. 3d 332 (S.D.N.Y. 2015)....................................................................... 19

*Assoc. of Private Sector Coll. & Univ. v. Duncan,*
   110 F. Supp. 3d 176 (D.D.C. 2015) .......................................................................... 39

*Baezer East Inc. v. EPA,*
   963 F.2d 603 (3d Cir. 1992)...................................................................................... 39

*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................................................ 16, 17

*Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson,*
   407 F. Supp. 2d 38 (D.D.C. 2005) ...................................................................... 43, 44

*BFP v. Resolution Trust Corp.,*
   511 U.S. 531 (1994).................................................................................................. 24

*Carpenters Indus. Council v. Zinke,*
   854 F.3d 1 (D.C. Cir. 2017)...................................................................................... 13

*Catskill Mts v. EPA.,*
   846 F.3d 492 (2d Cir. 2017)...................................................................................... 21

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).................................................................................................. 18

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017) ........................................................................... 14

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ..................................................................................... 20

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ..................................................................................... 38

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ....................................................................... 14

*Ctr. for Sci. in the Pub. Interest v. U.S. Food & Drug Admin.*,
   74 F. Supp. 3d 295 (D.D.C. 2014) ............................................................... 43, 44

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..................................................................................... 37

*Families for Freedom v. Napolitano*,
   628 F. Supp. 2d 535 (S.D.N.Y. 2009) .......................................................... 42, 43

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) .......................................................................... 38

*Glara Fashion, Inc. v. Holder*,
   No. 11-cv-889 (PAE), 2012 WL 352309 (S.D.N.Y. Feb. 3, 2012) ......................... 19

*Golden & Zimmerman, LLC v. Domenech*,
   599 F.3d 426 (4th Cir. 2010) .......................................................................... 18

*Gulf Restoration Ntwk. v. U.S. Dep't of Trans.*,
   452 F.3d 362 (5th Cir. 2006) .......................................................................... 38

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ..................................................................................... 15

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................... 45

*Henley v. Food & Drug Admin.*,
   77 F.3d 616 (2d Cir. 1996) ............................................................................. 37

*In re A Cmty. Voice*,
   878 F.3d 779 (9th Cir. 2017) .......................................................................... 43

iv

*In re Am. Rivers & Idaho Rivers United*,
   372 F.3d 413 (D.C. Cir. 2004) ................................................................. 43

*In re Barr Labs*,
   930 F.2d 72 (D.C. Cir. 1991) ................................................................... 46

*In re Cal. Power Exch. Corp.*,
   245 F.3d 1110 (9th Cir. 2001) ................................................................. 43

*In re Core Commc'ns, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008) ................................................................. 43

*In re Int'l Chem. Workers Union*,
   958 F.2d 1144 (D.C. Cir. 1992) ............................................................... 43

*In re People's Mojahedin Org. of Iran*,
   680 F.3d 832 (D.C. Cir. 2012) ................................................................. 44

*Innovator Enters. v. Jones*,
   28 F. Supp. 3d 14 (D.D.C. 2014) ............................................................... 3

*Jackson v. City and County of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ................................................................... 37

*Just Bagels Mfg., Inc. v. Mayorkas*,
   900 F. Supp. 2d 363 (S.D.N.Y. 2012) ...................................................... 19

*Karpova v. Snow*,
   497 F.3d 262 (2d Cir. 2007) ............................................................. 19, 37

*Kokajko v. FERC*,
   837 F.2d 524 (1st Cir. 1988) ................................................................... 45

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ................................................................. 15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................ 11, 14

*Manners v. Secretary of Defense*,
   242 Fed. App'x 723 (2d Cir. 2007) .......................................................... 36

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ................................................................. 12

*Midwest Gas Users Ass'n v. F.E.R.C.*,
    833 F.2d 341 (D.C. Cir. 1987) ................................................................. 43

*Modern Muzzleloading, Inc. v. Magaw*,
    18 F. Supp. 2d 29 (D.D.C. 1998) ....................................................... 39, 40

*Mullenix v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    No. 07-cv-154, 2008 WL 2620175 (E.D.N.C. July 2, 2008) ................... 39

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012) ..................................................................... 14

*Nebraska ex rel. Bruning v. Dep't of Health & Human Servs.*,
    877 F. Supp. 2d 777 (D. Neb. 2012) ......................................................... 12

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013) ....................................................................... 42

*Orion Reserves Ltd. P'ship v. Kempthorne*,
    516 F. Supp. 2d 8 (D.D.C. 2007) .............................................................. 42

*People of Colo. ex rel. Suthers v. Gonzales*,
    558 F. Supp. 2d 1158 (D. Colo. 2007) ...................................................... 12

*Perales v. Sullivan*,
    948 F.2d 1348 (2d Cir. 1991) ................................................................... 19

*Pub. Citizen Health Research Grp. v. Auchter*,
    702 F.2d 1150 (D.C. Cir. 1983) ................................................................ 43

*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*,
    740 F.2d 21 (D.C. Cir. 1984) .................................................................... 43

*Rousseau v. U.S. Dep't of Treasury*,
    No. 04-cv-4368 (MLC), 2010 WL 457702 (D.N.J. Feb. 5, 2010) ........... 18

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) ................................................... 16, 17, 18, 31

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .................................................................................. 14

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................ 44, 45

*Sig Sauer, Inc. v. Jones*,
    133 F. Supp. 3d 364 (D.N.H. 2015) ........................................................................ 37

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................... 11

*State of New York v. Sullivan*,
    894 F.2d 20 (2d Cir. 1990) ..................................................................................... 39

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .................................................................................. 37

*Telecommunications Research & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................................... *passim*

*United States v. Cruikshank*,
    92 U.S. 542 (1875) ................................................................................................. 37

*United States v. Dotson*,
    712 F.3d 369 (7th Cir. 2013) .................................................................................. 25

*United States v. Gravel*,
    645 F.3d 549 (2d Cir. 2011) ....................................................................... 22, 23, 24

*United States v. Howard*,
    214 F.3d 361 (2d Cir. 2000) ............................................................................. 36, 37

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ..................................................................................... 37

*United States v. Prince*,
    No. 09-cv-10008 (JTM), 2009 WL 1875709 (D. Kan. June 26, 2009) .................... 29

*United States v. Rivera*,
    415 F.3d 284 (2d Cir. 2005) ............................................................................. 22, 25

*United States v. Thomas*,
    No. 17-cr-194 (RDM), 2019 WL 4095569 (D.D.C. Aug. 29, 2019) ....................... 25

*United States v. Wick*,
    No. 15-cr-00030, 2016 WL 10637098 (D. Mont. July 1, 2016) .............................. 28

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n*,
    783 F.2d 1117 (D.C. Cir. 1986) ............................................................................. 43

*ViroPharma, Inc. v. Hamburg*,
  898 F. Supp. 2d 1 (D.D.C. 2012) ........................................................... 38

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................ 11

*WorldCom, Inc. v. FCC*,
  238 F.3d 449 (D.C. Cir. 2001) ............................................................... 39

**Statutes**

5 U.S.C. § 704 ......................................................................................... 16

5 U.S.C. § 706(1) .................................................................................... 41

18 U.S.C. § 901(3) .................................................................................... 4

18 U.S.C. § 921 ............................................................................... *passim*

18 U.S.C. § 922(a)(1)(a) ......................................................................... 13

18 U.S.C. § 923(a) .................................................................................... 3

18 U.S.C. § 923(i) ................................................................................ 3, 13

18 U.S.C. § 925(d)(3) .............................................................................. 39

26 U.S.C. 5845(b) .................................................................................... 22

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968) ............... 3, 36, 37

Firearms Owners' Protection Act, 100 Stat. 449 ...................................... 36

**Regulations**

27 C.F.R. § 478.11 ................................................................................. 3, 4

27 C.F.R. § 478.41 .................................................................................... 3

27 C.F.R. § 478.92 .................................................................................... 3

27 C.F.R. §§ 478.122-478.134 .................................................................. 3

28 C.F.R. § 0.130(a)(1) ............................................................................. 3

**Rules**

Fed. R. Civ. P. 56 .................................................................................................................. 18

**Congressional Reports**

S. Rep. 89-1866 at 14 (Oct. 19, 1966) ............................................................... 4, 26, 36

S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112 (Apr. 29, 1968) ....................................... 4, 24, 25, 36

**Other Sources**

Funk & Wagnall's Standard College Dictionary (1973) ............................................... 26

Random House Dictionary of the English Language, Unabridged (1966)................................... 26

Plaintiffs in this action are the City of Syracuse, the City of San Jose, the City of Chicago, the City of Columbia (collectively, "City Plaintiffs"), Everytown for Gun Safety Action Fund, and Everytown for Gun Safety Support Fund ("Everytown Plaintiffs" or "Organizational Plaintiffs" and collectively with the City Plaintiffs, "Plaintiffs").   Plaintiffs bring suit pursuant to the Administrative Procedure Act ("APA") against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Acting Director of ATF Regina Lombardo, the United States Department of Justice, and Attorney General William Barr (collectively, "Defendants").   Defendants submit this memorandum of law in support of their motion for summary judgment and in opposition to Plaintiffs' cross-motion for summary judgment.   *See* Dkt. No. 62 ("Plaintiffs' Motion" or "Pl. Mem.").

## PRELIMINARY STATEMENT

For over fifty years, courts, Congress, and the Executive Branch have consistently understood and interpreted the Gun Control Act of 1968 ("GCA" or the "Act"), 18 U.S.C. § 921 *et seq.*, to establish a uniform, federal floor for firearms regulation that takes into account public interests in managing crime, regulating commerce, and protecting the ability of law-abiding citizens to use firearms lawfully.   Plaintiffs now bring suit based upon ATF's longstanding interpretation of the GCA—specifically challenging ATF's definition of what constitutes a firearm for purposes of the Act.   For decades, ATF has assessed whether unfinished frames or receivers are "firearms" within the meaning of the GCA by looking to the item's degree of machining and completeness.   ATF applies a standard under which unfinished frames or receivers that have not yet reached a critical stage of manufacturing—devices that are not designed to expel a projectile and still require many steps, tools, and expertise to be converted into such a device—are not firearms within the meaning of the GCA.

As a threshold matter, Plaintiffs cannot establish standing to maintain their claims. Plaintiffs' failure to establish standing is particularly pronounced under the heightened standards applicable here, where Plaintiffs are not themselves the object of the government action they challenge. The City Plaintiffs lack standing because their alleged injury is not fairly traceable to ATF's determination of when unfinished frames and receivers are firearms. The Organizational Plaintiffs also lack standing, because they have not identified a legally cognizable injury, other than abstract harm to their advocacy interests.

Further, Plaintiffs' challenge to a 2015 ATF ruling related to gun manufacturers (the "2015 Ruling") and "Question and Answer" ("Q&A") posted on ATF's website are not subject to judicial review, because they do not constitute final agency action with respect to when an unfinished frame or receiver constitutes a firearm. The 2015 Ruling does not reflect agency decisionmaking on this issue at all, let alone the consummation of the agency's decisionmaking process. And neither the 2015 Ruling nor the Q&A determines parties' rights or obligations, or results in legal consequences.

Even if the Court were to exercise jurisdiction over Plaintiffs' claims, they fail as a matter of law. Plaintiffs' challenge to ATF's interpretation of the GCA cannot succeed because ATF reasonably interpreted the statutory terms at issue in accordance with their plain meaning, and Plaintiffs' arbitrary-and-capricious claims are contradicted by the administrative record ("Record" or "AR."). *See* Dkt. No. 60. Accordingly, the Court should grant summary judgment in Defendants' favor.

2

**BACKGROUND**

I.     **Statutory and Regulatory Background**

A.     **The GCA's Definition of "Firearm"**

Most federal regulation of firearms used for lawful purposes, including most semiautomatic handguns and rifles of .50 caliber or less (such as the AR-15), is contained in the GCA, Pub. L. No. 90-618, 82 Stat. 1213 (1968).   ATF is the federal agency charged with the administration of the GCA.   *See* 28 C.F.R. § 0.130(a)(1), (2).   Among ATF's responsibilities is the classification of firearms, which is handled by the Firearms and Ammunition Technology Division ("FATD"), previously called the Firearms Technology Branch ("FTB").   FATD employs numerous firearms examiners with expertise in ATF's technical authority relating to firearms and their classification under federal firearms laws.   *See Innovator Enters. v. Jones*, 28 F. Supp. 3d 14, 22 (D.D.C. 2014) ("[FTB] has expertise in classifying firearms and firearm silencers—much more so than the Court").   FATD routinely inspects devices submitted by the public or industry and classifies the submissions accordingly—determining whether the device at issue is a regulated firearm or not.   Those who wish to import, manufacture, or deal in firearms as defined by the GCA must be licensed, *see* 18 U.S.C. § 923(a), 27 C.F.R. § 478.41; must serialize each firearm for identification purposes, *see* 18 U.S.C. § 923(i), 27 C.F.R. § 478.92; and must maintain records of their firearms transactions, *see* 27 C.F.R. §§ 478.122-478.134.   The GCA does not impose such requirements on those who wish to manufacture firearms for personal use.

Under the GCA, a firearm is: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any

destructive device." 18 U.S.C. § 921(a)(3); *see also* 27 C.F.R. § 478.11 (same). The GCA specifically revised the definition of "firearm" used in prior federal law, the Federal Firearms Act ("FFA"), to exclude firearms parts other than the "frame" or "receiver" of a firearm.[1] *See* S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2200 (Apr. 29, 1968).[2]

As relevant here, pursuant to the above statutory definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. Importantly, the "designed to" and "readily be converted" language are only present in the first clause of the statutory definition. 18 U.S.C. § 921(a)(3)(A). Therefore, an unfinished frame or receiver does not meet the statutory definition of "firearm" simply because it is "designed to" or "can readily be converted into" a frame or receiver. Instead, a device is a firearm either: (1) because it *is* a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that "expel[s] a projectile by the action of an explosive." *Id.* § 921(a)(3)(A)-(B).

ATF's regulations define a "receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. A visual depiction of a receiver is provided below.

---

[1] The "receiver" is the part of a rifle that houses vital fire-control components that allow the weapon to shoot, such as the trigger and hammer. The "frame" of a handgun serves a similar purpose.

[2] The FFA was the operative federal law regulating most firearms prior to the GCA. It defined a "firearm" as "any weapon . . . which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such a weapon." 18 U.S.C. § 901(3) (1964). The revised definition of "firearm" in the GCA first appeared in the FFA Amendments of 1966. *See* S. Rep. 89-1866 at 14 (Oct. 19, 1966).



AR. at 284.

**B.      ATF's Classification of Unfinished Receivers**

The term "receiver blank," or "unfinished receiver," is used to describe forgings, castings, or machined bodies in various stages of machining that are not yet ready to house the hammer or other firing components and thus are not capable of operating as a fully functional frame or receiver.  Various manufacturers have used the colloquial term "80% receiver" to describe a receiver blank on which some machining has been performed, but which is not yet a finished receiver.  *See* AR. at 278.[3]

Over the last forty years, ATF has issued numerous classification decisions regarding receiver blanks.  Often at issue in such decisions is whether a given device amounts to a firearm under the Act.  In these decisions, ATF must use its technical expertise to determine at what point a piece of metal has been sufficiently machined or completed in order to be classified as a frame or receiver (under the second clause of the GCA's definition of "firearm") or a device that can be readily converted to expel a projectile (under the first clause of the definition).  The necessity of this line drawing is obvious.  At one end of the spectrum is a blank piece of rectangular metal that can be transformed into most anything, including a frame or receiver.  At the other end of the

---

[3] This term, "80% receivers," is "industry vernacular and [is] neither recognized nor defined in Federal firearms statutes and regulations."  AR. at 272.

spectrum is a fully functional frame or receiver.  As the agency charged with administering the GCA, ATF must determine when a device has been sufficiently transformed that it should be classified as a firearm.

Pursuant to longstanding precedent, ATF applies a rule whereby the degree of machining to the device—in other words, its degree of completeness—determines whether the device is a firearm pursuant to the GCA.  *See infra* at 30-32 (listing dozens of ATF determinations whereby devices were evaluated based upon their degree of completeness).  While the critical "stage of manufacture" that determines when a device becomes a firearm "is necessarily different from firearm to firearm due to the multitude of different model designs, methods of operation, features, materials, and manufacturing methods," *see* AR. at 606, 312, the guiding principle in ATF's evaluations is the degree of machining that the device has undergone.

For example, classification letters from the late 1970s through the 1990s repeatedly sought to determine whether the "manufacturing process" was sufficiently complete in order to be deemed a firearm.  *See, e.g.*, AR. at 1, 14.  These classification letters make clear that ATF focused on the types and degree of machining that remained to be done on the device at issue.  For example, in a 1990 classification letter, ATF determined that in light of six machining processes that still had to be performed on the device, the device was not a firearm.  AR. at 47.  By contrast, in a 1994 classification letter, ATF deemed a device to be a firearm because the only machining left to perform on the device was the drilling of two holes to allow installation of the trigger and hammer pins.  AR. at 51.  In classification letters from the early 2000s, ATF employed the same approach— evaluating the degree of completeness and whether the device had reached a critical stage of manufacture—but often went into greater detail as to what specific machining operations were or were not present on the device at issue.  *See, e.g.*, AR. at 61, 436.  Then, beginning in 2006, ATF

attempted to refine its analysis on exactly what machining operations had to occur in order for a device to have reached the critical stage of manufacture. Specifically, from 2006 on, ATF routinely noted in its classification decisions that a device is not a firearm if there is "absolutely no machining performed in the area of the trigger/hammer recess." AR. at 73. In other words, ATF focused on the degree of machining to the fire control cavity.

Accordingly, over the past several decades ATF has consistently focused on the degree of machining a device has undergone (and hence its degree of completeness) in order to determine whether the device is a firearm. By way of example, below is an example of an unmachined device, which is not a firearm, as compared to a machined device, which is a firearm.[4]

---

[4] The Record contains multiple visual depictions of frames and receivers that are unmachined (and thus not firearms) as compared to frames and receivers that have been partially machined (and thus are firearms). *See* AR. at 273-277, 298-299, 313.



*See* AR. at 313.

In addition, ATF has determined that "indexing" of any part of the fire-control area would require a device to be classified as a firearm. The term "indexing" refers to the placement of marks or indentations on a frame or receiver to indicate the exact location where one or more critical machining operations are necessary to make the weapon functional. AR. at 273 ("In addition to being solid, [the frame] must not contain any holes or dimples for the trigger, hammer, and selector."). A visual depiction of an indexed frame is provided below.



Example 5



AR. at 276.

Therefore, in short, an unfinished frame or receiver is not a firearm until it has been sufficiently machined such that it has reached a critical stage of manufacture, and that line-drawing exercise is necessarily carried out on a device-by-device basis. Once a device crosses that threshold, it becomes a regulated firearm. As described further below, ATF has applied this standard for decades when determining whether a device qualifies as a firearm under the GCA.

## II.   Plaintiffs' Allegations

Plaintiffs argue that the Gun Control Act regulates the "building block" of a firearm so long as it was "designed to or could readily be converted into a functional weapon." Complaint at ¶ 62 (internal quotation marks omitted). In line with this argument, Plaintiffs maintain that ATF

is effectively imposing too high of a threshold for something to be classified as a firearm under the Act.  Plaintiffs claim that, historically, ATF employed a temporal approach to its classification of unfinished frames or receivers, *see* Cmpl. at ¶¶ 70-77, but starting in 2006, "ATF appeared to change course from its temporal approach without explanation, stating—without support from and contrary to the Gun Control Act—that it would determine whether a receiver constitutes a firearm based solely on whether the receiver is solid or contains pin holes or other machining in certain specified areas." *Id*. ¶ 78.  Plaintiffs further state that, in 2015, ATF "memorialized into a public-facing, interpretive rule the rationale of its determination letters: that machining (or drilling) in the trigger group distinguishes a firearm from an unregulated frame or receiver, meaning that a solid unfinished frame or receiver—even if designed to be and readily converted to a firing weapon— is not a firearm." *Id*. ¶ 82 (internal quotation marks omitted).  According to Plaintiffs, the 2015 Ruling from ATF, *see* AR. at 290, memorialized what Plaintiffs characterize as the "solidity" test. *Id*. ¶ 85.

Plaintiffs further allege that, consistent with this 2015 Ruling, ATF began issuing a series of letter determinations to Polymer80 (the "Polymer80 Classification Letters"), stating that "Polymer80's unfinished frames and receivers are not firearms because they are solid and not drilled out or milled in certain specified areas." *Id*. ¶ 110.

Plaintiffs challenge ATF's focus on the degree of machining to the unfinished frame or receiver and the application of this standard in the classification letters to Polymer80 as arbitrary, capricious, and contrary to law under the APA.  In addition, Plaintiffs bring an APA claim based on ATF's alleged failure to reply to their petition (the "Petition") for rulemaking.

## ARGUMENT

I.    **Plaintiffs Lack Standing**

A.    **Legal Standards**

Plaintiffs bear the burden of establishing the Court's jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The doctrine of constitutional standing requires that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant . . . invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quotation marks omitted).  To establish standing under Article III of the Constitution, Plaintiffs must prove that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  The injury alleged must be "concrete and particularized, and . . . actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted).  The "causal connection between the injury and the conduct complained of" must be "fairly traceable" to the defendant "and not the result of the independent action of some third party not before the court."  *Id.* (alterations omitted).  Where, as here, "the plaintiff is not [itself] the object of the government action," standing "is ordinarily substantially more difficult to establish."  *Id.* at 562.

B.    **Standing of the City Plaintiffs**

The City Plaintiffs base their standing on two theories.  First, they allege that they incur substantial costs as a result of the "rapidly increasing numbers of ghost guns recovered from crime scenes," just as they incur costs from all gun crime, including law enforcement costs and costs from emergency services.  Pl. Mem. at 19.  Second, the City Plaintiffs assert that because "ghost

guns" are more difficult to trace, this has increased law enforcement investigatory costs and made it more difficult to "solve gun crime." *Id*. at 19-20.

The City Plaintiffs have failed to demonstrate that their alleged injuries are fairly traceable to ATF's treatment of unmachined frames and receivers.  "In cases where a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' [alleged] injuries, the Supreme Court . . . [has] found the causal chain too weak to support standing." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).  Here, the City Plaintiffs' theory requires a series of assumptions about the impact of ATF's actions on third parties, including that: 1) more companies are manufacturing unmachined frames or receivers due to ATF's interpretation; 2) those companies have decided to market these items to persons who wish to obtain firearms unlawfully; 3) rather than obtaining finished, operative firearms through another source, those persons have chosen to make their own firearms using unmachined frames or receivers; 4) those persons have then chosen to acquire unmachined frames or receivers from a company whose activities were influenced by ATF's interpretation rather than from other companies and rather than making their own, homemade firearms from other firearms parts; 5) after making a firearm, the persons have chosen to use those firearms in a crime; and 6) the crime at issue would not have been committed with another weapon had the person been unable to use an unmachined frame or receiver to commit the crime.  This chain of conjecture is too speculative to meet traceability requirements. *See Nebraska ex rel. Bruning v. Dep't of Health & Human Servs.*, 877 F. Supp. 2d 777, 795-96 (D. Neb. 2012); *see also People of Colo. ex rel. Suthers v. Gonzales*, 558 F. Supp. 2d 1158, 1163 (D. Colo. 2007) (finding causation argument speculative because "myriad additional contingencies need to be present" before the alleged harm could be linked to defendants' alleged failures with respect to illegal immigration).

Further, in light of the fact that Plaintiffs' alleged injuries are not fairly traceable to Defendants, a favorable decision will not redress those injuries. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6, n.1 (D.C. Cir. 2017) ("Causation and redressability typically overlap as two sides of a causation coin.  After all, if a government action causes an injury, enjoining the action usually will redress that injury." (citation and quotation marks omitted)).  First, even if this Court were to invalidate ATF's interpretation of the GCA, it would still be necessary for ATF to undertake a line-drawing exercise to determine under what circumstances frames and receivers in various stages of completeness are or are not firearms.  Because ATF will need to draw that line somewhere, individuals who wish to obtain unfinished frames and receivers that are not subject to the GCA's requirements will still be able to do so and undertake whatever effort would be necessary to ultimately use those objects as part of a firearm.

And aside from weapons assembled using unmachined frames and receivers, additional alternatives exist for individuals who wish to commit crimes using guns exempt from the GCA's requirements.  For example, the GCA does not generally prohibit the making at home of unserialized firearms for personal use.  *See* 18 U.S.C. § 922(a)(1)(a) (only persons "engage[d] in the business" of manufacturing require a license); 18 U.S.C. § 923(i) ("licensed" manufacturers are required to mark firearms with serial numbers); 18 U.S.C. § 921(a)(21)(A) (defining engaged in the business as a manufacturer).  Thus, even if ATF drew the line differently in regulating unmachined frames and receivers, criminal actors could still choose to make a firearm at home out of unregulated firearms parts, and attempt exactly the same crimes cited by the City Plaintiffs to establish injury for purposes of standing.  In sum, because the City Plaintiffs have not shown that invalidating ATF's current interpretation of the GCA would alter the amount of gun crime in their

cities or the costs associated therewith, the City Plaintiffs have not established that their asserted injury is "likely" to be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.

### C.     The Organizational Plaintiffs' Standing

The Organizational Plaintiffs lack standing because they have failed to show any injury to themselves beyond abstract harm to their advocacy efforts based on disagreement with ATF's interpretation of the GCA.  Generally, there are two ways in which organizations can establish standing. They can sue on behalf of their members (known as "associational standing") or they can "have standing in [their] own right" (known as "organizational standing"). *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quotation marks omitted). Where, as here, an organization premises its standing on "organizational standing," a plaintiff must show "(i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the defendant's actions]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotation marks omitted).

The Organizational Plaintiffs premise standing on the fact that ATF's interpretation of the GCA has caused them to "divert resources" to file a petition for proposed rulemaking and produce a report on ghost guns to raise public awareness.  *See* Pl. Mem. at 22.  They also assert, more broadly, that ATF's interpretation of the GCA "undermine[s] a wide range of Everytown's advocacy efforts to prevent gun violence."  Pl. Mem. at 22.  However, an organization's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected" so as to confer standing.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (internal quotation marks omitted); *see also Sierra Club v.*

*Morton*, 405 U.S. 727, 739-40 (1972).  An organization "cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  Rather, the organization "must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *Id.*

The leading case on organizational injury, *Havens Realty Corp. v. Coleman*, demonstrates the distinction between a burden on an organization's activities (which confers standing) and a burden on its social or advocacy interests (which does not).  In *Havens*, the plaintiff, a non-profit fair housing organization, alleged that the defendant's racially discriminatory steering practices "frustrated . . . its efforts to assist equal access to housing through counseling and other referral services [and it] had to devote significant resources to identify and counteract" those practices as a result.  455 U.S. 363, 379 (1982) (internal quotation omitted).  The Court held that these allegations "constitute[] far more than simply a setback to the organization's abstract social interests" as the defendant's actions "ha[d] perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers."  *Id.*  Accordingly, the organization had suffered an injury in its own right.  *Id.*

By contrast, here, the Organizational Plaintiffs offer no evidence that their usual activities have been burdened by ATF's classification of unfinished frames or receivers, such that the Organizational Plaintiffs would incur a cognizable injury if they did not invest resources in advocating against ATF's classification.  Indeed, the activities that the Organizational Plaintiffs identify as "injury" are the very activities that they engage in routinely to carry out their mission: public advocacy aiming to prevent gun violence.  *See* Cmpl. at ¶ 42.  As a result, the Organizational Plaintiffs have failed to establish standing.

II.     **The 2015 Ruling and Q&As Are Not Final Agency Action Regarding Unfinished Frames and Receivers**

Agency action is only subject to judicial review under the APA if it is "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  For an agency action to be "final," two conditions must be met.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "For the second prong, the core question is whether the result of [the agency's decisionmaking] process is one that will directly affect the parties." *Id.* (alteration in original) (internal quotation marks omitted).  Because neither the 2015 Ruling nor the "Q&A" from ATF's website satisfy these conditions, they are not subject to review by this Court.

A. **The 2015 Ruling Is Not Final Agency Action Regarding Unfinished Frames and Receivers**

The 2015 Ruling neither reflects a "consummation of the agency's decisionmaking process" nor constitutes an action "from which legal consequences will flow" with respect to when an unfinished frame or receiver may be classified as a firearm.  Indeed, the 2015 Ruling does not articulate any agency decision about when an unfinished frame or receiver becomes a firearm. Instead, the ruling sought to clarify the circumstances under which businesses are required to comply with the GCA's manufacturing license, marking, and recordkeeping requirements.  AR. 290-95.

As context, the ruling's introduction explains that occasionally, "[u]nlicensed individuals" may purchase "blanks . . . that have not yet reached a stage of manufacture in which they are

16

classified as firearm frames or receivers," and then "may perform minor drilling and machining activities . . . sufficient to create a firearm frame or receiver under the law." AR. 290 (quotation marks omitted). The ruling asserts that while a frame or receiver may, with such additional machining, "be sufficiently complete to be classified and regulated as a firearm, it generally requires substantial additional machining before it can accommodate fire control components . . . and be used to expel projectiles." AR. 290-91 (quotation marks omitted). The ruling goes on to explain the obligations imposed on gunsmiths and machine shops when individuals bring an unfinished frame or receiver for further machining so that it can be assembled into a functional firearm—namely, they must comply with the GCA's licensing, identification, and recordkeeping requirements. AR. 294-95.

This ruling did not, as Plaintiffs allege, "explain that frames or receivers have not yet reached a stage of manufacture in which they are classified as firearm frames or receivers under the GCA if they lack minor drilling and machining activities in or on the fire control area or other critical areas." Pl. Mem. at 11 (internal quotation marks omitted). Nor did it "formally embrace[]" a "solidity/machining approach." *Id.* (quotation marks omitted). In fact, the 2015 Ruling did not adopt any particular approach, or announce any rule, with respect to unfinished frames or receivers at all. It simply described as background the fact that, in some circumstances, unlicensed persons may obtain blanks that are not classified as firearm frames or receivers but may subsequently reach that threshold with additional drilling and machining. AR. at 290-91.

As the 2015 Ruling does not announce or reflect any agency "decision" at all with respect to the classification of unfinished frames or receivers, it certainly does not reflect "the consummation of the agency's decisionmaking process" on this issue. *Salazar*, 822 F.3d at 82. Nor does the ruling determine anyone's "rights or obligations" or result in "legal consequences"

with respect to when an unfinished frame or receiver will be classified as a firearm.  *Id.*  It therefore is not "final agency action" reviewable under the APA.

### B.  The Q&A Is Not Final Agency Action

Perhaps recognizing that the 2015 Ruling does not reflect a final agency decision on this issue, Plaintiffs also point to a "Q&A" from ATF's website, which they label an "Interpretive Rule" when considered together with the 2015 Ruling.  However, the Q&A web posting is simply informational.  *See* AR. at 310-12.  It does not reflect the "consummation of the agency's decisionmaking process," nor does it determine anyone's legal rights or obligations.  The Q&A does not bind any party.  It does not confer rights on manufacturers or purchasers of unfinished frames or receivers, and it does not commit ATF to any particular enforcement action.  *See Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010) (ATF's "FAQ" which served "simply to *inform* licensees of what the law . . . is" but did not "*determine* the law or the consequences of not following it" was not final agency action) (emphasis in original); *Rousseau v. U.S. Dep't of Treasury*, No. 04-cv-4368 (MLC), 2010 WL 457702, at *16 (D.N.J. Feb. 5, 2010), *aff'd on other grounds sub nom. Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382 (3d Cir. 2012) ("FAQ" containing a "general statement of policy" based on "hypothetical facts" was not final agency action).  As a result, the "Q&A" is not final agency action subject to judicial review.

### III.   Defendants Have Not Violated the APA

### A.   Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Where, as here, a party

seeks review of agency action under the APA," it is "generally appropriate" to resolve the party's challenge on summary judgment.  *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015) (quotation marks and brackets omitted).  In such cases, "the district judge sits as an appellate tribunal, and the entire case on review is a question of law."  *Id.*; *accord Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

"An agency's action is arbitrary and capricious when it fails to meet statutory, procedural, or constitutional requirements."  *Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991).  The scope of a court's "review under the arbitrary and capricious standard is narrow, and courts should not substitute their judgment for that of the agency."  *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (quotation marks omitted).  "[S]o long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned."  *Id.* at 268.[5]

### B.   The GCA Unambiguously Excludes Unmachined Frames or Receivers From the Statutory Definition of a Firearm

As stated above, *see supra* at 6-9, ATF applies a standard whereby the degree of completeness and machining to an unfinished frame or receiver determines whether it has crossed

---

[5] "Because this case arises under the APA, the Court's decision is based on the administrative record . . . Accordingly, no Rule 56.1 Statement was required to be submitted by the parties."  *See Glara Fashion, Inc. v. Holder*, No. 11-cv-889 (PAE), 2012 WL 352309, at *1, n.1 (S.D.N.Y. Feb. 3, 2012) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law.")); *see also Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012).  Accordingly, Defendants did not submit a Local Rule 56.1 Statement in conjunction with their motion for summary judgment, but they do respond to Plaintiffs' Rule 56.1 Statement that they submitted in connection with their motion.  *See* Dkt. No. 63 ("Pl. 56.1").

the critical stage of manufacture such that it is a firearm pursuant to the GCA.  In particular, in the Polymer80 letters that constitute the only reviewable agency action in this matter, ATF determined that five unfinished frames or receivers were not firearms because of a combination of (1) the specific machining operations not yet present or completed, (2) the length of the take down pin lug clearance area, (3) whether the item was completely solid in the fire control recess area, and/or (4) whether the item was cast in a homogenous manner.  AR. 225-47, 253-59.  ATF's broader standard, and the classification determinations in these letters in particular, are consistent with the GCA's plain meaning because unfinished frames or receivers that have not crossed a critical threshold of manufacturing are neither designed to expel a projectile nor readily converted into a device that expels a projectile, and, thus, are not firearms under the GCA.

   "[W]here the challenge to agency action disputes the agency's interpretation of a statute that Congress has designated for administration by the agency, [courts] apply the analytical framework articulated in *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)."  *Aleutian Capital Partners, LLC v. Scalia*, 975 F.3d 220, 229-230 (2d Cir. 2020).  "When a court reviews an agency's construction of the statute which it administers," the first question is "whether Congress has directly spoken" to the interpretive issue at hand.  *Chevron,* 467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  "[I]f the statute is silent or ambiguous . . . , the question . . . is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

   Plaintiffs launch two challenges as to why ATF's interpretation of the GCA is improper.  First, Plaintiffs allege that the unfinished frames or receivers at issue in the 2015 Ruling and the Polymer80 Classification Letters are firearms because they are "designed to . . . become an

operable weapon." Pl. Mem. at 27-28 (internal quotation marks omitted). Second, Plaintiffs assert

that the 2015 Ruling and Polymer80 Classification Letters fail to consider whether the unfinished

frames or receivers they address can "readily be converted into an operable weapon." Pl. Mem. at

28 (internal quotation marks omitted). As to each, the intent of Congress is clear and accords with

ATF's interpretation. However, even if the Court finds a degree of ambiguity and proceeds to step

two of the *Chevron* analysis, ATF's interpretation is a permissible construction of the statute.

### 1.    An Unmachined Frame or Receiver Is Not "Designed To" Expel a Projectile

An unmachined frame or receiver is not "designed to" expel a projectile, because its

purpose is not to expel a projectile. Rather, its purpose is to be incorporated into something else

that is designed to expel a projectile. Holding otherwise would mean that every part of a gun is

designed to expel a projectile and, therefore, would be deemed a firearm under the GCA. That

result is unsupported by the statute's plain meaning, legislative history, and judicial interpretation

of an analogous provision of the GCA.

The plain meaning of the term "designed to" in the GCA supports ATF's determination

that the unfinished frames or receivers at issue in the Polymer80 Classification Letters are not

firearms. As the Supreme Court has instructed, "[t]he starting point in statutory interpretation is

the language of the statute itself." *Ardestani v. Immigration and Naturalization Serv.*, 502 U.S.

129, 135 (1991) (quotation marks and alterations omitted); *see Catskill Mts v. EPA.*, 846 F.3d 492,

512 (2d Cir. 2017). Here, the relevant text of the GCA is whether an object "is designed to . . .

expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). As the Second Circuit

has stated in the context of the GCA, "Webster's Third [International] Dictionary (1993) defines

'design' as 'to conceive and plan out in the mind,' 'to plan or have in mind as a purpose,' and 'to

devise or propose for a specific function.' Similarly, Black's Law Dictionary (6th ed.1990) defines

'design' as '[t]o form plan or scheme of, conceive and arrange in mind, originate mentally, plan out, contrive.'" *United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011).

The purpose, or "specific function," of the unfinished frames and receivers addressed by the Polymer80 Classification Letters is not to expel a projectile. The object that is designed to expel a projectile is a gun—not its trigger, its hammer, the grip, front sight, or the frame. It is the combination of all these things into one that results in an object that is designed to expel a projectile. Plaintiffs' argument that unmachined frames and receivers are firearms because they are "designed to" expel a projectile should therefore be rejected.

This reading is supported by the fact that Section 921(a)(3) separately includes in its definition of "firearm" a device that "may readily be converted to" an object that expels a projectile. By using the disjunctive "or" between the phrases "will," "designed to" and "may readily be converted to," the GCA indicates that each has its own meaning. *See United States v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005) (noting that Section 921(a)(3) is "clearly written in the disjunctive"). If the meaning of "designed to . . . expel a projectile" in Section 921(a)(3) included objects that, when combined with other parts, may ultimately be converted into a device that expels a projectile, this would render superfluous the separate provision addressing devices that "may readily be converted to expel a projectile."

The Second Circuit has drawn this same distinction between what an object is "designed" to do and what the object may be converted into, when interpreting another section of the GCA. In *United States v. Gravel*, the Second Circuit assessed whether a given device was a machinegun within the definition of 26 U.S.C. § 5845(b), which defines a machinegun as something that "is designed to shoot, or can readily be restored to shoot, automatically more than one shot . . . ." There, the government argued "that under the plain meaning of the statute, 'designed' refers to

what the weapon was originally designed to do, not to post-manufacture modifications." *Gravel*, 645 F.3d at 551.  The court adopted this interpretation and held that "the word 'designed,' when applied to a manufactured object such as a firearm, refers to what the gun was conceived of and designed for, and not to any modifications made afterwards." *Id*.  The court found its conclusion to be "consistent with the statutory language further defining 'machinegun' as a weapon readily restorable to automatic fire.  There would be no need to include a definition taking future modifications into account if the word 'design' encompassed post-manufacture modifications." *Id*. at 551-52.  The same reasoning applies here.  That the statute contains a separate clause defining firearms to include weapons that "may readily be converted to" expel a projectile makes clear that the phrase "designed to" in the statute does not encompass items that are intended to become part of a gun only after being converted into something else.  As a result, Plaintiffs' reading—under which any object would be "designed to" be an operable firearm if it were intended to become part of one—must be rejected.

Effectively, Plaintiffs' argument would require any component of a gun to be regulated as a firearm.  But that result is unsupported by both the statute's text and its legislative history.  First, Plaintiff's argument is undermined by the provisions of the GCA that define a "destructive device" and "firearm silencer" or "firearm muffler." *See* 18 U.S.C. §§ 921(a)(4), (a)(24).  Destructive devices, firearm mufflers, and silencers fall within the definition of "firearm" pursuant to Section 921(a)(3).  The statute further defines a destructive device as including "any *combination of parts* either *designed or intended for use in converting* any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device *may be readily assembled*." *Id.* § 921(a)(3) (emphasis added).  Similarly, in defining firearm mufflers and silencers, the statute includes "any device for silencing, muffling, or diminishing the report of a portable firearm,

*including any combination of parts*, *designed* or redesigned, *and intended for use in assembling* or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." *Id.* § 921(a)(24) (emphasis added).  These provisions demonstrate that Congress knew how to regulate "parts" that were "designed" to be assembled into a regulated device.  Similarly, Congress knew how to regulate devices based upon what was "intended" to be done with them.  *Id.* (regulating any part "intended for use in assembling . . . a firearm silencer").  The absence of analogous language in Section 921's definition of "firearm," forecloses any argument that unfinished frames or receivers are firearms simply because they are parts that will later be assembled into firearms, or because they are intended to be incorporated into firearms.  *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation marks and alteration omitted); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another") (internal quotation and citation omitted).

Plaintiffs' proposed reading of the statute is also undermined by its legislative history.  As noted above, *see supra* at 4, the GCA specifically revised the definition of "firearm" used in prior federal law, to exclude firearms parts other than the "frame" or "receiver" of a firearm.  *See* S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2200 (Apr. 29, 1968) ("Under the present definition of 'firearm,' any part or parts of such a weapon are included.  It has been found that it is impractical to have controls over each small part of a firearm.  Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'").  Congress

cannot have intended Plaintiffs' reading of the phrase "designed to," because that reading would bring all firearm parts within the definition of "firearm" so long as the parts were intended to be incorporated into an operable weapon.  Pl. Mem. at 28.

The more natural reading of the "designed to" language is that Congress intended to regulate guns that were designed to expel a projectile, but, for one reason or another (perhaps due to a broken part), were incapable of doing so.  The GCA's legislative history supports this interpretation.  *See* S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2200 (Apr. 29, 1968) ("[Section 921(a)(3)] makes it clear that so-called unserviceable firearms come within the definition."). Indeed, courts routinely rely on the "designed to" language in concluding that unserviceable firearms come within the ambit of the GCA.[6]  In many of these cases, criminal defendants argue that, because a gun is broken, it is no longer designed to fire a projectile.  However, courts routinely reject this argument because a gun, even if inoperable, is nonetheless designed to expel a projectile. *See, e.g.*, *Rivera*, 415 F.3d at 286 ("Where a weapon designed to fire a projectile is rendered inoperable, whether on purpose or by accident, it is not removed from the statute's purview; although it is temporarily incapable of effecting its purpose, it continues to be 'designed' to fire a projectile.") (collecting cases); *United States v. Dotson*, 712 F.3d 369, 371 (7th Cir. 2013) (noting, by analogy, that "[a]n airplane is designed to fly; a defect in manufacture or maintenance that prevents it from flying does not alter its design.");  *United States v. Thomas*, No. 17-cr-194 (RDM), 2019 WL 4095569, at *5 (D.D.C. Aug. 29, 2019).

In short, unfinished frames and receivers are not designed to expel a projectile, even if they are designed to be finished and later incorporated into another device that expels a projectile.

---

[6] The Record similarly demonstrates that ATF, when contemplating the "designed to" language, focused on judicial opinions relating to inoperable firearms.  AR. at 303-09.

Accordingly, ATF's treatment of the unfinished frames and receivers in the Polymer80 Classification Letters—as well as the standard ATF applies more broadly—is consistent with the "designed to" prong of the GCA's firearm definition.

### 2. An Unmachined Frame or Receiver Cannot Be Readily Converted Into a Device that Expels a Projectile

ATF's determinations in the Polymer80 Classification Letters are consistent with the GCA's definition of "firearm" as encompassing "weapon[s] . . . which . . . may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a). Generally, before an unmachined frame or receiver can be converted into a device that expels a projectile, multiple significant steps must occur. First, the unmachined frame must be converted into a finished one, which requires tools, expertise, and time. Second, this finished frame must then be assembled into an operable weapon. This step requires the procurement of additional parts and the knowledge of how to assemble those parts into a functioning weapon. In the Polymer80 Classification Letters in particular, the devices at issue still required both machining to become finished frames/receivers and assembly with other parts to become operable firearms. As described below, this process is not one whereby an unmachined frame can "readily" be converted into a device that expels a projectile.

Dictionary definitions are virtually unanimous in the definition of "readily." "Readily" means something that can be done "without much difficulty" or "with fairly quick efficiency." *See* Pl. Mem. at 26 (quoting Webster's Third New International Dictionary of the English Language Unabridged (1965)); *see also* READILY, Funk & Wagnall's Standard College Dictionary 1121 (1973) ("In a ready manner, promptly, easily"). This definition is consistent with that found in a major unabridged dictionary issued in 1966, the same year the new

definition of "firearm" appears in S. Rep. 89-1866: "promptly; quickly; easily."  READILY, Random House Dictionary of the English Language, Unabridged 1195 (1966).

The devices at issue in the Polymer80 Classification Letters cannot "readily" be "converted to expel a projectile by the action of an explosive" within the meaning of these definitions.  An unfinished receiver that has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)," *see* AR. at 272, requires that numerous steps be performed simply to yield a receiver, which then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive.  For example, as noted in one of the Polymer80 Classification Letters where a device was not found to be a firearm, the following machining operations—each of which require skills, tools, and time—still had to occur: 1) drilling of the block pin holes; 2) drilling of the trigger pin holes; 3) cutting of the rail slots that allow for the installation of the slide; 4) machining of the side walls that allow for the installation of the slide; and 5) machining of the walls that allows for the installation of the barrel and recoil spring. AR. at 253; *see also* AR. at 231 (Polymer80 Classification Letter listing machining that still needed to occur).  Additionally, as noted above, ATF will treat any "indexing"—the inclusion on the unfinished frame or receiver of visual or physical indicators regarding the two-dimensional or three-dimensional parameters of the machining that must be conducted—as rendering the unfinished device a firearm.  *See supra* at 8-9.  This prevents the makers of receiver blanks from annotating the blank to instruct the purchaser as to the precise measurements needed, in three dimensions, to machine the critical components of the unfinished frame or receiver. The need to conduct this machining from scratch, without indexing, means a working gun cannot be produced "without difficulty."  And the work to excavate the cavities and drill holes in an unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area.

Therefore, the receiver cannot be completed "without delay" or "without difficulty"—even leaving aside the further assembly with (and procurement of) the other parts needed to create a weapon that can expel a bullet by explosive action.  A receiver blank therefore may not "readily be converted" into a firearm.

In support of its motion, Plaintiffs submitted a declaration from Justin McFarlin, a founding member of Everytown for Gun Safety's Veterans Advisory Council who is also a retired member of the Army.  *See* Dkt. No. 64-34 ("McFarlin Declaration").  According to his declaration, Mr. McFarlin purchased a Polymer80 "Buy, Build, Shoot Kit," which included an unfinished receiver. *Id*. ¶¶ 8-9.  Then, in order to build a functioning firearm, he watched a 30-minute video and spent 86 minutes building it.  *Id*. ¶¶ 10-11.  To complete this process, he used a power drill, punch set, a "Dremel" multifunctional tool, a "Dremel" tool attachment, and pliers.  *Id*. ¶ 12.  However, through this example, Plaintiffs are not comparing like to like.[7]  Mr. McFarlin purchased a buy, build, and shoot kit.  While this kit included an unfinished frame or receiver, it also included all of the other parts necessary to take the ultimately finished frame and make it into a device that expels a projectile.  *Id*. ¶¶ 16-18 (describing the other parts that were added to the frame).  In fact, ATF has deemed Polymer80's buy, build, and shoot kits to be firearms—as these kits contain all the parts necessary to create a functioning firearm (like the position advanced by the Department of Justice in *Wick*, *see supra* note 7).  By contrast, if one purchases only an unmachined frame, multiple steps

---

[7] For the same reason, Plaintiffs' reliance on *United States v. Wick*, No. 15-cr-00030, 2016 WL 10637098 (D. Mont. July 1, 2016), is misplaced.  *See* Pl. Mem. at 27 n.14.  There, the defendant was "selling disassembled, but complete, Uzis."  *See* Answering Brief of the United States at *23, *United States v. Wick*, No. 16-30176, 2017 WL 774210 (9th Cir. Feb. 22, 2017).  Moreover, like the buy, build, and shoot kits, the defendant was selling kits that "contained all of the parts necessary to assemble an Uzi capable of firing a projectile by action of an explosive."  *Id*. at *15-16.  Accordingly, *Wick* stands for the unremarkable proposition that a functioning gun that is taken apart is nonetheless a gun.

must still occur before that unmachined frame can be converted into a device that expels a projectile—one must learn how to machine it, have the proper tools to do so, have the technical skill to do so, purchase all the other necessary parts of a firearm that must be added to the frame, and then assemble all of those constituent parts into a functioning firearm. That the materials in a complete firearm kit can "readily be converted" into a weapon that expels a projectile does not mean that a standalone, unmachined frame or receiver can similarly become an operable weapon "without delay" or "difficulty."

C.    Even If the GCA Is Ambiguous As to the Meaning of "Readily be Converted," ATF's Interpretation Is a Reasonable One

Even if there is some ambiguity as to whether receiver blanks like those at issue in the Polymer80 Classification Letters "may readily be converted to expel a projectile with the force of an explosive," ATF's interpretation is certainly "based on a permissible construction of the statute" and must be upheld at *Chevron* Step Two. Plaintiffs, in fact, note that the definition of "readily" encompasses both "without much difficulty" and "with fairly quick efficiency." Pl. Mem. at 26. Plaintiffs seemingly prefer for ATF to focus on the quickness of the process, rather than the degree of difficulty, as they repeatedly argue that ATF should be using a temporal-based standard. However, ATF's decision to emphasize the degree of machining to an unfinished frame or receiver and the resulting implications on the difficulty of transforming the item into a functioning firearm is a permissible interpretation of "readily be converted."[8] That ATF's interpretation is a

---

[8] Supporting the fact that this interpretation is not arbitrary and capricious is the fact that courts have, in fact, come to the same conclusion as ATF. *See United States v. Prince,* No. 09-cv-10008 (JTM), 2009 WL 1875709, at *3 (D. Kan. June 26, 2009), *rev'd on other grounds*, 593 F.3d 1178 (10th Cir. 2010) (The "court simply does not believe that a flat piece of metal with laser perforations and holes constitutes a 'receiver,' i.e., a 'firearm.' . . . Simply put, this court has no evidentiary or legal basis for holding that a flat piece of metal with laser perforations and some holes constitutes, ultimately, a 'firearm.' It may become part of a firearm at some point, but not until further work has been accomplished to allow it to secure the stock, chamber, barrel and other

permissible one (and, therefore, not arbitrary and capricious) is supported by the following considerations.

### 1.   ATF's Interpretation Is Consistent and Longstanding

### i.   The General Standard Applied by ATF

ATF has consistently applied its interpretation of the GCA's language when determining whether an unfinished frame or receiver can be readily converted into a firearm—namely that the degree of machining to the frame or receiver (and thus its degree of completeness) determines whether a device is a firearm.  The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm. These classification letters undermine Plaintiffs' claim that, in 2006, ATF changed its standard from a temporal-based approach to one based on the degree of machining completed on the frame or receiver.  *See* Pl. Mem. at 35.

For example, in a 1986 letter, ATF stated that a "raw forging" would not be subject to the GCA but that "if any additional machining or finishing operations are performed, this classification is subject to review."  *See* AR. at 22.  In a 1990 letter, ATF noted that an "unfinished receiver[]" was not a firearm because it was "a flat rectangular piece of sheet metal approximately 11-3/4 inches in length and approximately 4-3/8 inches in width.  The ejecting port has been cut and two strengthening ribs have been pressed into the blank."  AR. at 47.  In light of the significant machinations that still had to occur, ATF determined that this device was not a firearm.  AR. at 47.  In responding to a July 24, 1998, letter from a member of the public seeking a classification

---

parts.  Until that time, it is not even a true component of a firearm, only a potential component of a firearm. The statute, as written, does not extend that far.").

determination, ATF noted that "[w]e have classified certain unfinished receivers as not being firearms. Those unfinished submachinegun type receivers, which have been classified as not being firearms, are solid bars with no internal machining performed . . . . If you plan to sell a solid bar having the exterior profile of [a submachinegun receiver] and having no internal machining, the item would not be a firearm." AR. at 49. Again, in a 1994 letter, ATF determined that an unfinished receiver was a firearm because "[t]he magazine opening and the receiver cavity are completely machined out and the sample receiver is capable of [accepting] various components to include, but not limited to, the magazine, magazine catch assembly, selector, rear take down pin, lower receiver retainer with complete buffer assembly, trigger guard, various small detent pins and springs." AR. at 51. A similar conclusion was reached in a 2003 classification letter where ATF concluded that a receiver was subject to the GCA because "[t]he external profile has been machined from a block of aluminum. The external profile has been machined and the magazine well has been cut out. The receiver cavity is in semiautomatic configuration and is complete with the exception of the trigger port and various holes for the fire control components and takedown pins." AR. at 57. Yet again, a 2004 classification letter determined that a receiver was a firearm due to the machinations that it had undergone. In distinguishing this receiver from a receiver that was not a firearm, ATF stated, "[h]owever, a solid AR-15 type receiver casting, without having the critical interior areas machined (magazine well and central area for the fire control components) or crosspin holes drilled, would not constitute a firearm." AR. at 61. In 2006, ATF stated that a device would not be a firearm if it was "completely solid and unmachined in the trigger/hammer recess area." AR. at 73.

These letters, all of which are from 2006 or earlier, undermine Plaintiffs' claim that ATF historically employed a temporal approach that it abruptly changed in 2006. Not one of the above-

noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver.  Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.  *See, e.g.*, AR. at 1, 11-12, 17, 47, 51, 57, 58, 60, 62, 64, 69, 71, 75, 79, 81, 83, 85, 87, 89, 96, 98, 99, 101, 103, 106, 108, 119, 121, 123, 129, 131, 133, 136, 156, 161, 167, 169, 171, 173, 176, 179, 182, 185, 188, 190, 193, 219, 222, 225, 231, 253, 438, 453, 455, 459.  Many of these classification letters specifically make reference to the degree of machining performed in the fire control cavity.  *See, e.g.*, AR. at 51, 57, 60, 62, 75, 83, 85, 101, 123, 157, 162-165, 192, 193, 220, 223, 225, 231, 253, 438, 466, 467, 469, 476, 479, 481, 484, 508, 513, 517, 521.

This approach was reiterated by ATF in a 2013 Technical Bulletin ("Technical Bulletin"). AR. at 272.  This Technical Bulletin noted that it was being issued to assist ATF agents in determining whether a device amounts to a firearm.  AR.  The Technical Bulletin stated, "In order to preclude classification as a firearm, this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector."  AR. at 273.  This principle is consistent with the classification letters noted above that focus on the degree of machining to the frame or receiver and, particularly, the fire-control cavity.

This interpretation is similarly reflected in the materials that Plaintiffs challenge here— specifically, the classification letters to Polymer80, as well as the 2015 Ruling and the Q&A on ATF's website.  Like ATF's past classification letters, these materials reference the degree of machining as the guiding principle in determining whether something is a frame or receiver.

Because these materials do not reflect an unexplained change in position, they are not arbitrary and capricious.

Plaintiffs contend that the focus on the degree of machining to the unfinished frame or receiver is a shift from a prior temporal-based approach. *See* Pl. Mem. at 34-35. However, of the dozens of classification letters in the Record, Plaintiffs point to only seven that make any reference to time. *See* Pl. Mem. at 6-8. Further, when ATF has relied on temporal considerations in its classification letters, this temporal measurement has been tied to the degree of machining done on the device at issue. Thus, while some classification letters have noted that, in light of the significant degree of machining performed, the time required to convert the device to a functioning firearm would be minimal, this does not change the fact that the test employed by ATF has always focused on the degree of machining.

For example, in a 1983 letter, ATF classified a receiver as a firearm and stated, "the interior of the sample was drilled out using a 5/8 inch drill and then finished with a 1/2 inch rotary file. Approximately 75 minutes (sic) time was required to make the receiver functional." AR. at 20; *see also* AR. at 54 (classification letter offering same analysis). This letter, however, does not state that the time required, as opposed to the stage of machining, is the basis on which ATF made its determination. Further, the incoming letter to which ATF responded suggests that some initial marking or machining of the "area for the trigger, hammer, and disconnector" had been performed, as the letter characterized those areas as "basically still unmachined and solid," rather than "completely unmachined." *See* AR. at 21. This underscores that ATF's determination in the 1983 letter is consistent with the standards applied in classification letters today, *i.e.*, whether the fire-control areas are "completely" unmachined.

Additionally, in a 1985 classification letter, ATF first noted that "[o]ur examination of the rough frame casting . . . reveals that it is cast (too close) to finish dimensions with all frame opening and pilot holes for all pin holes." AR. at 30. It then stated, "[i]n fact, our testing revealed that the frame can be made totally functional in approximately 20 minutes time using tools likely to be found in a home workshop." AR.[9] Similarly, in a 2004 letter, after listing all of the machining operations that had been done to the frame, ATF stated that "[t]he only critical operation yet to be made is the cutting of the slide rails. Although critical, this work can be completed in a minimal amount of time by a competent individual having the necessary equipment." AR. at 65. As to both of these letters, the crux of the letter and analysis focuses on the machining operations that have or have not been done to the frame. For example, the 2004 letter notes the twelve machining operations that have been made and contrasts this with the single piece of machining that still must be done. AR. at 65. Again, these letters make clear that the first-order analysis employed by ATF was what machining had or had not been done to the device at issue.[10] *See also* AR. at 67-68, 606 (other record examples making reference to timing).

---

[9] With respect to this 1985 letter, Plaintiffs cite to a different letter in the same series of letters that were issued with respect to this determination. *See* Pl. Mem. at 7 (citing to AR. at 23-25). However, both letters address the same classification decision.

[10] In 1980, ATF responded to an inquiry from a member of the public relating to the meaning of the phrase "readily converted." AR. at 16. In responding, ATF noted that "[d]ue to the vast variation in firearms design, construction, material, production techniques, and other variables, it is not possible to provide you with a simple answer to your question which would be applicable in all cases. Certainly, if an unfinished receiver could be converted to functional condition within a few hours' time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm. However, for us to provide you with a positive determination regarding the status of any particular unfinished receiver, it would be necessary for us to examine a sample." AR. at 16. Unlike the other classification letters discussed, however, the member of the public at issue here did not submit a sample with respect to the inquiry. Accordingly, ATF was providing a hypothetical response without the benefit of a sample that could provide the basis for it to note what machining had or had not been performed.

ii.     **Classification Letters to Polymer80**

It was this same principle—the degree of machining to the frame or receiver—that ATF applied in the Polymer80 Classification Letters.  In February of 2015, ATF issued several classification letters to Polymer80 based upon multiple devices that Polymer80 submitted for classification.  In one February 2015 classification letter, ATF determined that the device at issue was a receiver because it had a "partially formed fire control cavity."  AR. at 219.  A similar determination was reached in another February 2015 classification letter issued to Polymer80, where ATF again deemed the device a firearm because there was a "partially formed fire control cavity."  AR. at 222.  However, a 2015 classification letter as to a third device submitted by Polymer80 determined that the device was not a frame or receiver within the meaning of the GCA because "the submitted item incorporates a solid fire control cavity."  AR. at 225.  As these classification letters make clear, the critical distinction between the devices was the degree of machining to the frame or receiver, which is consistent with the decades of classification letters described above.

The same was true as to subsequent classification letters issued to Polymer80.   In November 2015, ATF applied a standard providing that a receiver blank "must be completely solid and un-machined in the fire-control recess area" so as not to be classified as a firearm.  AR. at 231.  A similar determination was reached with respect to a Polymer80 device in January 2017, when ATF deemed an unfinished receiver to fall outside of the GCA in light of the multiple machining operations that had not been performed.  AR. at 254-55.

Because the approach applied in the Polymer80 Classification Letters is consistent with ATF's longstanding focus on an unfinished receiver or frame's completeness and degree of machining, contrary to Plaintiffs' argument, the letters do not reflect an arbitrary and capricious

change in the agency's position.  However, Plaintiffs also allege that ATF switched to a "solidity test" beginning in 2006.  Thus, even under Plaintiffs' view of the facts, the 2015 Polymer80 Classification Letters—the only final agency action reviewable in this matter—were a continuation of an approach the agency had been applying for nine years.  And to the extent Plaintiffs seek to challenge ATF's actions dating back to 2006, such a claim would be time-barred.  A six year statute of limitations applies to APA claims.  *See Manners v. Secretary of Defense*, 242 Fed. App'x 723, 725 (2d Cir. 2007) ("Actions under the APA, like other civil actions against the United States, are subject to the six-year statute of limitations set forth at 28 U.S.C. § 2401(a).").  Thus, even if the Court were to accept Plaintiffs' argument that ATF changed its position in 2006, any such alleged change would fall outside of the statute of limitations period.

### 2.      ATF's Interpretation Reasonably Balances the Purposes of the GCA

The GCA is a statute with multiple purposes.  As Plaintiffs properly note, one of these purposes is to prevent crime, and "ATF recognizes the role that firearms play in violent crimes" and therefore pursues "an integrated regulatory and enforcement strategy."  ATF, Firearms, https://www.atf.gov/firearms.  Moreover, ATF is aware that unfinished frames and receivers implicate crime prevention.  *See* AR. at 301.  The prevention of crime is not the only purpose Congress set forth in the GCA, however, and ATF has acted reasonably to account for other GCA purposes.  These include the avoidance of "'unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the  . . .  possession . . . of firearms appropriate to the purpose of . . . lawful activity.'"  *United States v. Howard*, 214 F.3d 361, 364 (2d Cir. 2000) (quoting Pub. L. No. 90-618, § 101, 82 Stat. 1213); *see* S. Rep. 89-1866 at 43 (Oct. 19, 1966) (Congress intended to avoid "interfere[nce] with the legitimate uses of firearms by . . . lawabiding citizens . . . for hunting and other recreational purposes, self-protection, and other lawful purposes"); *accord* S.

Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2243; FOPA, 100 Stat. 449 ("reaffirm[ing] the intent" of the GCA).

As the Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the phrase "lawful purposes" is drawn from the Supreme Court's description of "the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" 554 U.S. at 620 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)). It has been recognized that, beyond the pre-existing right to keep and bear arms, "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (collecting cases). Among these ancillary rights is "'a corresponding right to obtain'" the "necessary" arms and ammunition. *Id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). In this instance, ATF's focus on the degree of machining done to a frame or receiver and whether that device can be readily converted into a device that expels a projectile accords with the multiple purposes of the GCA and upholds the balance that Congress struck in the statute itself—regulating devices that can be readily converted into something that expels a projectile, without placing such "undue or unnecessary" restrictions on law-abiding citizens' ancillary rights with respect to firearms. *See Howard*, 214 F.3d at 364 (quoting Pub. L. No. 90-618, § 101, 82 Stat. 1213); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (recognizing balance struck in 18 U.S.C. § 922(k)).

### 3. ATF's Expertise

The scope of a court's "review under the arbitrary and capricious standard is narrow, and courts should not substitute their judgment for that of the agency." *Karpova*, 497 F.3d at 267 (internal quotation omitted). This is especially true where, as here, the decision is based on the agency's "expertise" in the field at issue. *See, e.g.*, *Henley v. Food & Drug Admin.*, 77 F.3d 616,

621 (2d Cir. 1996); *Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 371 (D.N.H. 2015) (explaining that examination of firearms parts and comparison with other items on the market "require[s] expertise that is well within ATF's grasp. . . . [and] entitled to substantial deference").

Here, the Court should consider ATF's experience and expertise in regulating firearms. ATF, by necessity, is tasked with drawing a line as to when a piece of metal has become a frame or receiver or when that piece of metal can be readily converted into a device that expels a projectile. For example, in one classification letter, ATF explained that its "position [wa]s best understood by considering alternatives . . . ATF might have determined that a piece of metal or plastic is not a 'firearm receiver' until the cavity is capable of housing all of the fire-control components. However, this would have permitted the unregulated manufacture of receiver 'blanks' in which all but one of the major processes are completed. For example, a manufacturer could avoid licensing and prohibited persons could lawfully possess 'receiver blanks' with all but one fire-control component pinhole drilled. Further, this position would permit the manufacturer to index the remaining pinhole as long as the indexing would not create a hole so that the final component may be installed." AR. at 605-06.

This type of "interpretive line drawing" is at the heart of the deference that should be afforded to the agency. *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 21 (D.D.C. 2012); *see also City of Arlington v. FCC*, 569 U.S. 290, 307 (2013) ("Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow."); *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 944 (9th Cir. 2014) ("[T]he agency has to draw a line somewhere and has offered a reasonable justification for why it drew the line where it did."); *Gulf Restoration Ntwk. v. U.S. Dep't of Trans.*, 452 F.3d 362, 370 n.15 (5th Cir. 2006) ("[W]e find the Secretary has wide

discretion in determining where to draw the line, that the line must be drawn somewhere, and that he acted within his discretion when he [drew the line as he did.]"); *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (courts are "generally unwilling to review line-drawing . . . unless a petitioner can demonstrate that lines drawn are patently unreasonable, having no relationship to the underlying regulatory problem" (internal quotation and citation omitted)); *State of New York v. Sullivan*, 894 F.2d 20, 27 (2d Cir. 1990) ("[T]he Secretary's decision to draw the line . . . cannot be said to be arbitrary or capricious."); *Baezer East Inc. v. EPA*, 963 F.2d 603, 609 (3d Cir. 1992) ("We defer to this line-drawing provided the interpretation is both reasonable and consonant with Congress's intent."); *Assoc. of Private Sector Coll. & Univ. v. Duncan*, 110 F. Supp. 3d 176, 194 (D.D.C. 2015) ("[T]he lines had to be drawn somewhere, and it is not this Court's province—or the Association's, for that matter—to redraw the lines according to its own notions of what might be best." (internal citation and quotations omitted)).

Such deference has been specifically recognized by courts with respect to ATF's interpretation of various provisions of the GCA. *See Mullenix v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 07-cv-154, 2008 WL 2620175, at *4 (E.D.N.C. July 2, 2008) (deferring to agency interpretation of the term "sporting purposes" in Section 925(d)(3) of GCA); *Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29, 37 (D.D.C. 1998) (upholding ATF's interpretation of what constitutes an antique firearm and stating, "defendant does not bear the burden of convincing the Court that its position is better.  Instead, it merely need convince the Court that the decision was not arbitrary and capricious.").  Here, ATF's interpretation is not arbitrary and capricious, but rather a reasonable one informed by its expertise in this area.

4.      **Plaintiffs' Remaining Challenges to ATF's Classification Decisions Are Meritless**

Plaintiffs' remaining grounds for challenging the Polymer80 Classification Letters, and ATF's treatment of unfinished frames or receivers more broadly, similarly fail.  First, Plaintiffs argue that ATF has not provided an explanation as to why it interprets the GCA as it does.  *See* Pl. Mem. at 30.  However, ATF has explained that it is tasked with drawing the line "at which an unregulated piece of metal or plastic becomes a regulated item under Federal law."  AR. at 609. And focusing on the degree of completeness of the fire-control cavity specifically is warranted in light of it being the critical portion of a firearm that lets the firearm expel a projectile by way of an explosion.  AR. at 609. ("Thus, a particular type receiver-blank has reached a critical stage of manufacture when a possessor takes a vital step in what will ultimately allow the receiver to perform a critical function as defined by the statute—serving as the part of a weapon that will expel a projectile by the action of an explosive.").  As ATF has noted, "[i]n passing the GCA, Congress explicitly intended that the critical factor in determining whether an item is a firearm is that item's ability to expel a projectile by the action of an explosive.  Therefore, ATF has long held that because the fire-control cavity is the area that is vital to the item's ability to expel a projectile, it is appropriate to focus on this area in making classifications."  AR. at 605.  By focusing on the fire-control cavity, ATF has identified the critical component of a firearm that allows it to function. If no steps have been taken to manufacture this critical area of a firearm, then it is reasonable to deem it to be a device that cannot be readily converted into an operable weapon, especially when one considers the multiple steps still required to transform that device into something that will expel a projectile.

Second, Plaintiffs argue that ATF "did not undertake testing or other factual development that might have supported its classification decisions within the terms of the statute."  Pl. Mem. at

32.  This assertion is belied by the Record, which demonstrates that ATF routinely tests devices in order to determine whether they can be readily converted into firearms.  For example, several classification letters to Polymer80 involved whether an unfinished frame or receiver with a "biscuit" in the fire control cavity amounted to a frame or receiver.  *See* AR. at 217.  Such a device "involves making a completely milled lower receiver and then filling in the fire control cavity with a 'biscuit' of another material that the purchaser can more easily mill out."  AR. at 301.  In its classification letter responding to Polymer80, ATF stated, "An identical item you submitted for our evaluation . . . was cut in half in order to observe the internal configuration . . . .  This operation revealed that the submitted item incorporates a partially formed fire control cavity and was cast in a non-homogenous manner . . . .  Based on our examination . . . we are classifying it as a firearm receiver."  AR. at 220.  Again, while Plaintiffs may disagree with the standard against which ATF is measuring and testing unfinished frames or receivers, it cannot be said that ATF is not engaging in detailed examination and testing of these devices in order to determine whether they amount to firearms pursuant to ATF's interpretation.  Further, the fact that ATF may not have engaged in extensive testing with respect to the particular Polymer80 Classification Letters at issue in this case does not mean that ATF's decisions with respect to those items was not informed by ATF's general expertise and knowledge as to the degree of difficulty required in transforming unfinished frames and receivers of various types into finished firearms.

### D.   Plaintiffs' Petition for Rulemaking

Finally, Plaintiffs ask the Court to order Defendants to respond to their Petition for rulemaking.  *See* 5 U.S.C. § 706(1) (a court has the authority to "compel agency action unlawfully withheld or unreasonably delayed").  Defendants, however, have not unreasonably delayed in acting on Plaintiffs' Petition.  Courts routinely apply the six-factor test articulated in

*Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"), to assess whether an agency has "unreasonably delayed" action in relation to a petition for rulemaking.  *See NRDC v. FDA*, 710 F.3d 71, 84 (2d Cir. 2013) (citing TRAC as test for reasonableness of agency delay).  The six factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*TRAC*, 750 F.2d at 80 (internal quotation marks and citations omitted).  Courts have further noted that because only "egregious" agency delays "warrant a court to order agency action with[in] a specific time frame," "courts rarely compel an agency to render an immediate decision on an issue."  *Orion Reserves Ltd. P'ship v. Kempthorne*, 516 F. Supp. 2d 8, 11 (D.D.C. 2007) (internal citation omitted).

As to the first factor, the petition was submitted to Defendants approximately one year ago, *see* Pl. 56.1 Statement at ¶ 13, and, notably, in the interim there was a widespread health emergency that resulted in extensive, nationwide limitations on non-essential government operations, including ATF operations.  *See* Declaration of Andrew Lange ("Lange Declaration" or "Lange Decl.") at ¶ 11.  Even under normal circumstances, such a period of time does not constitute an unreasonable delay.  Indeed, courts have routinely found years-long timeframes for responses to petitions to be reasonable.[11]  For example, the Ninth Circuit, surveying the nationwide case law,

---

[11] Plaintiffs cite to *Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540 (S.D.N.Y. 2009), for the proposition that a reasonable amount of time for agency action is "typically counted in

noted that "[t]he cases in which courts have afforded relief have involved delays of years, not months. *A fortiori*, FERC's four-month delay does not run afoul of any 'rule of reason.'" *In re Cal. Power Exch. Corp*., 245 F.3d 1110, 1125 (9th Cir. 2001) (collecting cases comparing delays of four, eight, and ten years found unreasonable with delays of five years, two years, and fourteen months found reasonable); *Ctr. for Sci. in the Pub. Interest v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 300-01 (D.D.C. 2014) (three-year delay reasonable); *Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson*, 407 F. Supp. 2d 38, 40-41 (D.D.C. 2005) (more than three-year delay reasonable); *TRAC*, 750 F.2d at 70 (five-year delay reasonable); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1119-20 (D.C. Cir. 1986) (proposed 14-month schedule, after two-and-a-half-year delay, not reasonable).   When unreasonable delay has been found, the period of time has been significantly longer than one year.  *See Families for Freedom*, 628 F. Supp. 2d at 540 (two-and-a-half-year delay unreasonable); *In re Core Commc'ns, Inc*., 531 F.3d 849, 857 (D.C. Cir. 2008) (seven-year delay unreasonable); *Midwest Gas Users Ass'n v. F.E.R.C.*, 833 F.2d 341, 359 (D.C. Cir. 1987) (four-year delay, plus additional unspecified delay, unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (more than a six-year delay unreasonable); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (six-year plus delay unreasonable); *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) ("[t]hree years from announced intent to regulate to final rule" would be "too long"); *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug*

---

weeks or months, not years."  As discussed herein, the vast majority of courts disagree.  Moreover, *Families for Freedom* involved plaintiffs that petitioned the Department of Homeland Security to promulgate regulations with respect to allegedly "substandard and abusive conditions" in immigration detention facilities operated by DHS.  *Id*. at 536.  Therefore, in that case, the agency itself created the allegedly dangerous conditions by operating allegedly unsafe detention facilities, thus meaning that the agency only needed to address its own actions to remedy the alleged harm.

*Admin.*, 740 F.2d 21, 34-35 (D.C. Cir. 1984) (remanding to determine whether two-plus-year delay in acting on petition was unreasonable); *In re A Cmty. Voice*, 878 F.3d 779, 787 (9th Cir. 2017) (eight-year delay unreasonable); *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (twenty-month delay after remand and in violation of statutory timeframe unreasonable).

As to the second factor, the absence of a statutory timetable, as is the case here, *see* Pl. Mem. at 36, supports deference to Defendants' determination of the appropriate pace of action. *See Beyond Pesticides*, 407 F. Supp. 2d at 40 ("[A]bsent a statutory timetable in the enabling statute, an agency is entitled to considerable deference in how expeditiously it proceeds with agency action.").

As to the third factor, as a general matter, firearm regulation certainly implicates health and human welfare.  However, "virtually the entire docket of the agency involves issues of this type [interests relating to human health and welfare].  In such circumstances, whether the public health and welfare will benefit or suffer from accelerating this particular rulemaking depends crucially upon the competing priorities that consume [the agency's] time, since any acceleration here may come at the expense of delay of [agency] action elsewhere." *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987); *see also Ctr. for Science in the Public Interest v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (finding this factor to "run against Plaintiffs" because "public safety is [the agency's] *raison d'être*; its entire docket involves issues of human health and welfare.").  As explained in the Lange Declaration, the division within ATF responsible for acting on rulemaking petitions is also tasked with many other regulatory duties that similarly implicate health and welfare.  For example, in the past year, ATF has, *inter alia*, engaged in rulemaking on issues related to explosives licensing, secure gun storage, rules applicable to firearm

silencers, the electronic storage of National Firearm Act forms, and procedures relating to firearm sales.  In short, most all of ATF's activities—the Bureau of Alcohol, Tobacco, Firearms and Explosives—by their nature implicate health and welfare.  Lange Decl. at ¶ 12.

As to the fourth factor, as noted above, ATF had to weigh competing agency activities with responding to this particular Petition.  Notably, as detailed in the Lange Declaration (and as discussed further below), ATF has made significant progress in evaluating the Petition and preparing a response.  While it has not completed that process yet, there were many competing priorities with which ATF also had to engage in the past year.  With limited resources, ATF was required to prioritize its responsibilities and, notably, it did not ignore the Petition, but, rather, it has taken steps towards formulating a response.  *See, e.g.*, *Sierra Club*, 828 F.2d at 798 ("Given that Congress provides [the agency] with finite resources to satisfy these various responsibilities, the agency cannot avoid setting priorities among them. As we have said, we can perceive no statutory command that [the agency] assign this rulemaking a higher priority than any of its other activities."); *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988) (in declining to compel agency action despite a five-year delay, stating,"[w]hile not wishing to denigrate the importance of [a plaintiff's] claim or the necessity of it receiving a prompt resolution, [the Court] cannot ignore the impact that court-ordered deadlines in [a] case could have on agency activities of a competing or higher priority").

Moreover, deference to Defendants' determination of their own priorities should be particularly pronounced where, as here, the Petition implicates the enforcement of criminal laws. *See* Lange Decl. at ¶ 11.  The Supreme Court has held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  The significant

deference owed to an agency's enforcement discretion should inform whether an agency's delay is reasonable.  Specifically, to the extent a court orders a law enforcement agency to reorganize its competing priorities, it is, by necessity (given an agency's limited resources), inhibiting these competing law enforcement priorities.  Defendants are in "a unique –and authoritative– position to view [their] projects as a whole, estimate the prospects for each, and allocate [their] resources in the optimal way.  Such budget flexibility as Congress has allowed the agency is not for [the Court] to hijack." *In re Barr Labs*, 930 F.2d 72, 76 (D.C. Cir. 1991) (finding that the court had "no basis for reordering agency priorities").

The fifth *TRAC* factor counsels the Court to "take into account the nature and extent of the interests prejudiced by delay." *TRAC*, 750 F.2d at 80.  "The third and fifth factors identified in TRAC run together in this case." *Ctr. for Science*, 74. F. Supp. 3d at 304.  Accordingly, for the same reasons discussed with respect to factor three, this factor weighs in Defendants' favor.

As to the sixth factor, there is no suggestion of any impropriety on the part of the agency. This conclusion is reinforced by the factors above—that this delay is well within the bounds that courts have previously found to be reasonable, the delay came amid a global health pandemic, and Defendants, in the past year, have had substantial competing priorities.  Additionally, as described in the Lange Declaration, ATF subjected the Petition to the standard process it follows in response to petitions for rulemaking.  Here, the agency has taken numerous steps to respond to the Petition, and it continues to move through the process toward finalization.  *See* Lange Decl. at ¶¶ 8-10.

In sum, pursuant to the D.C. Circuit's *TRAC* analysis, there is no basis to find unreasonable delay and, therefore, no basis to compel agency action.

## CONCLUSION

For the reasons stated herein, the Court should grant Defendants' motion for summary

judgment in its entirety and deny Plaintiffs' cross-motion for summary judgment.[12]

Dated:  January 29, 2021
        New York, New York

                                    Respectfully Submitted,

                                    AUDREY STRAUSS
                                    United States Attorney of the
                                    Southern District of New York


                              By:   /s/ Alexander J. Hogan
                                    ALEXANDER J. HOGAN
                                    TALIA KRAEMER
                                    Assistant United States Attorneys
                                    86 Chambers Street, Third Floor
                                    New York, New York 10007
                                    Tel.: (212) 637-2799/2822
                                    Fax: (212) 637-2686/2702
                                    E-mail: alexander.hogan@usdoj.gov
                                            talia.kraemer@usdoj.gov

---

[12] In the event the Court disagrees, Defendants note that Plaintiffs ask the Court to "vacate and set aside the 2015 Interpretive Rule and Polymer80 determination letters."  Pl. Mem. at 40.  However, as discussed herein, the 2015 Ruling was not aimed at the definition of a firearm under the GCA, but at an entirely separate issue relating to manufacturers.  Accordingly, even if this Court finds that the 2015 Ruling constitutes final agency action and that it is arbitrary and capricious, only the portion of the 2015 Ruling that implicates the definition of firearms under the GCA should be vacated.  Moreover, Defendants agree with Plaintiffs that, if the Court finds Defendants' actions to have violated the APA, the proper remedy is to remand to the agency, as opposed to imposing any definition of what constitutes a firearm pursuant to the GCA.