UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                      :
CITY OF SYRACUSE, NY, et al.,                         :
                                                      :          No. 1:20-CV-06885-GHW
                           Plaintiffs,                :
                                                      :
              v.                                      :
                                                      :
                                                      :
BUREAU OF ALCOHOL, TOBACCO,                           :
FIREARMS AND EXPLOSIVES, et al.,                      :
                                                      :
                                                      :
                        Defendants.                   :
                                                      :
-------------------------------------------------------------X


**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


EVERYTOWN LAW
450 Lexington Avenue, P.O.#4184
New York, New York 10024
Telephone: (646) 324-8222

*Attorneys For Plaintiffs*


DATED: March 5, 2021

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.  THE COURT HAS JURISDICTION TO CONSIDER PLAINTIFFS'
    CHALLENGES. .......................................................................................................... 2

    A.  The Plaintiffs Have Standing. .......................................................................... 2

        1.  The Plaintiff Cities Have Standing. ...................................................... 2

        2.  Plaintiff Everytown Has Standing. ....................................................... 4

    B.  Plaintiffs Challenge Final Agency Actions ....................................................... 5

        1.  The 2015 Interpretive Rule Consummated ATF's Process. .................... 5

        2.  The 2015 Interpretive Rule Has Legal Consequences. ........................... 6

II.  ATF'S ACTIONS ARE BOTH CONTRARY TO LAW AND ARBITRARY
     AND CAPRICIOUS. .................................................................................................. 8

    A.  The Challenged ATF Actions Are Contrary to Law ........................................... 9

        1.  The GCA's Text Unambiguously Forecloses ATF's Approach. .............. 9

        2.  Even Were The GCA Ambiguous, ATF's Interpretation Is
        Impermissible. ................................................................................... 14

    B.  The Challenged ATF Actions Are Arbitrary And Capricious. ........................... 18

        1.  ATF Failed To Engage In Reasoned Decisionmaking Or Address
        The Statutory Factors. ........................................................................ 19

        2.  ATF's Approach Is Otherwise Arbitrary And Capricious. ..................... 20

III.  ATF HAS UNREASONABLY DELAYED ITS RESPONSE TO PLAINTIFFS'
      RULEMAKING PETITION. ..................................................................................... 22

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Rivers & Idaho Rivers United,*
   372 F.3d 413 (D.C. Cir. 2004) ............................................................................23

*Arent v. Shalala,*
   70 F.3d 610 (D.C. Cir. 1995) ..............................................................................18

*Barrick Goldstrike Mines Inc. v. Browner,*
   215 F.3d 45 (D.C. Cir. 2000) ................................................................................7

*Beazer E., Inc. v. EPA,*
   963 F.2d 603 (3d Cir. 1992) ...............................................................................18

*Cal. Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019) ..............................................................................6

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,*
   846 F.3d 492 (2d Cir. 2017) ...........................................................................8, 18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................... *passim*

*Ciba-Geigy Corp. v. EPA,*
   801 F.2d 430 (D.C. Cir. 1986) ..............................................................................7

*Fams. for Freedom v. Napolitano,*
   628 F. Supp. 2d 535 (S.D.N.Y. 2009) ................................................................23

*Geneme v. Holder,*
   935 F. Supp. 2d 184 (D.D.C. 2013) ....................................................................22

*Golden & Zimmerman, LLC v. Domenech,*
   599 F.3d 426 (4th Cir. 2010) ................................................................................6

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ..............................................................................................5

*In re Am. Rivers & Idaho Rivers United,* 372 F.3d 413 (D.C. Cir. 2004) ....................................23

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
   336 F.3d 1094 (D.C. Cir. 2003) ..........................................................................23

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ............................................................................................18

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ...........................................................................4

*Mayo Found. for Med. Educ. & Rsch. v. United States*,
   562 U.S. 44 (2011) ....................................................................................9, 13

*Midwest Gas Users Ass'n v. FERC*,
   833 F.2d 341 (D.C. Cir. 1987) ........................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..........................................................................................8

*M.R.R. v. State*, 411 So. 2d 983, 984 (Fla. Ct. App. 1982) ........................................13

*Nat. Res. Def. Council, Inc. v. U. S. Dep't of Interior*,
   397 F. Supp. 3d 430 (S.D.N.Y. 2019) ........................................................4, 5, 6, 8

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018) ..............................................................................3

*Nebraska ex. rel. Bruning v. U.S. Dept. of Health & Hum. Servs.*,
   877 F. Supp. 2d 777 (D. Neb. 2012) ..................................................................4

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) .............................................................................5

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) ...........................................................................6, 7

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ........................................................................................21

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ......................................................................................14

*U.S. Army Corps of Eng'rs v. Hawkes, Co.*,
   136 S. Ct. 1807 (2016) ....................................................................................6

*United States v. Gravel*,
   645 F.3d 549 (2d Cir. 2011) ...........................................................................11

*United States v. Howard*,
   214 F.3d 361 (2d Cir. 2000) ...........................................................................16

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ...............................................................................8, 13, 14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. One TRW, Model M14, 7.62 Caliber Rifle,*
   441 F.3d 416 (6th Cir. 2006) ..................................................................................11

**Statutes**

Adminsitrative Procedure Act
  5 U.S.C. § 706(2)(a)..........................................................................................................8

Firearm Owners' Protection Act of 1986...................................................................16

Gun Control Act of 1968
  18 U.S.C.
     § 921(a)(3) ...............................................................................................2, 13, 18
     § 921(a)(3)(A)...........................................................................................9, 11, 12
     § 921(a)(3)(B) ............................................................................................9 11, 12
     § 922.................................................................................................................16
     § 924(a)(1)(D) ...................................................................................................7
     § 926(a) ............................................................................................................14

National Firearms Act
  26 U.S.C. § 5845(b) ........................................................................................................13

**Other Authorities**

Thomas Fuller and Tim Arango, *Police Pin a Rise in Murders on Unusual*
  *Suspect: Covid*, New York Times (Oct. 30, 2020) ..................................................24

# INTRODUCTION

The Government seeks to defend the challenged actions of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") involving unfinished frames and receivers—which have contributed to a growing wave of ghost-gun violence—by advancing an unsupported and overly narrow construction of the term "firearm" in the Gun Control Act of 1968 ("GCA").  According to the Government, unfinished frames and receivers are not firearms if they lack machining or are solid in certain areas—end stop—even if such objects are designed to be, advertised as, readily converted to, and destined to be nothing other than operable firearms.  ATF's bright-line "solidity/machining" rule is precluded by statute, unreasonable, and unsupported.[1]  Indeed, the Government has failed to identify a single document in the Administrative Record with a reasoned explanation for ATF's construction of "firearm."

In light of recent developments, moreover, ATF's failure to respond to Plaintiffs' Petition for Rulemaking has moved from unreasonable to unconscionable.  On December 9, 2020, ATF filed a 56-page application in the District of Nevada seeking a warrant to search and to seize evidence from Polymer80's headquarters (the "Search Warrant").  In that application, ATF made several critical representations and admissions:

- In 2019, law enforcement officers recovered approximately 10,000 ghost guns nationally.  *See* Dkt. No. 92-2, Exhibit B, Application for Search Warrant ("Search Warrant") ¶ 28(b).

- Polymer80 ghost guns represent the overwhelming majority (86%) recovered and "were used in hundreds of crimes throughout the United States[,] . . . includ[ing]

---

[1] The Government at times uses the term "unmachined frames and receivers" to refer broadly to the subset of all unfinished frames and receivers that it classifies as non-firearms.  *See, e.g.*, Dkt. No. 98, Government's Brief in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (Gov't Br.) at 12, 13, 22.  Elsewhere in the Government's brief and in the administrative record—specifically, in ATF letters classifying certain AR-15 type receivers—the term "unmachined" describes only the fire-control cavity area.  *See, e.g.*, ATF0225.  In both the opening brief and this one, Plaintiffs use the phrase "solidity/machining test" to refer to the test ATF has generally used to classify both receivers and frames, based on whether the fire-control cavity or other critical areas are machined or indexed.  *See* Dkt. No. 62, Plaintiffs' Brief in Support of Motion for Summary Judgment (Pls. Br.) at 8–13.

unlawful firearm possession, firearm trafficking, domestic violence, aggravated assault, kidnapping, carjacking, robbery, and homicide." *Id.* ¶¶ 28(b), (e).

- An average person with ordinary tools can, *in under 30 minutes*, combine an unfinished Polymer80 frame with other parts to produce a functioning weapon. *Id.* ¶¶ 67–71.

- Polymer80's PF940C Buy Build Shoot Kits—the central component of which is the PF940C unfinished frame deemed *not to be a firearm* in ATF's January 2017 determination letter that is challenged in this action—"are, as a matter of law, firearms pursuant to 18 U.S.C. § 921(a)(3)." *Id.* ¶ 65 & n.6.[2]

The Government does not and cannot refute the public emergency that exists as a result of the proliferation of ghost guns.  Nor do the Government's standing and procedural arguments have any merit.  ATF's definition of "firearm," as expressed in the actions challenged in this case, is contrary to law and arbitrary and capricious.  And ATF's failure to respond to Plaintiffs' Petition for Rulemaking is unlawful.  The Court should enter summary judgment for Plaintiffs.

## ARGUMENT

### I.    The Court Has Jurisdiction To Consider Plaintiffs' Challenges.

#### A.    The Plaintiffs Have Standing.

##### 1.    The Plaintiff Cities Have Standing.

Plaintiff Cities have standing because ATF's actions have caused an increasing number of individuals to obtain ghost guns; those individuals have used ghosts guns to commit crimes in the jurisdictions of Plaintiff Cities; and ghost gun crimes are more difficult and costly to investigate than crimes committed with serialized firearms.  Pls. Br. at 18–20.  The Government does not dispute that the increased cost of investigation is a cognizable injury or that Plaintiffs have provided evidence to establish those costs.  *See* Gov't Br. at 11–12; Dkt. No. 63, Plaintiffs' 56.1 Statement (56.1 Statement) ¶¶ 19–24.  Instead, the Government disputes traceability and redressability.  Gov't Br. at 12–13.  Both objections are meritless.

---

[2] The government itself references the Polymer80 Search Warrant materials, which are properly before the Court, including because the Court can take judicial notice of them.

*Traceability.*  The Government incorrectly claims that Plaintiffs must establish a six-step purported chain of causation to show traceability, but at least three of these steps are irrelevant. Plaintiffs' standing does not depend on purported steps one and two:  the number of ghost-gun-kit manufacturers or those manufacturers' intended consumer group.  *See id* at 12*.*  All that matters is that, because of ATF's actions, more individuals are purchasing ghost-gun kits and components and are using those kits and components to commit crimes, which Plaintiffs have shown (and the Government has not refuted).  Additionally, Plaintiffs need not show that the crimes at issue would not have been committed absent use of ghost guns (the Government's purported sixth step). Plaintiffs have shown (and the Government has not disputed) that crimes committed with ghost guns are more difficult and costly to investigate than those involving serialized weapons.

Plaintiffs have presented evidence sufficient to establish every other step in the Government's claimed causal chain (*i.e.*, steps three, four, and five).  "[I]t is well-settled that '[f]or standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test . . . . even in cases where the injury hinges on the reactions of the third parties."  *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018) (internal citation omitted).  Plaintiffs have established that Polymer80 and other ghost-gun-kit sellers used (and continue to use) ATF's actions defining "firearm" to advertise their products.  *See* 56.1 Statement ¶¶ 8–9, 11.  Plaintiffs also have presented unrebutted evidence that, during this advertising campaign driven by ATF's faulty determinations, law enforcement officials in Syracuse, San Jose, and Chicago have recovered a greater number of ghost guns each year.  *See* 56.1 Statement ¶¶ 25–30, 33–35. Plaintiffs further have presented evidence that many of these recovered ghost guns were sold by Polymer80 and other companies that featured ATF's actions as proof of legality.  *See* 56.1

Statement ¶¶ 27, 29, 34–35.  Finally, Plaintiffs have presented evidence that numerous recovered ghost guns were linked to homicides, non-fatal shootings, and other crimes.  *See* 56.1 Statement ¶¶ 25–26, 28, 30, 34–35.  Plaintiffs' alleged harms are thus traceable to ATF.[3]

*Redressability.*  The Government concedes that traceability and redressability usually overlap, Gov't Br. at 13.  Thus, because Plaintiffs have shown traceability, they also have established redressability.  The Government further argues that even if Plaintiffs obtain a favorable ruling, criminal actors could still make their own ghost guns.  Gov't Br. at 13.  But "all that the redressability inquiry requires" is that vacating ATF's actions "would reduce [the] risk" that "third parties will undertake [the] activities" that cause Plaintiffs' injuries.  *Nat. Res. Def. Council, Inc. v. U. S. Dep't of Interior*, 397 F. Supp. 3d 430, 440–441 (S.D.N.Y. 2019) ("*NRDC*").  This is plainly the case here.  Numerous manufacturers advertise their products using ATF's flawed interpretations.  *See* 56.1 Statement ¶¶ 19, 48–55.  Vacating ATF's actions would deprive these manufacturers of their primary marketing tool, thereby "reducing the risk" of the harms from ghost guns alleged by Plaintiffs here.

### 2.    Plaintiff Everytown Has Standing.[4]

Defendants incorrectly assert that Everytown's injuries are simply "abstract harm to their advocacy efforts," a "mere interest in a problem," "manufacture[d]," and "the very activities that they engage in routinely to carry out their mission."  Gov't Br. at 14–15.  The record shows that ATF's flawed interpretations forced Everytown to divert resources from other projects, which "were either delayed or have still not been completed."  *See* Dkt. No. 64-30, Declaration of

---

[3] Defendants' chain-of-causation cases are easily distinguishable.  *See Nebraska ex. rel. Bruning v. U.S. Dept. of Health & Hum. Servs.*, 877 F. Supp. 2d 777, 795–96 (D. Neb. 2012) (rejecting theory of causation that relied on "layers of conjecture"); *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (holding that a "causation chain" with "several 'links'" must not be "'hypothetical or tenuous'" (citation omitted)).

[4] If the Court determines that any of Plaintiff Cities has standing, it is unnecessary to determine whether Plaintiff Everytown has standing.  *See* Pls. Br. at 18.

Nicholas Suplina ¶¶ 8–14.  Everytown's actions—including filing a petition for rulemaking (its first) and conducting a "ten-year, nationwide review of federal prosecutions involving ghost guns"—were "outside [its] traditional core advocacy and education efforts."  *Id.* ¶¶ 8, 10, 12.

These facts establish Everytown's organizational standing, which can be shown through an "expenditure of resources that could be spent on other activities."  *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011).  "[S]o long as the economic effect on an organization is real"—as here— "the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference].'"  *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.20 (1982)).

### B.    Plaintiffs Challenge Final Agency Actions.

The Government ***concedes*** that the Polymer80 letters are final agency action reviewable under the Administrative Procedure Act ("APA").  *See* Gov't Br. at 20, 36.  However, the Government erroneously argues that the 2015 Interpretive Rule—*i.e.*, the combination of ATF Ruling 2015-1 and related ATF Q&As—is not final agency action.

### 1.    The 2015 Interpretive Rule Consummated ATF's Process.

Agency action that uses "definitive" language to "unambiguously proclaim[]" the agency's interpretation of a statute typically consummates the agency's decisionmaking process.  *NRDC*, 397 F. Supp. 3d at 446–47.  The 2015 Interpretive Rule does exactly that. Specifically, Ruling 2015-1 "unambiguously proclaims," *id.* at 447, that whether an unfinished receiver or frame will be considered a firearm turns on "minor drilling and machining activities in or on the fire control area or other critical areas."  ATF0290.  The ATF Q&As unambiguously state that a receiver with a fire-control cavity area that is "completely solid and un-machined" has "not reached the 'stage of manufacture' which would result in the classification of a firearm per the GCA."  ATF0364.

The Government cites no support for its only argument against "consummation" in Ruling 2015-1—that because that Ruling reaches an ***additional*** question about whether entities can perform machining without being licensed, the Ruling cannot also be final agency action with respect to its clear pronouncement about the legal status of unfinished frames and receivers.  Gov't Br. at 16.  Specifically, the Government argues that the portion of Ruling 2015-1 implicated by Plaintiffs' challenge is merely "context" and "background," Gov't Br. at 16, 17.  But the Government cites no support for dissecting and then minimizing a portion of a final, otherwise reviewable agency ruling as non-reviewable "background."

The Government similarly seeks to minimize the Q&As as "simply informational."  Gov't Br. at 18 (citing *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010)).  But the Government's citation of a snippet of an out-of-Circuit case dealing with an unrelated ATF action is no substitute for an analysis of the specific language of the challenged Q&As.  For consummation, the question is whether the agency has used "definitive" language to "unambiguously proclaim[]" an interpretation of a statute the agency is tasked with administering.  *NRDC*, 397 F. Supp. 3d at 446–47.  The Q&As, like Ruling 2015-1, plainly do so.

**2.    The 2015 Interpretive Rule Has Legal Consequences.**

Determining whether "an agency action has direct and appreciable legal consequences is a 'pragmatic' inquiry" focused on the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (citing *U.S. Army Corps of Eng'rs v. Hawkes, Co.*, 136 S. Ct. 1807, 1814 (2016)).  The relevant consequences include not only formal rights and obligations but also any "substantial practical impact."  *See Salazar v. King*, 822 F.3d 61, 83 (2d Cir. 2016) (citation omitted).  The "concrete consequences" of the 2015 Interpretive Rule are clear.  Plainly, the regulated community would—and did—view these pronouncements as authorizing the

unregulated manufacture and sale of unfinished receivers and frames that lacked machining in certain key areas.  Indeed, as Plaintiffs have shown, sellers continue to cite the Rule to market their unfinished receivers and frames as immune from ATF regulation.  *See* 56.1 Statement ¶¶ 8–9, 11.

Addressing Ruling 2015-1 and the Q&As separately, the Government contends that neither had "legal consequences."  Gov't Br. at 16–18.  To begin with, the Court should reject ATF's attempt to "divide and conquer" by treating Ruling 2015-1 and the Q&A as independent and downplaying their "cumulative effect."  *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 n.7 (D.C. Cir. 1986).  The Government cites two out-of-Circuit cases in which the courts determined that ATF Q&As were not final agency action.  Gov't Br. at 18.  But these cases do not address a situation, as here, where Plaintiffs challenge the *combination* of Ruling 2015-1 and the Q&As. Defendants offer no response to the well-established principle that courts may "consider[] whether final agency action has resulted from a series of agency pronouncements rather than a single edict." Pls. Br. at 24 (citing *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000)).  Here, both aspects of the 2015 Interpretative Rule crystallized ATF's relevant interpretation of the GCA—an interpretation previously stated only in *ad hoc* letters.  And this crystallization had a clear effect:  manufacturers have understood the 2015 Interpretive Rule to mean that ATF will not regulate certain unfinished frames and receivers.  *See* 56.1 Statement ¶ 48.

In any event, even if viewed separately, Ruling 2015-1 and the Q&A each have "substantial practical impact," *Salazar*, 822 F.3d at 83 (citation omitted), and thus "legal consequences."  *Id.* The Government claims that Ruling 2015-1 only "clarif[ied] the circumstances under which businesses are required to comply with the GCA's manufacturing license, marking, and recordkeeping requirements," Gov't Br. at 16, but these requirements clearly have legal consequences—a willful violation creates criminal liability.  *See* 18 U.S.C. § 924(a)(1)(D).  And

the Government argues that the Q&As "do[] not commit ATF to any particular enforcement action," Gov't Br. at 18, but the "APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review." *NRDC*, 397 F. Supp. 3d at 447 (internal citations omitted).

## II.    ATF's Actions Are Both Contrary To Law And Arbitrary And Capricious.

The Government incorrectly conflates Plaintiffs' two independent APA challenges to the ATF's 2015 Interpretive Rule and ATF's three Polymer80 determination letters.  Plaintiffs challenge these actions as ***both*** contrary to law ***and*** arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(a).    The "contrary to law" challenge concerns whether ATF's bright-line solidity/machining test is authorized under the GCA, and the "arbitrary and capricious" challenge concerns whether the Administrative Record shows that ATF has sufficiently deliberated and justified this test.  Yet the Government incorrectly seeks to reduce the entire inquiry to one of statutory interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See* Gov't Br. at 29–30 (claiming that "ATF's interpretation is a permissible one (and, therefore, not arbitrary and capricious)").

The "contrary to law" challenge must be evaluated under the two-step *Chevron* inquiry and the related principles of *United States v. Mead Corp.*, 533 U.S. 218 (2001).  Under these standards, ATF's bright-line solidity/machining rule fails.  ATF's actions next must be assessed under the arbitrary and capricious standard.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).  ATF's actions fail under this standard as well. Although the frameworks have some overlap, they impose distinct requirements on ATF.  *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 522 (2d Cir. 2017) (explaining that "*Chevron* analysis . . . does not incorporate the *State Farm* standard of review").

8

A second key flaw pervading the Government's merits argument is that it addresses only the three Polymer80 determination letters, and not the 2015 Interpretive Rule, apparently due to its position that the Rule is not Final Agency Action. Using this avoidance tactic, the Government then seeks to portray, inaccurately, the three determination letters as containing case-specific reasoning and analysis when in fact they do not. The same flawed construction supports each of the challenged ATF actions, and they must all fall as a result.

### A. The Challenged ATF Actions Are Contrary to Law.

### 1. The GCA's Text Unambiguously Forecloses ATF's Approach.

*Chevron* first requires assessing "whether Congress has 'directly addressed the precise question at issue'" in unambiguous language. *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 52 (2011). Applied here, the question is whether the GCA unambiguously forecloses ATF's bright-line solidity/machining test that exempts unfinished frames and receivers from regulation if they are not machined in the fire control cavity or other "critical areas." The answer is yes: ATF's bright-line test is foreclosed by the GCA's unambiguous language.

To begin with, and as the Government does not dispute, the GCA unambiguously requires ATF to regulate at least *some* unfinished frames and receivers. Specifically, 18 U.S.C. § 921(a)(3)(A) directs ATF to regulate not only weapons that "will" fire projectiles, but also those "designed to" fire projectiles and those that "may readily be converted to" fire projectiles. And Section 921(a)(3)(B) directs ATF to regulate the frames and receivers of "any such weapons," cross-referencing Section 921(a)(3)(A). The category of weapons that "may readily be converted to" fire projectiles necessarily describes firearms that have not been completely machined, and frames and receivers are the primary components of those firearms. Likewise, the category of weapons "designed to" fire projectiles is distinct from those that "will" fire such projectiles. Thus, the GCA covers as "firearms" at least some incomplete frames and receivers.

Consistent with the statutory language, ATF has long recognized that it is required to regulate *some* unfinished frames and receivers as "firearms."   In 1976, soon after the GCA was enacted, ATF's Assistant Chief Counsel issued a memorandum about whether the manufacturers of "unfinished frames . . . must comply with the licensing, identification, and recordkeeping requirements of the Act."  ATF0266.  ATF's answer was straightforward: "If the castings may be readily converted it is our view that they are firearms." *Id.*  ATF further explained that "classifying 'firearms' on a case-by-case basis [is] consistent with the letter and spirit of the Gun Control Act" because "[it] is obvious that what constitutes 'readily convertible' depends upon the nature of each 'firearm.'"  *Id.*  ATF's acknowledgement that some unfinished frames or receivers must be regulated is confirmed by the actions challenged here, which do not dispute that some unfinished frames and receivers are "firearms," but look to the presence or absence of certain machining to make that determination.  *See* Pls. Br. at 11–13.[5]

In the Government's view, the GCA "unambiguously excludes unmachined frames or receivers from the statutory definition of a firearm."  Gov't Br. at 19.  This reductionist, arbitrary line, far from being compelled by the GCA's language, plainly conflicts with it.  Under ATF's bright-line test, an unfinished frame or receiver cannot be covered as a "firearm" unless the fire control cavity has machining, even if only "minor."   *See* ATF0290; ATF0364; ATF0225; ATF0230; ATF0253.  This mechanistic approach violates the GCA's clear command—as recognized by ATF as early as 1976—to determine if an unfinished frame or receiver "may readily be converted" into (or was "designed to" be) an operable firearm.  Pls. Br. at 25–29.  These terms are intentionally broad and flexible, and thus cannot be reduced to the bright-line consideration of

---

[5] *See also* ATF605 (May 2015 ATF determination letter, explaining that a "firearm frame or receiver" "is a specific item that is itself a 'firearm' under the GCA," and that, "[t]o fall under the purview of the GCA, an item" "need only be designed, re-designed, intended, readily convertible, readily restored, or combined with other parts").

a single attribute, like the presence or absence of certain machining.  As ATF itself recognized in the 1976 memorandum, "it is obvious that what constitutes 'readily convertible' depends upon the nature of each 'firearm'" and "[t]hat there may be cases where it is difficult to determine the side on which a particular 'firearm' falls is not a sufficient reason to establish a rigid criterion for the phrase 'readily convertible.'"  ATF0267.[6]

The Government seeks to distract by proposing a new "multi-step" conceptual framework that is contrary to the text of the GCA.  According to the Government, a "device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile."  Gov't Br. at 4.  It then argues that "an unmachined frame or receiver can be converted into a device that expels a projectile" only via "multiple significant steps": "[f]irst, the unmachined frame must be converted into a finished one" and "[s]econd, this finished frame must then be assembled into an operable weapon."  *Id.* at 26.  Thus, it concludes, an "unmachined frame or receiver" can never be a device that "can 'readily' be converted into a device that expels a projectile," *id.*, and likewise "[a]n unmachined frame or receiver is not 'designed to' expel a projectile, because its purpose is not to expel a projectile[,]" but instead to be "incorporated into something else that is designed to expel a projectile."  *Id.* at 21.

The Government's new position that "unmachined" frames or receivers are categorically outside the purview of the GCA because they are not full weapons has no basis.  As explained, the GCA unambiguously covers incomplete frames and receivers by defining "firearm" to include not only "weapons" but the "frame or receiver of any such weapon" that is "designed to or may readily

---

[6] In the context of the National Firearms Act ("NFA"), the Sixth Circuit has explained that determining whether a machinegun can be "readily restored" requires the consideration of "time," "ease," "expertise, *i.e.*, what knowledge and skills are required," "necessary equipment," the ease of acquiring necessary additional parts, and cost.  *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421–22 (6th Cir. 2006).  Also in the context of the NFA, the Second Circuit has held that whether a weapon is "designed to" be a machinegun depends on what the weapon was "conceived of, and planned for use as."  *United States v. Gravel*, 645 F.3d 549, 552 (2d Cir. 2011).

be converted to expel a projectile." *See* 18 U.S.C. §§ 921(a)(3)(A), (B).  The Government's framework ignores the "any such weapon" cross-reference contained in Section 921(a)(3)(B) and incorrectly assumes that Section 921(a)(3)(B) does not include incomplete frames and receivers. The Government cannot get rid of Congress's cross-reference just because it is inconvenient.

Moreover, ATF has ***never*** used the Government's proposed framework—indeed, this framework does not support the "machining" line that ATF has drawn.  As discussed, ATF has always taken the position that at least some incomplete frames and receivers come within the GCA under the "any such weapon" cross-reference in Section 921(a)(3)(B).  *See, e.g.*, ATF0266; ATF0014; ATF0020; ATF0023; ATF0051; ATF0605.  But the Government argues that "an ***unmachined*** frame or receiver can be converted into a device that expels a projectile" only via "multiple significant steps."  Gov't Br. at 26 (emphasis added).  The same logic holds for an unfinished frame or receiver with only ***minor*** machining—yet under ATF's view, minor machining in certain areas transforms an unfinished frame or receiver into a "firearm."  Simply put, the Government's purported new "framework" has no support in the statute and in any event provides no reason to view ATF's arbitrary "machining" line as compelled by the statute.

The Government's subsidiary arguments about the GCA's language also make no sense. Because the GCA specifically covers a frame or receiver *itself* as a "firearm," it is not necessary to consider, as the Government suggests, "procurement of additional parts and the knowledge of how to assemble those parts into a functioning weapon."  Gov't Br. at 26.  Similarly, it does not matter that a frame or receiver is not *itself* designed to fire projectiles—all that matters is that the frame or receiver corresponds to "any such weapon," *i.e.*, a weapon "designed to" fire projectiles.

18 U.S.C. §§ 921(a)(3)(A), (B).[7]  And because the GCA's definition of "firearm" specifically includes frames and receivers, as opposed to the many other component parts of an operable firearm, the Government's slippery slope argument—that Plaintiffs' theory will result in "every part of a gun" being regulated, Gov't Br. at 21, 23—is simply false.

Finally, the Government's argument that "designed to" is limited to "unserviceable firearms" is meritless.  That unserviceable firearms are covered by the "designed to" prong does not mean that unfinished frames and receivers lacking any purpose on this planet other than to be part of an operable firearm are not *also* covered.  The Government highlights a quote from the GCA's legislative history that "'[Section 921(a)(3)] makes it clear that so-called unserviceable firearms come within the definition[]'" and identifies several criminal cases in which courts rejected arguments that "because a gun is broken, it is no longer designed to fire a projectile." *Id.* at 25.  But these cases and the legislative history simply establish that "unserviceable firearms" are *included* within the category of weapons "designed to" fire projectiles, not that they are the *limit* of that category.  Congress has elsewhere used narrower language to limit a category only to unserviceable weapons.  *See* 26 U.S.C. § 5845(b) (including machineguns that "can be readily restored" as distinct from those "designed to shoot" in the NFA's definition of machinegun).

In sum, the GCA unambiguously forecloses the mechanistic machining approach that underlies the 2015 Interpretive Rule and the three Polymer80 determination letters.

---

[7] The Government also incorrectly argues that if the "designed to" formulation applies to unfinished frames and receivers, that would make the "readily convertible" category superfluous.  Gov't Br. at 23.  This argument misconstrues Plaintiffs' position, which is that "designed to" requires ATF to evaluate the characteristics of a frame or receiver that indicate the manufacturer's purpose or intent—*e.g.*, naming the frame or receiver to correspond to a specific firearm (as Polymer80 does with its products, *see* n.9, *infra*)—whereas "readily convertible" requires an evaluation of the frame or receiver's physical attributes as they relate to ease of conversion into an operable weapon. That "designed to" does not subsume "readily convertible" is further shown by examples of weapons that are "readily convertible" to fire projectiles, even if they are not "designed to" do so.  *See, e.g.*, *M.R.R. v. State*, 411 So. 2d 983, 984 (Fla. Ct. App. 1982) (holding that because a "starter gun is not designed to fire a projectile," it was "the State's burden to prove that [it] could expel a projectile by the action of an explosive, or that it could readily be converted to do so").

> ### 2.   Even Were the GCA Ambiguous, ATF's Interpretation Is Impermissible.

Although the GCA's text forecloses ATF's approach, even were the statute ambiguous, ATF's reading also fails.   Under *Chevron*, an agency receives deference to a "reasonable" interpretation of a statute it is authorized to interpret, *Mayo Found.*, 562 U.S. at 58–59, but only if the challenged agency action speaks with the force of law, *see id.* at 56–57.   Here, ATF's interpretations are insufficiently formal to receive *Chevron* deference and, indeed, should receive no deference given the lack of "thoroughness, logic, and expertness." *Mead*, 533 U.S. at 235.   In any event, they are unreasonable and thus not worthy of *Chevron* deference even were it available.

*At Most,* Skidmore *Deference Applies.*   The Government simply assumes, incorrectly, that it should receive the deference afforded by *Chevron* Step 2.   *See* Gov't Br. at 29.   But "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S at 226–27.   The "overwhelming number" of "cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication," and the absence of such a process—as here—is "significant." *Id.* at 230–31.   Accordingly, "interpretive rules generally 'enjoy no *Chevron* status as a class.'"   Pls. Br. at 29 n.16 (citing *Mead*, 533 U.S. at 232).

Neither the 2015 Interpretive Rule nor the Polymer80 determination letters were produced by formal procedures.   Although the GCA gives ATF the authority to issue "rules and regulations as are necessary to carry out the provisions of [the GCA]," 18 U.S.C. § 926(a), ATF failed to do so here, opting for an Interpretive Rule and determination letters as opposed to formal notice-and-comment rulemaking (or adjudication).   Thus, like the tariff classification letters in *Mead*, neither

14

the 2015 Interpretive Rule nor the determination letters are entitled to *Chevron* deference.  At most, ATF's actions deserve *Skidmore* deference, which is "proportional to its 'power to persuade'" and rests on the agency's "thoroughness, logic, and expertness."  *Mead*, 533 U.S. at 235 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

      ***ATF's Unreasonable Solidity/Machining Test Fails Under* Chevron *Or* Skidmore*.**  ATF's solidity/machining test is an unreasonable construction of the GCA and thus fails under *Chevron* (and thus necessarily under *Skidmore* as well).  ATF's approach is a reductionist bright line that conflicts with the GCA's "may readily be converted" and "designed to" formulations.  According to ATF, if the fire control cavity or other discrete areas contain no machining, then an unfinished frame or receiver is not a "firearm," but "minor" machining transforms the object into a "firearm."  By categorically exempting from regulation unmachined frames and receivers without regard for whether they can be readily converted into operable weapons or are designed for that very purpose, ATF has adopted an unreasonable construction of the GCA.

      ATF's bright-line solidity/machining test is especially unreasonable when viewed against the backdrop of ATF's position, reflected in its December 2020 raid and criminal investigation of Polymer80, that certain "gun building kits," such as those produced and sold by Polymer80, are "firearms."  *See* Search Warrant ¶¶ 7–8.  These kits contain the same unfinished finished frame (Glock-type PF940C) that ATF ***refuses*** to classify as a "firearm" on its own (ATF0253–0255), along with other materials needed to transform the unfinished object into an operable firearm.  Polymer80 "also sells each of the components that constitute the Buy Build Shoot Kit as separate items."  Search Warrant ¶ 48.  Thus, ATF's position seems to be that an unfinished frame or receiver is exempt from regulation on its own but not if combined at the point of sale with other items that can easily be independently purchased.  ATF's construction—under which the meaning

of "firearm" depends on the marketing and packaging techniques of those selling such frames or receivers—is unreasonable and has no basis in the GCA.

**The GCA's "Purpose" Does Not Support ATF's Construction.**  The Government claims that ATF is entitled to deference because ATF's job allegedly is to "balance[] the purposes of the GCA"—specifically "crime prevention" and the right to use firearms for "lawful purposes."  Gov't Br. at 36–37.  The Government then makes the conclusory assertion that "ATF's focus on the degree of machining done to a frame or receiver and whether that device can be readily converted into a device that expels a projectile accords with the multiple purposes of the GCA and upholds the balance that Congress struck in the statute itself."  *Id.* at 37.

To begin with, the Government's revisionist take on the GCA is incorrect:  the GCA's framers were primarily motivated by a wave of violence arising from the proliferation of mail-order handguns, and sought to stem that wave through regulating operable weapons, weapons that were designed to be and could readily be converted into operable weapons, and the frames and receivers of such weapons.  *See* Pls. Br. at 32–33.  The Government seeks to support its purpose argument with a quote from *United States v. Howard*, 214 F.3d 361, 364 (2d Cir. 2000), but that case has nothing to do with the provisions of the GCA at issue here, instead concerning the "Firearm Owners' Protection Act of 1986, which added a new scienter requirement to many [of the] penalties under Section 922 [of the GCA]."  *Id.* at 364.  Congress's purpose in adding a scienter requirement two decades after it defined "firearm" clearly has no relation to the reasonable scope of the terms "readily be converted" and "designed to be."  Nor does the Government's generic invocation of the Second Amendment.

In any event, even assuming that the GCA requires striking the "balance" claimed by the Government, ATF has failed to connect its bright-line solidity/machining test to any such balance.

16

Indeed, rather than providing any explanation as to how its rule advances law-abiding citizens' access to firearms (or acknowledging that the different approach urged by Plaintiffs would not eliminate the ability of law-abiding hobbyists to build their own firearms, *see* Pls. Br. at 38 n.20), the Government merely states the claimed balance allegedly required under the GCA, describes ATF's machining approach at a high level, and makes the conclusory statement that ATF has balanced the purposes of the GCA. Gov't Br. at 37. That line of reasoning could apply to ***any*** deregulatory interpretation of the GCA, regardless of text or context, and thus does not support the notion that the regulation of unfinished frames and receivers would be particularly burdensome.

**ATF's General "Expertise" Cannot Save its Specific Construction.** The Government also has failed to establish that ATF's "experience and expertise in regulating firearms" renders its bright-line solidity/machining approach reasonable. Although ATF may well have such experience and expertise in theory, its disjointed approach over the decades to regulating unfinished frames and receivers under the GCA, culminating in the bright-line "machining" approach challenged in this case, counsels against any deference to the interpretations at issue. The Government states that ATF "is tasked with drawing a line as to when a piece of metal has become a frame or receiver" and, for support, cites an ATF determination letter in which ATF concluded that the submitted unfinished receiver was a firearm. Gov't Br. at 38 (citing ATF605–06). But just because ATF has been "tasked with drawing a line" does not mean that it has used any expertise to do so. To the contrary, ATF's current approach marks a sharp deviation from its earlier efforts to rigorously apply the statutory criterion of "ready convertibility" through careful case-by-case assessment and testing. Thus, even if one cited letter—or ATF's experience generally—indicates ATF's ability to draw reasonable regulatory lines in theory, it does nothing

17

to support a conclusion that the solidity/machining bright line challenged in this case resulted from the application of any expertise—which it did not.

Unable to explain how ATF's expertise contributed to drawing the line at issue in this case, the Government offers a long list of cases in which courts deferred to agency interpretations. *See* Gov't Br. at 38–39. But not one of these cases stands for the proposition that an agency's general experience with drawing regulatory lines requires deference to every line the agency draws. Indeed, in each of the cases that the Government relies on, the court accepted the agency's position only after assessing the position's reasonableness. For example, in *Beazer E., Inc. v. EPA*, 963 F.2d 603 (3d Cir. 1992), the court explained that it would "defer to [the agency's] line-drawing *provided the interpretation is both reasonable and consonant with Congress's intent*." *Id.* at 609 (emphasis added). Thus, having failed to show that ATF's interpretation is reasonable, the Government cannot save that interpretation with an abstract reference to expertise.

### B.     The Challenged ATF Actions Are Arbitrary and Capricious.

In addition to being contrary to law, the 2015 Interpretive Rule and the Polymer80 determination letters are arbitrary and capricious. Courts often "'determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.'" *Catskill Mountains*, 846 F.3d at 522 (quoting *Arent v. Shalala*, 70 F.3d 610, 620 (D.C. Cir. 1995) (Wald, J., concurring)). The "relevant factors" include those specified by the controlling statute, and an agency must "comply with . . . clear statutory command[s]." *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007). Notably, the arbitrary and capricious inquiry sets forth "a much stricter and more exacting review of the agency's rationale and decisionmaking process than the *Chevron* Step Two standard." *Catskill Mountains*, 846 F.3d at 521. Thus, even were ATF's "machining" bright-line

not statutorily foreclosed, it would fail APA review because ATF did not consider the statutory factors, and otherwise has failed to justify its actions with a logical or rational explanation.

### 1.     ATF Failed to Engage In Reasoned Decisionmaking or Address the Statutory Factors.

ATF's actions failed to provide a reasoned justification for the solidity/machining test and display a brazen disregard for the GCA's "clear statutory command":  that "firearms" include the frames and receivers of weapons that are "designed to be" or "readily converted to" an operable firearm.  18 U.S.C. § 921(a)(3); *see* Pls. Br. at 30–32.  Ruling 2015-1 fails to explain why the absence of "minor drilling" precludes "ready conversion," or why a frame or receiver that is complete except for "minor drilling" is not "designed to be" a complete frame or receiver.  This failure to engage with the controlling statutory standard is arbitrary and capricious.

The Polymer80 determination letters similarly fail to provide a reasonable explanation (or any explanation at all) and fail to engage with the relevant statutory standards.  The letters do not assess how long and how difficult the process of completing the frame or receiver would be, what tools or skill level are involved, whether the number of remaining steps exceed what the term "readily" allows, or how machining would make a practical difference.  *See* Section III.A.1, *supra*.  The letters do not indicate that ATF undertook any "sound testing" at all, Pls. Br. at 32, and the Government's reference to *other* letters that used testing, Gov't Br. at 40–41, does not change that fact.  Moreover, the testing the Government references—ensuring that the fire-control cavity is homogeneous—is also divorced from the statutory factors.  Critically, the letter gives no consideration to the raft of unregulated jigs, drill parts, and instructional materials that have long been available to facilitate the machining process.  *See* 56.1 Statement ¶¶ 52, 55.  Had ATF undertaken the requisite analysis, it would have discovered that Polymer80 was selling its

unfinished receivers and frames alongside such jigs and parts.[8]  Finally, the letters do not consider

whether the submitted items qualify as firearms under the "designed to" prong—even though ATF

knew what it was looking at were objects designed and intended to be the frames of operable AR-

10s, AR-15s, and Glock-type pistols.[9]  Indeed, the Government has not identified ***any*** document

in the administrative record supporting its interpretation that reflects anything more than ATF

reciting the statutory standard without engaging with it.  These failures to offer a reasonable

justification or to engage with the statute are impermissible.

### 2.    ATF's Approach Is Otherwise Arbitrary and Capricious.

Although ATF's failure to address and to engage with the controlling statutory standard is

alone arbitrary and capricious, ATF's actions are arbitrary and capricious for additional reasons.

***ATF Did Not Adequately Explain Its Departure from Its Prior Flexible Approach.***  The

challenged actions fail to adequately explain ATF's shift from an earlier approach more tailored

to the statutory language to its current "machining" bright-line.  Pls. Br. at 34–35.  As noted, in its

1976 analysis of the GCA, ATF concluded that a "rigid criterion" was inappropriate for assessing

"the phrase 'readily convertible.'"  ATF0267.  Yet when ATF crystallized its mechanistic approach

in the 2015 Interpretive Rule, it failed even to acknowledge its previous approach.

The Government erroneously claims that ATF has always used the challenged approach,

misconstruing the nature of Plaintiffs' challenge.  According to the Government, Plaintiffs are

---

[8] *See, e.g.*, ATF0195–0200 (Polymer80 disclosing to ATF in 2015 that one of its unfinished receivers—which ATF
determined was a firearm—was being sold as part of a kit with a jig, drill bits, and a link to instructions about how to
finish it); Dkt. No. 64-1, Declaration of Aaron Esty ¶ 14(b) (showing that even before ATF issued its determination
letter on January 18, 2017, Polymer80 was soliciting preorders on Facebook and showing that the unfinished PF940
Glock frame could be paired with a jig and drill bits).  The ready availability of jigs refutes the Government's argument
that ATF reasonably looked to the presence or absence of any "indexing" to determine if an unfinished frame or
receiver would be classified as a firearm.  Gov't. Br. 27.  Jigs make drilling just as easy as indexing does.

[9] The challenged Polymer80 letters make that crystal-clear, describing, for example, the "AR-15 pattern receiver
casting, ATF0225, the "Glock-type 'GC9 Blank'" or "Glock-type receiver blank," ATF0229, ATF0232, the "AR10-
type receiver blank," ATF0231, and the "Glock-type 'PF940C Blank'" or "Glock-type receiver blanks," ATF0253,
ATF0255.

mistaken that "in 2006, ATF changed its standard from a temporal-based approach to one based on the degree of machining completed on the frame or receiver." Gov't Br. at 30. This argument misses the point. Although it is true that ATF used time as a factor in pre-2006 determination letters and has not done so since, the relevant shift identified by Plaintiffs was ATF's decision to abandon a *flexible* approach that assessed whether a frame or receiver was readily convertible into an operative weapon (as the statute requires) into a *mechanistic* bright-line based only on the presence or absence of machining. *See* Pls. Br. at 7–8. Moreover, even were ATF correct that it has always used the same mechanistic approach, consistency alone cannot overcome ATF's failure to justify that approach using the statutory factors. *See* Section II.B.1, *supra*.

*The Purpose of the GCA Cannot Justify ATF's Actions.* The Government's attempt to justify its actions based on the GCA's claimed directive to "balance" firearms regulation and lawful gun ownership fails. As discussed above, this argument fails generally, *see* Section II.A.2, *supra*, but it fails specifically with respect to Plaintiffs' arbitrary and capricious challenge because a "reasoned explanation" cannot be based on extra-record evidence. Rather, ATF's action must be judged by "what [ATF] did, not by what it might have done" and thus "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943). The only support the Government provides for its purpose-based argument is case law and legislative history. *See* Gov't Br. at 36–37. The Government has not identified a document in the Administrative Record where ATF relied on the purpose of the GCA as a justification for any of the challenged actions.

*ATF's General Line-Drawing Authority Does Not Justify Its Specific Approach.* The Government also cannot justify the specific line-drawing challenged here through a circular reference to ATF's general line-drawing authority under the GCA or to the importance of certain

parts of an operable weapon.  *See* Section II.A.2, *supra* (refuting general "line-drawing" as basis for reasonableness).  According to the Government, "ATF has explained that it is tasked with drawing the line 'at which an unregulated piece of metal or plastic becomes a regulated item under Federal law.'"  Gov't Br. at 40 (citing ATF609).  The Government further states, based on a March 2015 ATF letter (postdating both the 2015 Interpretive Rule and the first Polymer80 letter), that "ATF has noted '. . .that the critical factor in determining whether an item is a firearm is that item's ability to expel a projectile by the action of an explosive'" and that because "'ATF has long held that because the fire-control cavity is the area that is vital to the item's ability to expel a projectile, it is appropriate to focus on this area in making classifications.'"  *Id.* (citing ATF605).

To begin with, this post-decisional document cannot justify the 2015 Interpretive Rule or the February 2015 Polymer80 determination letter.  More fundamentally, however, this reasoning does not justify the **particular line** that ATF has drawn.  It simply restates ATF's power to draw lines and recognizes the importance of the fire-control cavity.  Of course ATF may draw reasoned lines, and of course the fire-control cavity is important.  But ATF's task was to justify why its bright-line solidity/machining approach corresponds to the statutory standard—something ATF has altogether failed to do.  That is the paradigm of arbitrary and capricious agency action.

## III.   ATF Has Unreasonably Delayed Its Response to Plaintiffs' Rulemaking Petition.

Plaintiffs' Petition for Rulemaking has gone unanswered for fifteen months.  During this time, ghost gun sales and ghost gun-related crime have skyrocketed.  No argument offered by the Government overcomes Plaintiffs' showing that ATF's delay continues to pose a threat to "health and human welfare," that no "rhyme or reason" justifies ATF's delay, and that ATF's delay has not been caused by competing agency priorities.  *See* Pls. Br. at 36–40.

***Health and Human Welfare.***  Where "human health and welfare are at stake," there is a strong presumption that a delay is unreasonable.  *See Geneme v. Holder*, 935 F. Supp. 2d 184,

192–93 (D.D.C. 2013).  And as Plaintiffs have established, the stakes could not be higher—the 15-month period since Plaintiffs filed their Petition has been characterized by a drastic increase in ghost gun crimes.  *See* 56.1 Statement ¶¶ 25–26, 28, 34–35.

The Government seeks to downplay the unique threat that ghost guns pose, dryly conceding that "firearm regulation certainly implicates health and human welfare."  Gov't Br. at 44.  But this understated description is belied by ATF's Polymer80 Search Warrant application:

> [A]pproximately 10,000 . . . "ghost guns" were recovered by law enforcement in 2019. Approximately 2,700 were recovered in California, including from crime scenes as well as law enforcement seizures from convicted felons, members of violent street gangs such as Mara Salvatrucha ("MS-13") and others, and individuals who were otherwise prohibited from possessing firearms.

Search Warrant ¶ 28(b).  ATF not only has acknowledged the general urgency presented by ghost guns, but the specific threat posed by Polymer80 ghost guns; its Search Warrant application noted that Polymer80 guns had been recovered in hundreds of crimes across the United States, including gun trafficking, domestic violence, kidnapping, carjacking, robbery, and homicides.  *Id.*  There is nothing ATF can say to hide the reality that the proliferation of ghost guns is an urgent human welfare crisis and that Defendants' 15-month delay is thus presumptively unreasonable.

***Rhyme or Reason.***  Given the gravity of the problem, and the recognition thereof by high-ranking ATF officials, ATF's fifteen-month delay has no rhyme or reason.  *See* Pls. Br. at 36–37. Moreover, ATF's recent decision to modify its bump stock regulation shows that ATF has the institutional capacity to act quickly; there, the rulemaking process began within ***three months*** of a mass shooting in Las Vegas that drew nationwide attention to bump stocks.  *See* Pls. Br. 38.

The Government's principal argument is that other courts have found longer delays reasonable.  Gov't Br. at 42–44.  But "[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100

(D.C. Cir. 2003).  Moreover, multiple courts have held that "'a reasonable time for agency action is typically counted in weeks or months, not years.'"  *Fams. for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540 (S.D.N.Y. 2009) (Chin, J.) (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004)); *see also Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[A] reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'") (internal citation omitted).

Plaintiffs certainly appreciate that the COVID-19 pandemic has impacted government operations.  ATF, however, was in receipt of Plaintiffs' Petition months before the pandemic.  And according to the Government's declaration in support of its motion for summary judgment, ATF sent a draft response letter to Defendant United States Department of Justice ("DOJ") in July 2020, Dkt. No. 99, Declaration of Andrew Lange ("Lange Decl.") ¶ 8, meaning that the draft letter has been sitting at DOJ for nearly ***eight months***.  Defendants offer no persuasive explanation for why DOJ has failed to act.  The failure to act is even more unjustifiable given exploding ghost gun sales and rising gun violence during the pandemic, a development that militates in favor of expedition.[10]

***Competing Priorities.***  Nothing in the Administrative Record suggests that ATF had higher administrative priorities for the past fifteen months.  Pls. Br. at 39–40.  Instead, the Government has submitted a declaration with a lengthy list of rules and other items that ATF worked on in 2020, Lange Decl. ¶ 12, contending that every one of these items addresses health and human welfare.  Gov't Br. at 44–45.  But every agency has multiple priorities, and the Government has provided no evidence that ATF's docket is especially full.  Indeed, the Government has not

---

[10] *See, e.g.*, Search Warrant ¶ 88 (noting that Polymer80 products were sold out by April 2020); Complaint ¶ 18 (ghost-gun-kit manufacturers announcing "pandemic buying surges").   And it has been widely reported that the pandemic of 2020 contributed to a massive increase in homicides across the country, most committed with firearms.  *See, e.g.*, Thomas Fuller and Tim Arango, *Police Pin a Rise in Murders on Unusual Suspect: Covid*, New York Times (Oct. 30, 2020), https://nyti.ms/3qj2Pwq.

identified any specific priorities that it believes were significantly more pressing than Plaintiffs' petition. Although some deference to ATF may be due, it is difficult to imagine (and the Government does not argue) that many of the listed items—such as "the electronic storage of National Firearms Act forms"—were more urgent than addressing the proliferation of ghost guns.

Finally, the Government observes that the change Plaintiffs seek is not "minor" and has wide-ranging implications, including in "the criminal law arena," Lange Decl. ¶ 11. According to the Government, this complexity justifies ATF's decision to address easier problems first. But the magnitude of the problem equally counsels in favor of a rapid response—the problem is urgent and must be addressed as quickly as possible. The Court should find ATF's now 15-month delay unreasonable and direct ATF to respond to the Petition for Rulemaking immediately.

## CONCLUSION

Summary judgment should be entered for Plaintiffs on all counts and the Government's motion for summary judgment should be denied in full. ATF's actions challenged in Counts I–IV of the Complaint should be vacated and set aside, and ATF should be ordered to respond to the Petition for Rulemaking within 30 days of the Court's decision with respect to Count V.

March 5, 2021                          Respectfully Submitted,

                                       EVERYTOWN LAW

                                       By:    */s/Eric Tirschwell*
                                              Eric Tirschwell (ET-3023)
                                              Len Kamdang (LK-3895)
                                              Aaron Esty (4793329)
                                              Krystan Hitchcock (5270202)
                                       450 Lexington Avenue, P.O. #4184
                                       New York, New York 10024
                                       Telephone: (646) 324-8222

                                       Kathleen R. Hartnett
                                       COOLEY LLP
                                       101 California Street
                                       San Francisco, CA 94111
                                       Telephone: (415) 693-2071

                                       Daniel Grooms
                                       COOLEY LLP
                                       1299 Pennsylvania Avenue, NW, Suite 700
                                       Washington, DC 20004-2400
                                       Telephone: (202) 776-2042

                                       *Attorneys For Plaintiffs*